

**DELAWARE HEALTH
AND SOCIAL SERVICES**

DIVISION OF SUBSTANCE
ABUSE AND MENTAL HEALTH

*EXHIBIT I, P.1*

DELAWARE PSYCHIATRIC CENTER

June 15, 2004

The Honorable Charles H. Toliver IV
Superior Court of Delaware
500 King Street, Suite 10400
Wilmington, DE 19801

RE:   Lewis, Jimmy
ID#:   0305016966

Dear Judge Toliver:

Enclosed herewith, please find the written report (s) by Sylvia Foster, MD. concerning the above named defendant. .

Should you require any further information. please do not hesitate to contact me.

Respectfully,

Michael S. Talmo, M.Ed.
Director
Delaware Psychiatric Center

MST/jld

cc:   Phebe Young, Deputy Attorney General
      Dianne Stachowski, Unit Director
      Richard Sadowsky, Ph.D.
      Ranga Ram, MD
      John Edinger, Esquire
      Deputy Attorney General's Office

*P. 2*

# Delaware Psychiatric Center
## Forensic Unit
### (Jane E. Mitchell Building)

### Forensic Psychiatric Evaluation

Examinee:              Jimmy Lewis              ID #: 0305016966

Date of Birth:         25 December 1966 (Current Age: 38)
Examiner:              Sylvia Foster, M.D.
Period of Evaluation:  21 May 2004 - present
Date of Report:        10 June 2004

## REASON FOR EVALUATION:

Mr. Lewis was referred to The Delaware Psychiatric Center (DPC) for forensic psychiatric evaluation by *Motion and Order* of the Honorable Charles H. Toliver, In the Superior Court of the State of Delaware, In and For New Castle County, on 1 December 2003, to determine his competency to stand trial and to obtain treatment for his own well-being.

## NOTIFICATION:

Upon admission to the Forensic Unit, Mr. Lewis was informed that he was being evaluated by Court Order, and that the results of all evaluations performed during this admission would not remain confidential, but would be disseminated to the Court, the prosecution, and his attorney.

## EXAMINER:

Medical Doctor specializing in Psychiatry with Board Certification, sub-specializing in Forensic Psychiatry

## LIST OF CHARGES:

Carjacking 2nd Degree
Theft $1000 or greater
Resisting Arrest

## SOURCES OF INFORMATION:

Face-to-face interview with Mr. Lewis on 21 May 2004 and various times thereafter
        on the Forensic Unit at DPC
Superior Court Criminal Docket

Seven page statement by Mr. Lewis regarding his social and legal history and his account
    of the crime, undated
Medical Records, Delaware Psychiatric Center, 21 May 2004 – present
Medical Records, First Correctional Medical (FCM), 5 March 2003 – 31 March 2004
Case Charge List
Complaint and Warrant
Exhibit A & B
Charge History Record
Letter from Donald Napolin, LSCW, to The Honorable Charles H. Toliver, 5 May 2004

## CURRENT MEDICATIONS:

Seroquel 50 mg twice daily for anger management and impulse control
Atenolol 25 mg daily for hypertension

## BACKGROUND INFORMATION:

Mr. Lewis was a 38-year-old African American male who presented to the Mitchell
Building based on an evaluation by Dr. Joshi, a prison psychiatrist. Dr. Joshi described
Mr. Lewis on 27 May 2003 as "psychotic and delusional, a danger to self and others,
refusing to take medication." He had assaulted a Correctional Officer, and was
transferred to the infirmary. Mr. Lewis was described as saying, "I can't distinguish
between right and wrong. I am hearing voices telling me to hurt myself and I'm seeing
shadows."

Mr. Lewis had been incarcerated on 17 November 2003 and convicted of Carjacking,
Theft and Resisting Arrest. According to the police report, Mr. Lewis was picked up by a
male driver who was out looking for a male companion for the evening. Mr. Lewis
allegedly attempted to rob the driver, at which point the driver jumped out of the vehicle
in fear, and Mr. Lewis drove off with the car. He allegedly resisted arrest when caught,
and was identified by the driver as the person who stole his car.

According to FCM records, Mr. Lewis was "flirtatious" at times, and had to be redirected
for asking personal questions of the mental health examiner. She confronted his
"narcissism and attention-seeking behaviors," and questioned the diagnosis of
Schizophrenia that had been given him by the physician. Mr. Lewis refused all
medication, requesting only Xanax and Valium (highly addictive drugs of the
Benzodiazepine family). He asked for art materials, and pornography, stating that these
items would be very helpful. He presented with, "broad mood and good eye contact, with
no suicidal, homicidal ideation and no auditory or visual hallucinations." He was
frequently argumentative and loud. He was observed wearing "paper horns," saying, that
they made him feel more comfortable. "It helps me deal with whatever I'm going
through. The horns are like a mask. If I deal with these things within me, I'll be a better
person, being unjustly accused." He was also described as calm and controlled. He
spoke of hearing voices but stated, "I don't know whether it's voices or just my

P. 4

Forensic Psychiatric Evaluation: Jimmy Lewis                    1) June 2004, Page 3 of 6

thoughts." Mr. Lewis stated later that he wore the paper horns and the cat's eye contact lenses for the "scare" factor.

Not much is known about Mr. Lewis' legal history as he is from out of state. However, he said that he had been in prison for six or seven years in New Jersey, from about 1993 to 2000. He added that he had been sentenced to six years for Robbery. "I pick-pocketed somebody," but his jail time had been prolonged for fighting.

Mr. Lewis had no psychiatric history. He saw a counselor as a child in New Jersey where he grew up. At first he said he didn't remember why, but shortly thereafter remembered that it was because his mother had become involved in a Lesbian relationship. "I didn't approve of it and I voiced my opinion to her, and I started misbehaving. I didn't like the lady and I didn't like the idea of the relationship." He went on to explain, "I might have accepted it if it had been presented to me differently, but I saw this lady actually twist my mother's arm to tell me about the [Lesbian nature of the] relationship. I had thought they were just close friends." Mr. Lewis' mother told the team social worker that he had been attention-seeking as a youth, and that he felt no one ever paid enough attention to him. She said he always felt that whatever someone was doing, they should stop, and attend to his needs. He blamed his mother for his current problems due to her homosexual affair. His parents had separated when Mr. Lewis was two years old, at which time Mr. Lewis' father had gone to live in North Carolina.

Mr. Lewis stated that he had been employed in construction and as a porter. "Whatever job was open, I was doing it." However, he added, "I've been fired more than ten times." The longest job he ever held was three months. "I would always argue, or go in late, and I'd get fired." He admitted to selling drugs off and on. "That's what I had to do to have money." Then I got to selling bootleg CD's and DVD's."

Mr. Lewis dropped out of the tenth grade, but later obtained a GED. He changed that idea later, and said that he had a high school diploma. His mother maintained that he actually had a GED. He said, "She thought wrong." He attended the American Business Institute, but did not stay long, ending up owing them money. He related that he had been attending commercial drivers' school to drive eighteen-wheelers just prior to his incarceration. "It was going to be my first job; Poland Springs was going to hire me."

Mr. Lewis stated that he been shot by a police officer ten years ago, with gunshot wounds to the left hip and left arm. He had history of hypertension for which he was being medicated, and history of kidney infection. He had no other significant medical or surgical history.

Mr. Lewis had never married, stating, "Every time I get into a relationship, we always argue." He was with one girlfriend off and on for eight years.

P. 5

use. He also admitted to smoking marijuana sixteen years ago, but denied all other illicit drug use. It was considered probable that he was minimizing his addiction issues.

## HOSPITAL COURSE:

Mr. Lewis became verbally unresponsive, selectively mute, and categorically refused to answer any questions on the day of admission. He also refused the initial physical examination. Later the same day, Mr. Lewis was observed interacting in a normal manner on the unit. Several days later, the initial examinations were completed without problem. He eventually explained that he had not felt like speaking on the first day.

Mr. Lewis' hospital course has been complicated by his aggressive, assaultive behavior. He was overheard making physical threats, observed taunting and laughing at his peers, taking pleasure in embarrassing them, and was                           . He complained of hearing voices sporadically but displayed no evidence of preoccupation with internal stimuli when he believed he was not being observed.

The team psychologist described Mr. Lewis in the following manner in the anger management group: arrogant, disruptive and instigating. While the other older patients tried to have a calming influence, Mr. Lewis displayed no sense of boundaries or respect for authority. She added that there was nothing odd or bizarre about his behavior that would suggest a psychotic disorder. Other therapists noted that he was disruptive in the group setting, talking out of turn, and making obscene comments while watching educational videos. When evaluated by the team, he made it clear that he would rather be at DPC rather than in jail in order to "get some help." When asked what help he needed, or what we could do for him, he answered he didn't know.

One staff member stated that she found Mr. Lewis to be engaging, intelligent and articulate, but noted his sense of entitlement, and his demand that things be done his way. Mr. Lewis stated that he needs to do "outlandish things" to get attention, such as wearing paper horns and wearing his cat's eye lenses. It was explained to him that he would not be allowed to wear his paper horns at any time while at DPC, after he placed them on his head at one point. He understood, and did not attempt to wear them again. He was noted to attempt to intimidate one female therapist by facing her in the hallway and stating, "I just want to get my point across that whatever you said about me in team meeting was wrong and derogatory."

On 6/7/04, a special meeting with Mr. Lewis was called to address his grossly inappropriate behavior on the unit the night before. He was angered by not receiving a certain salad at dinner to which he believed he was entitled, and assaulted a peer and a staff member, escalating to the point where he was difficult to redirect. In summary, he was noted to be disruptive in the group setting, to taunt his peers, to intimidate and flirt with therapists, and to make obscene comments. There were reports to the contrary by other staff members who reported that Mr. Lewis was cooperative and helpful in the milieu, tending to get loud and demanding at times when he felt his needs were not being

Initially, Mr. Lewis was prescribed no psychotropic medication, as there was no evidence of a mood disorder, and no evidence of psychosis. However, Seroquel was begun after it became evident that Mr. Lewis had difficulty managing his anger, and controlling his impulses.

## CURRENT MENTAL STATUS EXAM:

Mr. Lewis presented with shaved head, and was appropriately dressed. He was cooperative, and able to sit quietly for the examination with no abnormal motor activity. His speech was normal in rate, tone and volume, and there was no evidence of loud, pressured speech. He stated that his mood was "sensitive, and easily irritated." His affect was full range. His thought processes, assessed by the verbalizations of his thoughts and feelings, were goal directed; there was no evidence of loosening of associations or tangentiality. His thought content displayed no delusions. He was not thinking about suicide, although he maintained that he had been thinking about it. "But I don't really want to do it." He was not thinking about hurting others, and stated, "I'm not on the defensive unless there's a reason." He denied obsessions, compulsions, racing thoughts, paranoia, delusions, special powers, hyper-religiosity, and grandiosity. His cognitive functions were intact grossly. His insight and judgment were considered intact.

## COMPETENCY ASSESSMENT:

Mr. Lewis was presented the questions to the McGarry Criteria as cited in State of Delaware v. Joseph A. Shields, 593 A.2nd, 986 (Del. Super. 1990), p. 1000. Based upon the present examination, Mr. Lewis demonstrated that he does have sufficient present capacity to consult with an attorney with a reasonable degree of rational understanding of court procedures. He is fully able to understand the nature of the proceedings against him, to give evidence in his own defense and to instruct counsel on his behalf.

It should be noted that Mr. Lewis handed out a highly articulate, well-written explanation of his actions on the day of the alleged crime. It reveals a high level of education and intelligence, and highlights his excellent ability to give evidence in his own defense and to instruct counsel on his behalf.

## DIAGNOSIS:[1]

|  |  |
|---|---|
| Axis I: | Malingering; Alcohol Abuse; History of Conduct Disorder |
| Axis II: | Antisocial Personality Disorder |
| Axis III: | Hypertension |
| Axis IV: | Psychosocial and Environmental Problems: Incarceration |
| Axis V: | Global Assessment of Functioning (GAF) Scale (1 – 100): 50 |
|  | Serious impairment in social and occupational functioning |

---

[1] American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000.

OPINION:

The opinions expressed in this report are held with a reasonable degree of medical certainty, and are based upon the direct examination of Mr. Lewis, the observations reported by staff and therapists on the Forensic Unit, and the previous reports and records available for review. These opinions are subject to change if additional information or records become available.

Assessment:

The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as getting out of prison into a psychiatric unit. Malingering should be strongly suspected in the presence of Antisocial Personality Disorder.

Mr. Lewis demonstrated no evidence of a mood disorder or psychosis during his admission to DPC, and it is not likely that he ever had Schizophrenia or any other chronic psychotic disorder.

SUMMARY OF OPINIONS AND RECOMMENDATIONS:

1.      Mr. Lewis is psychiatrically stable and can be returned to prison.

2.      It is my opinion that Mr. Lewis is competent to stand trial.

3.      It is my opinion that, as in the case of many people with Antisocial Personality Disorder, Mr. Lewis may need to remain on his medication to help with anger management and impulse control

4.      Any threats made by Mr. Lewis to harm himself or others should be taken seriously as he is highly manipulative and will stop at little to obtain his goals.


Sylvia Foster, M.D.
Forensic Psychiatrist

IN THE UNITED STATES DISTRICT COURT (EX-B)

FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS, )
)
       Plaintiff, )    C.A. No.: 04-1350 (GMS)
)
  v. )
)
DR. SYLVIA FOSTER, STAFF )
MEMBERS, THE DELAWARE )
PSYCHIATRIC CENTER and )
MR. GREY, )
)
      Defendants. )

## MOTION TO DISMISS

COMES NOW Defendant Sylvia Foster, M.D. by and through her counsel and hereby moves this Honorable Court to dismiss the above-referenced matter pursuant to Federal Rule 12(b)(6) Failure to state a claim upon which relief can be granted. In support thereof Defendant Dr. Foster asserts the following:

1.    Mr. Lewis was transferred to the Delaware Psychiatric Center (hereinafter "DPC") pursuant to a Court Order signed by J. Toliver on December 1, 2003 to undergo a mental health evaluation to determine if he was mentally competent to assist in the defense of the criminal charges asserted against him. Since his confinement to DPC was pursuant to a Judge's Order in regards to a criminal matter, Mr. Lewis was confined to the secured building of the DPC. As such, Mr. Lewis would be considered a prisoner under the definition provided under 28 U.S.C. 1915 (h)

2.    Sylvia Foster, M.D. is the Chief Forensic Psychiatrist for the State of Delaware and in that capacity examined Mr. Lewis and authored a report which was submitted to the Delaware Superior Court in and of the County of New Castle. A copy of that report is an Exhibit

to Plaintiff's Complaint.

3.    Dr. Sylvia Foster is a contract employee and as such does not enjoy sovereign immunity which some government employees enjoy.

4.    In order to find that a claim should be dismissed under Rule 12(b)(6) the Court must first "accept as true factual allegations in the Complaint and all reasonable inferences that can be drawn therefrom." *Mami v. Fauver*, 82 F.2d 63, 65 (Third Circuit 1996). Pro Se Complaints such as the one in this case are held to less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim when "it appears beyond doubt that the plaintiff can prove no set of facts in support of this claim which would entitle him to relief." *Haines v. Kerner*, 404 U.S. 519, 520-521, 92 S.Ct. 594, 30 L. Ed 2d 652 (1972.) Therefore, counsel for Dr. Foster has set forth the possible interpretations of pro se Plaintiff's allegations and the defenses thereto in this motion.

5.    If the Court interprets Plaintiff's Complaint as being based on his imprisonment then he has only two avenues of relief available to him:

    a.    Petition for *habeas corpus* and;

    b.    A Complaint under the Civil Rights Act.

Plaintiff's Complaint contains no language that would imply that he is disputing his sentence or that he is seeking any relief under a writ of *habeas*.

6.    If the Court construes the Plaintiff's Complaint as a 1983 Complaint for a violation of his Fourteenth Amendment Due Process Right than the right at issue would be "freedom from restraint" and Plaintiff must allege he has suffered an "atypical and significant hardship" under *Sandin v. Conner*, 515 U.S. 472, 484, 115 Supr. Ct. 2293, 132 L. Ed. 2nd 418 (1995). In determining whether an inmate had suffered an "atypical and significant hardship" as a result of his confinement

the Court must consider two factors: 1) The amount of time the prisoner is placed into disciplinary segregation and; 2) Whether the conditions of this confinement and disciplinary segregation were significantly more restrictive than those imposed on other inmates in solitary confinement. *Shoats v. Horn* 213 F.3d 140, 144 (Third Cir. 2000) (citing *Sandin*, 515 U.S. at 486).

7.    Plaintiff Mr. Lewis does not allege that the conditions of his confinement were unconstitutional. The Plaintiff does not allege that his treatment or confinement was "significantly more restrictive than that imposed" on other patients at the Delaware Psychiatric Center.

8.    Furthermore *Sandin* instructs that whether the restraint at issue imposes "atypical and significant hardship" depends on the particular state in which the Plaintiff is incarcerated. *Torres v. Fauver*, 292 F.3d 141, 151 (Third Cir. 2002). The District Court of Delaware has repeatedly determined that the Department of Corrections' statutes and regulations do not provide prisoners with liberty or property interests protected by the due process clause. *Jackson v. Brewington-Carr*, 97-270, 1999 U.S. Dist. Lexis 535 (D. Del. Jan. 15, 1999). Thus after *Sandin*, a prisoner in this district has no constitutional right to any procedural safeguards regardless of what the state statutes and regulations provide, unless the deprivation complained of imposed an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *Turner v. Tezac*, 2005 WL41563 (D. Del. Jan. 4, 2005) citing the *Sandin* opinion. Since Mr. Lewis does not allege that he was placed in disciplinary custody which caused a "atypical and significant hardship", then his claim that Mr. Grey and Dr. Foster violated his Fourteenth Amendment right to due process has no arguable basis in law or in fact.

9.    Additionally, Plaintiff's Complaint alleges no physical injury. Rather Mr. Lewis' Complaint should be read as one for emotional damages. The only reference to any physicality is at the top of the second page of Plaintiff's Complaint regarding an alleged altercation when a bag

of M & M chocolate candy was forcibly removed from his hand and then he allegedly was assaulted by "Mr. Grey and three or four staff members".

10.     If the Court were to conclude that the claims against Dr. Foster were for emotional damages then those claims are barred under 28 U.S.C. § 1997(e)(e) which provides: "No federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injuries suffered while in custody without a prior showing of physical injury".

11.     Plaintiff's Complaint makes no claim of physical injury. To the contrary, a physician's note dated June 21, 2004 which was attached to Plaintiff's Complaint as an exhibit and which is attached hereto as Exhibit A, specifically addresses this issue. Dr. Eugene Lopez examined Mr. Lewis after Plaintiff complained of this alleged incident involving "Mr. Grey and four or five other staff members". The only physical finding of the examining physician was a rash on the Plaintiff's foot. There was no finding of any physical injury.

12.     Plaintiff has not claimed any physical injury. Since Mr. Lewis' claim against Dr. Foster has no arguable basis in law or fact, he therefore cannot receive damages, nominal or otherwise for his alleged "emotional damage". Thus, Mr. Lewis' request for compensatory damages based on his emotional damages is barred by 28 U.S.C. §1997(e)e. See *Turner v. Tezac,* 2005 WL41563 (D. Del.) at 4.

13.     Alternatively, if the Court were to construe Plaintiff's Complaint as a complaint of common law battery or medical negligence against Dr. Foster, then the District Court would apply the law of the forum. Under Delaware law, either of these allegations must be dismissed for failure to state a claim upon which relief may be granted.

14.     If the Court construes the Plaintiff's Complaint as being a complaint alleging medical negligence against Dr. Foster, then the Plaintiff's Complaint should be dismissed pursuant to 18 *Del. C.* §6853(1) since the Plaintiff has provided no affidavit of merit signed by an expert witness. This

requirement is an absolute prerequisite to the filing of any medical negligence claim in this forum. Thus, Plaintiff's Complaint must be dismissed.

15.    If the Court were to construe Plaintiff's Complaint as being an allegation of common law battery, then the claim must be dismissed since there is no allegation that Dr. Foster ever touched Mr. Lewis. The tort of battery is the intentional and unpermitted contact upon the person of another which is harmful or offensive. *Taylor v. Barwick*, 1997 WL527970 (Del. Super.). There is nothing in Plaintiff's Complaint that can be construed as alleging that Dr. Foster ever actually made any physical contact with Mr. Lewis.

16.    In addition, Dr. Sylvia Foster avails herself to defenses provided by Delaware law under 11 *Del. C.* 468. While principally enumerated as defenses available to criminal charges of assault and battery, since Plaintiff's Complaint may be alleging common law battery Dr. Foster avails herself to these statutory defenses. Under 11 *Del. C.* §468(3); (5); and (7), one in Dr. Foster's position, who is responsible not only for the safety of Mr. Lewis, but also for the safety of the other patients and the staff, is permitted to order the use of force which is necessary for the purpose of safeguarding the welfare of the patient and others and also for enforcing lawful rules or procedures of the institution.

17.    Nothing in Plaintiff's Complaint alleges a use of force which would fall outside of the parameters of 11 *Del. C.* §468.

18.    Thus, even in view of the liberal pleadings standards applied to pro se litigants, Mr. Lewis' Complaint does not adequately allege facts that, if proven, would give rise to a battery claim and as such his claim should be dismissed for failure to state a claim upon which relief may be granted. See *Browne v. Saunders,* 768 A.2d 467, (Del. Supr. 2001).

WHEREFORE, for the foregoing reasons Defendant Dr. Sylvia Foster hereby requests that this Court dismiss the Plaintiff's Complaint against her as one which fails to state a claim upon which relief may be granted.

Respectfully Submitted,

REGER RIZZO KAVULICH & DARNALL, LLP


_/s/ Cynthia G. Beam, Esquire_
Cynthia G. Beam, Esquire
Delaware State Bar I.D. No. 2565
1001 Jefferson Plaza, Suite 202
Wilmington, DE 19801
(302) 652-3611
Attorney for Defendant Dr. Sylvia Foster

Dated:   June 20, 2005

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JIMMIE LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 04-1350 (GMS) |
| | ) | |
| | ) | |
| | ) | |
| DR. SYLVIA FOSTER, STAFF | ) | |
| MEMBERS, THE DELAWARE | ) | |
| PSYCHIATRIC CENTER and | ) | |
| MR. GREY, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

**AND NOW, TO WIT**, this _____ day of _____, 2005, having considered

Defendant Dr. Sylvia Foster's Motion to Dismiss, and the Response thereto, if any:

**IT IS HEREBY ORDERED** that Defendant Dr. Sylvia Foster's Motion to Dismiss has

been GRANTED and the above-captioned action is dismissed with prejudice.

**BY THE COURT:**


_____

**The Honorable Gregory M. Sleet**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JIMMIE LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 04-1350 (GMS) |
| | ) | |
| | ) | |
| | ) | |
| DR. SYLVIA FOSTER, STAFF | ) | |
| MEMBERS, THE DELAWARE | ) | |
| PSYCHIATRIC CENTER and | ) | |
| MR. GREY, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify on this 20th day of June, 2005 that two true and correct copies of Defendant Dr. Sylvia Foster's Motion to Dismiss have been served by first class mail, postage prepaid, to the following:

Jimmie Lewis
SBI#506622
H.R.Y.C.I.
P.O. Box 9561
Wilmington, DE 19809

REGER RIZZO KAVULICH & DARNALL, LLP

_/s/ Cynthia G. Beam. Esquire_
Cynthia G. Beam, Esquire
Delaware State Bar I.D. No. 2565
1001 Jefferson Plaza, Suite 202
Wilmington, DE 19801
(302) 652-3611
Attorney for Defendant Dr. Sylvia Foster

Dated:  June 20, 2005



## PRN MEDICATIONS ADMINISTERED AND MEDICATIONS NOT ADMINSTERED

### PRN MEDICATIONS ADMINISTERED

| DATE | TIME | DRUG/ STRENGTH | REASON | EFFECTIVE | NURSE INT. |
|------|------|----------------|--------|-----------|------------|
| 5/28/04 | 9P | depakote tab prn meds | — | | cv |
| 5/28/04 | 2100 | Ativan 2mg PO | Agitation | | Q |
| 5/28/04 | 2100 | Benadryl 25mg PO | EPS | | ul |
| 5/28/04 | 9100 | Haldol 5mg PO | Agitation | | ul |
| /29/04 | 2000 | Haldol 5mg | PO reces² | | el |

### MEDICATIONS NOT ADMINISTERED

| DATE | TIME | DRUG/ STRENGTH | REASON | EFFECTIVE | NURSE INT. |
|------|------|----------------|--------|-----------|------------|
| | | | | | |

CardinalHealth

| MEDICATIONS | STOP DATE | HOUR | MONTH (1-31) |
|---|---|---|---|

MONTH

NURSE'S SIGNATURE / INITIAL

| NURSE'S SIGNATURE | INITIAL |
|---|---|
| Margaret Wilson | up |
| Helen Barlow | B |
| Cheryl Wagner | cw |
| Alicia Dans | D |

| NURSE'S SIGNATURE | INITIAL |
|---|---|
| Marlene Mac...rd | |
| Anne Lawrence | AL |
| Kara Gamble LPN | KC |
| Tanya White sub | |

PATIENT NAME

00181

PRN MEDICATIONS ADMINISTERED AND MEDICATIONS NOT ADMINISTERED

| DATE | TIME | DRUG/STRENGTH | REASON | EFFECTIVE | NURSE INT. | DATE | TIME | DRUG/STRENGTH | TIME | REASON | EFFECTIVE | NURSE INT. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/1/04 | 9:00 | Benadryl 25mg p.o. | pt. refused | | | | | | | | | |
| 6/6/04 | 1820 | Haldol 5mg Im | Agitation | | | | | | | | | |
| 6/6/04 | 1820 | Benadryl 50mg Im | Agitation | | | | | | | | | |
| 6/6/04 | 1820 | Haldol 5mg Im | Agitation | | | | | | | | | |
| 6/14/04 | 8:30 | Ativan 2mg p.o. | held | signed | | | | | | | | |
| 6/14/04 | 9:30 | Atenolol 25mg p.o. | given 1790 | | | | | | | | | |
| 6/21/04 | 3030 | Ativan 2mg PO | Agitation | | | | | | | | | |
| 6/21/04 | 3030 | Benadryl 20mg PO | Agitation | | | | | | | | | |
| 6/21/04 | 3030 | Benadryl 50mg PO | Agitation | | | | | | | | | |
| 6/31/04 | 2255 | Ativan 2mg Im | Agitation | | | | | | | | | |
| 6/31/00 | 2235 | Benadryl 50mg Im | Agitation | | | | | | | | | |
| 6/24/04 | | Geodon 20mg Im | Agitation | | | | | | | | | |
| 6/24/04 | | Ativan 2mg Im | Agitation | | | | | | | | | |
| | | Benadryl 50mg Im | | | | | | | | | | |

MONTH: May 2004

| MEDICATIONS | STOP DATE | HOUR |
|---|---|---|
| BENADRYL 50mg (PO) HS/PRN X 30 DAYS | 6/22/04 | HS |
| EFFEXOR XR 37.5mg (PO)@AM X 5 DAYS (unreadable) | 5/25/04 / 5/30/04 | 0800 |
| EFFEXOR XR 75mg (PO) @AM THEN X 5 DAYS | 5/25/04 / 5/30/04 | 0800 |
| EFFEXOR XR 150mg (PO)@AM THEN X 30 DAYS | 5/31/04 / 7/3/04 / 6/5/04 | 0800 |

NURSE'S SIGNATURE / INITIAL

Julie Heaton RN
Karen Hamlin LPN
Margaret Wilger

FACILITY NAME: DCC
SECTION: MITCHELL
ISS ALLERGY:

PHYSICIAN: FOSTER
ROOM #

PATIENT #: 2
PATIENT NAME: LEWIS, Timmy

00187

Copyright 5/89 (Rev. 1/94) All Rights Reserved   Gwen Healthcare   OHI-1304

## PRN MEDICATIONS ADMINISTERED AND MEDICATIONS NOT ADMINISTERED

| DATE | TIME | DRUG/STRENGTH | REASON | EFFECTIVE | NURSE INT. | DATE | TIME | DRUG/STRENGTH | REASON | EFFECTIVE | NURSE INT. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/25/04 | 2235 | Benadryl 50mg | disp | | ♭ | | | | | | |
| 5/06/04 | 1030 | Effexor XR 37.5mg | given @ 1500 ♭ | DO Refused | KC | | | | | | |
| 5/24/04 | 08 | Effexor 3.75mg | DO Refused | | | | | | | | |
| 5/29/04 | 2000 | Effexor XR | refused | error ♭ | ♭ | | | | | | |
| 5/30/04 | 08 | Effexor 37.5mg | DO Refused | — | XC | | | | | | |
| 5/31/04 | 08 | Effexor 75mg | DO Refused "it makes me dizzy" | | KC | | | | | | |