**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JIMMIE LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1350-GMS |
| | ) | |
| DR. SYLVIA FOSTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' (JOHNSON, SAGERS, GRAY AND MOFFETT)
RESPONSE TO PLAINTIFF'S MOTION FOR DISCOVERY V**

1.  The plaintiff seeks to present the trust, the whole truth and nothing but the truth to the honorable court, in order to ensure that justice is mutually served in accordance to the plaintiff's U.S.C.A. rights, as well as in accordance to the defendants U.S.C.A rights. Therefore, Mr. Moffitt, R.Gray, Sagers, and Mr. Johnson, your May 31, 2006 answers to the plaintiff's second amended complaint, number (2), (4), and (5) of the said complaint, ie., denied, are viewed as insufficient and evasive, and gives reason for the plaintiff hereby requesting specific details of you individual descriptions of exactly what happened, as stated in number (2), (4) and (5) of the plaintiffs second amended complaint.

    Response: Paragraph 2 of Plaintiff's Second Amended Complaint deals generally with the 6/6/04 incident that resulted in his placement in seclusion. At no point in paragraph 2 does Plaintiff allege the personal involvement of Answering Defendants. Paragraphs 4 and 5 allege that Lewis was placed in seclusion two separate times on 6/14/04. Defendant Sagers deny any involvement in either incident. As to the incident during the early morning hours of 6/14/04, Defendants Gray and Moffett deny any involvement. Defendant Johnson came to the Mitchell Building upon receiving a call for assistance from another staff member because of Lewis' highly agitated behavior. Defendant Johnson, along with another staff member, attempted to calm Lewis. Lewis refused to take any medication voluntarily to calm himself. Johnson and other staff then escorted Lewis to the seclusion room where medical staff administered medication by way of intramuscular injection. Johnson and other staff then returned Lewis from the seclusion room within approximately five minutes to his bedroom.
    Defendants Gray and Moffett were present to restrain Plaintiff at approximately 9:00 p.m. on 6/14/04 and to place him in seclusion. Defendants Gray and Moffett responded to a call for assistance in the dining area of the Jane E. Mitchell Building on 6/14/04. Despite a previous placement on vending machine restriction, Plaintiff had obtained a bag of M&M candy. Staff directed Plaintiff to

dispose of the candy, and Lewis refused, becoming loud and belligerent towards staff. Gray directed Lewis to dispose of the candy as previously directed. Lewis refused to do so, cursed at Gray, and attempted to physically assault Gray. After Lewis escalated the conflict from verbal non-compliance to physically assaultive behavior, Gray, Moffett, and additional staff (neither Johnson nor Sagers were part of this group) surrounded Lewis and took him to the floor. After securing Lewis' arms, Gray asked Lewis if he would walk to the seclusion room. Lewis walked, and was escorted to the seclusion room. In the seclusion room, Lewis punched and kicked at the walls and at staff. Medical staff administered Attivan, Geodon, and Benadryl by means of an intramuscular injection. Lewis was then kept in seclusion from 9:00 p.m. to 11:00 p.m. During that time in seclusion, Lewis refused to speak with staff. Lewis was not placed in four-point restraints during the 6/14/04 seclusion.

2.      During African studies group at the D.P.C., Florence S. Cobbs, Rose Ares and Pat Riley witnessed a patient (name unknown), jump up and attempted to assult me and blurted out several offensive statements directed to me. Due to the patients actions, he was placed in seclusion, (4) point restrained and injected with psychotropic drugs. Questions, what was the patients name, what date did this incident happen, and what was he given psychotropic drugs for.

        Response: Answering defendants are without sufficient knowledge or information.

3.      Provide a photocopy of the insurance policy that the D.P.C. utilizes for its staff.

        Response: No insurance exists.

4.      The plaintiff seeks to present the truth, the whole truth and nothing but the truth to the honorable court, in order to ensure that justice is mutually served in accordance to the plaintiff's U.S.C.A. rights, as well as in accordance to the defendants U.S.C.A. rights. Therefore, Dr. Foster, because your June 15, 06 answers to the plaintiff's second amended complaint, numbers 1-8 of said complaint, i.e., denied are viewed as insufficient and evasive, and gives reason for the plaintiff hereby requesting specific details of your description of exactly what happened as stated in numbers 1-8 of the plaintiff's second amended complaint.

        Response: This question appears to be directed only to Dr. Foster, not answering defendants, and therefore no response is required. To the extent a response is required, answering defendants are without sufficient knowledge or information.

5.      It is indeed correct that Helen Hanlon stoped all the patients on the plaintiff side of Mitchell building, then openly accused the plaintiff of stealing a patient name Tyree's money, ie., (I quote, because Mr. Lewis doest have money, unquote)  But about (15) minutes there after, Tyree found his money exactly where he left it before he went to the shower, in his shoe.

Response: Answering defendants are without sufficient knowledge or information.

6.      Dr. Foster did you playgiarize the information you noted about the plaintiff in your June 10, 04 Forensic Report, under the title "current mental status exam", from Annebel Lee Fields May 24, 04 TP 3 psychological assessment, if yes, why didn't you personally examine the plaintiff yourself, before you authored your report.

Response: This question appears to be directed only to Dr. Foster, not answering defendants, and therefore no response is required.  To the extent a response is required, answering defendants are without sufficient knowledge or information.

7.      Is it correct that Margret Wilson noted that the plaintiff requested a printout of side effects.

Response: Answering defendants are without sufficient knowledge or information.

8.      Is it correct that the plaintiff was moved to Room 71 on 5/23/04, after reporting to N.A Pat Riley that his room mate was masterbating in plain view.

Response: Answering defendants are without sufficient knowledge or information.

9.      Did Dr. Foster note the plaintiff reporting that he was assaulted on or about 6/3/04 by a patient named "Tim", if yes, when did the plaintiff get checked for the injuries he reported by the physician.

Response: This question appears to be directed only to Dr. Foster, not answering defendants, and therefore no response is required.  To the extent a response is required, answering defendants are without sufficient knowledge or information.

10.     On or about 5/27/04, did the plaintiff report what he though to be side effects of psychotropic drugs to R.Gray and Florence S. Cobb.

Response: Answering Defendant Gray acknowledges that Plaintiff complained about the side effects of his medications.  By way of further answer, answering defendants Johnson, Sagers, and Moffett are without sufficient knowledge or information.

11.     Provide photocopies of the D.P.C. register when a D.P.C. patient has to sign for legal mail, dating from 5/21/04 thru 6/25/04 (Mitchell building only).

Response: Legal mail was not signed for; however, the mail was only opened in

the presence of staff.

12.    Was the plaintiff ever involved with an incident at the D.P.C., where he claimed he was being denied his legal mail, if yes, describe the incident.

       Response: Answering defendants are without sufficient knowledge or information.

13.    What is an overdose of Ativan, for 235 lbs.

       Response: Answering defendants are without sufficient knowledge or information.

14.    What is an overdose of Geodon, for 235 lbs.

       Response: Answering defendants are without sufficient knowledge or information.

15.    What is an overdose of Haldol, for 235 lbs.

       Response: Answering defendants are without sufficient knowledge or information.

16.    How long does it take to conduct a competency evaluation, describe the scenario's of the various amounts of different times it takes.

       Response: Answering defendants are without sufficient knowledge or information.

17.    If a person is reported to have become mentally ill after incarceration, does it mean that that person is malingering, if no, state why.

       Response: Answering defendants are without sufficient knowledge or information.

18.    If a person is reported to have become mentally ill after incarceration, does it mean that that person has a mental health history, if yes, state why.

       Response: Answering defendants are without sufficient knowledge or information.

19.    What is the D.P.C. staffs course of action when they deemed that a patient is psychotic.

       Response: All patients have individual treatment plans.  Staff treats all patients with dignity and equality.  Answering defendants are not involved in the

diagnosis of medical conditions.

20.    What is the D.P.C. staff course of action when they have deemed that a patient is psychotic, a danger to himself and others.

Response: When a patient presents a danger to himself or others, and depending on the degree of danger presented, staff begins by verbally attempting to re-direct the patient. If verbal intervention is unsuccessful, staff will physically remove the patient from area. Next, a nurse or doctor may offer voluntary medication, followed by the involuntary administration of medication, followed by seclusion, and finally four-point restraints, if necessary.

21.    Is it possible for the involuntary administration of psychotropic drugs to cause antisocial behavior, if no, state why.

Response: Answering defendants are without sufficient knowledge or information.

22.    Is it possible for the involuntary administration of psychotropic drugs to cause aggressive behavior, if no state why.

Response: Answering defendants are without sufficient knowledge or information.

23.    On 6/3/04 at lunch time, was the D.P.C. patient named "Tim" put in seclusion and given psychotropic drugs after he allegedly assaulted the plaintiff in the dining hall.

Response: Answering defendants are without sufficient knowledge or information.

24.    What are the dates Florence S. Cobb conducted her African studies group, between dates 5/21/04 thru 6/25/04.

Response: Answering defendants are without sufficient knowledge or information.

25.    When a patient is aggressive and assultive towards staff and other patients, can it be deemed necessary to assign one or two attendants to monitor his behavior 24 hours a day, if yes, were one or two attendants assigned to monitor the plaintiffs behavior 24 hours a day.

Response: Yes, however Answering defendants do not believe Mr. Lewis was on 1:1 for 24 hours.

26.    What date was the plaintiff checked and or received therapy from the team psychologist after he reported being assaulted by the patient named "Tim", and

provide what the team psychologist stated to the plaintiff about the alleged incident.

Response: Answering defendants are without sufficient knowledge or information.

27.    Does a hyperdermic needle utilized to inject psychotropic drugs, break the skin in away that people find it painful.

Response: Yes, the administration of a medication by needle must break skin and causes a degree of pain.

28.    Does a hypodermic needle utilized to inject psychotropic drugs, penetrate muscle, if not state why not.

Response: Answering defendants are without sufficient knowledge or information.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

/s/_____
Gregory E. Smith, ID No. 3869
Deputy Attorney General
820 North French Street, 6th Floor
Carvel State Building
Wilmington, Delaware  19801
(302) 577-8398
Attorney for Defendants Johnson,
Moffett, Sagers, and Gray

Dated: November 30, 2006