IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS

   V.                      CA. NO. 04-1350 (GMS)

DR. SYLVIA FOSTER, ET AL.

MOTION FOR INTERROGATORY
ANSWERS # 2 FOR DR. FOSTER
PURSUANT TO FED R. CIV P # 33



FILED

FEB 26 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

DATE : 2/23/07

Jimmie Lewis
SBI # 506622
DEL. CORR. CENTER
1181 PADDOCK RD
SMYRNA, DEL 19977

1.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES, QUOTE, HE WAS ANGERED BY NOT RECEIVING A CERTAIN SALAD AT DINNER TO WHICH HE BELIEVED HE WAS ENTITLED, AND ASSULTED A PEER AND A STAFF MEMBER. (DENIED BY THE PLAINTIFF)

~~KRROE COKER RROEROOOO EXROIROROE OOO WOROOO OOO~~

~~OORLORO OO OR RROE ROROO, OROROOO OOR OOOO RROOO OOOOROOROOO~~

WHO WITNESSED THESE INCIDENTS.

2.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES, QUOTE. HE WAS NOTED ATTEMPTING TO INTIMIDATE ONE FEMALE THERAPIST BY FACING HER IN THE HALLWAY STATING, I JUST WANT TO GET MY POINT ACROSS THAT WHATEVER YOU SAID ABOUT ME IN TEAM MEETING WAS WRONG AND DEROGATORY. (DENIED) ~~OROROO~~ – ~~OOROROROROROOO OORE RROOOOOO OOO ROORROROROOO OOO~~ ~~ROROROOOOROROROOL.)  OOROOORO ROOROROO OOO ROOOROO~~ ~~OROROOROO~~, WHO WITNESSED THIS INCIDENT, ~~OOROOORO ORO ORORO~~

3.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES, QUOTE. ACCORDING TO F.C.M RECORDS, THE F.C.M MENTAL HEALTH EXAMINER DOCUMENTED THAT, HE WAS FREQUENTLY ARGUMENTIVE AND LOUD. ('DENIED BY THE PLAINTIFF).

~~ORORORO OOROROROROROROO OOROROO OOROROROROO ROROOOROROO OORO OROR~~ ~~ROROROROROO ROOROROROROR~~ DID DR. FOSTER WITNESS THE PLAINTIFF DISPLAY SUCH BEHAVIOR AT THE SAID TIME IT IS SAID TO HAVE HAPPENED.

4.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES,
OTHER THERAPIST NOTED THAT HE WAS DISRUPTIVE IN GROUP
SETTING, TALKING OUT OF TURN AND MAKING OBSCENE
COMMENTS WHILE WATCHING EDUCATIONAL VIDEO'S.
(DENIED BY THE PLAINTIFF) ~~who are these therapist and~~
~~other patients these remarks and to whatever~~,
WHAT WAS THE OBSCENE COMMENTS, ~~when were these~~
~~comments made~~.

5.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATE,
WHILE THE OTHER PATIENTS TRIED TO HAVE A CALMING
INFLUENCE, MR. LEWIS DISPLAYED NO SENSE OF BOUNDARIES
OR RESPECT FOR AUTHORITY. (DENIED BY THE PLAINTIFF)
WHAT WAS THE DISCRIPTION OF THE INCIDENT(S) RESPONSIBLE
FOR THESE SLANDEROUS REMARKS ABOUT THE PLAINTIFF,
~~what other patients were involved in whatever occurred~~
~~incidents were are~~.

6.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES,
QUOTE. MR. LEWIS STATED THAT HE NEEDS TO DO
" OUTLANDISH THINGS" TO GET ATTENTION, SUCH AS WEARING
PAPER HORNS AND HIS ~~was~~ CATS EYE LENSES
(DENIED BY THE PLAINTIFF).
~~who are these therapist and other patients that this~~
~~occurred in front of~~ WHO WITNESSED THE PLAINTIFF
MAKE SUCH STATEMENTS.

7.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT
STATES, QUOTE. THE TEAM PSYCHOLOGIST STATED
THAT MR. LEWIS WAS ARROGANT, DISRUPTIVE AND
INSTIGATING, (DENIED BY THE PLAINTIFF).
WHAT WAS THE INCIDENTS THAT CAUSED THE
TEAM PSYCHOLOGIST TO SLANDER THE PLAINTIFF,

~~WHO WITNESSED THESE INCIDENTS, AND PROVIDE~~
~~THE EXACT DATE OF THE TEAM PSYCHOLOGIST WHO~~
~~REPORTED THESE STATEMENTS.~~

8.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT
STATES THAT THE FCM MENTAL HEALTH EXAMINER
NOTED THAT QUOTE. LEWIS ASKED FOR MATERIAL
AND PORNOGRAPHY, STATING THESE ITEMS WOULD BE
VERY HELPFUL. (DENIED BY THE PLAINTIFF).
~~WHO WAS THE EXAMINER THAT HEARD THESE DISORDER,~~
~~WHO OVER HEARD THESE STATEMENTS MADE.~~ DID
DR. FOSTER WITNESS THE PLAINTIFF MAKE THESE
STATEMENTS.

9.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES, QUOTE. ACCORDING TO FCM RECORDS, THE FCM MENTAL HEALTH EXAMINER NOTED THAT HE PRESENTED WITH BROAD MOOD + GOOD CONTACT, WITH NO SUICIDAL OR HOMICIDAL IDEATION AND NO AUDITORY OR VISUAL HALLUCINATIONS, UNQUOTE. (DENIED BY THE PLAINTIFF) ~~REFERRED TO THE FCM MENTAL HEALTH EXAMINER, WHO WAS THE FCM MENTAL HEALTH EXAMINER AND WHEN~~ AND DID DR. FOSTER WITNESS. THESE SAID BEHAVIORS AT THE SAID TIME THEY ARE SAID TO HAVE OCCURED.

10.) IN REGARDS TO DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT, DID DR. FOSTER IN ANY WAY MISINTERPRET THE REASON WHY THE PLAINTIFF WAS ORDERED TO BE PSYCHIATRICLY EVALUATED FOR COMPETENCY ~~AND TO UNDERSTAND THE CHARGES OR STAND TRIAL FOR THESE SAID CHARGES AGAINST HIM.~~

11) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES, HE SAW A COUNSELOR AS A CHILD IN NEW JERSEY WHERE HE GREW UP. DID DR. FOSTER OBTAIN MENTAL HEALTH RECORDS FROM THE COUNSELOR, ~~AND IF HE COULD OBTAIN THESE RECORDS WHERE ARE THOSE RECORDS.~~

12.) DR. FOSTER, DID YOU CONSIDER THE
TP3 PSYCHOLOGICAL ASSESSMENT AUTHORED
BY ANNEBEL LEE FIELDS ON MAY 24, 04, ~~illegible~~,
~~illegible~~
~~illegible~~

~~illegible~~
~~illegible~~
~~illegible~~
~~illegible~~
~~illegible~~
~~illegible~~ ( ~~illegible~~ )
~~illegible~~
~~illegible~~
~~illegible~~

13. ~~illegible~~) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES,
THAT THE MENTAL HEALTH EXAMINER, CONFRONTED
HIS NARCISSIM AND ATTENTION SEEKING BEHAVIORS,
AND QUESTIONED THE DIAGNOSIS OF SCHIZOPHRENIA
GIVEN HIM BY THE PHYSICIAN. ~~illegible~~
~~illegible~~
~~illegible~~ DID DR. FOSTER WITNESS THE BEHAVIORS
RESPONSIBLE FOR F CM MENTAL HEALTH EXAMINER,
~~illegible~~ MAKING THESE STATEMENTS AGAINST THE
PLAINTIFF

14 ~~15~~.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT
STATES THAT THE FCM MENTAL HEALTH EXAMINER
DOCUMENTED, MR. LEWIS REFUSED ALL MEDICATIONS
REQUESTING ONLY XANAX AND VALUIM, (HIGHLY ADDICTIVE
DRUGS OF THE ~~XXXXX~~ BENZODIAZEPINE FAMILY),
(DENIED BY THE PLAINTIFF). ~~XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXX~~ DID DR. FOSTER WITNESS THE PLAINTIFF
MAKE THESE STATEMENTS?

15 ~~16~~.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES,
MR. LEWIS WAS FLIRTATIOUS AT TIMES, (DENIED
BY THE PLAINTIFF) ~~XXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX,
XXX~~ DID ~~XXXXXXXXX~~ DR. FOSTER WITNESS
THE PLAINTIFF DISPLAY THIS FLIRTATIOUS BEHAVIOR
NOTED IN HER JUNE 10, 04 2004 REPORT.

~~(scribbled out text)~~

16 ~~(scribbled)~~ ) DR. FOSTERS JUNE 10, 04 FORENSIC REPORT STATES, HE ALSO ADMITTED TO SMOKING MARIJUANA ~~(strikeout)~~ SIXTEEN YEARS AGO, BUT DENIED ALL OTHER ILLICIT DRUG USE, AND THAT IT WAS CONSIDERED PROBABLE THAT HE WAS MINIMIZING HIS ADDITION ISSUES. (DENIED BY THE PLAINTIFF), WHAT FORENSIC EVIDENCE DID DR. FOSTER UTILIZE TO COME TO THE CONCLUSIONS THAT THE PLAINTIFF ~~(scribbled out)~~, ~~(scribbled out)~~ MINIMIZING HIS ADDICTION ISSUES.

17 ~~(scribbled)~~ ) DR. FOSTERS JUNE 10, 04 FORENSIC REPORT STATES, MR. LEWIS' HOSPITAL COURSE HAS BEEN COMPLICATED BY HIS AGGRESSIVE, ASSULTIVE BEHAVIOR. HE WAS OVERHEARD MAKING PHYSICAL THREATS, OBSERVED TAUNTING AND LAUGHING AT HIS PEERS, AND TAKING PLEASURE IN EMBARRASSING THEM. (DENIED BY THE PLAINTIFF) THESE ARE A WIDE ARRAY OF SLANDEROUS ACCUSATIONS, AND THE PLAINTIFF SEEKS TO HAVE DR. FOSTER SPECIFICLY IDENTIFY EXACTLY WHOM THE PLAINTIFF DISPLAYED AGGRESSIVE AND ASSULTIVE BEHAVIOR TOWARD, ~~(scribbled out text)~~ ~~(scribbled out text)~~ ~~(scribbled out text)~~ ~~(scribbled out text)~~ ~~(scribbled out text)~~ ~~(scribbled out text)~~

18.) DR. FOSTERS JUNE 10, 04 FORENSIC REPORT STATES AXIS I, MALINGERING, ALCOHOL ABUSE, HISTORY OF CONDUCT DISORDER. DISCRIBE ~~THAT~~ ~~INFORMATION~~ IN DETAIL THE HISTORY OF CONDUCT DISORDER, ~~INCLUDING DATES & RECORDS~~, ~~INDENTIFYING AND WITNESS~~.

19 ~~(19)~~.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES ON MAY 27, 2003 LEWIS ~~WAS~~ ASSULTED A CORRECTIONAL OFFICER AND WAS TRANSFERED TO THE INFIRMARY. ~~WHERE DID THIS INFORMATION~~ ~~COME FROM AND WHO WITNESS THE ASSULT OR WAS INVOLVED~~ IS THIS YOUR FORENSIC DETERMINATION.

20 ~~(20)~~.) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES THAT MR. LEWIS TOLD THE TEAM SOCIAL WORKER THAT HE HAD BEEN ATTENTION SEEKING AS A YOUTH, AND THAT HE FELT NO ONE EVER PAID ENOUGH ATTENTION TO HIM, AND THAT HE ALWAYS FELT THAT WHATEVER SOMEONE WAS DOING, THEY SHOULD STOP AND ATTEND TO HIS NEEDS. (DENIED BY THE PLAINTIFF) DOES DR. FOSTER HAVE A SIGNED AFFIDAVIT TO VALIDATE THIS CLAIM, ~~AND OR PROVE WHERE THIS INFORMATION COME FROM~~ ~~TO VALIDATE IT~~

21 ~~8/14~~) DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES, IT SHOULD BE NOTED THAT MR. LEWIS HANDED OUT A HIGHLY ARTICULATE, WELL WRITTEN EXPLANTION OF HIS ACTIONS OF HIS ACTIONS ON THE DAY OF THE ALLEGED CRIME. (DENIED BY THE PLAINTIFF) ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~, ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~, ~~xxxxxxxxxxxxxxxxxxxxxxxx~~. DO YOU HAVE SAID WRITTEN NOTATION

22 ~~000B6~~) WHY DOES DR. FOSTER'S JUNE 10, 04 FORENSIC REPORT STATES, THE PLAINTIFF WAS REFERED TO THE D.P.C TO DETERMINE COMPETENCY TO STAND TRIAL, WHEN THE PLAINTIFF ALREADY STOOD TRIAL ON OCT 21-23-03.

23 ~~8/14~~) ON NUMEROUS OCCASSIONS WHEN THE PLAINTIFF WAS INJECTED WITH PSYCHOTROPIC DRUGS AGAINST HIS WILL, THE TERM AGGITATION WAS UTILIZED AS THE REASON. DISCRIBE EXACTLY WHAT AGGITATION MEANS TO A PSYCHIATRIST THAT PRESCRIBES COCKTAILS OF PSYCHOTROPIC DRUGS. ATIVAN, HALDOL AND GEODON.

24.) ON OR ABOUT 5/19/03 SEVEN DAYS BEFORE
THE PLAINTIFF WAS ARRESTED ON 5/26/03,
THE PLAINTIFFS MOTHER PLACED A MISSING PERSONS
ADD IN THE NEWARK NJ STAR LEDGER NEWSPAPER,
THAT RAN FOR TWO MONTHS, SEEKING THE ~~DISTRICT~~
PUBLIC'S ASSISTANCE IN FINDING THE PLAINTIFF,
STATING DIAGNOSES SUCH A SCHIZOPHRENIA AND
BIPOLAR DISORDER, ~~xxxxxxxxxxxxxxxxxxxxxxx~~
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~
~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxx.~~
    DR. FOSTER DID YOU CONTACT THE DETECTIVE
LT DEREK GLENN TO VARIFY IF THE MISSING
PERSONS ADD WAS AUTHENTIC


25.) DR. FOSTER IS IT RELEVANT TO THE
    PLAINTIFF'S COMPETENCY AT THE TIME
    OF HIS ARREST ON 5/26/03 THAT
    THE ARRESTING OFFICERS NOTED THE
    PLAINTIFF STATED THOUGHTS OF SUICIDE
    AND WAS TRANSFERED TO THE
    MULTI PURPOSE CRIMINAL JUSTICE FACILITY,
    (M.P.C.J.F), INFIRMARY.

AG Office RAP Sheet                                          Page      1

This is the criminal record of:
      JIMMY            LEWIS              DOB 12/25/1966 SBI # 00506622

| Arresting Agency | Name (Including Aliases) | Date of Arrest/ Offense | Complaint Number/ Charge | Disposition |
|---|---|---|---|---|
| Wilmington PD Wilmington | JIMMY LEWIS AG CASE: NC03006555 | 05/26/03 05/26/03 | 3003049370 RESISTING ARREST | DISP=BOPC |
| Wilmington PD Wilmington | JIMMY LEWIS AG CASE: NC03006555 | 05/26/03 05/26/03 | 3003049370 Theft $1000 or Greater (Deprive Person) | DISP=BOPC |
| Wilmington PD Wilmington | JIMMY LEWIS AG CASE: NC03006555 | 05/26/03 05/26/03 | 3003049370 CARJACKING SECOND DEGREE TAKE VEHICLE FROM ANOTHER IMMEDIATE PRESENCE | DISP=BOPC |

" JURY INSTRUCTION "

## STATE OF MIND

An element of a criminal offense deals with the state of mind of the defendant. It is, of course, difficult to know what is going on in another person's mind. Therefore, you are permitted to draw an inference, or in other words to reach a conclusion, about a defendant's state of mind from the facts and circumstances surrounding the act that the defendant is alleged to have done. In reaching this conclusion, you may consider whether a reasonable person acting in the defendant's circumstances would have had or would have lacked the requisite [intention, recklessness, knowledge or belief]. You should, however, keep in mind at all times that it is the defendant's state of mind which is at issue, and in order to convict the defendant you are required to find beyond a reasonable doubt that the defendant in fact had the [intention, recklessness, knowledge, or belief] required for a finding of guilt.

The fact that our law permits you to draw an inference about a defendant's state of mind in no way relieves the State of its burden of proving beyond a reasonable doubt every element of an offense.

14



**DELAWARE HEALTH
AND SOCIAL SERVICES**

DIVISION OF SUBSTANCE
ABUSE AND MENTAL HEALTH

*EXHIBIT* ~~ru cuauil~~

DELAWARE PSYCHIATRIC CENTER

June 15, 2004

The Honorable Charles H. Toliver IV
Superior Court of Delaware
500 King Street, Suite 10400
Wilmington. DE 19801

RE:    Lewis, Jimmy
ID#:    0305016966

Dear Judge Toliver:

Enclosed herewith, please find the written report (s) by Sylvia Foster, MD. concerning the above
named defendant.

Should you require any further information, please do not hesitate to contact me.

Respectfully,

Michael S. Talmo, M.Ed.
Director
Delaware Psychiatric Center

MST/jld

cc:    Phebe Young, Deputy Attorney General
Dianne Stachowski, Unit Director
Richard Sadowsky, Ph.D.
Ranga Ram, MD
John Edinger, Esquire
Deputy Attorney General's Office

*P. 2*

# Delaware Psychiatric Center
## Forensic Unit
### (Jane E. Mitchell Building)

### Forensic Psychiatric Evaluation

Examinee:              Jimmy Lewis                    ID #: 0305016966

Date of Birth:         25 December 1966 (Current Age: 38)
Examiner:              Sylvia Foster, M.D.
Period of Evaluation:  21 May 2004 - present
Date of Report:        10 June 2004

## REASON FOR EVALUATION:

Mr. Lewis was referred to The Delaware Psychiatric Center (DPC) for forensic
psychiatric evaluation by *Motion and Order* of the Honorable Charles H. Toliver, In the
Superior Court of the State of Delaware, In and For New Castle County, on 1 December
2003, to determine his competency to stand trial and to obtain treatment for his own well-
being.

## NOTIFICATION:

Upon admission to the Forensic Unit, Mr. Lewis was informed that he was being
evaluated by Court Order, and that the results of all evaluations performed during this
admission would not remain confidential, but would be disseminated to the Court, the
prosecution, and his attorney.

## EXAMINER:

Medical Doctor specializing in Psychiatry with Board Certification, sub-specializing in
Forensic Psychiatry

## LIST OF CHARGES:

Carjacking 2nd Degree
Theft $1000 or greater
Resisting Arrest

## SOURCES OF INFORMATION:

Face-to-face interview with Mr. Lewis on 21 May 2004 and various times thereafter
on the Forensic Unit at DPC
Superior Court Criminal Docket

Seven page statement by Mr. Lewis regarding his social and legal history and his account
    of the crime, undated
Medical Records, Delaware Psychiatric Center, 21 May 2004 – present
Medical Records, First Correctional Medical (FCM), 5 March 2003 – 31 March 2004
Case Charge List
Complaint and Warrant
Exhibit A & B
Charge History Record
Letter from Donald Napolin, LSCW, to The Honorable Charles H. Toliver, 5 May 2004

## CURRENT MEDICATIONS:

Seroquel 50 mg twice daily for anger management and impulse control
Atenolol 25 mg daily for hypertension

## BACKGROUND INFORMATION:

Mr. Lewis was a 38-year-old African American male who presented to the Mitchell
Building based on an evaluation by Dr. Joshi, a prison psychiatrist. Dr. Joshi described
Mr. Lewis on 27 May 2003 as "psychotic and delusional, a danger to self and others,
refusing to take medication." He had assaulted a Correctional Officer, and was
transferred to the infirmary. Mr. Lewis was described as saying, "I can't distinguish
between right and wrong. I am hearing voices telling me to hurt myself and I'm seeing
shadows."

Mr. Lewis had been incarcerated on 17 November 2003 and convicted of Carjacking,
Theft and Resisting Arrest. According to the police report, Mr. Lewis was picked up by a
male driver who was out looking for a male companion for the evening. Mr. Lewis
allegedly attempted to rob the driver, at which point the driver jumped out of the vehicle
in fear, and Mr. Lewis drove off with the car. He allegedly resisted arrest when caught,
and was identified by the driver as the person who stole his car.

According to FCM records, Mr. Lewis was "flirtatious" at times, and had to be redirected
for asking personal questions of the mental health examiner. She confronted his
"narcissism and attention-seeking behaviors," and questioned the diagnosis of
Schizophrenia that had been given him by the physician. Mr. Lewis refused all
medication, requesting only Xanax and Valium (highly addictive drugs of the
Benzodiazepine family). He asked for art materials, and pornography, stating that these
items would be very helpful. He presented with, "broad mood and good eye contact, with
no suicidal, homicidal ideation and no auditory or visual hallucinations." He was
frequently argumentative and loud. He was observed wearing "paper horns," saying, that
they made him feel more comfortable. "It helps me deal with whatever I'm going
through. The horns are like a mask. If I deal with these things within me, I'll be a better
person, being unjustly accused." He was also described as calm and controlled. He
spoke of hearing voices but stated, "I don't know whether it's voices or just my

thoughts." Mr. Lewis stated later that he wore the paper horns and the cat's eye contact lenses for the "scare" factor.

Not much is known about Mr. Lewis' legal history as he is from out of state. However, he said that he had been in prison for six or seven years in New Jersey, from about 1993 to 2000. He added that he had been sentenced to six years for Robbery, "I pick-pocketed somebody," but his jail time had been prolonged for fighting.

Mr. Lewis had no psychiatric history. He saw a counselor as a child in New Jersey where he grew up. At first he said he didn't remember why, but shortly thereafter remembered that it was because his mother had become involved in a Lesbian relationship. "I didn't approve of it and I voiced my opinion to her, and I started misbehaving. I didn't like the lady and I didn't like the idea of the relationship." He went on to explain, "I might have accepted it if it had been presented to me differently, but I saw this lady actually twist my mother's arm to tell me about the [Lesbian nature of the] relationship. I had thought they were just close friends." Mr. Lewis' mother told the team social worker that he had been attention-seeking as a youth, and that he felt no one ever paid enough attention to him. She said he always felt that whatever someone was doing, they should stop, and attend to his needs. He blamed his mother for his current problems due to her homosexual affair. His parents had separated when Mr. Lewis was two years old, at which time Mr. Lewis' father had gone to live in North Carolina.

Mr. Lewis stated that he had been employed in construction and as a porter. "Whatever job was open, I was doing it." However, he added, "I've been fired more than ten times." The longest job he ever held was three months. "I would always argue, or go in late, and I'd get fired." He admitted to selling drugs off and on. "That's what I had to do to have money. Then I got to selling bootleg CD's and DVD's."

Mr. Lewis dropped out of the tenth grade, but later obtained a GED. He changed that idea later, and said that he had a high school diploma. His mother maintained that he actually had a GED. He said, "She thought wrong." He attended the American Business Institute, but did not stay long, ending up owing them money. He related that he had been attending commercial drivers' school to drive eighteen-wheelers just prior to his incarceration. "It was going to be my first job; Poland Springs was going to hire me."

Mr. Lewis stated that he been shot by a police officer ten years ago, with gunshot wounds to the left hip and left arm. He had history of hypertension for which he was being medicated, and history of kidney infection. He had no other significant medical or surgical history.

Mr. Lewis had never married, stating, "Every time I get into a relationship, we always argue." He was with one girlfriend off and on for eight years.

Mr. Lewis reported that he began drinking alcohol in his teens, with his last use just prior

Forensic Psychiatric Evaluation: Jimmy Lewis                    10 June 2004, Page 4 of 6

use. He also admitted to smoking marijuana sixteen years ago, but denied all other illicit drug use. It was considered probable that he was minimizing his addiction issues

## HOSPITAL COURSE:

Mr. Lewis became verbally unresponsive, selectively mute, and categorically refused to answer any questions on the day of admission. He also refused the initial physical examination. Later the same day, Mr. Lewis was observed interacting in a normal manner on the unit. Several days later, the initial examinations were completed without problem. He eventually explained that he had not felt like speaking on the first day.

Mr. Lewis' hospital course has been complicated by his aggressive, assaultive behavior. He was overheard making physical threats, observed taunting and laughing at his peers, taking pleasure in embarrassing them, and was                                            . He complained of hearing voices sporadically but displayed no evidence of preoccupation with internal stimuli when he believed he was not being observed.

The team psychologist described Mr. Lewis in the following manner in the anger management group: arrogant, disruptive and instigating. While the other older patients tried to have a calming influence, Mr. Lewis displayed no sense of boundaries or respect for authority. She added that there was nothing odd or bizarre about his behavior that would suggest a psychotic disorder. Other therapists noted that he was disruptive in the group setting, talking out of turn, and making obscene comments while watching educational videos. When evaluated by the team, he made it clear that he would rather be at DPC rather than in jail in order to "get some help." When asked what help he needed, or what we could do for him, he answered he didn't know.

One staff member stated that she found Mr. Lewis to be engaging, intelligent and articulate, but noted his sense of entitlement, and his demand that things be done his way. Mr. Lewis stated that he needs to do "outlandish things" to get attention, such as wearing paper horns and wearing his cat's eye lenses. It was explained to him that he would not be allowed to wear his paper horns at any time while at DPC, after he placed them on his head at one point. He understood, and did not attempt to wear them again. He was noted to attempt to intimidate one female therapist by facing her in the hallway and stating, "I just want to get my point across that whatever you said about me in team meeting was wrong and derogatory."

On 6/7/04, a special meeting with Mr. Lewis was called to address his grossly inappropriate behavior on the unit the night before. He was angered by not receiving a certain salad at dinner to which he believed he was entitled, and assaulted a peer and a staff member, escalating to the point where he was difficult to redirect. In summary, he was noted to be disruptive in the group setting, to taunt his peers, to intimidate and flirt with therapists, and to make obscene comments. There were reports to the contrary by other staff members who reported that Mr. Lewis was cooperative and helpful in the milieu, tending to get loud and demanding at times when he felt his needs were not being met in a timely fashion.

Initially, Mr. Lewis was prescribed no psychotropic medication, as there was no evidence of a mood disorder, and no evidence of psychosis. However, Seroquel was begun after it became evident that Mr. Lewis had difficulty managing his anger, and controlling his impulses.

## CURRENT MENTAL STATUS EXAM:

Mr. Lewis presented with shaved head, and was appropriately dressed. He was cooperative, and able to sit quietly for the examination with no abnormal motor activity. His speech was normal in rate, tone and volume, and there was no evidence of loud, pressured speech. He stated that his mood was "sensitive, and easily irritated." His affect was full range. His thought processes, assessed by the verbalizations of his thoughts and feelings, were goal directed; there was no evidence of loosening of associations or tangentiality. His thought content displayed no delusions. He was not thinking about suicide, although he maintained that he had been thinking about it. "But I don't really want to do it." He was not thinking about hurting others, and stated, "I'm not on the defensive unless there's a reason." He denied obsessions, compulsions, racing thoughts, paranoia, delusions, special powers, hyper-religiosity, and grandiosity. His cognitive functions were intact grossly. His insight and judgment were considered intact.

## COMPETENCY ASSESSMENT:

Mr. Lewis was presented the questions to the McGarry Criteria as cited in State of Delaware v. Joseph A. Shields, 593 A.2nd, 986 (Del. Super. 1990), p. 1000. Based upon the present examination, Mr. Lewis demonstrated that he does have sufficient present capacity to consult with an attorney with a reasonable degree of rational understanding of court procedures. He is fully able to understand the nature of the proceedings against him, to give evidence in his own defense and to instruct counsel on his behalf.

It should be noted that Mr. Lewis handed out a highly articulate, well-written explanation of his actions on the day of the alleged crime. It reveals a high level of education and intelligence, and highlights his excellent ability to give evidence in his own defense and to instruct counsel on his behalf.

## DIAGNOSIS:[1]

| | |
|---|---|
| Axis I: | Malingering; Alcohol Abuse; History of Conduct Disorder |
| Axis II: | Antisocial Personality Disorder |
| Axis III: | Hypertension |
| Axis IV: | Psychosocial and Environmental Problems: Incarceration |
| Axis V: | Global Assessment of Functioning (GAF) Scale (1 – 100): 50 |
| | Serious impairment in social and occupational functioning |

---

[1] American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000.

## OPINION:

The opinions expressed in this report are held with a reasonable degree of medical certainty, and are based upon the direct examination of Mr. Lewis, the observations reported by staff and therapists on the Forensic Unit, and the previous reports and records available for review. These opinions are subject to change if additional information or records become available.

### Assessment:

The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as getting out of prison into a psychiatric unit. Malingering should be strongly suspected in the presence of Antisocial Personality Disorder.

Mr. Lewis demonstrated no evidence of a mood disorder or psychosis during his admission to DPC, and it is not likely that he ever had Schizophrenia or any other chronic psychotic disorder.

## SUMMARY OF OPINIONS AND RECOMMENDATIONS:

1.      Mr. Lewis is psychiatrically stable and can be returned to prison.

2.      It is my opinion that Mr. Lewis is competent to stand trial.

3.      It is my opinion that, as in the case of many people with Antisocial Personality Disorder, Mr. Lewis may need to remain on his medication to help with anger management and impulse control

4.      Any threats made by Mr. Lewis to harm himself or others should be taken seriously as he is highly manipulative and will stop at little to obtain his goals.

Sylvia Foster, M.D.
Forensic Psychiatrist

Department of Health and Human Services
Division of Alcoholism, Drug Abuse and
Mental Health

Delaware Psychiatric Center

Department of Psychology

TP-3 - PSYCHOLOGICAL ASSESSMENT

✧✧✧ **CONFIDENTIAL** ✧✧✧

CONFIDENTIAL INFORMATION
for professional use by authorized
persons only -- not to be duplicated
or released to others

**PATIENT NAME:** Jimmy Lewis
**EDUCATION:** High School Diploma
**OCCUPATION:** Currently Unemployed; Most Recent: "Sanitation Porter"
**MARITAL STATUS:** Single
**AGE:** 37
**GENDER:** Male
**DATE:** May 24, 2004
**INTERVIEWED BY:** Annabel Lee Fields, MA

Kathryn Sheneman, Psy.D.
Staff Psychologist

Annabel Lee Fields, M.A.
Psychology Intern

## REASON FOR HOSPITALIZATION:

Mr. Lewis was transferred to the Delaware Psychiatric Center (DPC) on 05/21/04 for determination of his adjudicative competency and to receive treatment for his own well-being. His current diagnosis is Alcohol Abuse. He has been charged with Carjacking Second Degree, Theft $1000 or Greater, and Resisting Arrest.

## PSYCHOLOGICAL AND MENTAL STATUS:

*Attention, Orientation, and Memory*

Mr. Lewis attended this interview without needing to be escorted by staff. He presents as a well-built dark-skinned male with African American features who appears younger than his stated age. His dress was neat and clean, and his hygiene appeared good -- his head is clean-shaven. He was cooperative throughout the 70-minute interview. He was able to focus for the most part, although he strayed from the topic occasionally and gave more information than was asked of him. He was not sure of the name of the

facility in which the interview was conducted, but he knew it was a hospital. He knew the day of the week and the year, but not the month or date. His immediate and long-term memories appear to be intact. However, he stated that he felt that he had difficulty with his short-term memory and this was evident during the interview – he could only recall one out of three novel words after five minutes, and would repeat information he had already given (he seemed unaware that he was repeating himself).

### Affect, Thought Processes

Mr. Lewis's stated mood was "confused...a little agitated." He explained that his roommate had masturbated in front of him the previous night, and that he was still feeling somewhat upset about that incident. He displayed a full range of affect, which was appropriate to the content at all times. The speed and volume of his speech were all appropriate to the situation. He rambled at times and gave more information than was asked of him. His judgment and insight appear limited at this time. His intellectual functioning seems to be average.

For the most part, Mr. Lewis's speech and thought content appeared to be logical. He expressed some strange ideas and thoughts, however. He said that he sometimes wears horns on his head because "only the devil should have to go through this," and that it makes him feel better (although he was not able to explain what it made him feel better about). He has put horns on his head since his admission to DPC. He stated that he also did this on the street, and that he "even got cat's eye contacts" to wear. While talking about this, he made a reference to "flames of enlightenment" but did not explain what that meant. He also said that he was with two guards at one time whose names were "Godwin" and "Santana." He explained that these names reminded him of "God" and "Satan," and he said that he believed there was a struggle between good and evil because these guards were with him.

Mr. Lewis reported that he has experienced auditory hallucinations in the past. He said that he hears a single male voice that he does not recognize. He hears the voice say his name, and it "commands me to do stuff" such as to yell or to hit people. Although he stated that he is able to refrain from doing what the voice tells him to do, he also admitted that he has acted on the commands in the past. He also reported that he hears music and "like footsteps in the hall but no one's there." He said that he experiences visual hallucinations that "freak me out sometimes." He stated that he sees shadows "peeking in" on him, but they are always far enough away that he needs to get up to see if anything is really there.

Mr. Lewis expressed some paranoid ideation during the interview. He said that, when he sees people whispering, he often thinks they are talking about him. He also said that he used to hear sirens in his neighborhood, and that this would trigger thoughts that people were after him. At first, he thought the police were involved, and then he gradually thought other people, including his mother, could be involved. He reported that he had (and still has) no idea why people may have been after him. He also said that he was shot by a police officer in 1989, and that he thinks that this may have led to the belief that people were after him. He does not believe that there is anyone after him at this time.



*Relationships, Family Involvement*

Mr. Lewis reported that his parents separated when he was two years old but never formally divorced. He lived with his mother after the separation, but visited with his father frequently until he was 12 or 13 years old. They lost contact at that time. He moved out of his mother's house in 10th grade and got an apartment with his girlfriend. When they broke up, he went to live with his father for approximately 9 months. His biological parents had another son who died of an asthma attack in 1987. Although his parents are not legally divorced, his father is in a relationship with another woman. He has one half brother from that relationship, as well as three stepbrothers and one stepsister.

Mr. Lewis seemed unsure of whether there is a history of psychiatric illness in his family. He stated that one of his maternal aunts has some bizarre behaviors, and that he has a paternal aunt who he thinks is "mentally ill." He stated that his father is a recovering alcoholic, and that several of his maternal aunts and uncles have problems with alcohol and drugs. He has phone contact with his mother fairly regularly. He says that his father does not use a telephone, but that they have written letters to each other on occasion.

*Work History*

Mr. Lewis stated that his most recent job was as a "sanitation porter," and that the job he had the longest (3 months) was preparing cars for new owners at a car dealership. He stated that he has been fired more than ten times. He also stated that has been trained as a carpenter, brick mason, and long-distance trucker.

*Substance Abuse Issues*

Mr. Lewis reported that he began using alcohol and marijuana when he was a teenager (he was unable to be more specific). He used marijuana two or three times per week, but only used it for two years. He drinks two or three times per week – usually on the weekends. He stated that he plans to continue drinking occasionally when he is released from custody.

*Medical Conditions*

Mr. Lewis has been told that he has hypertension and was treated with medication. Later he was told that he does not have hypertension, but the medication was continued in any event. He also suffers from athlete's foot and irritable bowel syndrome.

*Attitude Towards Hospitalization, Future Plans, and Goals*

When asked how he feels about being at DPC, Mr. Lewis stated, "really uncertain about that right now." When asked how he feels about his treatment thus far, he stated, "fair." He chose not to elaborate.

Mr. Lewis stated that his long-term goal is to "put the issues that keep me from obtaining stable employment so that I can get a stable start." His immediate goal is to "do research" for a book about the history and experiences of black people. He says that he has already titled it: "From the Pyramids, to the Plantations, to the Projects, to the Penitentiary, and Now to the Promised Land."

**DURING THE PAST 12 MONTHS, HAS PATIENT DEMONSTRATED EITHER SUICIDAL OR ASSAULTIVE BEHAVIOR? DESCRIBE:**

Mr. Lewis denies any present suicidal or homicidal ideation. He reported that he slit his wrists in 2001 due to depression and "a lot of hopelessness." This was his only suicide attempt. He said that he has never been charged with assault. However, he admits to being in three fights while in prison because he was "attacked" by others.

**STRENGTHS AND WEAKNESSES AS THEY RELATE TO TREATMENT:**
STRENGTHS:
- Mr. Lewis is very articulate.
- Mr. Lewis is a high school graduate.
- Mr. Lewis has been trained as a carpenter, brick mason, and long-distance trucker.
- Mr. Lewis expresses an interest in receiving help for his symptoms.

WEAKNESSES:
- Mr. Lewis has legal charges pending against him.
- Mr. Lewis has a poor work history – he has been fired at least ten times, and the longest job he had lasted only 3 months.
- Mr. Lewis seems to have poor impulse control when he feels that he is being "attacked."

**RECOMMENDATIONS:**

Mr. Lewis should meet with a member of the psychology staff on at least a bi-weekly basis to discuss important issues. He should attend any groups that may be offered that address the things he is working on.

**00026**

SATURDAY, JULY 5, 2003

## NEWS BRIEFS

### Three injured in jump from burning boat

BRICK: Three people suffered minor burns and two others escaped injury when all five jumped from a boat that caught fire in the Barnegat Bay near the Metedeconk River yesterday, Brick Township police said.

The boat was about 30 yards out from an Ocean County marina about 4:30 p.m. when flames engulfed the craft, possibly the result of an explosion, said Sgt. Craig Lash.

All five boaters were rescued, the sergeant said. The boat, which was gutted, drifted to shore and beached itself.

### Public is asked to help find missing Newark man

NEWARK: Police are seeking the public's assistance in finding a city resident who suffers from schizophrenia and a bipolar disorder.

Jimmie Lewis Jr., 36, talked last with his mother by telephone on May 19, but wasn't reported missing until June 25, said Lt. Derek Glenn, a city police spokesman.

**LEWIS**

He said Lewis, described as manic depressive, is 6 feet 2 inches, weighs 230 pounds, has brown eyes, black hair and a dark skin.

Glenn said anyone with information should contact police at (973) 733-5172.

# WILMINGTON DEPARTMENT OF POLICE 
## Detainee Assessment / Property Receipt

Detainee's Name: _Lewis, Jimmie_    Case #: _30-03-_
Last, First Middle

Charges: _Carjacking, Theft_    Arresting Officer: _E. Godwin_

Additional Officer: _J. Santana_

Detainee's Physical Condition:    OK ☑    Other ☐

Explain:    (Body deformities/Bruises/Sutures): _____

Medication: Yes ☑    No ☐    Type: _PSCHOTTOPIC_
_THORAZINE, DEPAKOTE, VISTORIL, RISPERDAL_

Unusual Behavior:
Explain: _DETAINEE STATED THOUGHTS OF SUICIDE,_
_TRANSFERED TO M.P.C.J.F INFIRMARY_

Detainee's Property    Seized as Evidence

Currency/Coin  U.S. Currency: _7.00_    U.S. Currency: _____
U.S. Coin: _2.26_    U.S. Coin: _____
Total: _9.26_    Total: _____

(Have detainee initial next to totals)

Clothing: _BELT, WALLET WITH S.S CARD, LICENCES (NJ)._

Jewelry: _NECKLESS WITH EGYPTION CROSS, DEVIL HORNS AND_
_CAT EYE CONTACT LENSES_

Miscellaneous: _3 SETS OF KEYS (ONE SET VICTIMS),_
_PSYCH TREATMENT PLAN, AMTRACK TRAIN TICKET_

_____    _06/26/03_    _06 21_ hours
Officer Receiving Property    Date    Time

_____    _____ hours
Transporting Officer    Date    Time

I, _____, have received the above property from the Wilmington Department of Police, which
was taken from me on the above date. _____    _____ hours.
Date    Time

Case 1:04-cv-01350-GMS    Document 158    Filed 03/01/2007    Page 27 of 32

**Northern State Prison-Main**
PO Box 2300   Newark, NJ

Page 1
Chart Document
December 21, 2001





**12/20/2001 - Internal Other: MH Treatment Plan: Update**
**Provider: Bernice M. Frinch, LCSW**
**Location of Care: Northern State Prison-Stabilization Unit**
**This document contains confidential information**

**Current Problems:**
HYPERTENSION, UNSPECIFIED (ICD-401.9)
ANTISOCIAL PERSONALITY DISORDER (A2) (DS4-301.7)
R/O SCHIZOAFFECTIVE DISORDER (A1) (DS4-295.70)
R/O BIPOLAR DISORDER NOS (A1) (DS4-296.80)

**Current Medications:**
VISTARIL CAPS 100 MG (HYDROXYZINE PAMOATE) Take 1 cap po HS prn Start 11/30/01 End
12/30/01
DEPAKOTE 500 MG 1 tab in am & 2 tabs @ hs x 15 days
RISPERDAL 1 MG 1 tab bid x 15 days
THORAZINE TABS 100 MG (CHLORPROMAZINE HCL) Take 1 tab po Q6h prn agitation


Housing: SU

## Strengths and Limitations
**Communication** good
**Medication Compliance** good
**Supportive Relationship** fair
**Physical Health** fair
**Social Skills** poor
**Estimated Literacy level** fair
**Insight** fair
**Motivation for treatment** fair
**ADL compentencies** good
**Substance Abuse History**Hx of drug abuse
**Suicide History**Hx suicide attempts and ideation

## New Problems
Axis IV
Patient has a problem with social environment, criminal and legal system.

## Treatment Goals and Modalities

**Thought to injure oneself**
**Problem Definition:**
Reoccurance thought to hurt self evidenced by verbal threat.
**Treatment Goals:**
Inmate will not hurt other
Inmate will learned new techniques to deal with his upset.
Inmate will eliminate acting out behaviors such as self- harm suicidal threats.
**Treatment Modalities:**
Psychiatrist will provide daily counseling and medication assessment.
Social worker will provide daily conseling and group session

Case 1:04-cv-01350-GMS   Document 158   Filed 03/01/2007   Page 28 of 32
**Northern State Prison-Main**
PO Box 2300   Newark, NJ

Page 2
Chart Document
December 21, 2001



Daily individual counseling by psychologist.

**Thought to injure others**
**Problem Definition:**
Reoccurance thought to hurt other evidenced by verbal threats and and argumentative behavior.
**Treatment Goals:**
Inmate will not hurt other.
Inmate will attend anger management session.
Inmate will demonstrate effective communication skills without threat to hurt other.
**Treatment Modalities:**
Daily contacts with psychiatrist for medication assessment,and prescription.
Daily group session with social worker  and focus on anger manent.
Daily individual counseling session with psychologist
**Additional Notes:** Inmate states that he want individual therapy to deal with his attitude because it has become an issues which has prevented him from making choices. He states he is beginning to make threats to solve problem,.

**Outpatient treatment plans must have social worker, psychiatrist, psychologist, and imate signatures.**

| OT | Date | SW | Date |

| Psychologist | Date | Psychiatrist | Date |

| RN | Date | Officer | Date |

Timmie Lewis   12/31/01
Inmate          Date

**Signed by Bernice M. Frinch, LCSW on 12/20/2001 at 10:32 PM**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| | ) | |
| v. | ) | IN03060175-77 |
| | ) | |
| | ) | I.D.# 0305016966 |
| JIMMY LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |

NOTICE OF MOTION

TO:  BRIAN ROBERTSON, ESQUIRE
     Deputy Attorney General
     Department of Justice
     State Office Building
     820 North French Street
     Wilmington, Delaware 19801

PLEASE TAKE NOTICE that the within Motion for Commitment for

Psychiatric Evaluation at the Delaware State Hospital will be

presented to this Honorable Court as soon as counsel may be heard.

JOHN S. EDINGER, JR., ESQUIRE
Assistant Public Defender
Office of the Public Defender
State Office Building
820 North French Street
Wilmington, Delaware 19801

Dated:  NOVEMBER 13, 2003

Case 1:04-cv-01350-GMS   Document 158   Filed 03/01/2007   Page 30 of 32

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE, )
)
v. ) IN03060175-77
)
) I.D.# 0305016966
JIMMY LEWIS, )
)
Defendant. )

## MOTION FOR COMMITMENT FOR COMPETENCY EVALUATION
### AT THE DELAWARE STATE HOSPITAL

COMES NOW, the defendant, Jimmy Lewis, by and through his attorney, John S. Edinger, Jr., Esquire, and respectfully moves this Honorable Court for an Order transferring the defendant to the Delaware State Hospital for a psychiatric evaluation. In support of this Motion, the following facts are asserted:

1. The defendant was convicted of the charges of Carjacking 2nd Degree, Theft $1,000 or Greater, and Resisting Arrest.

2. Since the defendant's conviction, the defendant, while at Gander Hill, has displayed inappropriate behavior.

WHEREFORE, the defendant moves for an Order of the Court transferring the defendant to the Delaware State Hospital for a psychiatric evaluation for the purpose of determining competency and to obtain treatment for his own well-being until such time that treatment is no longer warranted.

JOHN S. EDINGER, JR., ESQUIRE
Assistant Public Defender

## CERTIFICATE OF SERVICE

I, THE UNDERSIGNED PLAINTIFF JIMMIE LEWIS
DUE HEREBY CERTIFY ON THIS 23RD DAY OF FEB,
2007, THAT I DID MAIL ONE TRUE AND
CORRECT COPY OF THE MOTION FOR
INTERROGATORY ANSWERS #2 FOR DR. FOSTER
PURSUANT TO FED R. CIV P # 33, BY U.S MAIL
TO EACH OF THE FOLLOWING:

CLERK OF THE COURT (GMS)
UNITED STATES DISTRICT COURT
844 N. KING ST, LOCKBOX 18
WILMINGTON, DELAWARE 19801

LOUIS J. RIZZO JR ESQ
1001 JEFFERSON PLAZA
  SUITE 202
WILMINGTON, DELAWARE 19801

DATE: 2/23/07

Jimmie Lewis
SBI # 506622
DEL. CORR. CENTER
1181 PADDOCK RD
SMYRNA, DEL 19977

INM. *Jimmie Lewis*
SBI# *506622*  UNIT *D-4-2*
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

U.S.M.S.
X-RAY

CLERK OF THE COURT (gms)
UNITED STATES DISTRICT COURT
844 N. KING ST, LOCKBOX 18
WILMINGTON, DELAWARE
19801

