# EXHIBIT "A"

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,                    )
                                      )
                                      )
       v.          CONFIDENTIAL INFORMATION IN03060175-77
                   for professional use by authorize
                   persons only -- not to be duplicated  I.D.# 0305016966
JIMMY LEWIS,       or released to others, "
                                      )
       Defendant.                     )

                    O R D E R

       AND NOW, TO WIT, this _1st_ day of _December_ ,

A.D., 2003, the foregoing Motion having been heard and considered,

it is hereby;

       ORDERED that Jimmy Lewis, the defendant, be transferred to the

Delaware State Hospital for psychiatric evaluation for the purpose

of determining competency, and to obtain treatment for his own

well-being.  As soon as Delaware State Hospital notifies Gander

Hill of an available opening, Jimmy Lewis is to be transported and

evaluated.


                              _____
                                      JUDGE


**00008**

# EXHIBIT "B"

Delaware Psychiatric Ce.
Page 1 - Psychiatric Assessment Form
Rev. 5/00

**Department of Health and Social Services**
**Division of Substance Abuse and Mental Health**
**Delaware Psychiatric Center**

LEWIS, JIMMY                    12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028                05/21/2004

*same history obtained from court order + FCM records.*

## PSYCHIATRIC ASSESSMENT FORM

**Patient Name (Print):** Jimmy Lewis

**I.    ADMISSION STATUS:**    24 Hour / Civil / (Court) / Voluntary

**II.   CHIEF COMPLAINT:** Refused to speak

CONFIDENTIAL INFORMATION
for professional use by authorized
persons only -- not to be duplicated
or released to others.

**III.  SOURCES OF INFORMATION:**
Interpreter Needed?   Yes / (Not Needed)  (If yes, name of and type of interpreter)

**IV.  HISTORY OF PRESENT ILLNESS:** PX has been jailed at Gander Hill for several months

PX is a 38 y o AA male who presents to the Mitchell Bldg by court order for the purpose of determining competency, + to obtain tx for his own well-being. PX was evaluated by prison psychiatrist, Dr Dilip Joshi, on 5/27/03, as "psychotic + delusional, a danger to self + others, refusing to take medication." He had assaulted a CO, + was transferred to the infirmary. PX reported, "I can't distinguish between right + wrong. I am hearing voices telling me to hurt myself + I'm seeing shadows."

(over)

**Date:** 5/21/04  **Time:** 11 am  **Print Name of Interviewer:** Sylvia Foster, MD

Doc. No. 35 06 30 01 02 03

Delaware Psychiatric Center
Page 2 - Psychiatric Assessment Form
Rev. 5/00

LEWIS, JIMMY                    12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
HELDA JEAN LEWIS MOTH AREA 5
973-481-5028                    05/21/2004

## V.  PAST PSYCHIATRIC HISTORY:

**Current Psychiatrist or Clinician/date last seen:** unknown

**History of Major Depression?**  Yes / No

**History of Suicidal Behavior?**  (Yes) / No    unknown    — got once by wrists/arch
5/21/04    (no tx) — 4 yrs ago

**History of Violent Behavior?**  Yes / No

**History of Mania?**  Yes / No

**History of Anxiety Disorder?**  Yes / No

**History of Psychosis?**  Yes / No

CONFIDENTIAL INFORMATION
for professional use by authorized
persons only and not to be duplicated
disclosed to others.

**Give a detailed personal history regarding previous treatment, hospitalizations and medications:**

[unknown 5/21/04]

- Pt states he was at Crisis a few times but never was an inpt in a psychiatric hospital

- He said he went to Crisis for having hallucinations, hopeless feelings & suicidal thoughts.

- outpt: Saw counselor (of some sort) as a child in N.J. Pt doesn't know why. Told me his mother would know. He remembers that his mother was in a lesbian relationship & 2 didn't approve of it & 2 voiced my opinion to her & 2 started misbehaving — didn't like the lady & didn't like ... in the relationship

Delaware Psychiatric Center
Page 3 - Psychiatric Assessment Form
Rev. 5/00

LEWIS, JIMMY                    12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028                   05/21/2004

Confidential
For professional use by authorized
persons only -- not to be duplicated
or released in whole

## VI. MEDICAL HISTORY:

### Family MD and Date of Last Exam:

### Past or Current Medical Conditions/ Medical or Surgical Hospitalizations:

None / Heart disease / Seizures / Gastrointestinal Disease / Diabetes / Ulcer /   140/98

Hepatitis / Asthma / Arthritis / (Hypertension) / Major Injury / Head Injury /   on adm

Sexually Transmitted Diseases / Congenital Disease / Developmental Delays / Surgery /

HIV Tested / Other   HTN c̅ hx Lichee (problems ?) acc̅ tx'd c̅ Ab

Shot in ℗ hip + ℓ arm   to record genm)   c̅ no further
hospitalized x 1 week 10 yrs ago   problem,
[just recently]

### Immunization Status: [unknown]
up to date

### Medical Review of Systems: [Refused to answer 5/21/04]

**Sleep:**   no complaints / early morning awakening / nightmares /
(difficulty falling asleep) (frequent waking) other _____

**Appetite:** (no complaints) / increased / decreased / weight loss / weight gain /
bingeing / purging / other _____

**Sexual:** (sexually active) (unprotected sex) multiple partners / none
It depends on if I have a girl

### Current Prescribed Psychiatric and Non-Psychiatric Medications:
Pt refused all meds in jail — "I thought they
were going to give
me something that
would hurt me."

### Over-the-Counter Medications:
[unknown]

### Side-effects or History of Tardive Dyskinesia:
None

### Allergies (specify reaction):
[unknown]   NKDA

## VII. FAMILY HISTORY: [unknown]

mother one of the family

**Disorders:** (Psychiatric) / (Alcohol) / (Substance) / None
father used to drink

**Abuse:** Sexual / (Physical) (Emotional) / None   mos GF
"mo's G/F used to beat me — almost threw me out the 10 story window"
maternal   mo + GF together for 15 yrs   paternal
my uncle has a psychiatric illness — in a state Hosp   — aunt in state Hosp
(dad's sick)

Delaware Psychiatric Center
Page 4 - Psychiatric Assessment Form ~~CONFIDENTIAL INFORMATION~~
Rev. 5/00

For professional use by authorized
persons only - not to be disclosed
or released to others

LEWIS, JIMMY                      12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS ~~MOTH~~ AREA 5
5828                              05/21/2004

**VIII. SOCIAL HISTORY:**

List marital history, current status, friends, children (incl. ages) & names of people who reside in home: [Unknown 5/21/04]

Never married. "Every time I get into a relationship, we always argue." Last one GF of 10 for 8 yrs.

**Occupational History:** Occupation / last job worked / why stopped working / longest period worked:

Practicits selling drugs often "that's what I have to do to have money" porter construction "whatever job was open, I was doing"

Was attending comercial drivers' school - to try 18 wheeler - it was going to be my first job when I got to selling bootleg CD's + DVD's. I always argue, or go in late + I get fired. I've been fired more than 10 times. Longest job: 3 mos.

Poland Springs was going to hire me

**Educational History:** Grade level achieved: 10th grade Special Classes: Yes / No

~~GED~~ actually got a HS diploma

Trade School: Amer. Bus Institute - didn't stay long + ended up owing them.

**Legal History:** Charges / Incarceration / Litigation / None

[Unknown] Total: 6 yrs, mostly for theft "one was upgraded to Robbery - I pickpocket somebody"

1993 - 2000 "got into trouble" - so

**IX. ALCOHOL AND DRUG HISTORY** when released

**Alcohol:** never used / rarely uses / heavy use / blackouts / seizures / AM drinker / lost workdays / DTs / detox-rehab / DUI

Since teens - last use: just prior to incar. ⊕ h/o blackouts

I.V. 6 yr ago

**Drugs:** never used / cocaine / marijuana / amphetamines / heroin / phencyclidine / barbiturates / benzodiazepines / hallucinogens / inhalants / nicotine / caffeine / IV use / share needles / other _____

**X. MENTAL STATUS EXAM:** [Pt sat still c no abn motor activity status stared down at floor + refusing to speak] head shaved

**Appearance:** Kempt / Unkempt / Drowsy / Stuporous / Intoxicated

**Manner:** Pleasant / Cooperative / Uncooperative / Guarded / Angry / Suspicious

status [refused to answer any qur. Nun selectively mute Pt was speaking c staff earlier in normal manner] 5/28/03

**Speech:** Rate: Normal / Slowed / Pressured / Monotonous
Volume: Normal / High / Low
Content: Clear / Goal-directed / Rambling / Vague / Mute

**Motor Activity:** General: Calm / Agitated / Pacing
Gait: Normal / Ataxic / Shuffling
Movement: None / Tremor / Tic / Rigidity / Catatonia

Pt opened up to me (5/25/04)

Delaware Psychiatric Center
Page 5 - Psychiatric Assessment Form
Rev. 5/00 [*pt refused to answer any questions 5/21/04*]

```
LEWIS, JIMMY            12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028            05/21/2004
```

## X. MENTAL STATUS EXAM (Con't):

5/26/04

**Mood:** "I feel sensitive, easily irritated."

**Affect:** Appropriate / Full-range / (Constricted) / Blunted / Labile

**Thought Content:** Negative about himself, hopeless + helpless to make himself feel better

**Hallucinations:** (Auditory) / (Visual) / Command / Other / None
sees + hears things at night only when upset

**Current Suicidal Status:** (Ideation) / Plan / Intent / None
"I was thinking about it - but I don't really want to do it."

**Current Violent Status:** Ideation / Plan / Intent / (None) "I was just upset + this guy that attacked me a peer, + they blamed me."

**General:** Obsessions / Compulsions / Racing thoughts / Paranoia / Delusions / Special powers / Hyperreligiosity / Grandiosity / (None) "I'm not a the defensive unless there's a reason."

**Thought Process:** (Normal) / Looseness of association / Flight of ideas / Tangentiality / ~~Thought~~ blocking / Circumstantiality

**Sensorium:** (Alert) / Not Alert

**Oriented to:** (Person) / (Place) / (Time)

**Immediate Memory:** 3 / 3 objects remembered

**Short Term Memory:** 2 / 3 objects remembered after five minutes

**"WORLD" backwards:** OK

**Presidents:** Bush →

**Apple/Orange:** "You eat them."

**Glass House:** "I don't know what that means."

**Insight/Judgement:** (Poor) / Average / Good

**Fund of Knowledge:** (Poor) / Average / Good

**Intellectual Functioning:** Below Average / (Average) / Above Average

SUPPLEMENTAL INFORMATION
For professional use by authorized persons only - not to be duplicated or released to others.

Delaware Psychiatric Center
Page 6 - Psychiatric Assessment Form
Rev. 5/00

LEWIS, JIMMY          12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
970 461 9426 New 05/21/2004

## XI. ASSETS AND STRENGTHS:
**Knowledge about:** Illness / Treatment
**Cooperative with:** Treatment / Medication
**Able to provide for own:** Feeding / Dress / Safety
**Other:** _unknown_

## XII. DIAGNOSTIC IMPRESSION (DSM-IV diagnoses):

Axis I: Alcohol Abuse r/o Dependence
R/o Depressive D/O  R/o psychotic d/o
                    r/o malingering

Axis II: Deferred

Axis III: HTN

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only -- not to be duplicated

Axis IV: Social / Educational / Occupational / Housing / Economic (/ Legal /)
Limited Access to Health Care Services / Other _____

Axis V: Current level: _20_    Highest level past year: _unknown_

## XIII. RISK FACTORS FOR SUICIDE: (unknown)
low – "would try when I tell somebody"

## XIV. RISK FACTORS FOR VIOLENCE (unknown)
"As long as someone doesn't attack me."

## XV. RISK OF HIV/AIDS: (unknown)
low – no multiple partners

## XVI. SUMMARY AND DIFFERENTIAL DIAGNOSIS:
PX is a 38 y/o AA male who presents from G.H.
on a court order for Competency + tx. He is selectively
mute + refuses to speak in my presence.

## XVII. DISPOSITION: Admitted / Diverted

## XVIII. PLAN/ACTION PROBLEM LIST:
1) monitor pt on no psychotropics
2) begin multiple tx modalities
3) medical monitoring of BP
4) ✓ Labs
5) Facilitate disposition
6) Court order repeal

Date: 5/21/04 Time: 11 am Signature: _____ _____ 5/25/04

Date: _____ Time: _____ Reviewed by: _____

# EXHIBIT "C"

Department of Health and Human Services
Division of Alcoholism, Drug Abuse and
Mental Health

Delaware Psychiatric Center

Department of Psychology

TP-3 - PSYCHOLOGICAL ASSESSMENT

✧✧✧ **CONFIDENTIAL** ✧✧✧

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only -- not to be duplicated
or released to others

**PATIENT NAME:** Jimmy Lewis
**EDUCATION:** High School Diploma
**OCCUPATION:** Currently Unemployed; Most Recent: "Sanitation Porter"
**MARITAL STATUS:** Single
**AGE:** 37
**GENDER:** Male
**DATE:** May 24, 2004
**INTERVIEWED BY:** Annabel Lee Fields, MA

_____
Kathryn Sheneman, Psy.D.
Staff Psychologist

_____
Annabel Lee Fields, M.A.
Psychology Intern

---

**REASON FOR HOSPITALIZATION:**

Mr. Lewis was transferred to the Delaware Psychiatric Center (DPC) on 05/21/04 for determination of his adjudicative competency and to receive treatment for his own well-being. His current diagnosis is Alcohol Abuse. He has been charged with Carjacking Second Degree, Theft $1000 or Greater, and Resisting Arrest.

**PSYCHOLOGICAL AND MENTAL STATUS:**

*Attention, Orientation, and Memory*

Mr. Lewis attended this interview without needing to be escorted by staff. He presents as a well-built dark-skinned male with African American features who appears younger than his stated age. His dress was neat and clean, and his hygiene appeared good – his head is clean-shaven. He was cooperative throughout the 70-minute interview. He was able to focus for the most part, although he strayed from the topic occasionally and gave more information than was asked of him. He was not sure of the name of the

facility in which the interview was conducted, but he knew it was a hospital. He knew the day of the week and the year, but not the month or date. His immediate and long-term memories appear to be intact. However, he stated that he felt that he had difficulty with his short-term memory and this was evident during the interview – he could only recall one out of three novel words after five minutes, and would repeat information he had already given (he seemed unaware that he was repeating himself).

### Affect, Thought Processes

Mr. Lewis's stated mood was "confused…a little agitated." He explained that his roommate had masturbated in front of him the previous night, and that he was still feeling somewhat upset about that incident. He displayed a full range of affect, which was appropriate to the content at all times. The speed and volume of his speech were all appropriate to the situation. He rambled at times and gave more information than was asked of him. His judgment and insight appear limited at this time. His intellectual functioning seems to be average.

For the most part, Mr. Lewis's speech and thought content appeared to be logical. He expressed some strange ideas and thoughts, however. He said that he sometimes wears horns on his head because "only the devil should have to go through this," and that it makes him feel better (although he was not able to explain what it made him feel better about). He has put horns on his head since his admission to DPC. He stated that he also did this on the street, and that he "even got cat's eye contacts" to wear. While talking about this, he made a reference to "flames of enlightenment" but did not explain what that meant. He also said that he was with two guards at one time whose names were "Godwin" and "Santana." He explained that these names reminded him of "God" and "Satan," and he said that he believed there was a struggle between good and evil because these guards were with him.

Mr. Lewis reported that he has experienced auditory hallucinations in the past. He said that he hears a single male voice that he does not recognize. He hears the voice say his name, and it "commands me to do stuff" such as to yell or to hit people. Although he stated that he is able to refrain from doing what the voice tells him to do, he also admitted that he has acted on the commands in the past. He also reported that he hears music and "like footsteps in the hall but no one's there." He said that he experiences visual hallucinations that "freak me out sometimes." He stated that he sees shadows "peeking in" on him, but they are always far enough away that he needs to get up to see if anything is really there.

Mr. Lewis expressed some paranoid ideation during the interview. He said that, when he sees people whispering, he often thinks they are talking about him. He also said that he used to hear sirens in his neighborhood, and that this would trigger thoughts that people were after him. At first, he thought the police were involved, and then he gradually thought other people, including his mother, could be involved. He reported that he had (and still has) no idea why people may have been after him. He also said that he was shot by a police officer in 1989, and that he thinks that this may have led to the belief that people were after him. He does not believe that there is anyone after him at this time.



### Relationships, Family Involvement

Mr. Lewis reported that his parents separated when he was two years old but never formally divorced. He lived with his mother after the separation, but visited with his father frequently until he was 12 or 13 years old. They lost contact at that time. He moved out of his mother's house in 10th grade and got an apartment with his girlfriend. When they broke up, he went to live with his father for approximately 9 months. His biological parents had another son who died of an asthma attack in 1987. Although his parents are not legally divorced, his father is in a relationship with another woman. He has one half brother from that relationship, as well as three stepbrothers and one stepsister.

Mr. Lewis seemed unsure of whether there is a history of psychiatric illness in his family. He stated that one of his maternal aunts has some bizarre behaviors, and that he has a paternal aunt who he thinks is "mentally ill." He stated that his father is a recovering alcoholic, and that several of his maternal aunts and uncles have problems with alcohol and drugs. He has phone contact with his mother fairly regularly. He says that his father does not use a telephone, but that they have written letters to each other on occasion.

### Work History

Mr. Lewis stated that his most recent job was as a "sanitation porter," and that the job he had the longest (3 months) was preparing cars for new owners at a car dealership. He stated that he has been fired more than ten times. He also stated that has been trained as a carpenter, brick mason, and long-distance trucker.

### Substance Abuse Issues

Mr. Lewis reported that he began using alcohol and marijuana when he was a teenager (he was unable to be more specific). He used marijuana two or three times per week, but only used it for two years. He drinks two or three times per week – usually on the weekends. He stated that he plans to continue drinking occasionally when he is released from custody.

### Medical Conditions

Mr. Lewis has been told that he has hypertension and was treated with medication. Later he was told that he does not have hypertension, but the medication was continued in any event. He also suffers from athlete's foot and irritable bowel syndrome.

### Attitude Towards Hospitalization, Future Plans, and Goals

When asked how he feels about being at DPC, Mr. Lewis stated, "really uncertain about that right now." When asked how he feels about his treatment thus far, he stated, "fair." He chose not to elaborate.

Mr. Lewis stated that his long-term goal is to "put the issues that keep me from obtaining stable employment so that I can get a stable start." His immediate goal is to "do research" for a book about the history and experiences of black people. He says that he has already titled it: "From the Pyramids, to the Plantations, to the Projects, to the Penitentiary, and Now to the Promised Land."



**DURING THE PAST 12 MONTHS, HAS PATIENT DEMONSTRATED EITHER SUICIDAL OR ASSAULTIVE BEHAVIOR? DESCRIBE:**

Mr. Lewis denies any present suicidal or homicidal ideation. He reported that he slit his wrists in 2001 due to depression and "a lot of hopelessness." This was his only suicide attempt. He said that he has never been charged with assault. However, he admits to being in three fights while in prison because he was "attacked" by others.

**STRENGTHS AND WEAKNESSES AS THEY RELATE TO TREATMENT:**

STRENGTHS:
- Mr. Lewis is very articulate.
- Mr. Lewis is a high school graduate.
- Mr. Lewis has been trained as a carpenter, brick mason, and long-distance trucker.
- Mr. Lewis expresses an interest in receiving help for his symptoms.

WEAKNESSES:
- Mr. Lewis has legal charges pending against him.
- Mr. Lewis has a poor work history -- he has been fired at least ten times, and the longest job he had lasted only 3 months.
- Mr. Lewis seems to have poor impulse control when he feels that he is being "attacked."

**RECOMMENDATIONS:**

Mr. Lewis should meet with a member of the psychology staff on at least a bi-weekly basis to discuss important issues. He should attend any groups that may be offered that address the things he is working on.

# EXHIBIT "D"

**PROGRESS NOTES (Continued)**

Patient's Name _____    Hospital No. _____

LEWIS, JIM
45443 148    -1309 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
NELBA JEAN LEWIS MOTH AREA 5
973-481-5028    05/21/2004

CONFIDENTIAL INFORMATION
for professional use by authorized
persons only -- not to be duplicated
or released to others

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| | | something would happen. Pt on the Supervisor was inform also Nurse manager Pt was moved to room 71 temporarily Pt also placed two pieces of paper on his forehead sticking out like horns on his forehead I tried talking to Pt to remove them and he refused. — M. Wilson LPN |
| 5/24/04 | 0645 | pt rested quietly in his room ⊥ any complaints or problems — Sonya Wilson |
| 5/24/04 | 0915 | Pt stated that he wants to see the doctor due to athletes foot — M. Wilson LPN |
| 5/24/04 | 11⁰⁰A | Initial Social Service note. Unable to be part of the admissions process, due to ongoing family session. Met c̄ the consumer today. Consumer signed ROI and advance directive. This writer concurs c̄ the assessment of Dr. Foster. The consumer can present as flirtatious and doesn't take offense to redirection. His social assessment was initiated but interrupted due to the nurse re-viewing him for the doctor. Will complete Social assessment after lunch. Consumer contacted his mother's home leaving her a message c̄ his address and this writer's phone #. He has requested reading material which he states will enable him to continue his re— Florenda Scott-Cobb, MSW |

**DEPARTMENT OF HEALTH AND SOCIAL SERVICES**
**DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH**
**DELAWARE PSYCHIATRIC CENTER**

**PROGRESS NOTES**
**(Continued)**

```
LEWIS, JIHNY              12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ C7112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028           05/21/2004
```

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|---------------------------------------------|
| 6/3/04 | 12.15 AM | Addendum! Please note pt has a paper horns on his head and reportedly he sticks them to his scalp by himself. ⟶ SALEM MD |
| 6/4/04 | 1 AM | pt. talking out loud. Verbal intervention ineffective in redirecting his behavior. o.o notified and is here to evaluate pt. Will monitor pt. closely ⟶ m. Jan... |
| 6/4/04 | 6 am | no further behavioral problems noted. pt rested quietly in bed. no incident. ⟶ m. Jan... |
| 6/4/04 | 8:30am | Psychiatry — Pt was active last night, yelling at staff from his room. He was seen by the OD and he states that he had been hit on the head by a peer at 8 am. We spoke c the attendant who stated there was no contact between the two. OD states it appeared that pt was making up this incident as there was no documentation for the incident at 8 am. pt did not address the situation until 12 hrs later. We met c pt who displayed no evidence of psychosis & refused to say why he puts paper horns on his head. We explained that he needs to control his behavior & that he will lose his privileges if his inappropriate behavior persists. Plan – Benadryl PRN for agitation/insomnia |

TP-12A (Rev 12/01)

Document Control No.: 35 06 30 85 05 17

D2

**PROGRESS NOTES (Cont'd)**

Patient's Name: NELSA JEAN LEWIS    3-481-5028    05/21/2004

Hospital No. CONFIDENTIAL INFORMATION
For professional use by author — not to be duplicated or released to others.

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/4/04 (con't) | | Kudrate (Con't) He also sees shadows when upset + angry |
| | | plan - con't present X or no psychotropics |
| | | - Add Benadryl or PRN for insomnia |
| | | + anxiety. (Pt stated that when he asks for |
| | | a PRN he couldn't get it). We discussed |
| | | these issues c̄ pt who was argumentative |
| | | + defensive. He basically stated he wants |
| | | what he wants when he wants it. |
| | | S. Hebat |

**Weekly Nursing Summary** 6/4/04 @ 2130

| | |
|---|---|
| 1. Mental Status: | Alert and oriented X3 - manipulative |
| 2. Locomotion: | Ambulates independently |
| Bowel & Bladder Habits: | c/o burning c̄ urination - Rx c̄ pyridium - |
| ADL Habits: | neat & clean - well groomed. |
| 5. Fluid Intake: | adequate nutrition |
| 6. Food Intake: | 100% + @ meals - receives tray + chef's salad |
| 7. Sleep Pattern: | D/C insomnia |
| 8. Restraints or Support Safety Devices: | N/A |

Response to Nursing Interventions from MTP: Pt has required redirection due to sexually inappropriate behavior - places paper towns on bed so staff will believe him to be mentally ill, disruptive in group. Will continue to observe behavior. _____ dd. Haslar RN

| 6/5/04 | 7:45 am | Pt. Shaving head attempted to redirect. Pt. was argumentative and continued to shave head. It was explained to pt. that shaving of head is not permitted - very difficult to redirect. |
| | | K. Conyer NA. |

**PROGRESS NOTES** (Continued)

Patient's Name _4 EDWIN PLAC NEWARK NJ 07112_
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028    05/21/2004    Hospital No. _____

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/4/04 | CCW | Pertinent Addendum — Pt c/o Sx or UTI. No UTI by UA. Pt seen by medicine who ordered 5 day course Ab. Pt states he knows the Sx + is having them now. New urology consult. _[signature]_ |
| | | Addendum — Pt Therapist stated that pt is disruptive in the group setting, talking out of turn, making obscene comments while watching educational videos. When we spoke to pt this am, he made it clear that he would rather be here than in jail, in order to "get some help." When asked what help he needed, or what we could do for him, he answered he didn't know. Plan — monitor for improved behavior. _[signature]_ |
| 6/4/04 | | Patient was standing in the lobby talking to this nurse & another staff discussing mental illness. Patient stated that in order to get his needs met, he has to put on devil horns, bring out the devil in him and this is considered a mental illness. Patient states that he is not mentally ill but that he will be "deemed" mentally ill once he has to act a certain way to get what he needs "to get his needs met." Pt was asked point blank if he thinks he's mentally ill. Pt's response was that "I have issues like everybody else. It all depends on what "they" think is wrong." _[signature]_ |

D4

# EXHIBIT "E"

CONFIDENTIAL INFORMATION
For professional use by authorized persons only - not to be duplicated in any manner

**PROGRESS NOTES (Continued)**

| Patient's Name | | Hospital No. |
|---|---|---|
| 46443 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/66 309 UNK M AF U | | |
| 4 EDWIN PLACE NEWARK NJ 07112 | | |
| MELBA JEAN LEWIS MOTH AREA 5 | | |
| 973-481-5528 | | |

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|---|---|---|
| | | Cont. |
| 6/13/04 | 1 pm | patients and staff. This was reported to D. Lawrence, RN and pt was given a PRN. _____ R. Ross |
| 6/13/04 | 8 pm | Patient became disruptive on the unit due to his curses over being asked to leave the bathroom and clear the hall in order for 2:1 patient to have access. Pt began cursing & refused to follow unit routine. Patient was asked if he needed a prn to help him calm down, pt replied yes! Prn Geodon & Ativan was given. Pt cont. to refuse to go to the dayhall. Others pt went & pt remained on the unit c̄ a staff present. ___ D. Jackson Rn |
| 6/14/04 | 12:30 AM | During to changing of shift Pt. (Jimmie Lewis) was told to close the laundry room door. Pt then begin to threaten the staff and getting aggressive. Pt was told to clam down and relax. ___ end of statement ___ Chm E Dat |
| 6/14/04 | 1:20 AM | Pt. became extremely ↑ agitated for no apparent reasons. Pt level of agitation escalating rapidly. Verbal interventions ineffective in redirecting his behavior. Pt resisting ~~to take~~ prn & po and not willing to take prn meds. Nursing supervisor called for extra help due to pt's unpredictable ~~behavior~~ overt behavior. Pt continues to be ↑ agitated and not willing to take prn meds in even after much encouragement. Pt had to be physically escorted to Q.R & prn meds given. Pt remained in Q.R for 5 min and returned to his bedroom. Pt resting quietly at present time. Will monitor closely. ___ m j n |

**DEPARTMENT OF HEALTH AND SOCIAL SERVICES**
**DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH**
**DELAWARE PSYCHIATRIC CENTER**

**PROGRESS NOTES**
(Continued)

LEWIS, JIMMY
46443 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    12/25/66
4 EDWIN PLACE UNK M AF U
MELBA JEAN LEWIS NEWARK NJ 07112
0973ABLW5028 MOTH AREA 5
05/21/2004

*Confidential information — for professional use by authorized persons only — not to be duplicated or released to either.*

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/11/04 | 6 PM | Rested well. J further behavior problems will monitor for closely. — R. Gray |
| 6/14/04 | 9:25 A.M. | Pt Non-compliance to staff, threatening staff aggressive, very abusive verbally, agitated, threw a elbow @ staff — R. Gray |
| 6/14/04 | 21:25 | |
| 6/14/04 | 9:30 pm | OD Note. |
| | | Patient had been agitated and aggressive all evening. He was cursing, yelling and threatening staff members. He was tried earlier to verbally calm him down. He was actually angry this evening because he is not allowed to eat anything from vending machine. His priviledges were taken away slowly because he doesn't follow direction and any routine unit activities. Therefore, when he was told that patient couldn't have a candybar, he lost control and started to fight physically with staff members and also threatened to "get the staff". He was seperated, given prn medication of Geodon 20mg Ym, 2mg of Ativan and 50 mg of Benadryl. He had to be secluded because he continued to hit and kick the walls & staff. Seclusion was started at 9:00 pm not to exceed for more than 2 hrs. He may be released earlier if he calms down. — Sal Al DVREKHI, MD |
| 6/14/04 | 2200 | Pt remains in seclusion — upon approach @ 2200 slowabe, lying on side facing away from the door — door opened and inquired how he was feeling — glanced over his shoulder & refused to speak to staff. Seclusion continues. H Taylor RN. Dr. Ivanther contacted & aware of above. — H Taylor RN |

E 2

# EXHIBIT "F"

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only -- not to be duplicated

46443 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 UNK M AF U
4 EDWIN PLA.    PROGRESS NOTES (Cont ed)
MELBA JEAN LEWIS MOTH AREA 5
Patient's Name 973-481-5028    05/21/2004    Hospital No.

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/6/04 | 6:30 pm | OD note — Patient was agitated and hit another patient on the head and when he was separated he also hit the staff on the face. on evaluation. he stated that he did not get his salads and he was upset about that. He was given Haldol 5 im and Benadryl 50 im and when he continued to be agitated he was put in 4 point restraint for safety of self and others. He had intense eye contact speech loud. He appears alert. He denied AH. He denied SI or violent ideations. He will be taken off restraints when he calmed down ——————— SANDHU, MD |
| | | Addendum. His Papa, pool play visits and snack are will be restricted as advised by Dr Porter until evaluated by treatment team ————— SANDHU MD |
| 6/6/04 | N/ pm | [illegible handwriting] |

00093                                    F1

PROGRESS NOTES (Continued)

46443 148-64-1 EDWIN PLACE
4 EDWIN PLACE   NARK NJ 07112

Patient's Name MELBA JEAN LEWIS MOTH AREA 5     Hospital No. _____

973-481-5028     05/21/2004

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/21/04 | 9:00pm | OD Note |
| | | Mr. Lewis reportedly hit another on the (Left)(Right) and then (NB)(Right) side of jaw. err. |
| 6/21/04 | 9:20pm | OD Note |
| | | Mr. Lewis hit another pt on lower jaw on both sides. He needed PRN Meds and was secluded for extreme agitation. On interview Pt was calm, explained his behavior as a response to another pt stealing his casette tape. He refused to apologize and stated he had no regrets to hit the thief. Pt can be released from seclusion after calm and no danger to others. _____ BERRYMAN |
| 6/21/04 | 11:00 | Psych OD Note |
| | | Pt became agitated when evaluated for continuation of seclusion started forcefully banging the door and cursing. Pt was rapidly escalating becoming increasingly dangerous to self and others. Pt was given Geodon 20mg IM c̄ Ativan 2mg IM and restrained in 4 point restraint. After NB a. _____ BERRYMAN |
| 6/21/04 | 11:15pm | Pt was in 4 Pt Restraints. Pt Broke Restraint to (R) Hand. While attempting to secure (R) hand Pt Struck Writer in the Mouth. 4 Pt Restraints Re-applied. _____ |

CONFIDENTIAL INFORMATION
For professional use by authorized persons only -- not to be duplicated or released to others.

F.2

DEPARTMENT OF HEALTH AND SOCIAL SERVICES
DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH
DELAWARE PSYCHIATRIC CENTER

**PROGRESS NOTES**
(Continued)

```
LEWIS, JIMMY              12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028          05/21/2004
```

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/21/04 | 1350 | MEDICAL NOTES: Pt says he was restrained about 2 weeks ago & he said guard accidentally pushed on his neck area & since then he had been feeling "difficulty swallowing" — no SOB, ⊖ vomiting, ⊖ heartburn, ⊖ chest pains, ⊖ cough. Pt says he eat all types of food. |
| | | ambulatory, O: vs: 128/80 – 96.6° – 90 – 12 neck swelling, ⊖ neck tenderness. ⊖ deformity, ⊖ tracheal shift ⊖ pharyngeal mass, ⊖ pharyngeal erythema foot exam: (+) erythematous rash c̄ fissures border toes R foot A: 1. No evidence of tracheal injury; ⊖ pharyngeal obstruction 2. Tinea pedis P = Lotrimin cream |
| 6/21/04 | 8:30 pm | Pt stated earlier because he lost his privileges he was going to punch somebody out. Pt also stated "Staff can suck my dick." —Susana Haver NA |
| 6/21/04 | 2110 | Pt had struck peers – R ① jaw – also ① rib area which has small abrasion. Pt requested to walk to quiet room which he did – pacing rapidly around rm – PRN of geodon 20 mg – benedryl 50 mg – ativan 1 mg PO given @ 2030. Agitation apparent so seclusion was initiated – pt emptied pockets of papers & money – counted & marked $8.25 sealed & locked in med rm. shoes removed, clean shirt given & door relocked. ✗Harlow RN |

F3

# EXHIBIT "G"

**DEPARTMENT OF HEALTH AND SOCIAL SERVICES**
**DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH**
**DELAWARE PSYCHIATRIC CENTER**

**P R O G R E S S   N O T E S**
**(Continued)**

CONFIDENTIAL INFORMATION
for professional use by authorized
persons only — not to be duplicated
or released to patient

LEWIS, JIMMY          12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028
05/21/2004

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/23/04 | 1535 | Pt wrote a grievance against a female N.A. stating that ā snacks - she passed by making detrimental comments re: his sexual preferences etc.. At time this occurred, RN was passing meds from med cart just inside door of unit. N.A. entered unit and walked past the pts who were lined up awaiting their meds - walked to NA desk s̄ comments to anyone and went to desk. H. Harlow RN |
| 6/23/04 | 6:15PM | Pt was re-directed from peering into another patients door window and became verbally abusive towards staff asking "if they where trying to create a scene and if they wanted him to start focusing on him." Lance T. Segera N.A. |
| 6-24-04 | 1:20p | Pt was in the dining room @ his table during lunch MR Lewis threw his lunch tray against the wall and was ask by staff to pick up his tray, there was no response MR Lewis then reached over and grabbed another pts tray and threw it against then wall and stated "I want my fucking mail". The attempted to re-direct MR Lewis to clean up his trays and he refuse redirection. ⊕ |
| 6/24/04 | 1:48pm | pt's level of agitation escalating rapidly. Verbal intervention ineffective in redirect his behavior. PRN Ativan 2mg Im, Benadryl 50mg Im, Geodon 20mg Im given to help pt regain control of his behavior. Pt continues to be ñ agitated. O.D. called & 4 restraints order obtained & placed. pt 4⊕ restraints m grian → |

**PROGRESS NOTES**

Document Control No.: 35 06 30 85 05 17

# EXHIBIT "H"

STATE OF DELAWARE
DEPARTMENT OF HEALTH AND SOCIAL SERVICES

LEWIS, JIMMY                    12/../66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028                    05/21/2004

# DOCTOR'S ORDER SHEET

CONFIDENTIAL INFORMATION

" Authorization is given to dispense a Generic Equivalent under Hospital Formulary System unless NO SUBSTITUTION (Or NO SUBS) is noted."

for professional use by authorize

Name: _____    Facility not to be duplicate    Activity: _____    Case No.: _____

| DATE ORDERED | TIME | TREATMENT or MEDICATION | NOTED BY |
|---|---|---|---|
| 5/21/04 | 11 am | Admit to Mitchell | |
| | | Haldol 5 mg PO/IM q 6° PRN | |
| | | Severe agitation x 30 days-Give with | |
| | | Benadryl 25 mg PO/IM q 6° PRN x 30 days | |
| | | to prevent EPS. May give with | |
| | | Ativan 2 mg PO/IM q 6° PRN | |
| | | agitation x 30 days | |
| | | Medical consult to evaluate | |
| | | for possible HTN - needs | |
| | | medication | |
| | | M Jan W | |
| | | Stu Foster MD    5/21/04 1:30 pm | |
| 5/21/04 | 14:40 | CBC, UA | |
| | | CMP, lipid + Hepatitis panel | |
| | | TSH, serum B12 + folate level | |
| | | MOM 30 ml po q HS. PRN for constipation | |
| | | MAALOX 30 ml po q 6° prn for dyspnia | x |
| | | + Tylenol 650 mg po q 6° prn for discomfort | 30 |
| | | + Atenolol 25 mg po daily + hold | days |
| | | if BP is 90 systolic x 30 days | |
| | | Regular Diet | |
| 5/21/04 | | | |

DHSS — 019 A    "PRESS HARD – (USE BALLPOINT PEN ONLY) NO FELT TIPS    D.C.No.:39-06-002-84-10-04-DSH-183

WHITE – Medical Records  ALL OTHERS – Return To Pharmacy

00069

MEDICAL RECORDS COPY

# EXHIBIT "I"

**DEPARTMENT OF HEALTH AND SOCIAL SERVICES**
**DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH**
**DELAWARE PSYCHIATRIC CENTER**

LEWIS, JIMMY
46443 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    12/25/66
4 EDWIN PLACE  UNK M AF O
MELBA JEAN LEWIS NEWARK NJ 07112
9975MBLM5028  MOTH AREA 5
05/21/2004

**PROGRESS NOTES**
(Continued)

*(stamped overlay: CONFIDENTIAL INFORMATION for professional use by authorized persons only -- not to be duplicated or released to others)*

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/11/04 | 6ᵖᵐ | Rested well ṡ further behavioral problems will monitor for closely. _____ ___ ___ |
| 6/14/04 | 9ᵖᵐ | Pt non-compliance to staff, threatening staff aggressive, very abusive verbally, agitated, threw a elbow @ staff _____ R. Gray |
| 6/14/04 | 2125 | |
| 6/14/04 | 9:30 pm | OD Note.<br>Patient had been agitated and aggressive all evening. He was cursing, yelling and threatening staff members. He was tried earlier to verbally calm him down. He was actually angry this evening because he is not allowed to eat anything from vending machine. His priviledges were taken away slowly because he doesn't follow direction and any routine unit activities. Therefore, when he was told that patient couldn't have a candy bar, he lost control and started to fight physically with staff members and also threatened to "get the staff".<br>He was seperated, given prn medication of Geodon 20mg Ym, 2mg of Ativan and 50 mg of Benadryl. He had to be secluded because he continued to hit and kick the walls & staff. Seclusion was started at 9:00 pm not to exceed for more than 2 hrs. He may be released earlier if he calms down.<br>_____ Oureichi, MD |
| 6/14/04 | 2230 | Pt remains in seclusion - upon approach @ 2200 awake, lying on side facing away from the door - door opened and inquired how he was feeling - glanced over his shoulder & refused to speak to staff. Seclusion continues. H Taylor RN<br>Dr. Doctor contacted & aware of above. - H Taylor RN |

CONFIDENTIAL INFORMATION
for professional use by authorized
persons only — not to be duplicated

4 EDWIN PLACE **PROGRESS NOTES** (Cont'ed)
HELBA JEAN LEWIS MOTH AREA 5
Patient's Name 973-481-5028          05/21/2004          Hospital No.

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/14/04 | 2310 | Pt approached @ 2300 to determine if he was able to contract for safety to D/C seclusion — Pt awake and refusing to speak to staff. OD called to redew seclusion. — H Henlow RN |
| 6/15/04 | 2330 | Pt was able to contract for safety @ 2305 & was taken out of seclusion, exit interview completed, will continue to monitor pt's behavior — Tanya Wilson |
| 6/15/04 | 0105 | Pt rested quietly in bed, Ø aggressive behavior towards staff or other pts — Tanya Wilson |
| 6/15/04 | 7:15am | OD Note (Late Entry) Patient was released from seclusion at 11:15 pm last night after he contracted for safety. S Waters Oweibai, MD |
| 6/15/04 4:30pm | | Psychiatry Pt seen to discuss the aggressive, violent behavior he has been displaying over the last several days; he has been oppositional, aggressive + defiant since admission. Pt stated he was mistreated by staff and he basically took no responsibility for any of it. He was told that the RN had a right to investigate the situation of some money that disappeared that was later found. He had been told to come in off the patio + he refused to do it. Pt was anger because he said he had been told that his privilege restriction has been prolonged without his knowledge. Pt went on for arguing, oppositional. Pt took no responsibility for his actions + refused/denied all the issues involved. Plan — Restrictions to continue for 1 week from today S Waters |

I·2

PROGRESS NOTES (Continued)

Patient's Name MELBA JEAN LEWIS MOTH AREA 5   Hospital No. _____

4 EDWIN PLACE   NARK NJ 07112
973-481-5028   05/21/2004

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/21/04 | 4:00pm | MD Note |
| | | Mr. Lewis reportedly hit another on the (B) Left (Right) and the (MB) Right side of jaw. env. |
| 6/21/04 | 9:20pm | MD Note |
| | | Mr. Lewis hit another pt on lower jaw, on both sides. He needed PRN Meds and was secluded for extreme agitation. On interview Pt was calm, explained his behavior as a response to another Pt stealing his cassette tape. He refused to apologize and stated he had no regret to hit the thief. Pt can be released from seclusion when calm and no danger to others. _____ BERRAMM |
| 6/21/04 | 11:00 | Psych MD Note |
| | | Pt became agitated when evaluated for continuation of seclusion, started forcefully banging the door and cursing. Pt was rapidly escalating becoming increasingly dangerous to self and others. Pt was given Geodon 20mg IM c̄ Ativan 2mg IM and restrained in 4 point restraint. After (MB)a. _____ BERRAMM |
| 6/21/04 | 11:15pm | Pt was in 4 Pt Restraints. Pt Broke Restraint to (R) Hand. While attempting to secure (R) hand Pt struck writer in the Mouth. 4 PT Restraints Re-applied. _____ |

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only -- not to be duplicated
or released to others.

I 3

DEPARTMENT OF HEALTH AND SOCIAL SERVICES
DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH
DELAWARE PSYCHIATRIC CENTER

PROGRESS NOTES
(Continued)

```
LEWIS, JIMMY              12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028             05/21/2004
```

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/21/04 | 1350 | MEDICAL NOTES: |
| | | Pt says he was restrained about 2 weeks ago & he said guard accidentally pushed on his neck area & since then he had been feeling d "difficulty swallowing" — no SOB ⊖ vomiting ⊖ heartburn, ⊖ chest pain, ⊖ cough. Pt says he eat all types of food. |
| | | CONFIDENTIAL for professional use by authorized persons only — not to be duplicated or released to others. ambulatory, ⊖ distress, 128/80 – 96.6° – 90 – 17 ⊖ neck swelling, ⊖ neck tenderness, ⊖ spinal deformity, ⊖ tracheal shift ⊖ pharyngeal mass, ⊖ pharyngeal erythema |
| | | foot exam: (+) erythematous rash c̄ fissures border toes (R) foot |
| | | A 1. No evidence of tracheal injury; ⊖ pharyngeal obstruction |
| | | 2. Tinea pedis |
| | | P = Lotrimin cream |
| 6/21/04 | 8:30 pr | Pt stated earlier because he lost his privileges he was going to punch somebody out. Pt also stated "Staff can suck my dick." — Susana Haver NA |
| 6/21/04 | 2110 | Pt had struck peers – (R) (L) jaw – also (L) rib area which has small abrasion. Pt requested to walk to quiet room which he did – pacing rapidly around rm – PRN of geodon 20mg – benedryl 50 mg – ativan 2mg PO given @ 2030. Agitation apparent so seclusion was initiated – pt emptied pockets of papers & money – counted & marked @ .15 sealed & locked in med rm. shoes removed, clean shirt given & door relocked. H Hanley RN |

**DEPARTMENT OF HEALTH AND SOCIAL SERVICES**
**DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH**
**DELAWARE PSYCHIATRIC CENTER**

PROGRESS NOTES
(Continued)

LEWIS, JIMMY          12/25/66
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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028          05/21/2004

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/22/04 | 24:30 | Pt became Tranquy p assessment of OD to continue seclusion because he would not contract for safety. Pt kicking & banging door — OD determined that he would require 4 pt restraints. Supervisor called to request assistance due to explosive behavior. Pt placed in 4 pt restraints @ 11:05 PM & given PRN (IM). ——— _Helen Harlow RN_ |
| 6/22/04 | 1 AM ¹⁵ | Pt remains in 4° restraints due to agitation. OD called & renewed order for 4° restraints not to exceed 2hrs. Will monitor pt closely. ——— _m. Jenn RN_ |
| 6/22/04 | 2ᵃᵐ | Pt. is calm & quiet r arm & left leg restraint removed. ——— _RN stan RN_ |
| 6/22/04 | 3 am | Pt 4° restraints DC'd at this time. Pt contracted for safety & returned to bedroom. Will monitor pt closely. ——— _m. Jenn RN_ |
| 6/22/04 | 6 am ³⁰ | Pt rested well s further behavioral problems. Will monitor pt closely. ——— _m. Jenn RN_ |
| 6/24/04 | 6 ¹⁰ pm | Pt AEOx3, maintained as routine observation status. Any A/V hallucinations at present denied pt approx 430 pm Nurse Ames reported & noted that it was calling her a "bitch" as she worked. By Nurse along with pt. Howard L. Sayer took over pt. he reported that he did not say anything directed toward Mrs Ames pt did report cursing. Nurse informed pt that he should not be cursing at all. Pt agrees to stop. Therapeutic interaction effective @ this time. _Cremons RN_ |

**DEPARTMENT OF HEALTH AND SOCIAL SERVICES**
**DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH**
**DELAWARE PSYCHIATRIC CENTER**

CONFIDENTIAL INFORMATION
For professional use by authorized persons only -- not to be duplicated or released to others

**PROGRESS NOTES**
**(Continued)**

LEWIS, JIMMY          12/25/66
45443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
MELBA JEAN LEWIS MOTH AREA 5
973-481-5028          05/21/2004

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/23/04 | 1535 | Pt wrote a grievance against a female NA, stating that ∅ snacks - she passed by making detrimental comments re: his sexual preferences ,etc.. At time this occurred, RN was passing meds from med cart just inside door of unit. NA entered unit and walked past the pts who were lined up awaiting their meds - walked to NA desk ∅ comments to anyone and went to desk. H. Harlow RN |
| 6/23/04 | 6:15PM | Pt was re-directed from peering into another patients door window and became verbally abusive towards staff asking "if they where trying to create a scene and if they wanted him to start focusing on him." Lance L. Lagera N.A. |
| 6-24-04 | 1:20p | Pt was in the dining room @ his table during lunch MR Lewis threw his lunch tray against the wall and was ask by staff to pick up his tray, there was no response MR Lewis then reached over and grabbed another pt's tray and threw it against then wall and stated "I want my fucking mail". The attempted to re-direct MR Lewis to clean up his trays and he refuse redirection, ↑ _____ |
| 6/24/04 | 1:48pm | pt's level of agitation escalating rapidly. verbal intervention ineffective in redirect his behavior. Per Ativan 2mg Im, Benadryl 50mg Im, Geodon 20 mg Im given to help pt regain control of his behavior. Pt continues to be ↑ agitated. OD called & 4 restraint order obtained & placed pt 4 restraints I 6 _____ → |

CONFIDENTIAL INFORMATION
For professional use by authorized persons -- not to be duplicated or released to others

PROGRESS NOTES (Continued)

Patient's Name MELBA JEAN LEWIS MOTH AREA 5  Hospital No. _____
973-481-5028      05/21/2004

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/24/04 | 14 | continued :- at 1pm will monitor pt closely and document any changes. — |
| 6/24/04 | 1530 pm | MD Note — point pt was placed on 4 restraints. Because of disruptive, aggressive, threatening, cursing staff. Pt. was placed on 4 point restraints for his safety and other's safety. Mental Status: pt said he is upset. He denied any injury. He said something cost ⊕ AH. He does not understand why he did that. Pt. seems to be angry. Alert. Plan: pt. will receive Benadryl 50 mg now to keep pt sedated / drowsy & to decrease possibility to hurt himself or others. He already got PRN meds N2 hours ago Geodon 20 mg + Ativan 2 mg + Benadryl 50 mg. He will have 2 hours now. M. [signature], M.D. |
|  | 9 | restraints — [signature] |
| 6/24/04 | 1700 | Pt appears, was lying in Seclusion from ⊕ 4 point restraint. It's Seclusion renewed due to continued agitation @ 8pm. Pt refusing to discuss incident & taking no ownership to his aggressive behavior. Pt given additional PRN of Benadryl 50 mg Im & continued of Seclusion order. Pt was made to start content for safety of other & the restraints were down graded to two & then two ⊕ increase compliance |

I7

# EXHIBIT "J"

Department of Health and Social Services
Division of Mental Health
Delaware Psychiatric Center

Release Summary

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only - - not to be duplicated
or released to others.

LEWIS, JIMMY        12 25 66
46443    148 64 1309    UNK M AF D
4 EDWIN PLACE      NEWARK  NJ 07112
MELBA JEAN LEWIS  MOTHER  AREA 5
973 481 5028              05 21 04

| MAY 21, 2004 | JUNE 25, 2004 | DIRECT DISCHARGE |
|---|---|---|
| Date of Admission | Date of Discharge | Disposition |

IDENTIFYING DATA:    This 37 year old black, divorced male was admitted to Delaware Psychiatric Center for his first admission on a court commitment on May 21, 2004.

CHIEF COMPLAINT:    Patient refused to speak upon admission.  He was selectively mute.

HISTORY OF PRESENT ILLNESS:    Mr. Lewis had been jailed at Gander Hill for several months prior to his admission to the Mitchell Building.  He had been evaluated by the prison psychiatrist and found to be, "psychotic and delusional, a danger to self and others, refusing to take medication".  He had assaulted a CO and was transferred to the infirmary.  Patient reported at the time, "I can't distinguish between right and wrong; I'm hearing voices telling me to hurt myself and I'm seeing shadows".  He had been incarcerated on 11/17/03 for Car Jacking 2nd Degree, Theft $1000 or Greater and Resisting Arrest.

On 5/26/03, he was picked up by a male driver who was allegedly out looking for a male companion for the evening.  Mr. Lewis allegedly attempted to rob the driver, at which point the driver jumped out of the vehicle in fear and Mr. Lewis allegedly drove off with the car.  Mr. Lewis allegedly resisted arrest when caught, and was identified by the driver of the car as the person who had stolen his vehicle.

The examiners at First Correctional Medical, while he was in prison, described Mr. Lewis as, "flirtatious at times, requiring redirection for asking personal questions of mental health personnel".  He was confronted with his, "narcissism and attention seeking behaviors".  The CO questioned the diagnosis of Schizophrenia which had been given to

Cont…

CONFIDENTIAL INFORMATION

DISCHARGE SUMMARY
LEWIS, JIMMY
HOSPITAL #46443

For professional use by authorizePAGE 2
persons only - - not to be duplicated
or disclosed to others

him by the prison doctor. Mr. Lewis refused all medications, requesting only Xanax and Valium. He also asked for art materials and pornography, stating, "that would be very helpful". The CO's described him as, "with broad mood and good eye contact with no suicidal or homicidal ideation and no alteration in perception". He was, however, argumentative and loud. He was observed wearing paper horns, saying that the horns made him feel more comfortable. "It helps me deal with what I'm going through. It's like a mask; if I deal with these things within me, I'll be a better person. I'm being unjustly accused." During his time in prison, he was calm and controlled and spoke of hearing voices but stated, "I don't know whether it's voices or just my thoughts".

PAST PSYCHIATRIC AND FAMILY HISTORY:   Mr. Lewis stated that he had been seen at Crisis a few times but was never an inpatient at a psychiatric hospital. He said he went to Crisis for having hallucinations, hopeless feelings and suicidal thoughts.

He had been an outpatient as a child in New Jersey but did not know why.

ALCOHOL AND DRUG HISTORY:   Mr. Lewis reported that he began drinking alcohol in his teens with his last use just prior to incarceration. He had history of blackouts, but did not elaborate. He denied heavy use. He also admitted to smoking marijuana 16 years previously but denied all other illicit drug use. It was considered probable that he was minimizing his addiction issues.

MENTAL STATUS AT TIME OF ADMISSION: The mental status was obtained four days after admission as Mr. Lewis refused to answer any questions upon admission and just sat staring at the floor. Four days after admission, his mood was stated as sensitive and easily irritated.   His affect was constricted.   Thought content revealed negative thoughts about himself. He stated that he felt hopeless and helpless to make himself feel any better. He said he was having both auditory and visual hallucinations but only at night when he was upset. He said that he was having current suicidal thoughts. "I was thinking about it, but I didn't really want to do it." He was not having any current violent thoughts. "I was just upset with the guy that attacked me and the CO's blamed me." He denied obsessions, compulsions, paranoid, delusions, special powers, hyperreligiosity and grandiosity. "I'm not on the defensive unless there's a reason." Thought process was normal and there was no evidence of loosening of associations, flight of ideas or tangentiality. Sensorium was alert and he was oriented in three spheres. His immediate memory was intact as he remembered 3/3 objects immediately and 2/3 objects after five minutes. He was able to spell the word "world" backwards but only got the current president. He assessed the similarities between an apple and an orange, as "you eat

Cont…

DISCHARGE SUMMARY
LEWIS, JIMMY
HOSPITAL #46443

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only -- not to be duplicated
or released to others, be

PAGE 3

them". He was unable to give an answer to the glass house proverb. Insight and judgment were considered average to poor and his fund of knowledge poor. Intellectual functioning was considered average.

MEDICAL HISTORY AND PHYSICAL EXAMINATION:    The patient complained of having irritable bowel syndrome and hypertension.

LABORATORY DATA AND OTHER DIAGNOSTIC EXAMS:        Mr. Lewis complained of some urinary frequency during the admission and a urology consult was written. However, he was discharged before being evaluated. He was treated with Bactrim during the admission with resolution of the symptoms. However, as he had complained of these urinary tract symptoms frequently in the past, he was to undergo a urology consult which did not happen, as stated above. Mr. Lewis was treated for hypertension throughout the admission with good results.

Urinalysis revealed a 1+ protein and 1+ bilirubin. However, the urine C&S revealed no growth. The medical doctor wrote no evidence of the urinary tract infection. The CBC and differential and the comprehensive metabolic panel were completely unremarkable. The hepatic function panel and the thyroid function studies with TSH were all normal. Vitamin B12 and folate levels were normal and the RPR was nonreactive.

PROVISIONAL CLINICAL DIAGNOSIS:    Axis I:    Alcohol Abuse.    Rule out Dependence. Rule out Depressive Disorder. Rule out Malingering. Axis II: Deferred. Axis III: Hypertension. Axis IV: Severity of Psychosocial Stressors: Legal. Axis V: Global Assessment of Functioning:   Current GAF – 20.   Highest Level Last Year – Unknown.

SUMMARY OF CLINICAL COURSE: Mr. Lewis was verbally unresponsive, selective mute and categorically refused to answer any questions on the day of admission. He also refused the initial physical examination. Later the same day, he was observed interacting in a normal manner on the unit.   Several days later, the initial examinations were completed without problem. He eventually explained that he had not felt like speaking on the first day, and therefore simply did not.

Mr. Lewis' hospital course was complicated by his aggressive, assaultive behavior. He was overheard making physical threats and observed taunting and laughing at peers, apparently taking pleasure in embarrassing them.   He was sexually inappropriate, seductive and flirtatious with certain female staff members. He complained of hearing

Cont...

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only -- not to be duplicated PAGE 4
or released to others

DISCHARGE SUMMARY
LEWIS, JIMMY
HOSPITAL #46443

voices sporadically but displayed no evidence of preoccupation with internal stimuli when he believed he was not being observed.

The team psychologist described Mr. Lewis in the following manner in his anger management group: arrogant, disruptive and instigating. While the other older patients tried to have a calming influence, Mr. Lewis displayed no sense of boundaries or respect for authority. The psychologist added that there was nothing odd or bizarre about his behavior that would suggest a psychotic disorder. Other therapists noted that he was disruptive in the group setting, talking out of turn and making obscene comments while watching educational videos. When evaluated by the team, he made it clear that he would rather be at DPC than in jail in order to, "get some help". When asked what help he needed or what we could do for him, he answered he didn't know.

One staff member stated that she found Mr. Lewis to be engaging, intelligent and articulate, but noted his sense of entitlement and his demands that things be done his way. Mr. Lewis stated that he needed to do "outlandish things" to get attention, such as wearing paper horns and wearing his cat's eye lenses. It was explained to him that he would not be allowed to wear his paper horns at any time while at DPC, after he had placed them on his head at one point. He understood, and did not attempt to wear them again. He was noted to attempt to intimidate one female therapist by chasing her in the hallway and stating, "I just want to get my point across that whatever you said about me in team meeting was wrong and derogatory".

On 6/7/04, a special meeting with Mr. Lewis was called to address his grossly inappropriate behavior on the unit the night before. He was angered by not receiving a certain salad at dinner to which he believed he was entitled, and assaulted a peer and a staff member, escalating to the point where he was difficult to redirect. In summary, he was noted to be disruptive in the group setting, to taunt his peers, to intimidate and flirt with therapists and to make obscene comments. There were reports to the contrary by other staff members who reported that Mr. Lewis was cooperative and helpful in the milieu, tending to get loud and demanding at times when he felt his needs were not being met in a timely fashion.

Initially, Mr. Lewis was prescribed no psychotropic medication, as there was no evidence of a mood disorder and no evidence of psychosis. However, Seroquel was begun after it became evident that Mr. Lewis had difficulty managing his anger and controlling his impulses.

Cont...

**00005**

DISCHARGE SUMMARY                                                    PAGE 5
LEWIS, JIMMY
HOSPITAL #46443

CONFIDENTIAL INFORMATION
for professional use by authorize
persons only -- not to be duplicate
or released to others

FINAL CLINICAL DIAGNOSIS:
AXIS I:    MALINGERING.  CODE NO. V65.2
           ALCOHOL ABUSE.  CODE NO. 305.00
           HISTORY OF CONDUCT DISORDER.
AXIS II:   ANTISOCIAL PERSONALITY DISORDER.  CODE NO. 301.7
AXIS III:  HYPERTENSION.  CODE NO. 401.9
AXIS IV:   SEVERITY OF PSYCHOSOCIAL STRESSORS:  INCARCERATION.
AXIS V:    GLOBAL ASSESSMENT OF FUNCTIONING:  CURRENT GAF – 50
           WITH SEVERE IMPAIRMENT IN SOCIAL AND OCCUPATIONAL
           FUNCTIONING.
           HIGHEST LEVEL LAST YEAR – UNKNOWN.

CONDITION ON RELEASE:      Mr. Lewis displayed no evidence of psychosis,
depression or mania.  He was still having difficulty with limit setting and boundaries,
especially with respect to the rights of others.  It was felt that he had not benefited from a
psychiatric admission and had not been engageable in therapies.  He was having no
suicidal and no homicidal ideation and no auditory or visual hallucinations.  He admitted
during the admission that the "voices" he had been hearing were his thoughts.  Mr. Lewis
was considered highly manipulative and he would stop at nothing to obtain his demands.

MEDICATION ON RELEASE:  Seroquel 50 mgs q 12 hours for anger management and
impulse control.  Tenormin 25 mgs q a.m. for hypertension.  Mr. Lewis was on a lactose
intolerance diet  and there were no special restrictions on his physical activity.

PROGNOSIS:  Guarded to poor as Mr. Lewis was considered threatening and dangerous
to others.

RELEASE  NOTE AND AFTERCARE PLAN:   Mr. Lewis was returned to the care of
Department of Corrections with Gerry Greg as a contact person; 995-8614.  Mr. Lewis
needs daytime socialization activities.  Anticipated problems are that he may not be
compliant with clinic appointments, may encounter legal difficulties, may encounter
family problems and may return to using alcohol or drugs.

Sylvia Foster, M.D.
Staff Psychiatrist

Dict. 07/26/04
Typed 07/29/04
SF/gaf

# EXHIBIT "K"

*P. 2*

# Delaware Psychiatric Center
# Forensic Unit
## (Jane E. Mitchell Building)

### Forensic Psychiatric Evaluation

| | | |
|---|---|---|
| Examinee: | Jimmy Lewis | ID #: 0305016966 |

Date of Birth:        25 December 1966 (Current Age: 38)
Examiner:              Sylvia Foster, M.D.
Period of Evaluation:  21 May 2004 - present
Date of Report:        10 June 2004

## REASON FOR EVALUATION:

Mr. Lewis was referred to The Delaware Psychiatric Center (DPC) for forensic psychiatric evaluation by *Motion and Order* of the Honorable Charles H. Toliver, In the Superior Court of the State of Delaware, In and For New Castle County, on 1 December 2003, to determine his competency to stand trial and to obtain treatment for his own well-being.

## NOTIFICATION:

Upon admission to the Forensic Unit, Mr. Lewis was informed that he was being evaluated by Court Order, and that the results of all evaluations performed during this admission would not remain confidential, but would be disseminated to the Court, the prosecution, and his attorney.

## EXAMINER:

Medical Doctor specializing in Psychiatry with Board Certification, sub-specializing in Forensic Psychiatry

## LIST OF CHARGES:

Carjacking 2nd Degree
Theft $1000 or greater
Resisting Arrest

## SOURCES OF INFORMATION:

Face-to-face interview with Mr. Lewis on 21 May 2004 and various times thereafter
        on the Forensic Unit at DPC
Superior Court Criminal Docket

Seven page statement by Mr. Lewis regarding his social and legal history and his account of the crime, undated

Medical Records, Delaware Psychiatric Center, 21 May 2004 – present

Medical Records, First Correctional Medical (FCM), 5 March 2003 – 31 March 2004

Case Charge List

Complaint and Warrant

Exhibit A & B

Charge History Record

Letter from Donald Napolin, LSCW, to The Honorable Charles H. Toliver, 5 May 2004

## CURRENT MEDICATIONS:

Seroquel 50 mg twice daily for anger management and impulse control

Atenolol 25 mg daily for hypertension

## BACKGROUND INFORMATION:

Mr. Lewis was a 38-year-old African American male who presented to the Mitchell Building based on an evaluation by Dr. Joshi, a prison psychiatrist. Dr. Joshi described Mr. Lewis on 27 May 2004 as "psychotic and delusional, a danger to self and others, refusing to take medication." He had assaulted a Correctional Officer, and was transferred to the infirmary. Mr. Lewis was described as saying, "I can't distinguish between right and wrong. I am hearing voices telling me to hurt myself and I'm seeing shadows."

Mr. Lewis had been incarcerated on 17 November 2003 and convicted of Carjacking, Theft and Resisting Arrest. According to the police report, Mr. Lewis was picked up by a male driver who was out looking for a male companion for the evening. Mr. Lewis allegedly attempted to rob the driver, at which point the driver jumped out of the vehicle in fear, and Mr. Lewis drove off with the car. He allegedly resisted arrest when caught, and was identified by the driver as the person who stole his car.

According to FCM records, Mr. Lewis was "flirtatious" at times, and had to be redirected for asking personal questions of the mental health examiner. She confronted his "narcissism and attention-seeking behaviors," and questioned the diagnosis of Schizophrenia that had been given him by the physician. Mr. Lewis refused all medication, requesting only Xanax and Valium (highly addictive drugs of the Benzodiazepine family). He asked for art materials, and pornography, stating that these items would be very helpful. He presented with, "broad mood and good eye contact, with no suicidal, homicidal ideation and no auditory or visual hallucinations." He was frequently argumentative and loud. He was observed wearing "paper horns," saying, that they made him feel more comfortable. "It helps me deal with whatever I'm going through. The horns are like a mask. If I deal with these things within me, I'll be a better person, being unjustly accused." He was also described as calm and controlled. He spoke of hearing voices but stated, "I don't know whether it's voices or just my

thoughts." Mr. Lewis stated later that he wore the paper horns and the cat's eye contact lenses for the "scare" factor.

Not much is known about Mr. Lewis' legal history as he is from out of state. However, he said that he had been in prison for six or seven years in New Jersey, from about 1993 to 2000. He added that he had been sentenced to six years for Robbery, "I pick-pocketed somebody," but his jail time had been prolonged for fighting.

Mr. Lewis had no psychiatric history. He saw a counselor as a child in New Jersey where he grew up. At first he said he didn't remember why, but shortly thereafter remembered that it was because his mother had become involved in a Lesbian relationship. "I didn't approve of it and I voiced my opinion to her, and I started misbehaving. I didn't like the lady and I didn't like the idea of the relationship." He went on to explain, "I might have accepted it if it had been presented to me differently, but I saw this lady actually twist my mother's arm to tell me about the [Lesbian nature of the] relationship. I had thought they were just close friends." Mr. Lewis' mother told the team social worker that he had been attention-seeking as a youth, and that he felt no one ever paid enough attention to him. She said he always felt that whatever someone was doing, they should stop, and attend to his needs. He blamed his mother for his current problems due to her homosexual affair. His parents had separated when Mr. Lewis was two years old, at which time Mr. Lewis' father had gone to live in North Carolina.

Mr. Lewis stated that he had been employed in construction and as a porter. "Whatever job was open, I was doing it." However, he added, "I've been fired more than ten times." The longest job he ever held was three months. "I would always argue, or go in late, and I'd get fired." He admitted to selling drugs off and on. "That's what I had to do to have money. Then I got to selling bootleg CD's and DVD's."

Mr. Lewis dropped out of the tenth grade, but later obtained a GED. He changed that idea later, and said that he had a high school diploma. His mother maintained that he actually had a GED. He said, "She thought wrong." He attended the American Business Institute, but did not stay long, ending up owing them money. He related that he had been attending commercial drivers' school to drive eighteen-wheelers just prior to his incarceration. "It was going to be my first job; Poland Springs was going to hire me."

Mr. Lewis stated that he been shot by a police officer ten years ago, with gunshot wounds to the left hip and left arm. He had history of hypertension for which he was being medicated, and history of kidney infection. He had no other significant medical or surgical history.

Mr. Lewis had never married, stating, "Every time I get into a relationship, we always argue." He was with one girlfriend off and on for eight years.

Mr. Lewis reported that he began drinking alcohol in his teens, with his last use just prior to incarceration. He had history of blackouts, but did not elaborate. He denied heavy

use. He also admitted to smoking marijuana sixteen years ago, but denied all other illicit drug use. It was considered probable that he was minimizing his addiction issues

## HOSPITAL COURSE:

Mr. Lewis became verbally unresponsive, selectively mute, and categorically refused to answer any questions on the day of admission. He also refused the initial physical examination. Later the same day, Mr. Lewis was observed interacting in a normal manner on the unit. Several days later, the initial examinations were completed without problem. He eventually explained that he had not felt like speaking on the first day.

Mr. Lewis' hospital course has been complicated by his aggressive, assaultive behavior. He was overheard making physical threats, observed taunting and laughing at his peers, taking pleasure in embarrassing them, and was                    . He complained of hearing voices sporadically but displayed no evidence of preoccupation with internal stimuli when he believed he was not being observed.

The team psychologist described Mr. Lewis in the following manner in the anger management group: arrogant, disruptive and instigating. While the other older patients tried to have a calming influence, Mr. Lewis displayed no sense of boundaries or respect for authority. She added that there was nothing odd or bizarre about his behavior that would suggest a psychotic disorder. Other therapists noted that he was disruptive in the group setting, talking out of turn, and making obscene comments while watching educational videos. When evaluated by the team, he made it clear that he would rather be at DPC rather than in jail in order to "get some help." When asked what help he needed, or what we could do for him, he answered he didn't know.

One staff member stated that she found Mr. Lewis to be engaging, intelligent and articulate, but noted his sense of entitlement, and his demand that things be done his way. Mr. Lewis stated that he needs to do "outlandish things" to get attention, such as wearing paper horns and wearing his cat's eye lenses. It was explained to him that he would not be allowed to wear his paper horns at any time while at DPC, after he placed them on his head at one point. He understood, and did not attempt to wear them again. He was noted to attempt to intimidate one female therapist by facing her in the hallway and stating, "I just want to get my point across that whatever you said about me in team meeting was wrong and derogatory."

On 6/7/04, a special meeting with Mr. Lewis was called to address his grossly inappropriate behavior on the unit the night before. He was angered by not receiving a certain salad at dinner to which he believed he was entitled, and assaulted a peer and a staff member, escalating to the point where he was difficult to redirect. In summary, he was noted to be disruptive in the group setting, to taunt his peers, to intimidate and flirt with therapists, and to make obscene comments. There were reports to the contrary by other staff members who reported that Mr. Lewis was cooperative and helpful in the milieu, tending to get loud and demanding at times when he felt his needs were not being met in a timely fashion.

Forensic Psychiatric Evaluation: Jimmy Lewis                    10 June 2004, Page 5 of 6

Initially, Mr. Lewis was prescribed no psychotropic medication, as there was no evidence of a mood disorder, and no evidence of psychosis. However, Seroquel was begun after it became evident that Mr. Lewis had difficulty managing his anger, and controlling his impulses.

## CURRENT MENTAL STATUS EXAM:

Mr. Lewis presented with shaved head, and was appropriately dressed. He was cooperative, and able to sit quietly for the examination with no abnormal motor activity. His speech was normal in rate, tone and volume, and there was no evidence of loud, pressured speech. He stated that his mood was "sensitive, and easily irritated." His affect was full range. His thought processes, assessed by the verbalizations of his thoughts and feelings, were goal directed; there was no evidence of loosening of associations or tangentiality. His thought content displayed no delusions. He was not thinking about suicide, although he maintained that he had been thinking about it. "But I don't really want to do it." He was not thinking about hurting others, and stated, "I'm not on the defensive unless there's a reason." He denied obsessions, compulsions, racing thoughts, paranoia, delusions, special powers, hyper-religiosity, and grandiosity. His cognitive functions were intact grossly. His insight and judgment were considered intact.

## COMPETENCY ASSESSMENT:

Mr. Lewis was presented the questions to the McGarry Criteria as cited in State of Delaware v. Joseph A. Shields, 593 A.2nd, 986 (Del. Super. 1990), p. 1000. Based upon the present examination, Mr. Lewis demonstrated that he does have sufficient present capacity to consult with an attorney with a reasonable degree of rational understanding of court procedures. He is fully able to understand the nature of the proceedings against him, to give evidence in his own defense and to instruct counsel on his behalf.

It should be noted that Mr. Lewis handed out a highly articulate, well-written explanation of his actions on the day of the alleged crime. It reveals a high level of education and intelligence, and highlights his excellent ability to give evidence in his own defense and to instruct counsel on his behalf.

## DIAGNOSIS:[1]

| | |
|---|---|
| Axis I: | Malingering; Alcohol Abuse; History of Conduct Disorder |
| Axis II: | Antisocial Personality Disorder |
| Axis III: | Hypertension |
| Axis IV: | Psychosocial and Environmental Problems: Incarceration |
| Axis V: | Global Assessment of Functioning (GAF) Scale (1 – 100): 50 |
| | Serious impairment in social and occupational functioning |

---

[1] American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000.

OPINION:

The opinions expressed in this report are held with a reasonable degree of medical certainty, and are based upon the direct examination of Mr. Lewis, the observations reported by staff and therapists on the Forensic Unit, and the previous reports and records available for review. These opinions are subject to change if additional information or records become available.

Assessment:

The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as getting out of prison into a psychiatric unit. Malingering should be strongly suspected in the presence of Antisocial Personality Disorder.

Mr. Lewis demonstrated no evidence of a mood disorder or psychosis during his admission to DPC, and it is not likely that he ever had Schizophrenia or any other chronic psychotic disorder.

SUMMARY OF OPINIONS AND RECOMMENDATIONS:

1.    Mr. Lewis is psychiatrically stable and can be returned to prison.

2.    It is my opinion that Mr. Lewis is competent to stand trial.

3.    It is my opinion that, as in the case of many people with Antisocial Personality Disorder, Mr. Lewis may need to remain on his medication to help with anger management and impulse control

4.    Any threats made by Mr. Lewis to harm himself or others should be taken seriously as he is highly manipulative and will stop at little to obtain his goals.

Sylvia Foster, M.D.
Forensic Psychiatrist

# EXHIBIT "L"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS,                          )
                                       )
           Plaintiff,          )          C.A. No.: 04-1350 (GMS)
                                       )
      v.                         )
                                       )
SYLVIA FOSTER, LANCE SAGERS,           )
DAVE MOFFITT, R. GRAY,                 )
MR. JOHNSON, JOHN JOE,                 )
                                       )
           Defendants.         )

### AFFIDAVIT OF DR. SYLVIA FOSTER

STATE OF DELAWARE          :
                           :     SS.
NEW CASTLE COUNTY          :


1.     I, Sylvia Foster, M.D., am a Board Certified psychiatrist. I was the Chief Forensic Psychiatrist for the Delaware Psychiatric Center, at the Mitchell Building, during the time the plaintiff, Jimmie Lewis, was there, specifically between May 21, 2004 and June 25, 2004.

2.     I was responsible for examining and monitoring the plaintiff, Jimmie Lewis, during his stay at the Mitchell Building of the Delaware Psychiatric Center.

3.     As part of the evaluation, an examination was conducted upon arrival at the facility in which Mr. Lewis' treatment and procedures were explained.

4.     Following the initial evaluation, Mr. Lewis exhibited instances of aggression, agitation and inappropriate behavior toward staff and patients at the facility. The nature of these incidents are documented within the daily reports for the facility.

5.     Pursuant to the procedures for the Delaware Psychiatric Center, Mr. Lewis was placed in seclusion and in four (4) point restraints in an effort to alleviate the conditions which were disrupting the facility.

6.     Mr. Lewis was placed in these restraints and seclusion within the purview of the Delaware Psychiatric Center Policy and Procedure Directive for such activities. A copy of the procedure is attached hereto as Exhibit "1".

7.    Mr. Lewis was also injected with medications during his stay at the Delaware Psychiatric Center, which were in addition to the seclusion and restraints utilized. The use of these medications was to assist in the maintenance of safety and security in the facility.

8.    The use of the following medications, Seroquel, Ativan, Geodon, and Benadryl, were for the purpose of calming Mr. Lewis during periods of agitation. These medication are used on an as needed basis to calm an severely agitated and/or aggressive patient. The use of these medications is accepted in the psychiatric community for use to calm an individual during a period of severe agitation and/or increased aggression.

9.    The use of medications in situations of increased aggression and severe agitation is part of an overall procedure to assist in maintaining the safety of not only the specific patient, but other patients and staff at the facility. The use of the medications is permitted to be refused by a patient, except in emergency situations in which the need for the use is warranted for the safety of all parties involved to prevent physical harm to self or others.

10.   Each of the occasions in which Mr. Lewis received injections of medication were following emergency incidents in which Mr. Lewis had displayed increased aggression and severe agitation. In some cases, the increased aggression resulted in assaults on staff and fellow patients in the facility.

11.   The decision to have the medications available on a PRN, or as needed basis, is part of the standard admission orders for patients admitted to the Mitchell Building. Admission orders for Mr. Lewis included this standard order of PRN medication.

12.   Throughout the time of Mr. Lewis' stay, he did not exhibit any adverse symptoms as a result of the injection of these medications.

13.   I made a decision upon the arrival of Mr. Lewis to the Delaware Psychiatric Center that PRN medications would be available, and administered by staff of the Delaware Psychiatric Center, in emergency situations. Those emergency situations would include increased aggression and/or severe agitation displayed by the patient. The use of these medications would be for the preservation of the security of the facility and the maintaining of the safety of Mr. Lewis, fellow patients and staff.

Sylvia Foster, M.D.

SWORN TO AND SUBSCRIBED before me the day and year aforesaid.

State of _Delaware_
County of _New Castle_

Notary Public

This instrument was acknowledged before me on _26_ day of _march_ by _2008_

Notary Public's Signature
My Commission Expires _7/8/08_



**DELAWARE PSYCHIATRIC CENTER
POLICY AND PROCEDURE DIRECTIVE**

**Division of Alcoholism, Drug Abuse and Mental Health
Delaware Health and Social Services**

| FUNCTION | REVISION/REVIEW DATES | |
|---|---|---|
| CARE OF PATIENTS | June 14, 1990 June 5, 1991 June 22, 1992 June 2, 1993 June 29, 1995 | June 12, 2001 (revised) August 27, 2002 (revised) |
| **SUBJECT**        **PAGE 1 OF 14** SECLUSION OR RESTRAINT | September 20, 1996 May 9, 1997 | |
| **POLICY NUMBER**             **TX 1** | July 7, 1997 July 1, 1998 (revised) | |
| **EFFECTIVE DATE**     **June 8, 1989** | August 21, 1998 (revised) December 21, 2000 (revised) | |
| **APPROVED**                  **DATE** | April 20, 2001 (revised) | |

**DISCIPLINES INVOLVED:** ___Dietary ___Finance/Acct.Business ___Housekeeping ___Maintenance _X_ Medical _X_ Nursing ___Personnel ___Pharmacy ___Psychology ___Rehab Services ___Risk Management ___Security ___Social Work ___Training
Other: Utilization Review, PI Dept.

**PURPOSE:**

This policy describes the procedures to be followed whenever the use of seclusion or restraint is required for those situations with adequate, appropriate clinical justification based on the patient's assessed needs and when less restrictive alternatives have been considered and used.

**STANDARDS:**

Seclusion or restraints are used ONLY in emergency situations where there appears to be imminent danger to the patient or others. An emergency exists when less restrictive measures have not been effective or cannot be initiated and the exhibited behavior continues to be dangerous to self or others. Seclusion and restraint are never ordered simultaneously nor ordered on a PRN basis.

Patients are assisted and monitored during the use of seclusion or restraint to provide for the patient's well being and to minimize the length of the intervention. A debriefing involving the patient and staff occurs after each intervention. Delaware Psychiatric Center staff communicate the hospital's policy on the use of seclusion and restraints to patients and/or their families upon admission as appropriate. Clinical leadership is notified when a patient experiences prolonged

1

or multiple episodes of seclusion or restraint. Data is aggregated on the use of seclusion or restraint in order to monitor risk and improve performance.

**NOTE:** Due to the potential to produce serious consequences including physical injury, psychological harm and negative social effects, seclusion or restraint is never used as a convenience for staff, a threat used to control a patient's behavior or as a punishment to the patient.

## DEFINITIONS:

QUIET ROOM/TIME OUT – The voluntary separation of a patient in a room from which the individual has a means of leaving and may leave. Quiet room/time out refers to a situation in which a patient willingly goes alone into a room that is left unlocked.

SECLUSION – The involuntary isolation of a patient in a room from which the individual has no means of leaving. If the patient has no means of leaving an area but has the ability to voluntarily move limbs, body, and head, the patient is considered to be in seclusion.

RESTRAINT – The use of a physical or mechanical device to involuntarily restrict the movement of the patient's limbs, head, or body. Restraint includes the use of physical force and/or mechanical devices (leather restraints or other hospital-approved restraints) as a means to control physical activities/movement to protect the patient or others from injury.

FOUR POINT RESTRAINTS – The use of leather bracelets or other hospital-approved restraints to restrict the movement of a patient's limbs. The bracelets are attached by means of a belt to a bed frame so that the patient is maintained in a supine position.

FIVE POINT RESTRAINTS – The use of a soft belt when the four limbs are restrained on a highly agitate, aggressive or combative patient who is "bucking" uncontrollably in bed. The soft belt may be utilized on the mid-trunk area and the straps are secured to the bed frame.

## PROCEDURES:

I.    INITIATION OF SECLUSION OR RESTRAINT (The following procedures take place almost simultaneously)

    A.    When a patient's behavior has not responded to less restrictive alternatives, and the use of seclusion or restraint is being considered, the Nursing staff checks the patient's medical record (Physical, Psychiatric Assessment) for any history of pre-existing medical conditions, physical disabilities, and sexual or physical abuse.

2

**NOTE**: In an emergency situation, it may not be possible to review the patient's medical record prior to the initiation of seclusion or restraint; however, staff should become familiar with the patient's history after initiating the intervention and communicate relevant information to appropriate staff.

B.    In a psychiatric emergency, in the absence of a Physician on the unit, the Licensed Nurse may initiate seclusion or restraint.

C.    A Licensed Nursing staff informs the patient, calmly and concretely, that he/she is being placed in seclusion or restraints and the reason that such intervention is necessary. An attempt is also made to elicit the patient's cooperation with the intervention.

D.    Nursing staff ensure that the environment is safe and secure by:

1.    Removing all bed linens and pillows if the decision has been made to place the patient in seclusion.

2.    Ensuring that a flame-retardant sheet is over the mattress for the patient being restrained.

3.    Checking the patient's pockets for sharps and other dangerous items and removing them along with the patient's money, belt, shoes, matches, jewelry and eyeglasses. Objects that are removed from the patient are **itemized** on the *Seclusion or Restraint Nursing Assessment* form. The items are safely stored and returned to the patient upon termination of seclusion or restraint. Contraband items are handled in accordance with the contraband policy.

E.    The Licensed Nursing staff also:

1.    informs the patient of the behavior expected in order for the seclusion or restraint to be terminated.

2.    assigns a staff member to monitor the patient in seclusion or remain with the patient in restraints.

3.    completes the *Seclusion or Restraint Nursing Assessment* form:

a.    specifics should be documented when "Imminent risk of harm," "Self-injurious behaviors, " or "Other" is checked under PATIENT BEHAVIOR LEADING TO INTERVENTION. Who was at risk and what the risk was should be noted as applicable.

3

b.    if "Emergency situation precluded the use of less restrictive alternatives" is checked, an explanation is required.

c.    objects removed from the patient are **itemized** on this form and kept together in an inter-office envelope that is labeled with the patient's name. Money is counted and witnessed by another staff. The money is placed in a white envelope and signed by both staff. The white envelope is placed inside the inter-office envelope which is secured in the medication room until the patient is removed from the intervention.

d.    physiological or psychological risk factors that are present in the patient's medical record (i.e., H&P, psychiatric assessment) are noted on this form and communicated to the Physician who is being contacted for the order. Staff are directed to be sensitive to and observant of any behaviors that may be related to pre-existing medical conditions, physical disabilities, history of sexual or physical abuse.

e.    family notification occurs and is documented after the Licensed Nursing Staff reviews the Advance Directive Query form (located in the Advance Directive section of the chart) to see if the patient wants his/her family notified, and whether the family wishes to be notified in the event of a seclusion or restraint episode. The Licensed Nurse notifies the family unless the patient has indicated that family notification should not occur. If the family indicates upon notification that they do not wish to be contacted or prefers to be notified at a specified time, the Licensed Nursing Staff notes this in Section III of the Advance Directive Query form.

4.    completes and signs the first page of the Seclusion or Restraint Record sheet.

5.    **promptly** notifies the Physician and receives an order for the use of the intervention.

6.    notifies the Nursing Supervisor immediately of all episodes of seclusion or restraint.

F.    The Nursing Supervisor monitors the intervention by checking the patient in person and assessing if there are any interventions that can be offered to the staff to shorten the duration of the intervention.

4

G.  The Physician writes/gives an order for the seclusion or restraints which must include the following:

   1.  type of intervention (i.e., seclusion, four point restraints, five point restraints)

   2.  reason for and/or purpose of the intervention

   3.  maximum duration of the intervention (note: initial maximum duration and subsequent renewals are **not to exceed 2 hours**)

   4.  endpoint criterion

H.  The Physician, after personally examining the patient **within one hour** after the initiation of the intervention, utilizes the Seclusion/Restraint stamp or writes a progress note which must include the following:

   1.  type of intervention (i.e., seclusion, four point restraints, five point restraints)

   2.  reason for and/or purpose of the intervention

   3.  other less restrictive alternatives attempted as appropriate (include the source of the information if Physician was not present at the time of initiation)

   4.  maximum duration of the intervention (note: initial maximum duration and subsequent renewals are **not to exceed 2 hours**)

   5.  endpoint criterion

I.  The Physician signs and dates the order and the progress note at the time that he/she assesses the patient **within one hour** after the initiation of the intervention.

J.  If the patient regains control and is released from seclusion or restraints before the Physician arrives, the Physician must still see the patient face-to-face and perform the assessment **within one hour**. The assessment includes:

   1.  an assessment of the incident/situation that led to the intervention

5

2.    the physiological and psychological condition of the patient at the time of the assessment

3.    whether there is a continued need for the intervention

4.    what the root cause of the incident was

5.    whether the intervention was appropriate

K.    When the seclusion or restraint intervention is terminated before the time-limited order expires, that original order can be used to reapply the restraint or seclusion if the individual is at imminent risk of physically harming himself or herself or others, and non-physical interventions are not effective.

L.    If the seclusion or restraint intervention is renewed after two (2) hours, another order must be obtained from the Physician and the Physician must reevaluate the patient in person and write another progress note (refer to I.G. and I.H. above). The Physician reevaluates the efficacy of the patient's treatment plan and works with the individual to identify ways to help him or her regain control.

II.    MONITORING OF PATIENTS DURING SECLUSION OR RESTRAINT

A.    Patients in restraints are monitored via 1:1 observation. Patients in seclusion are monitored through *continuous* visual observation. Staff who monitor patients in seclusion are physically stationed directly outside the seclusion room door.

B.    All patients are assessed at least every fifteen (15) minutes or more frequently if clinically indicated. All attempts are made to assess the secluded patient in person, depending on his/her clinical status. In cases where the secluded patient is in crisis without behavioral control and is threatening harm to others, assessment and monitoring may be accomplished by constantly observing and communicating with the patient through the observation window. If the patient is engaging in behavior that is self-injurious or refuses to move into the line of sight, the door is unlocked under the direction of the Licensed Nursing staff and a minimum of two (2) staff must be present to enter the room.

C.    The staff member assigned to observe the patient in seclusion or restraint explains that he or she will be available as needed to provide for fluids, toileting, or other needs of the patient. Any requests for such needs are to be met promptly. Intake and toileting are to be documented when they occur on the Seclusion or Restraint Record sheet. At all times, the staff must be cognizant of the patient's right to privacy and respectful care that maintains his

6

or her dignity.

III.  ASSESSING AND ASSISTING THE PATIENT IN SECLUSION OR RESTRAINTS

A.  Nursing staff utilize a *Seclusion or Restraint Record* sheet for each occurrence of seclusion or restraints (see attached). **Beginning at the time of the initiation of the intervention**, the assigned staff member documents every 15 minutes on the *Seclusion or Restraint Record* sheet the observed behaviors of the patient along with any needs provided during the intervention. These assessments include:

1.  Vital signs (blood pressure, pulse, respiration) and interpreting their relevance to the physical safety of the patient in restraint or seclusion. (NOTE: When this is not possible due to the patient's behavior, documentation to this effect is required.)

2.  Recognizing nutritional/hydration needs. (NOTE: Meals are restricted to finger foods [no utensils] and the patient is observed continuously while he/she is eating. The Licensed Nursing staff removes one arm restraint to allow the patient in restraints to eat in a semi-sitting position. When this is not possible due to the patient's behavior or refusal, a liquid nutritional supplement can be provided and documented.)

3.  Checking circulation and skin integrity.

4.  Checking range of motion in the extremities by a Licensed Nursing Staff. (NOTE: The process of removal and if necessary reapplication is done on one limb at a time. When this is not possible due to the patient's behavior, documentation to this effect must be made in the "Nursing Assessment" section.)

5.  Addressing hygiene and elimination. (NOTE: The patient in restraints is offered the use of a urinal or bedpan.)

6.  Addressing physical and psychological status and comfort by talking with the patient and addressing complaints of discomfort or distress.

7.  Assisting patients in meeting behavior criteria for the discontinuation of restraint or seclusion.

8.  Recognizing readiness for the discontinuation of restraint or

7

seclusion and communicating this readiness to the Licensed Nursing staff.

9.   Recognizing when to contact Licensed Nursing staff who will contact the Attending Physician or MOD in order to evaluate and/or treat the patient's physical status.

B.   Staff utilize the "Comments" section to elaborate on all areas of assessment that require further clarification so that the patient's condition and needs and services provided are clearly described.

C.   Clinical leadership (Director of Nursing, Medical Director, and Director of Professional Services) are informed on the next regular work day of instances in which patients experience extended, or multiple episodes of restraint or seclusion to include the following:

1.   any instance in which a patient remains in seclusion or restraint for more that 12 hours.

2.   two (2) or more separate episodes of seclusion and/or restraint of any duration within 12 hours.

3.   If either of the above conditions continue, the leadership is notified every 24 hours.

D.   This information is reviewed to assess whether additional resources are required to facilitate discontinuation of seclusion or restraint and to minimize recurrent instances.

IV.   TERMINATION OF INTERVENTION

A.   In addition to the Q15 monitoring by Nursing Attendants, a Licensed Nursing staff assesses the status of the patient's condition every hour and documents this assessment on the Seclusion or Restraint Record.

B.   The Licensed Nursing staff directs the removal of the restraints, assessing the patient's response at the removal of each. If a fifth restraint has been used, it should be removed first. Four point restraints are removed by the following method: four point to three point, three point to two point, and the last two restraints are removed simultaneously (one point restraint is never utilized).

C.   If at any time during the restraint removal process, the patient's response is negative, full restraints are re-applied.

D.   Once seclusion or restraints have been terminated, the Licensed Nursing staff debriefs the patient regarding the intervention and completes the Seclusion/Restraint Patient Feedback form prior to

8

seclusion and communicating this readiness to the Licensed Nursing staff.

9.    Recognizing when to contact Licensed Nursing staff who will contact the Attending Physician or MOD in order to evaluate and/or treat the patient's physical status.

B.    Staff utilize the "Comments" section to elaborate on all areas of assessment that require further clarification so that the patient's condition and needs and services provided are clearly described.

C.    Clinical leadership (Director of Nursing, Medical Director, and Director of Professional Services) are informed on the next regular work day of instances in which patients experience extended, or multiple episodes of restraint or seclusion to include the following:

1.    any instance in which a patient remains in seclusion or restraint for more that 12 hours.

2.    two (2) or more separate episodes of seclusion and/or restraint of any duration within 12 hours.

3.    If either of the above conditions continue, the leadership is notified every 24 hours.

D.    This information is reviewed to assess whether additional resources are required to facilitate discontinuation of seclusion or restraint and to minimize recurrent instances.

IV.    TERMINATION OF INTERVENTION

A.    In addition to the Q15 monitoring by Nursing Attendants, a Licensed Nursing staff assesses the status of the patient's condition every hour and documents this assessment on the Seclusion or Restraint Record.

B.    The Licensed Nursing staff directs the removal of the restraints, assessing the patient's response at the removal of each. If a fifth restraint has been used, it should be removed first. Four point restraints are removed by the following method: four point to three point, three point to two point, and the last two restraints are removed simultaneously (one point restraint is never utilized).

C.    If at any time during the restraint removal process, the patient's response is negative, full restraints are re-applied.

D.    Once seclusion or restraints have been terminated, the Licensed Nursing staff debriefs the patient regarding the intervention and completes the Seclusion/Restraint Patient Feedback form prior to

8

returning the patient to the unit milieu. If completing the Patient Feedback questionnaire is contraindicated immediately after the event, the questionnaire is completed by a member of the Treatment Team within 24 hours. Counseling is provided for any trauma that may have resulted from the incident. A copy of the Patient Feedback form is forwarded to the Performance Improvement Department where it is incorporated into performance improvement activities. The original form is attached to the seclusion/restraint paperwork and filed in the patient's medical record. This information is used by the Treatment Team to incorporate the patient's feedback into his/her treatment plan.

E.    The Unit Nursing Supervisor or Unit Director reviews all episodes of seclusion or restraint for completeness of the required documentation. The Unit Nursing Supervisor or Unit Director signs, dates, and times the reviewed documentation forms. The Unit Nursing Supervisor or Unit Director ensures that the original documentation remains in the medical record and a copy is forwarded to the Performance Improvement Department.

V.    FOLLOW-UP

A.    All cases of seclusion or restraints are reviewed at each scheduled meeting of the Treatment Team. Recurring issues leading to seclusion or restraint must be addressed on the patient's treatment plan. The discussion and documentation may include (but are not limited to) changing the clinical plan for treatment, other less restrictive alternatives and changing the dose or type of medication prescribed for the patient.

B.    The Treatment Team identifies and explains to the patient the behavior that leads to seclusion or restraints and the requirements for terminating seclusion or restraints. The Treatment Team uses the information contained in the Seclusion/Restraint Patient Feedback form at the first Treatment Team meeting after the seclusion or restraint incident.

C.    The Treatment Team refers to and reviews page 1 of the Advance Directive Query form to ensure that the patient's suggested strategies for dealing with crises have been considered in the less restrictive alternatives attempted by staff. The Treatment Team documents any new information received from the patient on the Advance Directive Query form for future use.

D.    The seclusion or restraints issues identified on a patient's treatment plan must be reviewed during the regularly scheduled patient treatment plan review.

9

VI.  PERFORMANCE IMPROVEMENT

   A.  The following data is collected on each episode of seclusion or restraint:

      1.  shift
      2.  staff who initiated the intervention
      3.  length of each episode
      4.  date and time each episode was initiated
      5.  day of the week each episode was initiated
      6.  type of restraint used
      7.  whether injuries were sustained by patient or staff
      8.  age and gender of patient

   B.  The Performance Improvement Department monitors each episode and ensures that seclusion/restraint are used only as emergency interventions and pays particular attention to multiple instances of seclusion or restraint experienced by a patient within a 12 hour time frame and events that extend beyond 12 consecutive hours.

   C.  This data is aggregated on a monthly basis and any issues related to the use of seclusion/restraint are discussed with appropriate staff in order to identify opportunities for incrementally improving the rate and safety of restraint and seclusion use and the need to redesign care processes.

   D.  The Performance Improvement Department makes regular reports to the Quality Council regarding its recommendations for improvement.

10

# EXHIBIT "M"

**DEPARTMENT OF HEALTH AND SOCIAL SERVICES**
**DIVISION OF SUBSTANCE ABUSE AND MENTAL HEALTH**
**DELAWARE PSYCHIATRIC CENTER**

**PROGRESS NOTES**
(Continued)

LEWIS, JINNY          12/25/66
46443 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 UNK M AF U
4 EDWIN PLACE NEWARK NJ 07112
NELBA JEAN LEWIS MOTH AREA 5
(XXX) 481-5028      05/21/2004

CONFIDENTIAL INFORMATION
for professional use by authorized
persons only — not to be duplicated
or released

| DATE | TIME | OBSERVATION, ACTION, OR POSSIBLE SOLUTION |
|------|------|-------------------------------------------|
| 6/15/04 | 5 pm | Addendum — Psychiatric |

PT c/o receiving PRN's when he's "not psychotic." I explained that we give PRN medication that include Haldol, Geodon, Benadryl + Ativan to patients who are escalating, becoming more + more aggressive + argumentative + confrontational in order to keep help that pt calm down. I reminded him that I had explained the current use of the PRN medication to protect the other pts and the staff from a violent pt, + that he would only receive a PRN if his behavior warranted it — that is — if he were escalating to the point of refusing all verbal redirection + all other less restrictive means of calming him down. His history continued to c/o having received a PRN med over the last few days when he didn't need it + we reiterated that it was the RN's decision at the time that he did need it for the protection and safety of the milieu. No c/o side effects to Risperdal — Continue to give PRN medication if necessary.
— Stuart

noted/cont'd by 6/30/04 [Pt has no further psychological complaint]
Stuart

TP-12A (Rev. 12/01)                                Document Control No.: 35 06 30 85 05 17

# EXHIBIT "N"

**BRONWYN ANGLIN, Plaintiff, v. CITY OF ASPEN, COLORADO, a municipality, LOREN RYERSON, CHIEF OF POLICE, in his official and individual capacity, ASPEN POLICE OFFICER MELINDA CALVANO, in her official and individual capacity, ASPEN POLICE OFFICER DAN DAVIS, in his official and individual capacity, PITKIN COUNTY COMMISSIONERS, in their official and individual capacities, PITKIN COUNTY SHERIFF ROBERT BRAUDIS, in his official and individual capacity, PITKIN COUNTY DEPUTY SHERIFF WALT GEISTER, in his official and individual capacity, DOCTOR CHRIS MARTINEZ, Defendants.**

Civil Action No. 06-cv-01592-EWN-KLM

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

*2008 U.S. Dist. LEXIS 16137*

**February 29, 2008, Decided
February 29, 2008, Filed**

**COUNSEL:** [*1] For Bronwyn Anglin, Plaintiff: David Arthur Lane, LEAD ATTORNEY, Elisabeth Hunt White, Killmer, Lane & Newman, LLP, Denver, CO.

For City of Aspen, Colorado, a municipality, Loren Ryerson, Chief of Police, in his official capacity, Loren (I) Ryerson, in his individual capacity, Dan Davis, Aspen Police Officer, in his official capacity, Dan (I) Davis, in his individual capacity, Defendants: Andrew Joseph Fisher, LEAD ATTORNEY, Marni L. Nathan Kloster, Nathan, Bremer, Dumm & Myers, PC, Denver, CO.

For Melinda Calvano, Aspen Police Officer, in her official capacity, Melinda (I) Calvano, in her individual capacity, Defendants: Eric Michael Ziporin, LEAD ATTORNEY, Senter Goldfarb & Rice, LLC, Denver, CO.

For Walt (I) Geister, in his individual capacity, Defendant: Melanie Bailey Lewis, LEAD ATTORNEY, Josh Adam Marks, Berg Hill Greenleaf & Ruscitti, LLP, Boulder, CO.

**JUDGES:** EDWARD W. NOTTINGHAM, Chief United States District Judge.

**OPINION BY:** EDWARD W. NOTTINGHAM

**OPINION**

**ORDER AND MEMORANDUM OF DECISION**

This is a civil rights case in which Plaintiff Brownyn Anglin alleges Defendants violated her rights to due process and free speech, as well as her right to be free from unreasonable seizure, by forcibly injecting her with [*2] antipsychotic medication while in custody at the Pitkin County Jail. This matter is before the court on "Defendants Pitkin County Commissioners, Robert Braudis, and Walt Geister's Brief in Support of Motion for Summary Judgment," filed April 11, 2007. Two other summary judgment motions are currently pending before the court in this case. The instant motion is brought solely by the Defendants associated with Pitkin County, which include Piktin County Commissioners, Pitkin County Sheriff Robert Braudis, and Pitkin County Deputy Sheriff Walt Geister (hereinafter collectively "County Defendants"). Jurisdiction is premised upon the existence of a federal question pursuant to *28 U.S.C. §§ 1331* and *1343*.

**FACTS**

*1. Factual Background*

On the evening of December 11, 2004, Plaintiff and her four-year-old daughter attended a dinner party at the apartment of her friend, Amber Nespeca. (Defs. Pitkin County Comm'rs, Robert Braudis, and Walt Geister's Br. in Supp. of Mot. for Summ. J. [hereinafter "Defs.' Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] P 1 [filed Apr. 11, 2007]; *admitted at* Resp. to Pitkin County Defs.' Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Resp. to Statement [*3] of Undisputed Material Facts [hereinafter "RSOF"] P 1 [filed June 14, 2007].) Kevin Dunkleburg, Ms. Nespeca's boyfriend, also attended the party. (*Id.,* SOF P 2; *admitted at* Pl.'s Resp., RSOF P 2.) During the party, Ms. Nespeca and Mr. Dunkleburg became embroiled in an argument, and Plaintiff witnessed Mr. Dunkleburg hitting Ms. Nespeca. (*Id.,* SOF P 3-4; *admitted at* Pl.'s Resp., RSOF PP 3-4.) Out of concern for Ms. Nespeca, Plaintiff called 9-1-1, and Defendants Aspen Valley Police Officers Melinda Calvano and Ron Fabrocini, as well as Officer Dan Davis were dispatched to the scene. (*Id.,* SOF PP 4-5; *admitted at* Pl.'s Resp., RSOF PP 4-5.) Upon arrival, the police arrested Ms. Nespeca. (*Id.,* SOF P 6; *admitted at* Pl.'s Resp., RSOF P 6.) Plaintiff was shocked at Ms. Nespeca's arrest, because she thought Mr. Dunkleburg should have been arrested instead. (*Id.*)

Ms. Nespeca was then taken to Pitkin County Jail. (*Id.,* SOF P 8; *admitted at* Pl.'s Resp., RSOF P 8.) At around 1:00 A.M., Plaintiff arrived at the jail in an effort to secure Ms. Nespeca's release. (*Id.,* SOF P 10; *admitted at* Pl.'s Resp., RSOF P [*4] 10.) Defendant Deputy Walt Geister, who was working at the jail teller window when Plaintiff arrived, informed her that Ms. Nespeca would need to post a $ 250 bond in order to be released. (*Id.,* SOF PP 9-10; *admitted at* Pl.'s Resp., RSOF PP 9-10.) Deputy Geister then allowed Ms. Nespeca to come to the teller window to give Plaintiff her ATM card and PIN number so that Plaintiff could obtain sufficient funds to bond Ms. Nespeca out of jail. (*Id.,* SOF P 11; *admitted at* Pl.'s Resp., RSOF P 11.) Plaintiff left the jail and returned a short time later with the funds. (*Id.,* SOF P 12; *admitted at* Pl.'s Resp., RSOF P 12.) When Plaintiff arrived, Officer Fabrocini was in the booking room with Deputy Geister. (*Id.,* SOF P 14; *admitted at* Pl.'s Resp., RSOF P 14.) When Officer Fabrocini saw Plaintiff enter the jail, he told Deputy Geister that Plaintiff had been present when Ms. Nespeca was arrested and that the only reason she had not also been arrested for interfering with Ms. Nespeca's arrest was because Plaintiff's young daughter was present with her at the time. (*Id.,* SOF P 14; *admitted at* Pl.'s Resp., RSOF P 14.) Further, Officer Fabrocini stated that Plaintiff was not a sober, [*5] party. (*Id.*) Deputy Geister then told Plaintiff that she could leave the bond money but that he had been informed by the police officers that she was not a sober, responsible party due to her actions at the arrest scene. (*Id.,* SOF P 15; *admitted at* Pl.'s Resp., RSOF P 15.)

Plaintiff then went to the jail lobby and called 9-1-1 from her mobile phone in an attempt to get a county sheriff to help her bond Ms. Nespeca out of jail. (*Id.,* SOF P 17; *admitted in relevant part at* Pl.'s Resp., RSOF P 17; *see also* Pl.'s Resp., Ex. 1 at 5-6 [Pl. Dep.].) Plaintiff was unsure how to reach a county sheriff at that time of night other than by calling 9-1-1. (Pl.'s Resp., Statement of Additional Disputed or Undisputed Facts [hereinafter "SAF"] P 1; *admitted at* Pitkin County Defs.' Reply in Supp. of Mot. for Summ. J [hereinafter "Defs.' Reply"], Resp. Concerning Disputed Facts [hereinafter "RSAF"] P 1 [filed July 9, 2007].) After being put on hold for what Plaintiff believed to be approximately two minutes, she thought the dispatcher had lost the call; so, she hung up and called 9-1-1 a second time. (Defs.' Br., SOF PP 17-18; *admitted in relevant part at* Pl.'s Resp., RSOF PP 17-18; *see also* Pl.'s Resp., [*6] Ex. 1 at 5 [Pl.'s Dep.].) Again, the dispatcher placed Plaintiff on hold for approximately two minutes, and, again, Plaintiff hung up and called 9-1-1. (Defs.' Br., SOF P 18; *admitted at* Pl.'s Resp., RSOF P 18.)

The 9-1-1 dispatcher, in turn, called the jail booking room to report that Plaintiff's repeated phone calls were tying-up the 9-1-1 system and had forced her to drop one legitimate emergency call. (*Id.,* SOF P 20; *admitted at* Pl.'s Resp., RSOF P 20.) The dispatcher requested that jail personnel do something to prevent Plaintiff from continuing to interfere with 9-1-1 operations. (*Id.*) Officers Calvano and Davis proceeded to the lobby and shackled and handcuffed Plaintiff without warning. (Pl.'s Resp., SAF P 2; *admitted at* Defs.' Reply, RSAF P 2.) Because all the other cells in the jail were already occupied by other inmates, Deputy Geister decided to put Plaintiff in the jail's maximum security cell. (Defs.' Br., SOF P 23; *admitted at* Pl.'s Resp., RSOF P 23.) Plaintiff struggled and had to be dragged to her cell, because she was terrified by the thought of being placed in maximum security. (Pl.'s Resp., SAF P 2; *admitted at* Defs.' Reply, RSAF P 2.) The maximum security cell was [*7] tiny, and Plaintiff is claustrophobic. (*Id.,* SAF P 3; *admitted at* Defs.' Reply, RSAF P 2.) The cell had a small, narrow window that prevented Plaintiff from seeing anyone outside it. (*Id.*)

Before she was placed in her cell, Plaintiff asked several times to make a phone call to ensure her daughter was safe. (*Id.*, SAF P 4; *admitted at* Defs.' Reply, RSAF P 4.) Once Plaintiff was in her cell, Deputy Geister left to attend to other inmates and directed Officers Calvano and Davis to keep an eye on Plaintiff. (Defs.' Br., SOF P 24; *admitted at* Pl.'s Resp., RSOF P 24.) Plaintiff began yelling out her request for a phone call in hopes that someone would hear her, since the cell door was thick steel. (Pl.'s Resp., SAF P 4; *admitted at* Defs.' Reply, RSAF P 4.) Officer Calvano testified that she did not know what Plaintiff was yelling, but called it "intrusive to the inmates" and "obstructive" to jail staff. (*Id.*, SAF P 5; *admitted at* Defs.' Reply, RSAF P 5.) Plaintiff began pounding on her cell's door. (*Id.*, SOF P 25; *admitted in relevant part at* Pl.'s Resp., RSOF P 25.) After about ten minutes, Officer Davis reported to Deputy Geister that Plaintiff had been pounding on the door and expressed [*8] concern that Plaintiff might hurt herself. (*Id.*, SOF P 26; *admitted at* Pl.'s Resp., RSOF P 26; *see also* Pl.'s Resp., SAF P 10; *admitted in relevant part at* Defs.' Reply, RSAF P 10.) According to Plaintiff, Officer Davis came into her cell and told her to shut up or he would have her sedated. (Pl.'s Resp., SAF P 11; *admitted at* Defs.' Reply, RSAF P 11.) Deputy Geister testified that he told Plaintiff that if she continued to pound against the door "we're going to contact the hospital and see about sending the paramedics and having [you] sedated." [1] (Pl.'s Resp., Ex. 2 at 6 [Geister Dep.].)

      1   I quote directly from Deputy Geister's deposition transcript due to Plaintiff's mischaracterization of his testimony. (*See* Pl.'s Resp., RSAF P 10 [citing Deputy Geister's deposition transcript for the proposition that he told Plaintiff "that if she didn't stop, he would call the hospital and arrange to have her sedated"].)

Deputy Geister attempted to contact the emergency room physician, Defendant Chris Martinez, M.D., to discuss Plaintiff's behavior, but the deputy could not make contact. (Defs.' Br., SOF P 27; *admitted at* Pl.'s Resp., RSOF P 27.) As a result, Deputy Geister instructed dispatch to [*9] page paramedics to the jail. (*Id.*) Paramedics Damien Coniglio and Mark Hutchinson (the "Paramedics") were dispatched to the jail. (*Id.*) When the Paramedics arrived, Deputy Geister told them that Plaintiff was "combative" and had been banging her head. (*Id.*, SOF P 28; *admitted at* Pl.'s Resp., RSOF P 28.) Plaintiff testified that she used only her hands to bang on her cell door -- never her head, arms, or body -- and that she pounded as hard as she could on the door without hurting herself. (Pl.'s Resp., SAF PP 6-7; *admitted at* Defs.' Reply, RSAF PP 6-7.) Deputy Geister described his role *vis a vis* the Paramedics as "argu[ing] the case [for sedation]." (*Id.*, SAF P 29; *admitted at* Defs.' Reply, RSAF P 29.) According to Deputy Geister, the Pitkin County Jail had "been sedating people for [eighteen years]," and at least two have been sedated since Plaintiff. (*Id.*, SAF P 41; *admitted in relevant part at* Defs.' Reply, RSAF P 41.)

Paramedic Hutchinson testified that he saw Plaintiff pounding her fists against her cell door, being "very vocal and shouting obscenities." (*Id.*, SAF P 12; *admitted in relevant part at* Defs.' Reply, RSAF P 12.) The Paramedics entered Plaintiff's cell with Officer [*10] Davis and evaluated Plaintiff while Deputy Geister was working on other matters at the jail. (Defs.' Br., SOF PP 29, 33; *admitted at* Pl.'s Resp., RSOF PP 29, 33.) Plaintiff plainly and repeatedly stated that she did not want medical treatment. (Pl.'s Resp., SAF P 13; *admitted at* Defs.' Reply, RSAF P 13.) With the aid of officers using force, as well as by placing Plaintiff in shackles and handcuffs, medics took Plaintiff's vital signs, which were normal. (*Id.*, SAF PP 13, 32; *admitted in relevant part at* Defs.' Reply, RSAF PP 13, 32.) Paramedic Hutchinson assessed Plaintiff as "very upset" and as having slurred speech. (*Id.*, SAF P 12; *admitted in relevant part at* Defs.' Reply, RSAF P 12.) He also noted that she was "shouting obscenities." (*Id.*) Paramedics saw no injury on Plaintiff and did not witness the purported head-banging Deputy Geister claimed to have seen. (*Id.*, SAF P 12; *admitted in relevant part at* Defs.' Reply, RSAF P 12.)

Paramedic Coniglio then called Dr. Martinez to discuss the information he had been given about Plaintiff's behavior that night, as well as his own observations of Plaintiff's behavior at the jail, his evaluation and examination of Plaintiff, and his concern [*11] that Plaintiff was hurting herself and creating a danger to herself and others. (Defs.' Br., SOF P 29; *admitted at* Pl.'s Resp., RSOF P 29.) Mr. Coniglio also held the telephone up so that Dr. Martinez could hear Plaintiff screaming and pounding on the door of her cell. (*Id.*, SOF P 30; *admitted at* Pl.'s Resp., RSOF P 30.) Dr. Martinez authorized the Paramedics to sedate Plaintiff. (*Id.*, SOF P 31; *admitted at* Pl.'s Resp., RSOF P 31.) After Dr. Martinez's authorization, the Paramedics approached Deputy Geister to inform him that they were going to sedate Plaintiff and that they would stay with Plaintiff until they knew that the sedative had taken effect and that she did not have any adverse effects. (*Id.*, SOF PP 33-34; *admitted at* Pl.'s Resp., RSOF PP 33-34.) The

Paramedics asked Deputy Geister to assist them with restraining Plaintiff so that they could safely administer the sedative. (*Id.,* SOF P 35; *admitted at* Pl.'s Resp., RSOF P 35.) Deputy Geister agreed. (*Id.,* SOF P 6; *admitted at* Pl.'s Resp., RSOF P 6.)

When the Parmadics walked into Plaintiffs cell to inject her, Plaintiff was sitting on her bed in shackles and handcuffs. (Pl.'s Resp., SAF P 32; *admitted in relevant part at* Defs.' [*12] Reply, RSAF P 32.) Plaintiff pleaded not to be injected and asked Deputy Geister for his name, stating that she intended to sue him. (*Id.,* SAF PP 14, 17; *admitted in relevant part at* Defs.' Reply, RSAF PP 14, 17.) To assist in injecting Plaintiff, Officer Calvano pushed Plaintiff's face down on the bed so that she could be injected. (*Id.,* SAF P 15; *admitted at* Defs.' Reply, RSAF P 15.) Officer Calvano and Deputy Geister, as well as the Paramedics, used force to restrain Plaintiff for the injection as she lay face down in shackles and handcuffs. (*Id.*) In fear and panic, Plaintiff put her arm next to her head to keep from being injected and was holding her hair. (*Id.,* SAF P 16; *admitted at* Defs.' Reply, RSAF P 16.) Officer Calvano admitted that she and a paramedic pried Plaintiff's arm away, pulling some hair from her head in a clump which caused blood to run down Plaintiff's face. (*Id.*) Officer Calvano also testified that the prospect of the injection "escalated" the situation and dramatically increased Plaintiff's distress. (*Id.,* SAF P 17; *admitted at* Defs.' Reply, RSAF P 17.) Plaintiff cried as she was being injected. (*Id.*) About thirty minutes after Plaintiff's injection, the sedative [*13] began to take effect and Deputy Geister removed Plaintiff's restraints. (Defs.' Br., SOF P 37; *admitted at* Pl.'s Resp., RSOF P 37.)

Droperidol, the drug used to sedate Plaintiff, is most similar to the antipsychotic Haldol. (Pl.'s Resp, SAF P 18; *admitted in relevant part at* Defs.' Reply P 18.) This drug has received a "black box warning," which denotes the Food and Drug Administration's highest level of risk for an available prescription medication. (*Id.; see also id.,* Ex. 6 at 3 [Martinez Dep.].) Alcohol is listed as an agent that interacts with Droperidol, and intoxication and female gender increase the risk for potentially fatal arrhythmia associated with the drug. (*Id.,* SAF P 20; *admitted in relevant part at* Defs.' Reply, RSAF P 20.) The Paramedics injected Plaintiff with four times the manufacturer's maximum recommended dosage and twice the dosage prescribed in Dr. Martinez's own training protocol. (*Id.,* SAF P 22; *admitted in relevant part at* Defs.' Reply, RSAF P 22; *see also id.,* Ex. 6 at 5 [Martinez Dep.].)

Subsequent physical exam revealed that the only injuries Plaintiff suffered that night were bruising and soreness from the injection, finger-mark bruises from being restrained [*14] so forcefully, and bruises and indentation on her wrists from tight handcuffs. (*Id.,* SAF P 7; *admitted at* Defs.' Reply, RSAF P 7.)

Plaintiff testified that she would have stopped beating on the door and yelling for a telephone call if someone had told to her that they would check on her daughter's safety. (*Id.,* SAF P 8; *admitted at* Defs.' Reply, RSAF P 8.) Plaintiff was not told until paramedics were in her cell that an officer would make sure that her daughter was all right. (*Id.*) Deputy Geister testified that he usually allowed detainees to make a phone call. (*Id.,* SAF P 9; *admitted at* Defs.' Reply, RSAF P 9.) He also stated that he was not aware Plaintiff wished to call her child until he entered her cell with the Paramedics around 4:00 A.M. (*Id.,* Ex. 2 at 8 [Geister Dep.].) By that point, according to Deputy Geister, Plaintiff "had lost all credibility" with him. (*Id.*) He testified that did he not allow her to make a phone call, because doing so would only wake up her young daughter. (*Id.*)

At the time of Plaintiff's sedation, the jail's restraint chair and isolation cell were already occupied by other inmates. (Defs.' Br., SOF P 36; *admitted at* Pl.'s Resp., RSOF P 36.) Officer Davis [*15] testified that the padded isolation cell was "typically used for really intoxicated people who may . . . hurt themselves." (Pl.'s Resp., SAF P 33; *admitted at* Defs.' Reply, RSAF P 33.) The padded cell was only partially padded, in that the windows, toilet, and door had no padding. (*Id.,* SAF P 36; *admitted at* Defs.' Reply, RSAF P 36; *see also id.,* Ex. 2 at 3-4 [Geister Dep.].) Acknowledging the deficiency of the padded cell, Deputy Geister testified that the jail's cells were designed for compliant inmates. (*Id.,* SAF P 37; *admitted at* Defs.' Reply, RSAF P 37.)

Sheriff Braudis, who was not at the Pitkin County Jail during the night in question, testified that the policy of the Pitkin County Sheriff's Department is to leave the decision of whether or not to involuntarily sedate an inmate to paramedics who are guided by a physician-advisor. (*Id.,* SOF P 38; *admitted at* Pl.'s Resp., RSOF P 38; *see also* Pl.'s Resp., RSAF P 35; *admitted at* Defs.' Reply, RSAF P 35.) He also stated that his staff was trained that when they believed an individual needed forcible medication, they were to call the Paramedics, and then it would become a medical decision as to whether or not to sedate. (*Id.,* Ex. 12 [*16] at 4 [Braudis Dep.].) Sheriff Braudis testified that he did not know what training, if any, paramedics had

regarding inmates' constitutional rights when it came to forced injections. (Pl.'s Resp., SAF P 25; *admitted at* Defs.' Reply, RSAF P 25.)

Deputy Geister testified that when an inmate was "out of control," and the jail had no other means of restraining that individual, he understood that he had a right to page paramedics so that they could determine whether sedation was necessary. (*See id.,* Ex. 2 at 10-11 [Geister Dep.].) Deputy Geister was unaware of the source of medical authority to involuntarily sedate people. (*Id.,* SAF P 27; *admitted at* Defs.' Reply, RSAF P 27.) No Pitkin County Jail policies prohibited deputies from lobbying medical personnel to sedate a detainee. (*Id.,* SAF P 31; *admitted at* Defs.' Reply, RSAF P 31.)

Officer Calvano testified that she was trained that individuals have a right to refuse medical treatment but was not specifically trained on the circumstances under which forcible injection is permissible. (*Id.,* Ex. 3 at 2 [Calvano Dep.].) Further, Officer Calvano testified to her understanding that the decision of whether to inject a detainee "gets turned over to [*17] the Paramedics and the people in the medical profession. It's not my responsibility to let them waive their medical rights or anything, because that's not my capacity of [sic] my job." (*Id.*)

On a final note, Deputy Geister testified that, in rare instances, when the Pitkin County Jail needs extra help, it utilizes the Aspen Police Department as auxiliary deputy sheriffs. (*Id.,* SAF P 38; *admitted at id.,* Ex. 2 at 15 [Geister Dep.].) The night of Plaintiff's injection, Deputy Geister did utilize the help of the Aspen Police Department at Pitkin County Jail. (*Id.,* SAF PP 38-39; *admitted in relevant part at id.,* Ex. 2 at 15 [Geister Dep.].)

### *2. Procedural History*

On August 11, 2006, Plaintiff filed a complaint in this court alleging the following constitutional violations stemming from her involuntary sedation: (1) denial of due process by all Defendants in violation of the *Fourteenth Amendment*; (2) unreasonable seizure by all Defendants in violation of the *Fourth Amendment*; (3) constitutional failure to train by Police Chief Loren Ryerson, Sheriff Braudis, Aspen Valley Hospital, and Dr. Martinez; and (4) retaliation for Plaintiff's exercise of free speech in violation of the *First Amendment* [*18] by Officer Davis, Officer Calvano, and Deputy Geister. (Compl. and Jury Demand [filed Aug. 11, 2006] [hereinafter "Compl."].) On April 11, 2007, County Defendants filed a motion for summary judgment, on all counts against them. (Defs.' Br.) On June 14, 2007, Plaintiff responded to the motion. (Pl.'s Resp.) On July 9, 2007, Defendants filed a reply in support of their motion. (Defs.' Reply.) This matter is fully briefed and ripe for review.

### ANALYSIS

### *1. Legal Standard*

Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure,* the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c) (2008); *see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Concrete Works, Inc. v. City & County of Denver, 36 F.3d 1513, 1517 (10th Cir. 1994).* The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* "Once the moving party meets this burden, the burden shifts to the nonmoving [*19] party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, 36 F.3d at 1518* (citing *Celotex, 477 U.S. at 325*). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex, 477 U.S. at 324; see Fed. R. Civ. P. 56(e)(2)* (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, 119 F.3d 837, 839 (10th Cir. 1997)* (citing *Anderson, 477 U.S. at 248*). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).* The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque, 150 F.3d 1271, 1274 (10th Cir. 1998)* (citing *Concrete Works, 36 F.3d at 1517*).

### 2. Evaluation of Claims

County Defendants argue they are entitled to summary judgment on all [*20] claims against them for the following reasons: (1) Defendants Pitkin County Commissioners should be dismissed as a party because they are not liable for the acts of those Defendants who participated in forcibly injecting Plaintiff; (2) Plaintiff's *Fourth* and *Fourteenth Amendment* claims fail as to Defendants Sheriff Braudis and Deputy Geister because they did not personally participate in the decision to sedate Plaintiff, and Plaintiff showed no unconstitutional custom, policy, or practice; (3) Plaintiff's *Fourth Amendment* claim also fails because an involuntary injection is not cognizable as a "seizure;" (4) Defendants Sheriff Braudis and Deputy Geister are entitled to qualified immunity on Plaintiff's *Fourth* and *Fourteenth Amendment* claims; (5) Plaintiff's *First Amendment* claim against Deputy Geister must fail because Plaintiff admits she has no evidence to support it; and (6) Plaintiff has failed to proffer evidence of inadequate training by Sheriff Braudis. (Defs.' Br.) After briefly reviewing the law of *42 U.S.C. § 1983 ("Section 1983")*, I consider Defendants' arguments in turn.

Plaintiff brings all of her claims under *Section 1983*, which provides a remedy for constitutional violations [*21] committed by state or private actors under color of state law. *See 42 U.S.C. § 1983 (2006)*. Specifically, *Section 1983* provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* Thus, to establish a violation of *Section 1983*, Plaintiff must allege that: (1) Defendants acted under color of state law to deprive her of a right, and (2) the right of which Defendants deprived her was secured by the Constitution or the laws of the United States. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)*. Defendants do not address, and therefore necessarily do not dispute, that Defendants are state actors. (*See* Defs.' Br.; Defs.' Reply.) With these general considerations in mind, I address Defendants' arguments in further detail below.

### a. Defendants Pitkin County Commissioners as a Party

County [*22] Defendants argue that because, under Colorado law, the sheriff, not Pitkin County Commissioners, is liable for the acts of his undersheriff and deputy sheriffs, Pitkin County Commissioners should be dismissed as a party. (Defs.' Br. at 8-9.) Plaintiff counters that Pitkin County Commissioners are liable for damages due to the unconstitutional forcible injection policy set by Sheriff Braudis. (*See* Pl.'s Resp. at 24-26.)

*Section 1983* does not provide for liability under the theory of *respondeat superior. See Worrell v. Henry, 219 F.3d 1197, 1214 (10th Cir. 2000)*. However, municipal entities can be sued for monetary, declaratory, or injunctive relief for deprivations of constitutional or civil rights under *Section 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*; *Meade v. Grubbs, 841 F.2d 1512, 1525 (10th Cir. 1988)* ("While an agency of the state may fall under the protective umbrella of the [Eleventh] Amendment, political subdivisions of the state do not."). Municipal liability is limited to deprivations of federally protected rights caused by actions taken pursuant to official municipal policy or custom and "attaches only where the decisionmaker possesses final authority [*23] to establish municipal policy with respect to the action taken." *Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)*; *accord Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)*.

As County Defendants point out, under Colorado law, the county sheriff is a separate and distinct position from the board of county commissioners. *Bristol v. Bd. of County Comm'rs, 312 F.3d 1213, 1219 (10th Cir. 2002)* (citing *COLO. CONST. art XIV, §§ 6, 8*). Sheriffs retain . exclusive control over the hiring, firing, and terms and conditions of employment of their employees. *Id.* "Because the [b]oard of county commissioners has no control over the [s]heriff's employees," the Tenth Circuit has determined that "the [b]

oard is not liable for the negligent acts of the [s]heriff's employees." *Id.* Thus, argue County Defendants, the Pitkin County Commissioners cannot be held liable the for training, supervision, or acts of Sheriff Braudis' employees, who allegedly caused the constitutional violation at issue in this case. (Defs.' Br. at 8-9; Defs.' Reply at 20-21.)

County Defendants' argument misses the mark. The United States Supreme Court has made clear that "it is when execution of a government's policy [*24] or custom, whether made by its lawmakers *or by those whose edicts or acts that may fairly be said to represent official policy,* inflicts the injury that the government as an entity is responsible under *[Section] 1983.*" *Monell, 436 U.S. at 694* (emphasis added). In concert with this holding, Plaintiff does not contend that Pitkin County Commissioners are directly liable for the *acts* of Sheriff Braudis' employees; she contends that Pitkin County Commissioners are liable for the *consequences* of Sheriff Braudis' *policy,* as set for Pitkin County, with regard to involuntary sedation of individuals in custody. (*See* Pl.'s Resp. at 24-26.) Thus, I find the Pitkin County Commissioners are an appropriate party to this suit.

Contrary to County Defendants' argument, *Bristol* is no bar to this conclusion. (*See* Defs.' Br. at 8-9.) *Bristol* addressed the limited issue of whether county commissioners were the "employer" of a sheriff's deputy for purposes of the Americans with Disabilities Act. *See 312 F.3d at 1221.* The court explicitly recognized that *Section 1983* liability was not at issue in the case but, nevertheless, took pains to note that ample caselaw "suggest[ed] that counties can be held liable [*25] for the misdeeds of [s]heriffs and their employees when the [s]heriff is held to set 'official policy' for the county." *312 F.3d at 1221; accord Gonzales v. Martinez, 403 F.3d 1179, 1182 n.7 (10th Cir. 2005).*

In the instant case, reading the facts in the light most favorable to Plaintiff, Sheriff Braudis sets the official policy relating to involuntary medication for Pitkin County. Defendant Braudis testified regarding Pitkin County Jail's involuntary sedation policy without objection to Plaintiff counsel's characterization of Sheriff Braudis' role as the individual who set "the official policy of Pitkin County" relating to involuntary sedation. (*See* Pl.'s Resp., Ex. 12 at 3-4 [Braudis Dep.]); *see also* Colo. Rev. Stat. § 30-10-511 (2007) ("Except as provided in *section 16-11-308.5,* [Colo. Rev. Stat.], the sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself or through a deputy or jailer"). Thus, I find Pitkin County Commissioners cannot escape potential shared liability with Sheriff Braudis by arguing that he, alone, is responsible for the acts of his employees. *See St. Louis v. Praprotnik, 485 U.S. 112, 126, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)* [*26] (recognizing that if "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, *[Section] 1983* could not serve its intended purpose").

### b. Fourth and Fourteenth Amendment Claims Against Deputy Geister and Sheriff Braudis in Their Individual Capacities

### i. Qualified Immunity

Defendants Sheriff Braudis and Deputy Geister argue they are entitled to summary judgment on Plaintiff's *Fourth* and *Fourteenth Amendment* claims against them in their individual capacities, because they did not personally participate in Plaintiffs forcible injection. (Defs.' Br. at 18-21.) They further contend that even if their actions resulted in a violation of Plaintiff's constitutional rights, they are entitled to qualified immunity because Plaintiff cannot establish that a reasonable officer in their position would have believed that their conduct violated the *Fourth* or *Fourteenth Amendments.* (*Id.*)

The doctrine of qualified immunity shields government officials from individual liability when they are performing discretionary functions that do not violate clearly established statutory or constitutional rights of which a reasonable person would [*27] have known. *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).* "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an *immunity from suit* rather than a mere defense to liability." *Saucier v. Katz, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)* (citations omitted) (emphasis in original). Whether a defendant is entitled to qualified immunity is a question of law. *Derda v. City of Brighton, 53 F.3d 1162, 1164 (10th Cir. 1995).* Once a defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of demonstrating that: (1) the defendant's alleged actions violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established at the time of the alleged violation. *Trigalet v. Young, 54 F.3d 645,*

*647 (10th Cir. 1995)* (quoting *Albright v. Rodriquez, 51 F.3d 1531, 1534 [10th Cir. 1995]*).

In determining whether qualified immunity shields Sheriff Braudis and Deputy Geister from liability, this court is obligated to consider whether there has been a constitutional violation *before* determining whether the law was clearly established at the [*28] time of the alleged violation. *McCook v. Spring Sch. Dist., 44 F. App'x 896, 902 (10th Cir. 2002)* (citing *Saucier, 533 U.S. at 201*). The goal in first answering the constitutional question is to ensure that the law of qualified immunity does not stymie the development of constitutional law. *See id.* Accordingly, I now turn to the question of whether Plaintiff's allegations regarding her forcible injection of antipsychotics are sufficient to support a *Section 1983 Fourth* and/or *Fourteenth Amendment* claim.

### (1) Involuntary Sedation Principles Under the Fourteenth Amendment

I review the law related to involuntary sedation of detainees under the *Fourteenth Amendment* here, because it provides a useful framework for considering the personal participation question discussed in detail below. It is well-established that "the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," thus, triggering the protections of the *Due Process Clause. Washington v. Harper, 494 U.S. 210, 229, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990).* In *Harper,* the Supreme Court found that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding [*29] justification and a determination of medical appropriateness." *Riggins v. Nevada, 504 U.S. 127, 135, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992)* (citing *Harper, 494 U.S. at 229*). In *Riggins,* the Court found that "[t]he *Fourteenth Amendment* affords at least as much protection to persons the State detains for trial." *Id.* In reaffirming this precept, the Court found that the injection of antipsychotic drugs compromises a person's liberty in a "particularly severe" way. *Id. at 134.* The Court in *Harper* and *Riggins* did not have before it, and did not address, what process might be required before state prison authorities may administer an antipsychotic drug in an emergency circumstance, as opposed to regularly in the course of ongoing, long-term treatment. *See Harper, 494 U.S. at 246-47* (Stevens, J. dissenting). Since the Supreme Court's decision in *Harper,* neither the Supreme Court nor the Tenth Circuit has addressed what due process is required to sedate a detainee in emergency circumstances.

Prior to *Harper,* however, the Tenth Circuit had already addressed this issue to some degree in *Bee v. Greaves, 744 F.2d 1387 (10th Cir. 1984).* In *Bee,* the court explicitly held that "a pretrial detainee retains a liberty interest derived [*30] from the Constitution in avoiding unwanted medication with [antipsychotic] drugs." *744 F.2d at 1394.* The court based its holding, in part, upon the "undisputed nature of antipsychotic drugs," which "have the capacity to severely and even permanently affect an individual's ability to think and communicate." *Id. at 1393-94.* Nonetheless, the court found that, even absent a hearing, forcing antipsychotic medication upon a pretrial detainee may be appropriate when the State makes a showing that "treatment with [such] medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of [the detainee's] own safety or the safety of others." *Id. at 1395.*

Based on the foregoing authority, Plaintiff clearly retains a protected liberty interest in avoiding unwanted medication. This conclusion does not end the court's inquiry, however. Plaintiff's liberty interest "must be balanced against competing state interests to determine whether it is outweighed by 'the demands of an organized society.'" *Id. at 1394* (quoting *Youngberg v. Romeo, 457 U.S. 307, 320, 102 S. Ct. 2452, 73 L. Ed. 2d 28 [1982]*). The only competing state interest the Tenth Circuit has explicitly recognized that may be sufficient [*31] to overcome a pre-trial detainee's liberty interest in avoiding unwanted antipsychotic medication without a hearing is an emergency that threatens the safety and security of jail occupants. *Id. at 1395-96.* The court was careful to note, however, that "[a]bsent an emergency, . . . [it] did not believe forcible medication with antipsychotic drugs is reasonably related to the concededly legitimate goals of jail safety and security." *Id. at 1395* (internal quotations and citation omitted).

Further, according to the court:

Determining that an emergency exists sufficient to warrant involuntary medication with this type of drug requires a professional judgment-call that includes a balancing of the jail's concerns for the safety of its occupants against a detainee's interest in freedom from unwanted antipsychotics. Any decision to administer antipsychotic drugs forcibly must be the product of professional judgment by appropriate medical authorities, applying accepted medical standards. It requires an evaluation in each case of all the relevant circumstances,

including the nature and gravity of the safety threat, the characteristics of the individual
involved, and the likely effects of particular [*32] drugs.

*Id. at 1395-96* (internal citations omitted). In making this evaluation, the decisionmaker should consider the
availability of less restrictive alternatives to antipsychotic sedation, "such as segregation or the use of less
controversial drugs like tranquilizers or sedatives." *Id.*

### (2) Personal Participation in a Constitutional Violation

County Defendants argue that, because Sheriff Braudis and Deputy Geister did not personally
participate in the decision to sedate Plaintiff, summary judgment on Plaintiff's *Fourth* and *Fourteenth
Amendment* claims against them in their individual capacities is warranted. (Defs.' Br. at 9-12.) Plaintiff
counters that the evidence supports a finding that Deputy Geister personally participated in Plaintiff's
unconstitutional injection by: (1) participating in the decisionmaking process of whether or not to inject
Plaintiff; and (2) participating in the actual injection by restraining Plaintiff during the procedure. (*See* Pl.'s
Resp. at 26-36.) As an initial matter, I note that it is beyond dispute that "for liability to arise under
*[Section] 1983*, a defendant's direct personal responsibility for the claimed deprivation of a constitutional
right must be [*33] established." *Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006); Olson v.
Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993)* (affirming district court's dismissal, in part, where "plaintiff
failed to allege personal participation of the defendants"); *accord Clayton v. Ward, 232 F. App'x 827, 830
(10th Cir. 2007).*

Plaintiff does not specify in what way Sheriff Braudis personally participated in the alleged
constitutional violation. Because Plaintiff has literally presented *no* evidence supporting a finding that
Sheriff Braudis, who was not present in the jail on the evening in question, personally participated in the
decision to inject Plaintiff or in the injection itself, I grant summary judgment in favor of Sheriff Braudis on
Plaintiff's *Fourth* and *Fourteenth Amendment* claim against him in his individual capacity. (*See* Pl.'s Resp.)
Thus, I need not reach the qualified immunity question with respect to Sheriff Braudis. I now address
Deputy Geister's personal participation in the alleged constitutional violation.

### (a) Personal Participation in the Decision to Sedate Plaintiff

Plaintiff argues that by lobbying for Plaintiff's sedation and failing to properly assess whether an
emergency existed [*34] warranting sedation, Deputy Geister personally participated in the decision to
sedate her. (Pl.'s Resp. at 26-36.) Additionally, Plaintiff's briefing suggests that Deputy Geister may have
lied to the Paramedics about Plaintiff's behavior, thus affecting the ultimate decision of whether or not to
sedate Plaintiff. (*See* Pl.'s Resp., RSOF P 28.) I address each of Plaintiff's contentions in turn.

### (i) Lobbying for Plaintiff's Sedation

Deputy Geister openly admitted to lobbying the medics to sedate Plaintiff. (*See* Pl.'s Resp., Ex. 2 at 10
[Geister Dep.].) He also testified to his understanding that he did not have the "authority" to make a
decision about whether to sedate a detainee. (*See id.,* Ex. 2 at 10 [Geister Dep.].) He stated: "[The medical
professionals] look at the situation and say, Yes, you're right. This woman needs to be sedated, or this guy
needs to be sedated, or this person needs to be sedated. I don't make the call." (*Id.*) Deputy Geister further
stated that "[the medical professionals] do what they're going to do regardless of what I say. I can put my
input in there, which I do, and [they] take it from there." (*Id.,* Ex. 2 at 11 [Geister Dep.].)

Deputy Geister's view of his lack [*35] of authority in deciding whether to sedate a detainee generally
and in the case at bar finds ample support in the record before the court. First, it is undisputed that the Pitkin
County Jail's policy regarding involuntary sedation of prisoners is to leave the decision of whether to sedate
a detainee to medical professionals. (*See* Defs.' Br., SOF P 38; *admitted at* Pl.'s Resp., RSOF P 38.).
Second, Deputy Geister testified that he had called emergency medical staff for possible sedation of inmates
in the past and the paramedics had refused to sedate based on their medical judgment that sedation was
unnecessary. (Pl.'s Resp., Ex. 2 at 12 [Geister Dep.].) He explained, "[I]f [the ER doctor] say[s] no, it
doesn't get done. And I don't argue about it. You don't argue -- you don't order the ER doctor to do
anything." (*Id.*) Third, Paramedic Coniglio makes clear in his testimony that, in the instant case, the medical
professionals -- and, in fact, Dr. Martinez alone -- made the decision to sedate Plaintiff. Paramedic Coniglio

testified that he "initiated contact with Dr. Martinez on [his] own based upon [his] observations," and that he "was not asked or instructed by law enforcement personnel [*36] to contact Dr. Martinez or to seek Dr. Martinez's permission to sedate [Plaintiff]." (*Id.,* Ex. 7 P 8 [Coniglio Decl.].) He further testified to informing Dr. Martinez, based upon his own observations, that "[Plaintiff] was resistive to medical evaluation, refused to come to the hospital emergency room for evaluation, was combative, and was hurting herself by violently pounding and throwing herself against the cell door and by violently struggling against the handcuffs and shackles." (*Id.,* Ex. 7 PP 8-9 [Coniglio Decl.].) Further, Paramedic Coniglio stated that "[a]t no time did [he] suggest to Dr. Martinez that [Plaintiff] be sedated" and that, "[b]ased upon the information [Mr. Coniglio] provided, Dr. Martinez gave [him] a medical order to sedate [Plaintiff] . . . ." (*Id.,* Ex. 7 PP 9-10 [Coniglio Decl.].) Fourth, it is undisputed that it was Dr. Martinez who authorized the Paramedics to sedate Plaintiff and that the doctor at no time spoke with Deputy Geister. (Defs.' Br., SOF PP 27, 31; *admitted at* Pl.'s Resp., RSOF PP 27, 31.) That Deputy Geister *attempted* to convince the Paramedics to sedate Plaintiff shows -- at worst -- that he *wished* to participate in the decision of whether [* 37] or not to sedate Plaintiff. It does not show that he *did* actually participate in such decisionmaking. Because Plaintiff has presented no evidence to counter undisputed testimony that medical authorities made the decision to sedate Plaintiff based upon their independent professional judgment, rather than on the deputy's repeated requests for sedation, I find Plaintiff has failed to show that Deputy Geister's lobbying rendered him a personal participant in the decision to sedate Plaintiff.

### (ii) Assessment of Emergency

Not withstanding this finding, Plaintiff also obliquely argues that Deputy Geister *did* participate in the decision to sedate Plaintiff by incorrectly assessing whether an emergency existed warranting involuntary sedation. (Pl.'s Resp. at 26-36.) Specifically, Plaintiff argues that Deputy Geister failed to properly determine whether less restrictive means of restraint were appropriate. (*Id.*) Whether or not this is true, I cannot agree that such actions constitute personal participation in the decision to sedate Plaintiff.

As an initial matter, there is no record evidence that Deputy Geister assessed whether an emergency existed or whether alternative, less-restrictive means [*38] of restraint would have been appropriate for Plaintiff. (*See id.,* Ex. 2 [Geister Dep.].) Instead, there is only undisputed evidence that Deputy Geister reported to the Paramedics his observations of Plaintiff's behavior and the availability -- or lack thereof -- of alternative means of restraint within the jail. (*See id.,* Ex. 7 P 3 [Coniglio Decl.].) There is some dispute as to whether Deputy Geister's report to the Paramedics was accurate, which I will address below.

First, however, I find that by relaying to medical authorities accurate information about a detainee's behavior and alternative means of restraint within the jail, a law enforcement official does not, thereby, become a personal participant in the medical decision of whether or not to sedate a detainee. *Bee* makes clear that whether an emergency exists sufficient to warrant sedation is a "professional judgment-call" to be undertaken by medical professionals rather than by law enforcement officials. *See* 744 F.2d at 1395-96. Although an officer may be required to accurately report the behavior of a detainee, as well as whether alternative means of restraint are *available* within the jail, this court finds that it is outside [*39] the officer's area of expertise to determine whether or not a detainee's behavior and the availability of alternative means of restraint constitute an "emergency" sufficient to warrant sedation. Reflected in this conclusion is the court's concern that an alternative holding may cause an officer to hesitate to call medical authorities for possible sedation of a detainee out of fear that the officer may not have appropriately assessed whether an "emergency" exists or whether less restrictive, alternative means of restraint would be sufficient, and that such hesitation may prove detrimental to the detainee, jail staff, and other inmates. Thus, any failure to properly assess the existence of an emergency and the appropriateness of alternative, less intrusive means of restraint, properly falls on the shoulders of the medical decisionmakers. Accordingly, I find the fact that Deputy Geister relayed information regarding Plaintiff's behavior and alternative means of restraint available within the jail to the Paramedics simply does not establish him as a personal participant in the decision to sedate Plaintiff.

That being said, should a law enforcement officer knowingly make a *false* report to [*40] medical authorities regarding detainee's behavior or the availability of alternative means of restraint, and should that report factor into the medical decision of whether or not to sedate, there would be a stronger argument that the officer made statements to insert him or herself into the decisionmaking process, constituting personal participation in that decision. In the case at bar, there can be no dispute that any report by Deputy Geister that the padded room and the restraining chair were occupied on the night in question was, in fact, accurate.

(*See* Defs.' Br., SOF P 36; *admitted at* Pl.'s Resp., RSOF P 36 [noting that at the time of Plaintiff's sedation, the jail's restraint chair and isolation cell were already in use by other inmates].) However, there is some dispute as to whether Deputy Geister falsely reported to the Paramedics that Plaintiff had been banging her head against her cell door. (*See* Def.'s Br. P 28; *admitted at* Pl.'s Resp. P 28 [Deputy Geister testified that he told paramedics that Plaintiff was banging her head]; Pl.'s Resp., SAF PP 6-7; *admitted at* Defs.' Reply, RSAF PP 6-7 [Plaintiff testified that she used only her hands to bang on her cell door, never her [*41] head].)

On a motion for summary judgment, I must resolve all factual disputes in favor of Plaintiff. *Byers, 150 F.3d at 1274.* Presuming Deputy Geister did make such a false report, I find that a reasonable juror could conclude that Deputy Geister's alleged falsehood influenced Dr. Martinez's decision to sedate Plaintiff. Dr. Martinez testified to his knowledge that the Paramedics had been told by law enforcement personnel "that [plaintiff] had been throwing herself against the jail door and striking the door with her head." (Resp. to Med. Def.'s Mot. for Summ. J., Ex. C at 6 [Martinez Dep.] [filed June 14, 2007].) Moreover, Dr. Martinez stated that in deciding to sedate Plaintiff, he relied, in part, on the reports of jail personnel regarding Plaintiff's behavior. (*See* Defs.' Br., Ex. A-5 P 11 [Martinez Interrogatory].) Finally, Dr Martinez made clear that his decision to authorize sedation was based, in large part, on his view that Plaintiff's behavior suggested she was in danger of hurting herself. (Pl.'s Resp., Ex. 7 at 2 [Martinez Dep.].) Making all reasonable inferences in favor of Plaintiff, a report that she was banging her head against her cell door, rather than simply her fists [*42] and feet, could have influenced Dr. Martinez's perception that Plaintiff was likely to injure herself and, thus, required involuntary sedation. Accordingly, I find that by pointing to Deputy Geister's alleged misstatements regarding Plaintiff's self-injurious behavior, Plaintiff has demonstrated a genuine issue of material fact as to whether he injected himself as a "participant" in the decision to sedate Plaintiff.

### *(b) Personal Participation in Injecting Plaintiff*

Alternatively, Plaintiff argues that Deputy Geister personally participated in the alleged constitutional violation by restraining her during the involuntary sedation. (Pl.'s Resp. at 20-23.) County Defendants urge that Deputy Geister was merely complying with the medics' request and, thus, cannot be said to have "personally participated" in Plaintiffs sedation. (Defs.' Br. at 9-12.) I disagree.

As an initial matter, it is important to note that Plaintiff does not allege that Deputy Geister used more force than necessary to restrain her during the injection. [2] (*See* Pl.'s Resp. at 20-23.) Second, to this court, it is a matter of common sense that Deputy Geister participated in sedating Plaintiff when he physically restrained [*43] her during the injection. To find otherwise strains credulity. That Deputy Geister was complying with a medical request goes more to the question of whether the law was clearly established that compliance with the medical request would result in a violation of Plaintiff's constitutional rights, rather than to the more straightforward question of whether, by holding Plaintiff down during the injection, Deputy Giester personally participated in Plaintiff's injection.

> 2  To be clear, Plaintiff does claim that "the restraint and injection which [Deputy Geister]
> facilitated were unreasonable seizures constituting excessive force," but Plaintiff does not allege that
> Deputy Geister used more force than necessary to restrain Plaintiff in order to permit the Paramedics
> to inject her without injuring her. (*See* Pl.'s Resp. at 36.)

Given my findings that a genuine issue of material fact exists as to whether Deputy Geister did, in fact, participate in the decision to sedate Plaintiff, as well as my finding that Deputy Geister personally participated in Plaintiff's sedation by restraining her during the injection, I must next determine: (1) whether Deputy Geister's actions violated Plaintiff's *Fourth* [*44] and/or *Fourteenth Amendment* rights; and, if so, (2) whether those rights were clearly established at the time of the alleged violation. *Trigalet, 54 F.3d at 647.*

### *(3) Fourteenth Amendment Violation*

I have already found in a separate order that, based on the information before Dr. Martinez at the time, he made a proper professional judgment-call that an emergency existed warranting involuntary sedation of Plaintiff. (*See* Order and Memorandum of Decision [filed Feb. 29, 2008] [hereinafter "Order"].) Thus, I found his decision to sedate Plaintiff could not have violated her constitutional rights under the *Fourth* or

*Fourteenth Amendments. (Id.)* In light of the disputed issue of fact as to whether Deputy Geister falsely reported that Plaintiff was banging her head, however, my holding regarding Dr. Martinez does not completely resolve the question of whether Deputy Geister participated in a constitutional violation. Because I am required to read the facts in the light most favorable to Plaintiff, I must pay credence to the possibility that, had Dr. Martinez not received a report that Plaintiff was banging her head, he may not have concluded that she was such a danger to herself as to warrant [*45] forcible sedation. [3] Absent a finding that Plaintiff was a danger to herself or others, Defendants have identified no other medical emergency that may have warranted sedation. Thus, reading the facts in the light most favorable to Plaintiff, I find a reasonable juror could conclude that Deputy Geister's alleged misrepresentations to the Paramedics could have led to an incorrect medical judgment that Plaintiff was a danger to herself and, in turn, an unconstitutional decision to involuntarily sedate Plaintiff with antipsychotics. Accordingly, I deny summary judgment on Plaintiff's *Fourteenth Amendment* claim against Deputy Geister in his individual capacity.

> 3    This court's review of the record shows that Dr. Martinez has offered no testimony on this point. (*See* Pl.'s Resp., Ex. 6 [Martinez Dep.]; Defs.' Br., Ex. A-5 [Martinez Interrogatory].)

### (4) Fourth Amendment Violation

Although Deputy Geister argues that forcible sedation is not cognizable as a "seizure" under the *Fourteenth Amendment*, he has pointed to no cases so holding. (*See* Defs.' Br. at 15-16.) The Supreme Court has clearly stated that "[w]henever an [*46] officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985).* Here, Plaintiff was physically restrained during the injection and subsequently physically incapacitated by the anitpsychotic medication. As discussed above, read in the light most favorable to Plaintiff, a reasonable juror could conclude that that Deputy Geister participated in both forms of restraint. Thus, this court sees no bar to Plaintiff's *Fourth Amendment* claim against Deputy Geister in the case *sub judice.*

Moreover, read the light most favorable to Plaintiff, Deputy Geister's allegedly false report that Plaintiff had been banging her head could also establish a *Fourth Amendment* violation. "Pretrial detainees retain some *Fourth Amendment* rights upon commitment to a corrections facility." *Bell v. Wolfish, 441 U.S. 520, 558, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).* To determine the constitutionality of a seizure, a court "balance[s] the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the importance of the governmental interests alleged to justify the intrusion." *Garner, 471 U.S. at 8.* In the instant case, the governmental interest allegedly at [*47] stake was preventing Plaintiff from injuring herself. As discussed above, if Dr. Martinez's conclusion that Plaintiff was likely to injure herself may have been different had he not heard reports that Plaintiff was banging her head, the governmental interest at stake would fall away. Thus, reading the facts in the light most favorable to Plaintiff, she has established a genuine issue of material fact as to whether Deputy Geister's allegedly false report led to an unreasonable seizure of her person by forcible injection of an antipsychotic. Accordingly, I deny summary judgment on Plaintiff's *Fourth Amendment* claim against Deputy Geister in his individual capacity.

### (5) Clearly Established Law

Having found two possible constitutional violations under the summary judgment standard, I must next determine whether the law was clearly established at the time Deputy Geister acted. *See Trigalet, 54 F.3d at 647-48.* There simply can be no doubt that any reasonable officer would know that lying to medical authorities regarding a detainee's behavior in order to encourage forcible sedation was an apparent violation of pre-existing law. *See id.* (noting that qualified immunity should not be granting [*48] when unlawfulness of action was apparent "in light of preexisting law"). Qualified immunity jurisprudence establishes that although, "[t]he contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right[, t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. . . ." *Id.* In the instant case, it was clearly established at the time of the alleged incident that detainees have a protected liberty interest in avoiding unwanted administration of antipsychotic drugs. *See Riggins, 504 U.S. at 132.* Moreover, it was clearly established that unwanted sedation, without a hearing, *may* be appropriate in an emergency situation in which the safety and security of jail occupants are threatened. *See Bee, 744 F.2d at 1395-96.* Further, it was clearly established that, absent such an emergency, forcible sedation could not be "reasonably related to the concededly legitimate goals of jail safety and security." *Id.* Reading the facts in the light most favorable

to Plaintiff, I find a reasonable juror could conclude that Deputy Geister lied to the [*49] Paramedics in order to convince them that a medical emergency existed warranting sedation, knowing that absent such an emergency the sedation would be unconstitutional. Thus, I hold that Deputy Geister is not entitled to qualified immunity on the *Fourteenth Amendment* claim against him.

Regarding the *Fourth Amendment* claim, Plaintiff has failed to point to a single case in which forcible sedation was considered under the *Fourth Amendment* and this court's research has failed to reveal any such case. (*See* Pl.'s Resp. at 36-37.) Therefore, it cannot be said that it was clearly established in 2004 that participation in forcible sedation could result in the violation of a detainee's *Fourth Amendment* rights. Accordingly, Deputy Geister is entitled to qualified immunity for Plaintiff's *Fourth Amendment* claim against him.

Additionally, this court is inclined to note that if Deputy Geister did not, in fact, lie to the Paramedics regarding Plaintiff banging her head, I would find no *Fourteenth* or *Fourth Amendment* violation here. According to the facts and law I have laid out above, determining whether or not Deputy Geister engaged in a constitutional violation by restraining Plaintiff with no more [*50] force than necessary to allow safe injection of the antipsychotic requires determining whether the medical decision to inject Plaintiff complied with the law. In my earlier Order, I decided that Dr. Martinez's medical judgment did comply with the law. (*See* Order.) Thus, absent a finding that Deputy Geister made some false report that affected the decision to sedate Plaintiff, his assistance in restraining Plaintiff at the request of medical professionals and with no more force than necessary, could not have violated clearly established federal law. [4]

> 4   Even if I had found Dr. Martinez's decision to inject Plaintiff unconstitutional, considering that the law requires medical professionals, not jail staff, to independently determine, based on their professional judgment, whether or not to sedate a detainee, this court cannot justifying placing "law enforcement officers in the impossible position of having to second-guess the medical judgments" of medical professionals. *Sullivan v. Bornemann, 384 F.3d 372, 377 (7th Cir. 2004)* (finding "[t]here is no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining a detainee at the direction of qualified [*51] medical personnel, with the purpose of minimizing injury to the detainee"); *see also Bee, 744 F.2d at 1395-96*. As a non-medical professional, a reasonable law enforcement officer cannot be expected to question the judgment of qualified medical professional absent some extraordinary circumstances, the nature of which the court cannot even conjecture at this point. Thus, in this court's view, absent extraordinary circumstances, liability for the medical decision to sedate detainees and order restraint during sedation does not lie with the law enforcement officials who contact medical professionals or who assist in the restraint at the request of those medical professionals.

### c. Fourth and Fourteenth Amendment Official Capacity Claims

Plaintiff assert several claims against Pitkin County Commissioners, as well as Sheriff Braudis and Deputy Geister in their official capacities. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" -- in this case Pitkin County. *Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); accord Monell, 436 U.S. at 691* (noting "official-capacity suits generally represent only another way of pleading an action against [*52] an entity of which an officer is an agent"). As noted above, municipal entities can be sued for deprivations of constitutional or civil rights under *Section 1983. Monell, 436 U.S. at 690.* "To establish municipal liability, Plaintiff must show: (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood, 81 F.3d 988, 993-94 (10th Cir. 1996)* (citation omitted). "The official policy must be the moving force for the constitutional violation in order to establish [municipal liability]." *Haines v. Fisher, 82 F.3d 1503 (10th Cir. 1996)*. Thus, if a final policymaker's decision results in a constitutional violation, the municipality will be liable for the violation. *Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1319 (10th Cir. 1998)*.

Here, assuming that Plaintiff's forcible injection was unconstitutional, there is no evidence that a policy of Pitkin County had a "direct causal link" to "the violation alleged." *Jenkins, 81 F.3d at 993-94*. Instead, as discussed above, it is undisputed that the policy of Pitkin County Sheriff's Department regarding involuntary sedation of individuals in custody [*53] is to leave the decision of whether to sedate to paramedics guided by a physician-advisor. (Defs.' Br., SOF P 38; *admitted at* Pl.'s Resp., RSOF P 38.) Plaintiff has presented no evidence that Deputy Geister failed to follow this policy in any way. (*See* Pl.'s

Resp.) In the case *sub judice*, I find any connection between the policy of leaving the decision of whether to sedate a detainee to medical professionals and those professionals' ultimate decision to sedate the detainee far too attenuated to constitute a direct causal link. [5] In fact, the whole point and obvious import of a policy which places the decision of whether to sedate a detainee into the hands of medical professionals is to break any causal chain between law enforcement personnel's actions and any sedation that may occur.

> 5   The court notes that "'[i]n some sense, of course, almost any injury inflicted by a municipal agent or employee ultimately can be traced to a municipal policy.'" *D.T. v. Indep. Sch. Dist., 894 F.2d 1176, 1188 (10th Cir. 1990)* (quoting *Springfield v. Kibbe, 480 U.S. 257, 267, 107 S. Ct. 1114, 94 L. Ed. 2d 293 [1987]* [O'Connor, J., dissenting]).

Additionally, I note that Pitkin County's policy comports with Tenth Circuit precedent mandating [*54] that the decision to sedate be left to medical professionals. *See Bee, 744 F.2d at 1395-96*. Further, Plaintiff has presented no evidence that the policy itself-- rather than its implementation in her case -- was unconstitutional. (*See* Pl.'s Resp.) "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than a single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Okla. City v. Tuttle, 471 U.S. 808, 824, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)*. Here, Plaintiff has only pointed to a single incident of alleged constitutional deprivation. Based on the foregoing, I find Plaintiff has failed to set forth sufficient facts to establish a direct causal connection between the municipal policy and the alleged constitutional violation at issue. Thus, I grant summary judgment on Plaintiff's *Fourth* and *Fourteenth Amendment* claims against Pitkin County Commissioners, as well as Deputy Geister and Sheriff Braudis in their official capacities.

### d. Failure to Train

Plaintiff also alleges constitutional failure to train against Sheriff Braudis in his official [*55] capacity. (Compl. P 57-68.) County Defendants argue that the training provided by Sheriff Braudis -- that the decision of whether to sedate is to be left to medical professionals -- comports with constitutional requirements. (*See* Defs.' Br. at 17-18; Defs.' Reply at 20.) The Supreme Court has established that "the inadequacy of police training may serve as a basis for *[Section] 1983* liability only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*. Here, it is undisputed that Sheriff Braudis trained his staff that when they believed an individual needed forcible medication, they were to call the Paramedics, and then it became a medical decision as to whether or not to sedate. (Pl.'s Resp., Ex. 12 at 4 [Braudis Dep.]; *see id.* at 38-41.) As I have already discussed in detail above, it is the medical authorities who must determine whether sedation is appropriate, considering all relevant factors, including whether an emergency exists such that the safety of the detainee or others in the jail are at risk and whether alternative, less restrictive means of [*56] restraining the detainee are available. Leaving this decision in the hands of medical professionals by no means constitutes "deliberate indifference" to the rights of detainees. *See Harris, 489 U.S. at 389*. Instead, as discussed above, it reflects the sound conclusion of the Supreme Court and the Tenth Circuit that medical professionals, rather than law enforcement personnel, are the individuals most qualified to balance these competing interests. *See Riggins, 504 U.S. at 135; Bee, 744 F.2d at 1395-96*. Thus, I hold that employee training by Pitkin County Jail with respect to sedation of detainees was not in violation of *Section 1983*. Taken together, my findings throughout this order stand for the proposition that, even if Plaintiff's sedation was in violation of the constitution, Plaintiff must look to those who made the decision to sedate her for redress, rather than to law enforcement personnel who -- following the Pitkin County policy and Tenth Circuit law -- opened their doors to those decisionmakers.

### e. First Amendment

Plaintiff's only remaining claim with respect to County Defendants is her allegation that Deputy Geister retaliated against her for exercising her *First Amendment* [*57] right to free speech by pounding on the jail cell door and calling for assistance in order to ensure the safety of her child. (Compl. PP 96-77.) County Defendants argue summary judgment is warranted on this claim because: (1) Plaintiff has admitted that no staff member retaliated against her; and (2) Plaintiff's screaming and pounding on the door of her jail cell was not protected speech. (Defs.' Br. at 21-22; Defs.' Reply at 16-18.) I need only address County

Defendants' second argument.

*First Amendment* retaliation claims are most often brought in the public employment context. *McCook v. Spring Sch. Dist.*, 44 F. App'x 896, 903 (10th Cir. 2002). However, when a plaintiff is not an employee of and has no contractual relationship with the defendant, caselaw from this circuit suggests applying the substantive standard announced in *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000); *see McCook*, 44 F. App'x at 902 (applying *Worrell* standard outside the public employment context); *McCormick v. City of Lawrence*, 253 F. Supp. 2d 1156, 1168 (D. Kan. 2003) (same). The *Worrell* standard requires proof of the following elements to support a *First Amendment* retaliation claim:

> (1) that the plaintiff [*58] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*219 F.3d at 1212* (internal quotations omitted).

In the case at bar, I find Plaintiff fails at the first element. For speech to be constitutionally protected, it must involve a matter of public concern or an issue of public importance. *McCook*, 44 F. App'x at 904 (citing *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 [1983].) "In determining whether speech pertains to a matter of public concern, the court may consider 'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 [10th Cir. 2000]). "[T]he relevant inquiry is not whether the public would be interested in the topic of the speech [*59] at issue but rather is whether the purpose of [the plaintiff's] speech was to raise issues of public concern." *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000) (internal quotation marks omitted).

Plaintiff has failed to cite a single case supporting her proposition that pounding on her cell door and screaming that she wanted to call her daughter constitutes a matter of public concern. (*See* Pl.'s Resp. at 41-44.) Reading the facts in the light most favorable to Plaintiff, the record supports the finding that Plaintiff's intention in pounding on her cell door was exclusively to air her personal grievance regarding the jail's failure to allow her to contact her daughter. (*See id.*, SAF P 4; *admitted at* Defs.' Reply, RSAF P 4.) Nowhere does Plaintiff suggest this failure was illegal, only that it caused her great personal distress. (*See id. passim.*) Instead, she testified that "she would have stopped beating on the door and yelling for a call if someone had said they would check on her child's safety." (*Id.*, SAF P 8; *admitted at* Defs.' Reply, RSAF P 8.) Plaintiff's testimony supports a finding that her goals were patently personal in nature.

Moreover, this court's independent research [*60] has revealed no cases suggesting that Plaintiffs understandable concerns regarding the well-being of her own daughter who was *not* in the custody of the state was a matter that was in and of itself of interest to the public at large. *Cf. Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1411 (8th Cir. 1990) (finding that police officer's grievance regarding the police department's sick leave policy was not a matter of public concern, even though it was a matter of significance to the police officer's own family and all relatives of city police officers); *Boyce v. Andrew*, 510 F.3d 1333, 1344 (11th Cir. 2007) (noting an individual "may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run") (quotation marks omitted). Based on the foregoing, I find summary judgment against Plaintiff on her *First Amendment* claim against Deputy Geister is warranted.

### 3. Conclusion

Based on the foregoing it is therefore ORDERED as follows:

1. County Defendants' Motion for Summary Judgment (# 47) is GRANTED IN PART.

A. All of Plaintiffs Claims against Defendants Pitkin County Commissioners are DISMISSED.

B. All of Plaintiff's [*61] Claims against Sheriff Braudis in his official and individual capacities are DISMISSED.

C. All of Plaintiff's Claims against Deputy Geister in his official capacity are DISMISSED.

D. Plaintiff's *First* and *Fourth Amendment* claims against Deputy Geister is DISMISSED.

E. Plaintiffs *Fourteenth Amendment* Claims against Deputy Geister in his individual capacity remain PENDING.


2. The clerk shall forthwith enter judgment in favor of Defendants Pitkin County Commissioners and Sheriff Braudis, dismissing all claims with prejudice. These Defendants may have their costs by filing a bill of costs within eleven days of the date of this order.


Dated this 29th day of February, 2008.

BY THE COURT:

s/ Edward W. Nottingham

EDWARD W. NOTTINGHAM

Chief United States District Judge

# EXHIBIT "O"

DERIOUS J. JOHNSON, Plaintiff, v. BRADLEY BEREZANSKY,
Defendant. DERIOUS J. JOHNSON, Plaintiff, v. CPL. ROGERS AND
BRADLEY BEREZANSKY, Defendants.

C.A. No. 03-562 (KAJ) (CONSOLIDATED), C.A. No. 03-710 (KAJ)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE

*2005 U.S. Dist. LEXIS 7552*

April 28, 2005, Decided

**PRIOR HISTORY:** *Johnson v. Berezansky, 2004 U.S. Dist. LEXIS 13482 (D. Del., June 15, 2004)*
*Johnson v. Rogers, 2004 U.S. Dist. LEXIS 13483 (D. Del., June 15, 2004)*

**COUNSEL:** [*1] For Derious J. Johnson, Pro se, Delaware Correctional Center, Delaware.

For Defendants: Eileen Kelly, Deputy Attorney General, Delaware.

**JUDGES:** JORDAN, District Judge.

**OPINION**

**MEMORANDUM OPINION**

April 28, 2005

Wilmington, Delaware

**JORDAN, District Judge**

**I. INTRODUCTION**

Darius J. Johnson ("Plaintiff") is currently incarcerated at the Delaware Correctional Center ("DCC")
in Smyrna, Delaware. (Docket Item ["D.I."] 10.) [1] Plaintiff was previously housed at the Sussex
Correctional Institution ("SCI") in Georgetown, Delaware, during the period relevant to the complaints.
(D.I. 2 at 3.) On June 17, 2003, Plaintiff filed a complaint pursuant to *42 U.S.C. § 1983* against
Correctional Officer Bradley Berezansky ("Berezansky") alleging that Berezansky violated Plaintiff's
*Eighth Amendment* right to be free of excessive force. (D.I. 2.) Plaintiff filed another complaint on July 14,
2003 against Corporal Rogers ("Rogers"), a prison staff supervisor alleging Rogers conspired with
Berezansky in violating Plaintiff's civil rights. (D.I. 2 in C.A. No. 03-710.) The complaints were
consolidated in an order issued November 30, 2004. (D.I. 56.) [*2]

> 1  Unless otherwise noted, docket item references are to the earlier filed of these consolidated
> actions, C.A. No. 03-562 (KAJ).

Presently before me is a motion for summary judgment filed by Berezansky and Rogers (collectively
"Defendants") (D.I. 70), and several miscellaneous motions filed by Plaintiff (D.I. 38, 40, 43, and 72). [2] For
the following reasons, Defendants' motion for summary judgment will be granted, rendering the remaining
motions moot.

> 2  Plaintiff's motions include: 1) a petition for a writ of habeas corpus to permit Plaintiff to call
> eleven inmate witnesses at trial (D.I. 38); 2) a request for a change in housing to facilitate access to
> legal resources and potential witnesses (D.I. 40); 3) a motion to compel discovery (D.I. 43); 4) a
> motion for an evidentiary hearing to determine the identity of Cpl. Rogers (D.I. 72).

[*3] **II. BACKGROUND** [3]

> 3 The following rendition of background information does not constitute findings of fact, and is cast in the light most favorable to the plaintiff.

On May 31, 2003, Plaintiff and Berezansky were involved in an incident at SCI which started during breakfast. (D.I. 71, Ex. C, Dep. of Derious Johnson, Dec. 8, 2004 (hereafter "D.I. 70, Ex, C") at 22:17-23:8.) According to Plaintiff, Berezansky accused Plaintiff and his cell mate of trading food in violation of housing rules, and instructed Plaintiff to throw away his tray and "lock in" [4] his cell. (*Id.*) Despite protesting Berezansky's order, Plaintiff complied, threw away his food, and went to his cell. (D.I. 36 at 2, D.I. 71, Ex. Cat 23:8-12.) Plaintiff acknowledges that, after returning to his cell, he "banged on the door," repeatedly complained about missing his meal, and requested to speak to a lieutenant. (D.I. 71, Ex. Cat 23:17-24:10.) Plaintiff also concedes that Berezansky repeatedly instructed Plaintiff to stop calling [*4] out and banging on the door. (*Id.*)

> 4 While the term is not specifically defined, I take it that an order to "lock in" requires prisoners to return to their cells from a common area and remain locked in their cells.

Eventually, Berezansky came to Plaintiff's cell, and Plaintiff asserts that Rogers [5] released the cell door allowing Berezansky to open it. (D.I. 36 at 2-3; D.I. 71, Ex. C at 26:4-27:5.) According to Plaintiff, Berezansky entered his cell and instructed him to "get up on [his] bunk." (D.I. 71, Ex. Cat 24:17-20.) In response to this instruction, Plaintiff requested that his complaint be relayed to a sergeant. (*Id.*) Plaintiff contends that Berezansky again requested that Plaintiff "get up on the bunk." (*Id.*) In response, Plaintiff contends that he "was walking back to get on [his] bunk and to take [his] slippers off," and before he got on his bunk, he requested grievance forms to "let the sergeant know I didn't eat." (D.I. 71, Ex. C, at 24:23-25:5.) According to Plaintiff, this is [*5] when Berezansky sprayed him with capstun and instructed his cell mate to leave the cell. (D.I. 71, Ex. Cat 25:6-12.) Plaintiff alleges that he was sprayed a second time with capstun while bent over "gasping for air." (D.I. 36 at 3.) Plaintiff was eventually escorted to a different housing module. (D.I. 71, Ex. Cat 25:18-20.)

> 5 The identity of "Cpl. Rogers" named as defendant in Plaintiff's case is unclear from the record. The Plaintiff specifies "Cpl. Rogers" in his complaint. (D.I. 2 in C.A. No. 03-710.) Berezansky indicates that he contacted both Sergeant Anthony Rogers and Corporal Brian Rogers concerning his incident with Plaintiff. (D.I. 71, Ex. Bat 2, P 5, P 7.) Plaintiff has requested an evidentiary hearing to determine which staff member fits the physical description of Cpl. Rogers provided by Plaintiff (D.I. 72.) Because the motion for summary judgment will be granted, the identity of defendant Rogers is immaterial.

Berezansky describes Plaintiff's behavior in his cell as "causing a disturbance on the [*6] housing unit," which prompted Berezansky to approach his cell to speak with him. (D.I. 71, Ex. Bat 2 P 4.) Berezansky contends that as Plaintiffs cell door opened, Plaintiff stepped out, continued to "[yell] that he wanted to see a lieutenant," and ultimately "clenched his fists and began to approach [Berezansky] in an aggressive manner," to which Berezansky responded by drawing and using his capstun. (D.I. 71, Ex. Bat 2, P 6.)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. Where the plaintiff is a pro se litigant, the court has an obligation to construe the complaint liberally. *See Haines v. Kerner, 404 U.S. 519, 520-21, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972); Gibbs v. Roman, 116 F.3d 83, 86 n.6 (3d Cir. 1997); Urrutia v. Harrisburg County Police Dep't., 91 F.3d 451, 456 (3d Cir. 1996).*

The moving party bears [*7] the burden of proving that no genuine issue of material fact exists. *See Matsushita Bee. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir.*

*1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita, 475 U.S. at 587* (quoting *Fed. R, Civ. P.56(e)*).

The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; [*8] there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

## IV. DISCUSSION

A. Excessive Force Claim Against Defendant Berezansky

The *Eighth Amendment* protects inmates from excessive use of force by prison officials. *See Whitley v. Albers, 475 U.S. 312, 327, 89 L. Ed. 2d 251, 106 S. Ct. 1078 (1986).* Whenever prison officials stand accused of excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian, 503 U.S. 1, 7, 117 L. Ed. 2d 156, 112 S. Ct. 995 (1992)* (citing *Whitley, 475 U.S. at 320-21).*

Whenever corrections officers use force to keep order, they must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. [*9] *Hudson, 503 U.S. at 6* (internal quotations omitted). Circumstances involving potential or actual unrest may require prison officials to act quickly and decisively and also implicate the principle that "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley, 475 U.S. at 321-22* (quoting *Bell v. Wolfish, 441 U.S. 520, 547, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979).*

In deciding whether force was applied in good faith, the court must consider several factors including: 1) the need for the application of force; 2) the relationship between the need and the amount of force that was used; 3) the extent of injury inflicted; 4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and 5) any efforts made to temper the severity of a forceful response. *See Whitley, 475 U.S. at 321* (internal citations omitted). The defendants cannot prevail on a motion for summary judgment if [*10] "it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." *Id. at 322.* Thus, the plaintiff must be able to establish that the force was maliciously applied to cause harm. *Id.*

Although the plaintiff does not have to demonstrate serious injury, the extent of injuries suffered is a factor in determining whether the use of force was necessary or not. *Hudson, 503 U.S. at 7; see also Brooks v. Kyler, 204 F.3d 102, 104 (3d Cir. 2000).* "Although the extent of an injury provides a means of assessing the legitimacy and scope of the force, the focus always remains on the force used ... ." *Brooks, 204 F.3d at 108.*

Applying the five *Whitley* factors, I find that no genuine issue of material fact exists to prevent summary judgment for the Defendants..

1. The Need for the Application of Force

The use of force was justifiable because, as Plaintiff admitted, he continued to cause a disturbance in the housing unit after Berezansky instructed him to remain quiet. (D.I. 36 at 2; D.I. 71, Ex. Cat 23-24.) Although it is disputed [*11] whether or not Plaintiff threatened Berezansky, Plaintiff's disorderly conduct was sufficient to create a need for Berezansky to use force to quell Plaintiff's disruptive behavior. *See Wilson v. Reinhart, 2003 U.S. Dist. LEXIS 13161, No. CIV.A.02-1551-SLR, 2003 WL 21756393, at *4 (D. Del. July 29, 2003).*

2. The Relationship Between the Need for Force and the Amount of Force Used

Because relatively minor force was used, the amount of force used cannot be said to have been inappropriate for the situation. *Id.* SCI's policies and procedures provide that "capstun use is justifiable to subdue unruly inmates, ... [and] may also be used to move inmates that fail to comply with lawful orders." (D.I. 71, Ex. Gat 2, Department of Correction, Policy & Procedures, pg. 8, ch. 1, no. 4.) Spraying Plaintiff with capstun was in proportion to the need to stop him from causing a disturbance in the prison through his continued shouting and banging on the cell door, and to address his lack of compliance with Berezansky's instructions. Even if, as Plaintiff claims, he did not threaten Berezansky, but merely failed to follow instructions, Berezansky's response was reasonable under the circumstances. *See* [*12] *Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984)* ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhumane punishment" even if the inmate is handcuffed or locked in the cell).

Berezansky used capstun only after Plaintiff ignored Berezansky's orders to be quiet. Plaintiff also acknowledges that he was not prompt in complying with Berezansky's instructions to get on his bunk. Plaintiff has not presented evidence that Berezansky used a dangerous amount of capstun for a typical inmate or sprayed Plaintiff for a prolonged period of time. (D.I. 71, Ex. C at 59:16-61:21.)

3. The Extent of the Injury Inflicted

The extent of the injury is a factor to be considered, even though Plaintiff does not have to show serious injury to state an *Eighth Amendment* claim. *See Hudson, 503 U.S. at 7.* Here, Plaintiff has not claimed any persistent or serious injury stemming from the incident, and his medical records affirmatively indicate that no injuries were noted. (D.I. 60, Ex. B at 4.) Although Plaintiff asserts that he suffered mental and emotional [*13] injuries as a result of the incident with Berezansky, he has failed to introduce any evidence to support even those claims. Thus Plaintiff has failed to show that he suffered a serious injury.

4. Extent of the Threat to the Safety of Staff and Inmates

The extent of the threat to the safety of the staff and inmates, as perceived by the responsible officials on the basis of the facts known to them must also be considered in justifying the use of force. *Hudson, 503 U.S. at 7.* Prison officials are allowed great deference in setting and executing policies that are, in their opinion, necessary to maintain order, discipline, and security. *Id.* Berezansky was in the best position to perceive any threat to his safety or the security of the prison by Plaintiff's behavior.

Although the parties differ on the facts immediately preceding the use of capstun in Plaintiff's cell, [6] Plaintiff described himself as "agitated" when Berezansky entered his cell (D.I. 71, Ex. Cat 62:16-18), and Berezansky claimed that he perceived a threat to his safety (D.I. 71, Ex. Bat 2 P 6; Ex. Fat 1). Berezansky has reasonably justified his perception that Plaintiff presented [*14] a threat to Berezansky's safety, thus warranting the use of capstun.

> 6  Plaintiff claims that he was in the process of getting on his bunk, in compliance with Berezansky's instructions when he was sprayed with capstun. (D.I. 36 at 3.) Berezansky claims that Plaintiff was coming towards him aggressively when he used the capstun. (D.I. 71, Ex. Bat 2, P 6.)

5. Efforts Made to Temper the Severity of a Forceful Response

Finally, Berezansky made several attempts to temper the severity of a forceful response. Plaintiff describes how Berezansky offered him several opportunities to calm down before Berezansky came to his cell and used his capstun. (D.I. 71, Ex. Cat 50:13-52:5.) Plaintiff and Berezansky's confrontation began during breakfast and continued well after Plaintiff had returned to his cell. Berezansky did not immediately respond with force when Plaintiff refused to follow instructions. Plaintiff has failed to set forth evidence that Berezansky acted maliciously or sadistically, and his claim under *§ 1983* [*15] cannot survive summary judgment.

B. Excessive Force and Conspiracy Claim against Cpl. Rogers

Plaintiff filed a complaint against Rogers in July 2003 for conspiring with Berezansky to assault Plaintiff with capstun. (D.I. 2 in C.A. No. 03-710.) Because Plaintiff has not shown misconduct by

Berezansky, he necessarily cannot establish liability on the part of any alleged co-conspirator or supervisor. *See Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986).*

## V. CONCLUSION

Accordingly, Defendants' motion for summary judgment (D.I. 70) will be granted, and Plaintiff's petition for a writ of *habeas corpus* (D.I .38), motion for transfer (D.I. 40), motion to compel discovery (D.I. 43), and motion for an evidentiary hearing (D.I. 72) will all be denied as moot.

## ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that Defendants' motion for summary judgment (D.I.70) is GRANTED, and Plaintiff's petition for a writ of *habeas corpus* (D.I. 38), motion for transfer (D.I. 40), motion to compel discovery (D.I. 43), and motion for an evidentiary hearing (D.I. 72) are all DENIED as moot.

[*16]  UNITED STATES DISTRICT JUDGE

April 28, 2005

Wilmington, Delaware