**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JIMMIE LEWIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 04-1350-GMS |
| | ) |
| DR. SYLVIA FOSTER, NURSE | ) |
| ASSISTANT ROBERT N. GRAY, MR. | ) |
| JOHNSON 1, MR. JOHNSON 2, LANCE | ) |
| SAGERS, and DAVE MOFFETT, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPENDIUM OF EXHIBITS IN THE OPENING BRIEF OF DEFENDANTS
ROBERT N. GRAY, LANCE SAGERS, AND DAVID MOFFETT IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

WOLFBLOCK LLP
Thomas P. McGonigle (I.D. No. 3162)
Joseph C. Schoell (I.D. No.3133)
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 777-5860

Attorneys for Defendants Robert N. Gray,
Lance Sagers and David Moffett

OF COUNSEL:

Cara E. Leheny
WOLFBLOCK LLP
1940 Route 70 East, Suite 200
Cherry Hill, New Jersey 08004
(856) 874-4275

Dated: March 26, 2008

# EXHIBIT A

# DELAWARE PSYCHIATRIC CENTER

## HOSPITALIZATION DATES AND DIAGNOSES

NAME: LEWIS, JIMMY          HOSPITAL #: 46443

| DATES | DIAGNOSES ON RELEASE | CODE |
|---|---|---|

```
  05/21/04---------1st ADMISSION--------COURT
06/25/04---DIRECT DISCHARGE---AXIS I:   MALINGERING.  CODE NO. V65.2
                                        ALCOHOL ABUSE.   CODE NO. 305.00
                                        HISTORY OF CONDUCT DISORDER.
                              AXIS II:  ANTISOCIAL PERSONALITY DISORDER.. CODE NO. 301.7
                              AXIS III: HYPERTENSION.  CODE NO. 401.9
                              AXIS IV:  SEVERITY OF PSYCHOSOCIAL STRESSORS:  INCARCERATION.
                              AXIS V:   GLOBAL ASSESSMENT OF FUNCTIONING:  CURRENT GAF - 50
                                        WITH SEVERE IMPAIRMENT IN SOCIAL AND OCCUPATIONAL
                                        FUNCTIONING.
                                        HIGHEST LEVEL LAST YEAR - UNKNOWN.
```

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only - not to be duplicated
or released to others.

UA – Unauthorized Absence
OA – Otherwise Absent

# EXHIBIT B

05/13/2004    13:22    S    RIOR COURT JUDGES CHAMBERS → 9429?    NO.394    D04

## Offender Status Sheet

Date: 05/27/20

SBI #: T1785585    Name: JIMMY LEWIS
Location(s): UPCJF    Level(s): Q    Race: BLACK    DOB: 1225/
Anal
Offender Type: Detendonar    Officer(s):

### Detainer Charge Information

| START DATA | CASE# | CRA#/... | Descriptions | Active | Court | | BOND Amo... |
|---|---|---|---|---|---|---|---|
| 05/26/2003 | 0305016966 | 0305016966 | Carjacking Second Degree Take Possession o | Y | U4 | | $10,000 |
| 05/26/2003 | 0305016966 | 0305016966 | Theft $1000 or Greater (Deprive Person) | Y | U4 | | $1,000 |
| 05/26/2003 | 0305016966 | 0305016966 | Resisting Arrest | Y | U4 | | $1,000 |

CONFIDENTIAL INFORMATION
For professional use by authorized
persons only -- not to be duplicated
or released to others.

A-2

05/13/2004    13:22    SUPERIOR COURT JUDGES CHAMBERS → 94297          NO.394    P03

# First Correctional Medical

Donald Napolin, LCSW, CADC
Mental Health Supervisor
HRYCI, 1301 E. 12th Street
Wilmington, DE 19809
(302) 429-7762 phone
(302) 429-7709 fax



May 5, 2004

The Honorable Judge, Charles H. Toliver, IV, Superior Court
Daniel L. Herrmann Court House
1020 King Street
Wilmington, DE 19801

Dear Judge Toliver :

This letter, with attached psychiatric evaluation by Dr. Joshi, M.D., is presented to the Court to request a court order for the immediate admission and psychiatric evaluation and treatment of Jimmy Lewis at the Delaware Psychiatric Center. The Patient's Identifying information follows:

NAME: Jimmy Lewis        DOB: 12/25        SBI #: 506622    Case #: 0305016966

Jimmy Lewis is currently being housed at the HRYCI infirmary. He has a significant history of mental Illness and he has been diagnosed with Schizophrenia, Undifferentiated Type. He is currently psychotic, refusing to take his psychiatric medicine and a danger to self and others. Last week he attacked a Correctional Officer and he is currently responding to internal stimuli. We are requesting to have Mr. Lewis evaluated for involuntary medication.

If you desire additional information, please contact me at 302-429-7762 or via my pager at 800-426-4319. Dr. Joshi may also be reached at 302-429-7762. Our fax number is 302-429-7709. Thank you for your time and consideration of this matter.

Sincerely,

*Donald Napolin LCSW, CADC*

Donald Napolin, LCSW, CADC
Mental Health Supervisor

Cc: Warden Williams, Deputy Warden Phelps, Dr. Kris Foli

A-3

# EXHIBIT C

Jimmie Lewis

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS,                          )
                                       )
          Plaintiffs,                  )   C.A. No. 04-1350
                                       )
v.                                     )
                                       )
SYLVIA FOSTER, M.D., et al.,           )
                                       )
          Defendants.                  )

          Deposition of JIMMIE LEWIS taken pursuant to
notice before Renee A. Meyers, Registered Professional
Reporter and Notary Public, in the Delaware Correctional
Center, 1181 Paddock Road, Smyrna, Delaware, on Monday,
December 18, 2006, beginning at approximately 10:05 a.m.,
there being present:

APPEARANCES:

          JIMMIE LEWIS, Pro Se

          REGER, RIZZO, KAVULICH & DARNALL, LLP
          RONALD W. HARTNETT, JR., ESQ.
            1001 Jefferson Plaza, Suite 202
            Wilmington, Delaware  19801
            for Sylvia Foster, M.D.,

          DEPARTMENT OF JUSTICE
          GREGORY E. SMITH, ESQ.
           ILONA M. KIRSHON, ESQ.
            Carvel State Office Building, 7th Floor
            820 North French Street
            Wilmington, Delaware  19801
            for Defendant.

                CORBETT & WILCOX
          Registered Professional Reporters
     230 North Market Street      Wilmington, DE 19899
                  (302) 571-0510
              www.corbettreporting.com
          Corbett & Wilcox is not affiliated
        with Wilcox & Fetzer, Court Reporters

Jimmie Lewis

Page 9

1    time you were transferred from Gander Hill to DPC?

2         A.    No.  I had already been adjudicated guilty.

3         Q.    You were then a sentenced inmate at that time?

4         A.    No.  I don't understand if I am still -- at

5    this point, I don't understand if I was -- if I am a

6    pretrial -- if I am pretrial before I get sentenced,

7    then, yes, I was still pretrial because I wasn't yet

8    sentenced but I was already adjudicated guilty.  That's

9    the gray area for me.

10        Q.    Thank you.  I apologize for that.  You had

11   already had your trial at that time?

12        A.    Yes, October 21st to October 23rd of 2003.

13        Q.    But you had not yet been sentenced as a result

14   of that trial?

15        A.    Correct.

16        Q.    I apologize for that.  I did not mean that as

17   a trick question.

18              Did do you anything while you were at

19   Gander Hill that resulted in your transfer to DPC?

20        A.    I -- that's irrelevant.  I find that to be

21   irrelevant towards the conditions -- the situation that's

22   regarding the plaintiffs -- the defendants, I am saying.

23   I object to that line of questioning, I should say.

24        Q.    And you have a right to register an objection.

Jimmie Lewis

Page 14

1       A.   Okay.

2       Q.   Certainly, you know, don't hesitate, since I

3   will be asking you some questions about it.

4       A.   Okay.  I wrote it, so I pretty much know what

5   it is.

6       Q.   Let me turn your attention to the first part

7   of the complaint.

8            Would you disagree that that first, what

9   you have labeled as No. 1, nothing in that first part of

10  your complaint alleges any misconduct on the part of

11  Lance Sagers, David Moffett, Brian Johnson, or Robert

12  Gray?

13      A.   I reserve the right on that question.

14      Q.   Now, Mr. Lewis, this is very much -- there is

15  no question that this is relevant to the complaint.  This

16  is your complaint.

17      A.   My question -- I am -- if it's something

18  that's dealing with what Mr. Gray and Mr. Sagers done to

19  me, do you understand what I am saying, if you can

20  specifically identify something specific instead of in

21  general, I will answer -- I will be glad to answer your

22  question.  You are asking me an in general question that

23  causes me to speculate and I am not going to do that.

24      Q.   Mr. Lewis, I am not asking you to speculate.

Jimmie Lewis

Page 15

1    That's why I thought you might want to have the complaint

2    open in front of you.

3        A.   Yes.

4        Q.   Do you want me to hand you a copy of it?

5        A.   No.  I need you to be more specific in your

6    question, your line of questioning, sir.

7        Q.   I would like you to look at the first part of

8    your complaint, what you have labeled as No. 1 within

9    your statement of facts; okay.

10       A.   I heard your question.  I heard what you said

11   initially.  What I am telling you is that your question

12   was too general and too broad for me to give you a

13   specific answer to an in general question.

14       Q.   Is there anything in that paragraph that

15   relates to the four individuals whom I represent?

16       A.   I reserve the right on that question because

17   it's too in general and it's not -- it's -- for me to

18   give you a specific question -- a specific answer.

19       Q.   So, you are refusing to answer that question?

20       A.   I reserve the right to answer.  I reserve my

21   right on that.  It's too in general.  You have to be more

22   specific, sir.

23       Q.   I will be a little more specific, then.

24       A.   Yes.

Jimmie Lewis

Page 16

1       Q.   Mr. Lewis, from my reading of that complaint,

2   none of those defendants are mentioned by name in part

3   one of your complaint.

4       A.   Mm-hmm.

5       Q.   Do you agree with that statement?

6       A.   At this point, discovery has -- may reveal

7   that those individuals were involved in situations that

8   occurred throughout the course of that complaint, so,

9   therefore, you know what I am saying, I am not going to

10  say that they weren't involved in situations where I was

11  unconstitutionally violated.

12      Q.   Mr. Lewis, I am not trying to get you to talk

13  about the whole complaint, just that first part.

14      A.   You spoke earlier -- you mentioned

15  specifically that it was broken down into eight points

16  and that you was going to question me on each point.

17      Q.   Right.

18      A.   So I would -- in the focus of my thoughts, I

19  will answer your questions.

20      Q.   Mr. Lewis, I certainly acknowledge that you

21  have their names written in many parts of the complaint,

22  but right now, I am just trying to get you to focus on

23  that first part; okay, so that we can deal with, in an

24  orderly fashion, who you have alleged to have been

A.-8

Jimmie Lewis

1  involved in conduct; okay?

2       A.   Yes.

3       Q.   With that in mind, are you willing to answer

4  the question that I have asked you?

5       A.   You have to pose the question in a manner that

6  is not so in general that I would have to speculate on

7  facts that have not been forthcoming throughout the

8  course of this discovery process.

9       Q.   Mr. Lewis, I am not asking you to speculate.

10      A.   Okay.

11      Q.   I am just talking about what you put in

12  writing in that first part of your complaint.  All I am

13  asking you is that in that first part of the --

14      A.   They may very well have been involved in

15  situations throughout -- that I have depicted in each

16  eight sections as you have depicted it in the complaint.

17      Q.   In each of the eight sections, you are saying?

18      A.   That's what you said initially, and I am

19  answering it in that -- in that format.  They may very

20  well be individuals that were involved in violating my

21  constitutional rights throughout the course of, as you

22  say, the eight parts that constitute all or construct the

23  complaint itself.

24      Q.   Since you said you have a copy of it in front

Jimmie Lewis

Page 18

1   of you, I am going to ask you to turn to that first, what

2   I have been referring to here as the first portion of

3   your complaint.  Can you look at that for me, please?

4        A.   Yes.  Okay.  I have it.

5        Q.   You have it in front of you?

6        A.   Yes.

7        Q.   Can I ask you to read that, please, beginning

8   with, "I arrived at the Delaware Psychiatric"?

9        A.   I am willing to answer questions.  If you have

10  a question that you want to ask me, then I will answer a

11  question.

12       Q.   Yes, I do.  My question is:  Will you please

13  read this paragraph for me?

14       A.   I reserve the right -- I reserve that.  I

15  am --

16       Q.   You are refusing to even read your own

17  complaint?

18       A.   Yes, at this point.  The first page, yes.

19       Q.   Mr. Lewis, let me refer you now to the second

20  part of your complaint.

21       A.   Is that the second page?

22       Q.   Yes.  It has a pound sign two?

23       A.   Yes.

24       Q.   Is it fair to say that this paragraph is

Jimmie Lewis

1  talking about allegations that you have raised on June

2  6th of 2004, regarding an individual by the name of James

3  Floyd?

4      A.   That issue seems to be directed for

5  Dr. Foster, and I refuse to answer that question.  I

6  retain the right to answer that.  That just seems to be

7  directed for Dr. Foster, so I am, you know, I don't see

8  the relevancy in answering the questions regarding

9  Dr. Foster when the motion to depose has been for other

10 defendants other than Dr. Foster at this point.

11     Q.   So, the second portion is about Dr. Foster?

12     A.   I am saying that you are -- you are asking me

13 about situations that aren't specifically identifying the

14 defendants who you are saying that you are here to

15 represent at this point.

16     Q.   So, paragraph two doesn't deal with any of my

17 defendants?

18     A.   I am not saying that.  What I am saying is

19 that you are not specifying what it is that you -- or why

20 you are asking me this in regards to the defendants that

21 you are here to depose me on.  Do you understand what I

22 am saying?  They may very well be involved with this

23 situation that took place on 6/6, 2004, but discovery

24 hasn't, you know, made that forthcoming at this time.

Jimmie Lewis

Page 22

1      Q.   I just specifically pointed out.

2      A.   I am going to say that I reserve the right to

3  answer that question.  I think that's a fact-finding

4  process that need to be determined in, you know,

5  discovery.  You know, at this point, we are still in the

6  discovery process, and I can't specify specifically that

7  your clients weren't involved with the situation that

8  took place on 6/6, 2004, regarding, you know,

9  constitutional violations that I alleged on that date.

10     Q.   Let's talk about part three of the second

11 amended complaint.

12          Do you have that in front of you?

13     A.   Pound three?

14     Q.   Yes, please.

15     A.   Yes.

16     Q.   And just to make sure we are both referring to

17 the same thing, it begins, "At the Delaware Psychiatric

18 Center, Delaware, on or about 6/9, 2004"?

19     A.   Yes.

20     Q.   Is it fair to say that this portion of your

21 complaint deals with shaving your head, in part?

22     A.   As a religious writ, yes.

23     Q.   What's your religious affiliation?

24     A.   I reserve the right to answer that question at

Jimmie Lewis

Page 23

1    this point.

2         Q.   Now, Mr. Lewis, in your complaint, you state

3    that you are a Hebrew Israelite; is that correct?

4         A.   If that's what's stated, yes.

5         Q.   Is that your religious affiliation?

6         A.   Yes.

7         Q.   What is a Hebrew Israelite?

8         A.   I am going to reserve the right to answer that

9    question at this point.

10        Q.   As a result of being a Hebrew Israelite, how

11   did that impact on your hair?

12        A.   I reserve the right to answer that question.

13        Q.   Did Lance Sagers have anything to do with

14   shaving your hair?

15        A.   Subsequently, I spoke with several staff

16   members regarding that matter, and, at this point, I am

17   not specifically -- I am not going to say that he wasn't

18   one of the individuals who I spoke with at that time

19   regarding that issue, so I am going to reserve the right

20   to answer that.

21        Q.   Did David Moffett have anything to do with

22   shaving your hair?

23        A.   The defendants work at the Delaware

24   Psychiatric Center and they were individuals who were

A-13

Jimmie Lewis

Page 24

1    assigned to passing out razors or assigned to enforcing

2    the rules and regulations that I may add that I never

3    received, the rule books that I never received; do you

4    understand what I am saying?  So, at this point, this is

5    why I am saying I am not going to specifically say that

6    they were individuals that did not, you know, prevent me

7    from practicing my religious right.

8         Q.   Did Brian Johnson have anything to do with

9    shaving your hair?

10        A.   No, not at all.

11        Q.   Did Robert Gray have anything to do with

12   shaving your hair?

13        A.   I reserve the right, at this point, to answer

14   that question.  Brian Johnson had nothing to do with it.

15   Brian Johnson was not affiliated with the situation at

16   that point.

17        Q.   Now, a part of your complaint focuses on the

18   psychiatric evaluation of doctor -- conducted by

19   Dr. Foster; correct?

20        A.   Yes.

21        Q.   Did Lance Sagers have anything to do with

22   Dr. Foster's psychiatric evaluation of you?

23        A.   Yes.

24        Q.   What did Mr. Sagers have to do with

A-14

Jimmie Lewis

Page 25

1  Dr. Foster's evaluation of you?

2       A.   He made notes inside the doctor's notes,

3  progress notes, and that reflected upon my -- the psych

4  report that was submitted to the Superior Court.  And he

5  committed other acts that were also taken into

6  consideration in regards to Dr. Foster, Dr. Foster's

7  evaluation.

8       Q.   Where are these notes that you mentioned that

9  Mr. Sagers, you say, were --

10      A.   They were sent to me via discovery.

11      Q.   And where?

12      A.   Pardon me?  I don't understand exactly what

13  you are saying.

14      Q.   Where did Mr. Sagers write the notes?

15      A.   At the Delaware Psychiatric Center.

16      Q.   And in what document did he make these notes?

17      A.   The progress notes, the doctor's progress

18  notes that -- that's what they -- it's something that the

19  doctor would look at and be able to reflect upon with

20  what has been said about my behavior and what has been

21  said about my psychiatric, psychological, mental health

22  condition during the course of my stay while I was at the

23  Delaware Psychiatric Center.

24      Q.   Would that have been part of your medical file

Jimmie Lewis

Page 26

1   at DPC?

2        A.   Yes.

3        Q.   And do you have that with you today?

4        A.   Not -- no.  I didn't bring the medical

5   records.  Did you?

6        Q.   I have the medical records that you attached

7   to your complaint.

8        A.   Okay.

9        Q.   I did not bring everything in discovery that's

10  been provided to you.

11       A.   Okay.

12       Q.   Do you recall what Mr. Sagers, you say, wrote

13  in the progress notes that affected Dr. Foster's

14  psychiatric evaluation of you?

15       A.   I would have to -- I would have to reflect

16  upon the doctor's notes to be specific, and I don't want

17  to misquote and say something that Mr. Sagers did not

18  say, so I am going to reserve the right to answer that

19  question at this point.

20       Q.   How many times did Mr. Sagers write something

21  in your progress notes that impacted Dr. Foster's

22  evaluation of you?

23       A.   To my -- to my recollection, at least three to

24  four times, and that's off the top -- and don't, you

Jimmie Lewis

1    know, don't hold me to that, you know, per se, but, to my

2    recollection, that's about -- about as many times as I

3    can, you know, recall off the top of my head.

4        Q.   And without trying to ask you to quote

5    directly what those statements were, generally speaking,

6    what notes are you saying Mr. Sagers made that impacted

7    on Dr. Foster's evaluation?

8        A.   I was going to ask -- that's going to have to

9    -- I will have to answer that with being -- with

10   specifying what it is that, you know, that I thought that

11   he said.  I am not going to do that, you know what I am

12   saying?  I don't want to violate Mr. Sagers in any way by

13   falsely accusing him of something that he didn't do, so I

14   reserve the right to answer that question.

15       Q.   David Moffett, did Mr. Moffett have anything

16   to do with Dr. Foster's evaluation of you?

17       A.   At this point, I can't say.  I haven't been

18   provided with all the documents and all necessary -- or

19   all affidavits that have -- that was before Dr. Foster,

20   and, at this point, Dr. Foster has failed to answer

21   discovery requests that I presented to her, so I can't --

22   I can't -- I can't specifically say yes or no at this

23   point, so I reserve the right to answer that question.

24       Q.   Robert Gray, was he involved with Dr. Foster's

Jimmie Lewis

Page 28

1   evaluation of you?

2       A.   Yes.

3       Q.   How is Mr. Gray involved?

4       A.   He submitted notes regarding my behavior, my

5   psychological condition, my mental health, my physical

6   health upon the progress notes, and, therefore, those

7   notes were reviewed by Dr. Foster in conducting her

8   evaluation.

9       Q.   Finally, Brian Johnson, was Mr. Johnson

10  involved in any way with Dr. Foster's psychiatric

11  evaluation?

12      A.   All the discovery material hasn't been

13  forthcoming at this point, and I can't identify

14  specifically if Mr. Johnson was or was not, you know,

15  offered anything that Dr. Foster took into consideration

16  when she authored the psychiatric evaluation.  So I

17  reserve the right to answer that question at this point.

18      Q.   The third part of your complaint, is it fair

19  to say that it does not list Lance Sagers, David Moffett,

20  Brian Johnson, and Robert Gray by name?

21      A.   Yes.

22      Q.   And let's talk about the fourth part of your

23  second amended complaint.

24               Can I ask you to read that first

Jimmie Lewis

Page 34

1    Q.    Now, you mentioned earlier that you had some

2    20-minute conversation with Mr. Johnson.

3    A.    Well --

4    Q.    When did that take place?

5    A.    That was after the situation that, you know,

6    me being instructed to go back to the room.

7    Q.    Because you said you tucked in.

8    A.    Listen.  After I was instructed to go back to

9    my room, I tucked in, and about shortly thereafter, you

10   know, I was resting 15 minutes, then that's when

11   Mr. Johnson, male nurse, and someone else came to my

12   assigned room, room 71, and awoke me and was explaining

13   to me that they were -- they were here because there were

14   reports of -- that I was extremely agitated.

15   Q.    Was anyone else in the room with you?

16   A.    I was assigned a room by myself.

17   Q.    Did this conversation with Mr. Johnson and the

18   two other individuals take place with the door open or

19   with the door closed?

20   A.    The door was open.

21   Q.    What was the tone of the conversation?

22   A.    It was very civil, in the manner that we are

23   speaking here today.

24   Q.    And what was the result of this conversation?

Jimmie Lewis

Page 36

1    me and Mr. Johnson was talking, so I believed that he was

2    going to call the nurse -- I mean call the doctor, pardon

3    me.  I believe he was going to call the doctor, you know,

4    to -- to see if, in fact, I did -- you know, if, you

5    know, if I still should be given any psychotropic

6    medications.  And -- but about, like I said, throughout

7    the course of that, he was gone for like ten minutes, you

8    know, he left in the course of about ten minutes of me

9    and Mr. Johnson talking, he was gone ten minutes.  When

10   he returned, he returned with five or six other people.

11        Q.   Do you know who these five or six other people

12   were?

13        A.   I understand that they were staff members of

14   the psychiatric center, the Delaware Psychiatric Center.

15        Q.   Was Lance Sagers one of those five or six

16   other people?

17        A.   No.

18        Q.   Was David Moffett one of those five or six

19   other people?

20        A.   No.

21        Q.   Was Robert Gray one of those five or six other

22   people?

23        A.   No.

24·       Q.   After this group arrived, what happened next?

Jimmie Lewis

Page 45

1    Q.    Okay.

2    A.    The early a.m. hours.  Sometimes I always get

3  them confused when I was coming up.  I never was able to

4  differentiate between the morning and, you know, the

5  evening, and still sometimes even the evening, right now,

6  I am still -- I don't know -- what is the evening?  Is it

7  4:00 or 6:00?  You know, like that.  So I was confused in

8  regards to my depiction of interpreting what the morning

9  was.

10    Q.    So, the laundry room incident, you meant

11  actually June 15th?  I am not trying to put words in your

12  mouth.

13    A.    No.  I was actually seen -- Mr. Johnson -- I

14  actually seen Mr. Johnson on the evening, 11 p.m., at or

15  about 11 p.m. on 6/14, 2004, but it carried on until the

16  morning of June 15th, 2004, after this incident depicted

17  in pound five of the amended complaint.

18    Q.    Now, my understanding was you testified that

19  Mr. Johnson came to your door the morning after this

20  other incident that we are about to get to.

21    A.    Yes.

22    Q.    And spoke with you for about 20 minutes.

23    A.    Yes.

24    Q.    Now, are you saying he also came and spoke.

Jimmie Lewis

Page 49

1      Q.    Just somebody you met while you were at DPC?

2      A.    Correct.

3      Q.    You didn't know him from the outside?

4      A.    No.

5      Q.    What does Mr. Smith look like?

6      A.    Brown-skinned, African-American male, maybe

7    5'7", 5'8".  He was young, so he was probably still

8    growing, about 140 pounds, slim guy.  I would recognize

9    him if I seen him.

10     Q.    Why did you give him a dollar to purchase M&Ms

11   for you?

12     A.    I was unconstitutionally placed on vending

13   machine restriction, and I wanted to eat some M&Ms.  I

14   wanted snacks like everybody else.  I didn't feel as

15   though it was fair for me to be, you know, denied the

16   privilege of snacks and watch everyone else eat snacks

17   and be denied snacks.  So --

18     Q.    At the DPC, you had access to their vending

19   machines within the building?

20     A.    Yes.

21     Q.    And these vending machines sold candy and

22   snacks?

23     A.    Yes.

24     Q.    And you were allowed to have money on your

Jimmie Lewis

Page 52

1    I tend to be, you know, a little bit more mental in

2    regards to my psychological conditions.

3        Q.   After you had been placed on vending machine

4    restriction, what did that prohibit you from doing?

5        A.   From obtaining personally, from going into the

6    area where the vending machines were located to purchase

7    vending -- to purchase the products that are available.

8        Q.   So, but you believed that if you gave somebody

9    else money, that you would be -- it was still okay for

10   you to have access to the vending machines that way?

11       A.   Yes.

12       Q.   That was your understanding?

13       A.   Yes.  I don't believe it was, you know,

14   significant enough to be assaulted and things of that

15   nature for being in possession of a product purchased

16   from the vending machine.

17       Q.   So, what happened after Mr. Smith got these

18   M&Ms for you?

19       A.   We sat at the table and we were eating our

20   snacks.

21       Q.   While you were sitting at a table eating the

22   M&Ms, what happened next?

23       A.   Helen Hanlon recognized that I was eating some

24   M&Ms.  She called to me and got my attention and asked me

A-23

Jimmie Lewis

Page 53

1    to throw the M&Ms in the trash.  And I said --

2        Q.    What happened next?

3        A.    I said, "No.  I just purchased these.  I want

4    them.  I love M&Ms.  I am not going to throw these away.

5    I just used my dollar to purchase these."

6        Q.    And what happened after you did not throw them

7    away?

8        A.    She became irate and very angry, got on the

9    walkie-talkie, and called for emergency assistance.  In

10   came Mr. Moffett, Mr. Sagers, Mr. Evans, and Mr. Gray,

11   bewildered as to what the emergency was because the scene

12   was so serene upon them entering into the dining hall.

13   They was like, What's going on?  What's going on?  They

14   was really amped up like, you know, What's happened?

15   This is supposed to be an emergency.  But it wasn't no

16   emergency.

17       Q.    Would you describe the tone of your

18   conversation with Ms. Hanlon?

19       A.    In the same manner that we are speaking here

20   today.  She asked me to throw away the M&Ms, and I said,

21   "No.  I want to eat them.  I love M&Ms.  I want them.  I

22   just paid for them."

23       Q.    So, it was not emotional?  No cursing?

24       A.    Not at all.  I don't -- I very seldom use

Jimmie Lewis

Page 56

1    me -- actually, that's what occurred -- but I felt --

2    when I fell back, I think I fell back more so because

3    Mr. Gray was -- he was like -- he was like -- I don't

4    know if he was, like, tugging at my neck and he was

5    choking me.  And I was telling them I couldn't breathe.

6    I was mumbling, "I can't breathe.  I can't breathe.

7    Stop.  Stop."

8              So, in the process of my falling back, I

9    was, like, on Mr. Gray, and that's when they start

10   hitting me and punching me and kicking me with their fist

11   and hands.

12        Q.   Who punched you?

13        A.   Mr. Moffett, Mr. Sagers, and Mr. Evans is who

14   I identified as being Mr. Johnson, I believe -- I believe

15   -- I didn't know why I thought his name was Mr. Johnson,

16   but it came to me that that's -- it was Mr. Evans, a

17   short guy, about 5'5", brown-skinned, bald-headed.

18        Q.   So Mr. Johnson was not there?

19        A.   Mr. Brian Johnson -- nobody named Mr. Johnson

20   was there.  The person identified as John Doe, a/k/a,

21   Mr. Johnson, I am now identifying as Mr. Evans, 5'5",

22   brown-skinned, bald head, African-American male, and I

23   would recognize him if I seen him.

24        Q.   And who do you say kicked you?

A-25

Jimmie Lewis

Page 59

1      A.    Yes.

2      Q.    -- was doing the same on the other side?

3      A.    Yes.

4      Q.    And Mr. Sagers was on your legs?

5      A.    For the most part, he was, like, crouched down

6   by my legs where he had already had tackled me and, you

7   know, so his body weight was, more or less, holding my

8   legs clamped down to the point where he was able to, you

9   know, lift up off me and he was waling with his hands,

10  with both hands.

11     Q.    And during this time, Mr. Gray, you say, had

12  one of his arms around your neck?

13     A.    He had a choke hold on me and he was

14  clenching, he kept clenching on my neck at the time, so

15  that's what I was focused on more so than anything, was

16  trying to breathe, you know, as far as, you know, what

17  was immediate to him and, you know, but, yeah, they was

18  all -- they all went to work on me.

19     Q.    But Mr. Gray, himself, was on the floor and

20  you were on top of him; is that --

21     A.    Yes.

22     Q.    And then on top of you was Mr. Sagers?

23     A.    Yes, on my legs.

24     Q.    Just on your legs?

Jimmie Lewis

Page 65

1    able to -- if anything I was going to say, it was going

2    to be regarding me trying to breathe.  That was first and

3    foremost, me breathing, my being able to breathe.

4        Q.   Okay.

5        A.   That's what I was saying, "I can't breathe.  I

6    can't breathe.  Stop.  Stop.  I can't breathe."  I was in

7    fear for me life.  I thought I was going to die because I

8    couldn't breathe.

9        Q.   How far is the isolation room from the dining

10   hall?

11       A.   Again, about 30, 40 feet, about the same

12   distance from room 71 to isolation is about the same

13   distance from the isolation room to the dining hall, give

14   or take a few more feet.

15       Q.   Approximately how long did it take to walk

16   from the dining hall to the isolation room?

17       A.   Less than a minute.

18       Q.   Once you got into isolation room, what

19   happened?

20       A.   I was held down.  I believe I was four-point

21   -- I was four-point restrained, four-point restrained.

22   Let me reflect on this complaint to see if it -- that's

23   what I said.  Yes, I was four-point restrained.

24       Q.   Who placed you in the four-point restraints?

A-27

Jimmie Lewis

Page 78

1    wrists and ankles due to the tight four-point restraints,

2    swollen eye, swollen lip from being punched, a sore

3    throat for about a month due to being choked, you know, a

4    sore and bruised ribs, sore and bruised legs and arms for

5    about two months due to being kicked and punched and

6    things of that nature, persisting and reoccurring

7    migraine headaches, bouts of amnesia, I had insomnia, a

8    swollen tongue, body tremors, persistent ear ringing,

9    video and -- video and audio hallucinations, nerve and

10   brain damage that were the result of my brain cells being

11   killed, lost cognitive and volitional functions regarding

12   matters of hygiene, social conduct, etiquette, history,

13   and culture, things of that nature.  Those are the basic

14   descriptions of my injuries.

15        Q.   And is it fair to say that you were willing to

16   read that from your complaint just now, part five, P3?

17        A.   Yes.  It's fair to say that.

18        Q.   I am going to ask you to turn your attention

19   now to part six of your complaint.  I am going to refer

20   to this as the June 21st, 2004, isolation room incident.

21   I am going to give you a chance to look at this part of

22   the complaint.

23        A.   Yeah.  I am familiar.

24        Q.   Where in this part of the complaint do you

Jimmie Lewis

Page 79

1    allege that Robert Gray was involved with this incident?

2          A.   In way of further response, I am going to

3    reserve the right to answer that question at this point.

4          Q.   Is it fair to say that Mr. Gray's name does

5    not appear in this part of the complaint?

6          A.   Correct.  But I am not saying that he is not

7    -- he wasn't involved.

8          Q.   You are just not willing to tell me how he was

9    involved?

10         A.   At this point, I reserve the right to answer

11   that question.

12         Q.   Which means you are not willing to tell me, at

13   this time, how he was involved?

14         A.   Isn't that repetitive?

15         Q.   Mr. Lewis, please.

16         A.   I mean, I will be answering your questions but

17   you kind of like be asking me the same questions after I

18   answer your question again.

19         Q.   I am not trying to be difficult with you.

20              Mr. Sagers, how was Mr. Sagers involved

21   in the June 21st, 2004, incident you alleged?

22         A.   Pending discovery, things of that nature, I am

23   going to reserve the right to answer the question at this

24   point.

Jimmie Lewis

Page 80

1      Q.   Is it fair to say, at this point, that

2  Mr. Sagers' name is not listed in part six of your

3  complaint?

4      A.   Correct.

5      Q.   David Moffett, how was Mr. Moffett involved in

6  this June 21st, 2004, incident?

7      A.   I reserve the right to answer that question

8  pending discovery.

9      Q.   Is it fair to say that Mr. Moffett's name is

10  not listed in part six of this complaint?

11      A.   Correct.

12      Q.   Mr. Johnson, Mr. Brian Johnson, how is he

13  involved in the June 21st, 2004, incident?

14      A.   He is not.

15      Q.   Mr. Johnson was not involved in this incident?

16      A.   Not at all.  For the record, Mr. Johnson was

17  only involved in the incident that occurred on 6/14 at

18  about 11:00.

19      Q.   Are you willing to tell me anything about the

20  allegations in part six, the June 21st, 2006, incident?

21      A.   Yes.

22      Q.   What will you tell me happened?

23      A.   If you present a specific question to me, I

24  can answer it in that format, not in an in general format

Jimmie Lewis

Page 82

1        Q.   I am going to ask you to turn your attention

2   to part seven of your complaint.

3        A.   Yes.

4        Q.   I am going to refer to this as the June 22nd,

5   2004, isolation room incident.

6                    How was Mr. Robert Gray involved in this

7   incident?

8        A.   I reserve the right to answer that question

9   pending further discovery.

10       Q.   Is it fair to say you do not have Mr. Gray's

11  name listed in part seven of your complaint at this time?

12       A.   Correct.

13       Q.   David Moffett, how is Mr. Moffett involved in

14  the June 22nd of 2004 incident?

15       A.   I reserve the right to answer that question

16  pending further discovery response.

17       Q.   Is it fair to say Mr. Moffett's name is not

18  listed in part seven of the complaint at this time?

19       A.   Correct.

20       Q.   And Mr. Lance Sagers, how is Mr. Sagers

21  involved in the June 22nd, 2004, incident?

22       A.   I reserve the right to answer that question,

23  you know, pending further discovery response.

24       Q.   Is it fair to say that, at this time,

Jimmie Lewis

Page 83

1    Mr. Sagers is not listed, his name does not appear in

2    part seven of your complaint?

3        A.    Correct.

4        Q.    And I am not trying to be repetitive, but

5    Mr. Johnson, you previously stated he was not involved in

6    any other --

7        A.    Any other incident.

8        Q.    So he is not involved in the June 22nd, 2004?

9        A.    Not at all.

10       Q.    We are getting close to the end.  Part eight,

11   I am going to refer to this as the June 24, 2004,

12   incident.

13       A.    Yes.

14       Q.    Mr. Robert Gray, how was he involved in this

15   incident?

16       A.    I reserve the right to answer that question at

17   this point pending further discovery response.

18       Q.    And is it fair to say, as the claim is written

19   at this time, that Mr. Gray's name not mentioned in part

20   eight of the complaint?

21       A.    Correct.

22       Q.    Mr. David Moffett, how is Mr. Moffett involved

23   in the June 24, 2004, incident?

24       A.    I reserve the right to answer the -- to answer

A-32

Jimmie Lewis

Page 84

1    that question pending further discovery pretrial

2    investigation response and things of that nature.

3          Q.   Is it fair to say that Mr. Moffett's name is

4    not listed in part eight of the complaint at this time?

5          A.   Corrects.

6          Q.   Mr. Sagers, Lance Sagers, how is he involved

7    in the June 24, 2004, incident?

8          A.   I reserve the right to answer that question at

9    this point pending further discovery response.

10         Q.   And is it fair to say that Mr. Sagers' name is

11   not listed in the part eight of your complaint at this

12   time?

13         A.   Yes.

14         Q.   And, again, that's being dually repetitive,

15   but you are not alleging that Mr. Johnson is involved in

16   the June 24th, 2004, incident; correct?

17         A.   Pardon me?

18         Q.   You are not alleging that Mr. Johnson is

19   involved?

20         A.   Not at all.  Actually, I would like to make a

21   statement about Mr. Johnson.  If anyone acted any way

22   civil towards me, it was him.  I think he was reluctant

23   in doing what he done, but he done it anyway.  And I

24   think that, you know, if -- I don't understand why he