# EXHIBIT "A"

GERRON MAURICE LINDSEY, Plaintiff, v. ATTORNEY GENERAL
JANE BRADY, WARDEN THOMAS CARROLL, COMMISSIONER
STANLEY TAYLOR, BUREAU CHIEF PAUL HOWARD, INTERNAL
AFFAIRS, SERGEANT JOSEPH BELANGER, CORPORAL LISA
MERSON, and C/O ROSALIE VARGUS, Defendants.

Civ. No. 05-632-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE

*2008 U.S. Dist. LEXIS 18483*

**March 11, 2008, Decided**

**COUNSEL:** [*1] Gerron Maurice Lindsey, Plaintiff, Pro se, Smyrna, Delaware.

Ralph K. Durstein, III, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.
Counsel for Defendants.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

Dated: March 11, 2008

Wilmington, Delaware

**ROBINSON, District Judge**

**I. INTRODUCTION**

On August 29, 2005, pro se plaintiff Gerron Maurice Lindsey ("plaintiff") filed the present complaint
(D.I. 1), pursuant to *42 U.S.C. § 1983*, [1] against defendant Sergeant Joseph Belanger ("defendant") [2] for
allegedly violating his constitutional right to receive medical treatment under the *Eighth Amendment*.
Presently before the court is defendant's motion for summary judgment. [3] For the reasons set forth below,
defendant's motion is granted. (D.I. 59)

> 1  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any
> State or Territory, subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, [*2] or other proper proceeding for redress." *Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct.
> 285, 50 L. Ed. 2d 251 (1976).*
> 2  On May 14, 2007, plaintiff filed a notice of dismissal for defendants Thomas Carroll, Stanley
> Taylor, Paul Howard, Internal Affairs, Lisa Merson and Rosalie Vargas. (D.I. 64) Also, plaintiff
> signed a stipulation of dismissal for defendant Jane Brady on March 5, 2007, making Sergeant
> Joseph Belanger the sole remaining defendant in the instant case. (*See* D.I. 55)
> 3  Plaintiff waives, in his answering brief, his allegation that defendant subjected him to an
> unconstitutional strip search. (D.I. 63 at 10)

**II. BACKGROUND**

In February 2005, plaintiff was an inmate at the Delaware Correctional Center ("DCC") in Smyrna, Delaware and was housed in building seventeen of the Secure Housing Unit ("SHU"). (D.I. 60, ex. A at 3-5) Plaintiff suffers from chronic asthma and the DCC supplied him with two inhalers to keep in his cell: Qvar for twice daily use and Albuterol for use in emergencies, such as shortness of breath. (*Id.* at 6-7) On the morning of February 23, 2005, security escorted plaintiff to the prison medical department in building seventeen because his Albuterol inhaler failed to relieve his asthma symptoms. [*3] (*Id.* at 8-9)

At the medical office, Nurse Holly Furne ("Nurse Furne") administered several nebulized Albuterol treatments ("breathing treatment") to relieve plaintiff's shortness of breath. (*Id.* at 10; D.I. 63, ex. A at P 8) When the "first treatment only produced minimal relief," Nurse Furne repeated the breathing treatment. (D.I. 63, ex. A at P 11) The second treatment provided plaintiff with some additional relief, after which Nurse Furne decided to administer a third treatment. (*Id.* at P 12) Plaintiff received these breathing treatments in the medical office from 8:57 a.m until 9:40 a.m. (D.I. 60, ex. C)

Five to ten minutes into the third breathing treatment, plaintiff alleges that defendant entered the medical office and ordered Nurse Furne to stop the treatment. (*Id.,* ex. A at 12) Nurse Furne testified that she told defendant that plaintiff "had severe asthma that needed treatment and that it could be dangerous to cease treatment since [the prison medical department] was very short staffed and his condition could worsen, potentially to a life threatening level." (D.I. 63, ex. A at P 14) Defendant allegedly stated that the treatment "took up enough of his time" and "was holding [*4] him up from doing his work." (D.I. 60, ex. A at 12) Plaintiff further alleges that defendant warned he would write-up both plaintiff and Nurse Furne for wasting his time. (*Id.* at 14)

Defendant denies that he forced Nurse Furne to stop the breathing treatment. (D.I. 47 at P 1) Defendant alleges that when Nurse Furne terminated the breathing treatment, "[p]laintiff did not appear to be in any medical or physical distress." (D.I. 61 at P 11) Nurse Furne testified that plaintiff said, "It [is] all right if you give me a new inhaler, I think I can get by." (D.I. 63, ex. A at P 15)

Defendant further testified that he had received information prior to February 23, 2005 regarding the possibility of a personal relationship between plaintiff and Nurse Furne. (D.I. 61 at PP 8, 12-13) Based on this, defendant perceived as a security risk the possibility that Nurse Furne might pass contraband to plaintiff. (*Id.*) Defendant and two other officers removed plaintiff from the medical office and escorted him to the shower and conducted a strip search for contraband. (D.I. 60, ex. A at 12)

Plaintiff subsequently met with a mental health counselor, from whom he did not request medical assistance, and returned [*5] to his cell where he received a new Albuterol inhaler from the medical office. (*Id.* 16-17; D.I. 61 at P 15) Plaintiff alleges he continued to experience shortness of breath when he returned to his cell. (D.I. 60, ex. A at 17-18) At some point thereafter, plaintiff's breathing eventually returned to normal. (*Id.* at 18) Plaintiff testified that the incident in the medical office did not cause him any continuing physical problems. (*Id.* at 29)

On February 25, 2005, defendant submitted an incident report describing what occurred in the medical office on February 23, 2005. (*Id.* ex. C) The incident report indicates that officers could not complete their assigned duties because two officers had to accompany plaintiff during his breathing treatment. (*Id.*) Consequently, a staffing problem arose because various prison activities were in progress simultaneously, such as recreation, visits, a mental health meeting and an inmate discharge. (*Id.*) Specifically, officers were not able to complete "telephone punches [,] and tier checks could not be accomplished as required by post orders/policy and procedures." (*Id.*) In addition, Thomas J. Seacord, the prison officer who investigated the incident, instructed [*6] Nurse Furne "that she should not take too long for each individual." (D.I. 63, ex. D)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has

demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*).

The court will "view the underlying facts and all reasonable [\*7] inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)*. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A pro se complaint is liberally construed and held to a standard less stringent than formal pleadings drafted by lawyers. *Erickson v. Pardus, 127 S.Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)*.

## IV. DISCUSSION

### A. Deliberate Indifference

The *Eighth Amendment* prohibits the "unnecessary and wanton infliction of pain." *Estelle, 429 U.S. at 104*. Plaintiff brings the instant complaint on the theory that defendant was deliberately indifferent to his right to receive treatment for a serious medical need. *Id.* "Deliberate [\*8] indifference" occurs when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. According to plaintiff, defendant's act of deliberate indifference intentionally interfered with and prevented him from receiving Nurse Furne's recommended treatment for his asthma. *See Estelle, 429 U.S. at 105; Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993)*.

Even when taking as true Nurse Furne's affidavit stating that she warned defendant that plaintiff's asthma could become worse or potentially life threatening, a reasonable jury cannot find that defendant acted with deliberate indifference. (D.I. 63, ex. A at P 14) In particular, defendant could not have drawn an inference from Nurse Furne's statement that a substantial risk of serious harm to plaintiff presently existed because she merely said plaintiff's asthma "could" worsen or become "potentially" life threatening. [4] *See Colburn v. Upper Darby Township, 946 F.2d 1017, 1024 (3d Cir. 1991)* (holding that [\*9] deliberate indifference is not the mere possibility a harm will occur, rather a strong likelihood); (*Id.*) Therefore, sufficient evidence is absent from the record that would allow a reasonable jury to find that defendant knew of, and disregarded, a substantial risk of serious harm to plaintiff.

> 4    The record indicates that plaintiff said, at the time the treatment was terminated, "It [is] all right if you give me a new inhaler, I think I can get by." (D.I. 63, ex. A at P 15) Plaintiff did receive a new inhaler when he was placed back in his cell and choose not to use the inhaler for fear it could actually worsen his condition. (D.I. 60, ex. A at 17-18)

### B. Serious Medical Need

In addition, plaintiff fails to establish that he had a serious medical need. A "serious" medical need arises when an inmate's condition is "such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." *Colburn, 946 F.2d at 1023*. A medical need also is considered serious "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss." *Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)*. Furthermore, a medical [\*10] need is serious when it "has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Id. at 347*. Courts will not question the sound judgment of medical professionals as to "propriety or adequacy of a particular course of treatment." *Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (1979)*.

The record indicates that plaintiff was not suffering from a severe asthma attack subsequent to, or at the time the breathing treatment was terminated. *See Bates v. Sullivan, 6 Fed. Appx. 425, 426 (7th Cir. 2001)* (non-precedential) (finding an inmate had not suffered a serious asthmatic attack, thus, his shortness of breath and headaches were not proven serious enough to implicate the *Eighth Amendment*). [5] Plaintiff

claims that, prior to returning to his cell, his "condition hadn't improved at all" and, after he returned to his cell, he still experienced shortness of breath. (D.I. 60, ex. A at 16-18) The record shows that plaintiff received three breathing treatments: (1) his first treatment provided relief, albeit minimal; (2) his second treatment provided some additional relief; and [*11] (3) his third treatment was terminated within five to ten minutes. (D.I. 63, ex. A at PP 11, 12) Furthermore, no evidence exists that plaintiff, subsequent to the incident, put in a sick call slip, or sought additional medical attention. (D.I. 61 at P 15) Moreover, plaintiff testified that the incident did not cause him continuing medical problems. (D.I. 60, ex. A at 29) For the above mentioned reasons, a reasonable jury cannot determine that subsequent to, or at the time the breathing treatment was terminated, plaintiff experienced a serious medical need. [6]

> 5  *Cf. Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)* (finding a layperson would consider relatively minor an inmate's "breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy," if a physician has not deemed them as serious); *and Oliver v. Deen, 77 F.3d 156, 160 (7th Cir. 1996)* (holding *Eighth Amendment* not implicated when medical records evaluate inmate's asthma as only a mild case) *with Hathaway v. Coughlin, 37 F.3d 63, 68 (2d Cir. 1994)* (holding inmate's degenerative hip disease constituted a serious medical condition when prison physician failed to inform inmate of two broken surgical [*12] pins in his hip).
> 6  Based on the aforementioned reasons, plaintiff is not entitled to nominal or punitive damages. In addition, defendant is entitled to summary judgment based on qualified immunity because he did not violate a constitutional right. *See Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)* (holding officer's conduct must violate a constitutional right).

## V. CONCLUSION

For the above reasons, the court grants defendant's motion for summary judgment. (D.I. 51). An appropriate order shall issue.

## ORDER

At Wilmington this 11th day of March, 2008, consistent with the memorandum opinion issued this same date;

IT IS HEREBY ORDERED that defendant's motion for summary judgment (D.I. 59) is granted. The Clerk of Court is directed to enter judgment in favor of defendant and against plaintiff.

/s/ Sue L. Robinson

United States District Judge

# EXHIBIT "B"

JACQUELINE D. BERRY, Plaintiff, v. STATE OF DELAWARE,
DIVISION OF CHILD SUPPORT, Defendant.

Civil Action No. 06-217 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE

*2008 U.S. Dist. LEXIS 26754*

April 1, 2008, Decided
April 1, 2008, Filed

**COUNSEL:** [*1] For Jacqueline D. Berry, Plaintiff: Daniel F. Tyrrell, Jr., LEAD ATTORNEY, Daniel F. Tyrrell, Jr., Esq., New Castle, DE.

For State of DE Division of Child Support, Defendant: Marc P. Niedzielski, LEAD ATTORNEY, Department of Justice, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, CHIEF, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

On March 31, 2006, Jacqueline D. Berry ("Berry") filed this employment discrimination suit *pro se* against the State of Delaware, Department of Health & Social Services, Division of Child Support Enforcement ("DCSE" or "the defendant"). (D.I. 1.) Berry brings claims under Title VII of the Civil Rights Act, *42 U.S.C. §§ 2000e et seq.* ("Title VII"), the Fair Labor Standards Act, *29 U.S.C. § 201 et seq.,* and the Americans with Disabilities Act, *42 U.S.C. §§ 12111-12117* ("ADA"). Berry, an African-American female, alleges that she was subjected to a hostile work environment, harassment, and retaliation by her then-supervisor. Berry also claims that she was denied reasonable accommodation for her disability. Finally, Berry alleges impermissible wage differences between men and women employed in Berry's former position at DSCE. Now before the court is the [*2] defendant's motion for summary judgment on all claims, the plaintiff's motions for a protective order and for summary judgment, and the defendant's motion to strike the plaintiff's own motion for summary judgment. For the reasons that follow, the court will grant the defendant's motion for summary judgment, and deny the plaintiff's motions and the defendant's motion to strike as moot.

**II. BACKGROUND**

Berry's intermittent [1] employment with the State of Delaware began in 1977 as a Certified Nursing Assistant. In 2000, Berry became employed by the DCSE in the Consumer Service Unit, located in New Castle County, as a Child Support Specialist ("CSS"). This position required typing on a computer keyboard and answering the telephone calls of non-custodial parents paying child support, as well as custodial parents receiving child support, throughout the workday. During 2003, Berry transferred within DSCE to Sussex County to be a case worker. She then returned to her CSS position at the Consumer Service Unit eight months later.

> 1 Between 1977 and 2005, when Berry resigned, Berry was continuously employed with the State for only 11 years, 1 month, and 15 days.

In June 2004, Berry became unable to [*3] perform her CSS duties due to the onset of bilateral carpal

tunnel syndrome and an unrelated surgery. On November 4, 2004, Berry's treating physician released her to return to work but imposed restrictions precluding her from working as a CSS. On January 12, 2005, Berry filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the DSCE. In June 2005, Berry was assigned to the defendant's tax intercept unit as an alternative duty assignment. That same month, Berry applied for and was denied State disability. On August 15, 2005, Berry tendered her resignation by telephone to the Human Resources Representative for DSCE. She informed the State that she had received employment with the North Carolina Division of Child Support Enforcement.

Before she resigned, Berry alleges, she was "subject to a hostile work environment, harassment, and retaliation by her then supervisor, Brenda Annand." [2] (D.I. 35 at 8.) During her time at the Consumer Service Unit, Berry was also allegedly "provided false information as to advancement and pay grade." [3] (D.I. 35 at 11.) On March 30, 2006, based on these allegations, Berry commenced this action *pro se.* [4]

2   Berry does [*4] not cite to any record evidence that would support a hostile work environment, harassment, or retaliation claim in her brief. (D.I. 35.)
3   Again, Berry does not cite to record evidence supporting this claim.
4   Berry subsequently obtained counsel before filing her answering brief in opposition to the defendant's summary judgment motion now before the court.

### III. LEGAL STANDARD

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Biener v. Calio, 361 F.3d 206, 210 (3d Cir. 2004).* In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming only if no reasonable jury could find for the non-moving party. *See Whiteland Woods, L.P. v. Twp. of West Whiteland, 193 F.3d 177, 180 (3d Cir. 1999).* Thus, a trial court should grant summary judgment only if it determines that no "reasonable jury could return a verdict for the non-moving party," [*5] that is, that there is no genuine issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* The non-moving party must "present affirmative evidence" to establish the existence of a genuine issue. *Liberty Lobby, 477 U.S. at 257.* When the non-movant has failed to do so, it may be said that the record as a whole points in one direction and the dispute is not "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*

### IV. DISCUSSION

#### A. Berry's Claims Under Title VII

Under Title VII, it is unlawful for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1).* Berry claims that she was subjected to racial discrimination, harassment, and retaliation in violation of Title VII.

#### 1. Discrimination on the Basis of Race

Courts analyze Title VII discrimination claims under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case by showing that: (1) [*6] she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action despite being qualified; and (4) the action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when non-members of the protected class are treated more favorably than the plaintiff. *Sarullo v. United States Postal Servs., 352 F.3d 789, 797 (3d Cir. 2003); Miller v. Delaware Dep't of Prob. & Parole, 158 F. Supp. 2d 406, 410-11 (D. Del. 2001), aff'd 41 Fed. Appx. 581, 2002 U.S. App. LEXIS 15310 (3d Cir. 2002).* If the plaintiff makes this prima facie showing, the burden then shifts to the defendant to provide one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant does so, the presumption of discrimination is rebutted. The burden then shifts back once more, and the plaintiff must prove that the employer's reasons for its employment decision were pretextual -- that is, that the stated reasons are false and that the true reason for the employment decision was

discriminatory. *Id.* If the plaintiff cannot carry this burden, the defendant is entitled to summary judgment. *Stafford v. Noramco of Delaware, Inc.*, 2000 WL 1868179, at *1 (D. Del. Dec. 15, 2000).

Here, [*7] Berry has established that she is a member of a protected class. Berry next asserts that she has "identified [an] adverse employment action and retaliation due to commencing the Equal Employment Opportunity Commission ["EEOC"] administrative proceeding in January 2005." (D.I. 35 at 13.) Besides this one-sentence, conclusory mention of her EEOC claim, however, Berry fails to present a single piece of affirmative evidence that would allow a reasonable juror to find in her favor as to the remaining elements of a prima facie showing of discrimination. As such, she has failed to present a triable issue of fact with regard to the alleged discrimination. Therefore, DSCE is entitled to summary judgment on this claim.

## 2. Retaliation

Berry also claims that she was subject to retaliation in violation of Title VII. An employer cannot "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a)*. Courts analyze claims under [*8] this provision using the *McDonnell-Douglas* burden-shifting framework discussed above. To establish a prima facie retaliation claim, the plaintiff must show a "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Kachmar v. SunGard Data Sys., 109 F.3d 173, 177 (3d Cir. 1997)*. Here, Berry has presented no affirmative evidence as to any of these elements of her prima facie retaliation claim. Berry thus creates no genuine issue of material fact regarding retaliation. Accordingly, DSCE is also entitled to summary judgment on this claim.

## B. Berry's Claims Under the ADA and the Equal Pay Act

In addition to her Title VII claims, Berry contends that DCSE failed to provide her reasonable accommodation for her disability under the ADA. Berry also alleges wage differences between male and female employees in the CSS position in violation of the Equal Pay Act, *29 U.S.C. § 206(d)(1)*. The defendant argues that both of these claims are barred by the *Eleventh Amendment to the Constitution of United States*. Berry [*9] counters that, while the *Eleventh Amendment* may bar suits brought by citizens of other states, it does not prevent suits against Delaware brought by the state's *own* citizens. [5]

> 5  The amendment in question reads: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." *U.S. Const. amend. XI.*

It is well settled, however, that "an unconsenting State is immune from suits brought in federal courts by [the State's] own citizens as well as by citizens of another State." *Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)*. This is so because the States' immunity from suit "neither derives from nor is limited to the terms of the *Eleventh Amendment*": such immunity "is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today" except as abrogated by the Constitution or certain constitutional Amendments. *Alden v. Maine, 527 U.S. 706, 711-13, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999)*. Therefore, Berry's ADA claim against the defendant is barred by the *11th Amendment. Board of Trustees v. Garrett, 531 U.S. 356, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001)* [*10] (ADA claims against non-consenting States barred by *11th Amendment*); *cf. Alden v. Maine, 527 U.S. at 711* (Congress cannot abrogate, using its Article I powers, non-consenting States' immunity to private suits for damages); *Koslow v. Pennsylvania, 302 F.3d 161, 167-68 (3d Cir. 2002)* (discussing *Garrett*).

Contrary to the defendant's contentions, however, Congress does have the power under *§ 5 of the Fourteenth Amendment* to prohibit sex discrimination in employment. *Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976)*. And Congress has in fact exercised this power by applying the Equal Pay Act to state and local entities in their roles as employers. *Arnold v. BLaST Intermediate Unit 17, 843 F.2d 122, 126 (3d Cir. 1988)* (citing *Fitzpatrick v. Bitzer*). Since Congress has abrogated Delaware's immunity from suit with respect to the Equal Pay Act, Berry's claim is not barred on sovereign

immunity grounds. Thus, the court turns to the provisions of the Act itself.

The Equal Pay Act prohibits sex discrimination in wages. It provides that

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees [*11] on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

*29 U.S.C. § 206(d)(1).* In this case, Berry has failed to present any evidence that DSCE in fact paid wages to male employees at rates different from those paid to women. As such, Berry fails to create a triable issue of fact as to her Equal Pay Act claim. Thus, summary judgment is appropriate on this claim as well.

**C. The Remaining Motions**

Because the court will grant summary judgment to the defendants on all claims, the plaintiff's motions for summary judgment and for a protective order, and the defendant's motion to strike, have become moot.

**V. CONCLUSION**

For the reasons just stated, the court will grant the defendant's motion [*12] for summary judgment, and deny all other motions as moot.

Dated: April 1, 2008

/s/ Gregory M. Sleet

CHIEF, UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion for Summary Judgment is GRANTED.

2. The plaintiff's Motion for Protective Order (D.I. 21), Motion for Summary Judgment (D.I. 29), and the defendant's Amended Motion to Strike (D.I. 30) are DENIED as moot.

3. The Clerk of Court is directed to close this case.

Dated: April 1, 2008

/s/ Gregory M. Sleet

CHIEF, UNITED STATES DISTRICT JUDGE

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS,                          )
                                       )
              Plaintiff,               )
                                       )
    v.                                 )    Civil Action No. 04-1350 GMS
                                       )
DR. SYLVIA FOSTER, STAFF               )
MEMBERS, and MR. GRAY,                 )
                                       )
              Defendants.              )
                                       )

## AMENDED MEMORANDUM

### I.    INTRODUCTION

Jimmie Lewis ("Lewis") is presently incarcerated at the Delaware Correctional Center (the

"DCC"), which is located in Smyrna, Delaware.  On October 13, 2004, Lewis filed this *pro se* civil

rights action pursuant to 42 U.S.C. § 1983.  This action arises out of incidents that allegedly

occurred while Lewis was confined to the Delaware Psychiatric Center (the "DPC") in order to

undergo a mental health evaluation, pursuant to a court order signed by Judge Charles Toliver.  In

his complaint and amended complaint (D.I. 10) Lewis alleges that Sylvia Foster, M.D. ("Dr.

Foster"), Robert Gray ("Gray"), and other DPC staff members ("DPC Staff Members") have

violated his constitutional rights.

Presently before the court are the following motions: (1) Dr. Foster's motion to dismiss for

lack of jurisdiction; (2) Dr. Foster's motion to dismiss for failure to state a claim; (3) Gray's motion

to dismiss for failure to state a claim; and (4) Lewis' motion to amend and supplement thereto.  For

the reasons stated below, the court will deny Dr. Foster's motion to dismiss for lack of jurisdiction;

the court will grant in part and deny in part Dr. Foster's motion to dismiss for failure to state a claim;

(3) the court will deny Gray's motion to dismiss for failure to state a claim; and the court will grant

in part and deny in part Lewis' motion to amend and supplement thereto.

## II.    BACKGROUND

Lewis' first complaint alleges that Dr. Foster diagnosed Lewis as "malingering"[1] and stated

that he received no "psychotropic" medication during his stay at the DPC, because he "revealed no

evidence of mood disorder." (D.I. 2 ¶ 4.)   Lewis further alleges that, contrary to Dr. Foster's

diagnosis, he was "strapped down with restraints and injected with psychotropic drugs[,] such as

Haldol, Ativan and Geodon." (*Id.*) He requests the court to investigate his claim and award him

monetary relief for pain and suffering because he was "violated." (*Id.* ¶ 5.)

On March 8, 2005, Lewis filed an amended complaint naming Dr. Foster, as well as several

DPC Staff Members, including Gray, as defendants. (*See* D.I. 10.) According to Lewis, "Judge

Charles H. Toliver IV ordered that [he] be transfered [sic] to the Delaware Psychiatric Center for

a psychiatric evaluation to determine [his] competency [to assist in the defense of criminal charges

against him] and to receive treatment." (D.I. 10, at 1.) Lewis also alleges that after he arrived at the

DPC he "was ill and couldn't complete the admissions interview," which resulted in a "disciplinary

restriction." (*Id.*)

According to the amended complaint, on June 6, 2004, Lewis was "strapped down with four

point restraint [sic] and injected with psychotropic medicines for disciplinary reasons, not for

psychiatric reasons per Dr. Foster." (*Id.*) The amended complaint then documents several occasions

during which Lewis was "strapped down with four point restraints and injected with psychotropic

medicines." (*Id.* at 2.) Lewis alleges that Dr. Foster ordered him restrained for disciplinary, rather

---

[1] Malingering is defined as "the purposeful exaggeration of physical or psychological
complaints in order to receive some kind of reward." *Psychology Today*, available at
www.psychologytoday.com/conditions/malingering.html (last visited January 24, 2006).

than psychiatric reasons, amounting to deliberate indifference on her part. (*Id.* at 1-2.)

Additionally, Lewis alleges that, on or about June 13, 2004, "Nurse Helen" instructed four or five DPC Staff Members to forcibly remove a bag of M&Ms candy from his hand because he was on disciplinary restriction. (*Id.* at 2.) According to Lewis, one of the DPC Staff Members, "Grey [sic]," choked him while the other staff members assaulted him. (*Id.*) After he was subdued, one or several unnamed DPC Staff Members put him in restraints and injected with psychotropic medicine. (*Id.*)

On June 25, 2005, the DPC released Lewis and transferred him back to the DCC. (*Id.* at 3.) Lewis makes several allegations regarding the absence of a court order for his transfer, as well as erroneous responses to a Writ of Habeas Corpus filed in the state court. However, he does not explain the significance of these events to the case at bar. (*See id.*)

## III.    DISCUSSION

### A.    Dr. Foster's Motion to Dismiss for Lack of Subject Matter Jurisdiction

Dr. Foster has filed a motion to dismiss for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). Dr. Foster contends that Lewis' claims must be dismissed because the court is without jurisdiction to hear them. Specifically, Dr. Foster contends that Lewis has not presented a federal question because he seeks monetary damages only for pain and suffering. (D.I. 15 ¶ 3.) Dr. Foster further contends that Lewis raises no issues in his pleadings based on his imprisonment. Therefore, his complaint cannot even arguably be construed as stating claims under 42 U.S.C. § 1983. (*Id.* ¶ 4.)[2] Lastly, Dr. Foster contends that Lewis' complaint fails to meet the

---

[2] Dr. Foster contends in this motion that Lewis has not made any allegations in his pleadings based on his imprisonment. However, in her motion to dismiss for failure to state a claim Dr. Foster states that Lewis is a "prisoner" and that the court may construe his claims as

requirements under the diversity of citizenship statute, 28 U.S.C. § 1323, because it does not allege that the parties are citizens of different states. (*Id.* ¶¶ 6-7.)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *Mortensen v. First Fed. Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Dr. Foster's motion makes several facial challenges to the complaint because her arguments are based solely upon the application of legal principles to the facts as alleged in the complaint. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiffs' favor. *See id.*

After having considered Lewis' allegations as true and drawing all reasonable inferences therefrom, the court concludes that Dr. Foster's motion is without merit. Federal courts are vested with original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Nothing in the language of section 1331 requires a plaintiff to plead any type of damages, i.e. compensatory or punitive. Lewis' amended complaint states that Dr. Foster was deliberately indifferent when she ordered him to be strapped down and given "psychotropic" medicines for disciplinary reasons. (D.I. 10, at 1.) Because Lewis is imprisoned and he complains, at the very least, about his conditions of confinement, his claims arise under 42 U.S.C. § 1983, a law of the United States. The court, therefore, has jurisdiction over Lewis' claims. Accordingly, the court will not address Dr. Foster's additional jurisdictional attacks.

**B.    Whether Lewis has Stated Claims against Dr. Foster and Gray Under Section 1983**

Dr. Foster and Gray have filed motions to dismiss pursuant to Federal Rule of Civil

---

being based on his imprisonment under the Civil Rights Act. (D.I. 16 ¶¶ 1, 5-6.) Thus, she concedes that Lewis' claims arise under 42 U.S.C. § 1983.

4

Procedure 12(b)(6). The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz*, 1 F.3d 183 (3d Cir. 1993). Thus, as in the case of a Rule 12(b)(1) motion, the court must accept the factual allegations of the complaint as true. *See Graves v. Lowery*, 117 F.3d 723, 726 (3d. Cir. 1997); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn v. Upper Darby Tp.*, 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3rd Cir.1997). A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves*, 117 F.3d at 726; *Nami*, 82 F.3d at 65 (both citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). However, *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Lewis filed his complaint and amended complaint against Dr. Foster and Gray, alleging civil rights violations pursuant to 42 U.S.C. § 1983. In order to recover against the defendants, Lewis must show that he was deprived of a constitutional right by a person acting under the color of state law. 42 U.S.C. § 1983; *see, e.g.*, *Groman v. Tp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Here, it is clear that Dr. Foster and Gray were

5

acting under color of state law because, at the time of the alleged incidents, Dr. Foster was Chief

Forensic Psychiatrist for the State of Delaware and Gray was an employee of the DPC, an agency

of the State of Delaware. *See West v. Atkins*, 487 U.S. 42, 48-54 (1988). Therefore, the court next

turns to whether Lewis has sufficiently alleged that Dr. Foster and/or Gray deprived him of any

constitutional rights.

      1.      Whether Lewis has sufficiently stated a claim that Dr. Foster's order to restrain him
               violated his Fourteenth Amendment right to be free from restraint

      Lewis alleges that Dr. Foster ordered several unnamed DPC staff members to strap him in

four point restraints on several occasions. Implicit in Lewis' allegation is a claim that Dr. Foster and

the DPC Staff Members violated his Fourteenth Amendment right to be free from restraint. Dr.

Foster concedes that Lewis has alleged a Fourteenth Amendment claim. However, she contends that

the claim must fail under a "freedom from restraint" analysis because Lewis cannot meet the

"atypical and significant hardship" requirement enunciated by the Supreme Court in *Sandin v.

Conner*. (*Id.*) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). The court agrees.

      "Liberty interests protected by the Fourteenth Amendment may arise from two sources, the

Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983),

*overruled in part by Sandin v. Conner*, 515 U.S. 472 (1995); *Bd of Regents v. Roth*, 408 U.S. 564,

575 (1972). In *Sandin*, the Supreme Court explained that state created liberty interests under the due

process clause are limited to "freedom from restraint" that imposes "atypical and significant

hardship in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483. In

determining whether an inmate has suffered an "atypical and significant hardship" as a result of his

confinement, the court considers two factors: "1) the amount of time the prisoner was placed into

disciplinary segregation, and 2) whether the conditions of his confinement in disciplinary

segregation were significantly more restrictive than those imposed on other inmates in solitary confinement." *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (citing *Sandin*, 515 U.S. at 486).

In the present case, Lewis alleges only that Dr. Foster's decision to strap him down with four point restraints was disciplinary. The complaint does not allege that Lewis was placed in restraints for an unusual amount of time, or that he was treated differently than the other inmate patients at the DPC. Thus, the court cannot conclude that Lewis suffered an "atypical and significant hardship" when he was placed in restraints. Consequently, Lewis' "freedom from restraint" claim has no arguable basis in law or in fact. As such, the court will grant Dr. Foster's motion to dismiss this claim.

        2.      Whether Lewis has sufficiently stated a claim that Dr. Foster's order to have him injected with antipsychotic medicines against his will violates his Fourteenth Amendment rights

Lewis' amended complaint alleges that Dr. Foster's decision to have him injected with psychotropic drugs was against his will, thereby violating his constitutional rights. It is clear that a prisoner "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteen Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22 (1990). In *Harper*, the Supreme court explained that this liberty interest is protected by principles of both procedural and substantive due process. *Id.* at 220-23. "[T]he Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, [only] if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227. Moreover, "forcing antipsychotic drugs on a convicted [or pretrial] prisoner is impermissible absent a finding of overriding

7

justification and a determination of medical appropriateness." *Riggins v. Nevada*, 504 U.S. 127, 135 (1992).

Here, the amended complaint alleges that Dr. Foster ordered Lewis to be injected with unwanted psychotropic drugs. Lewis, therefore, has stated a claim for violation of his Fourteenth Amendment Due Process rights. Absent from Dr. Foster's motion to dismiss, however, is any discussion of this claim, or why the antipsychotic drugs were given to Lewis against his will. Thus, it appears to the court at this juncture that Lewis can prove a set of facts that would entitle him to relief with respect to this claim. Accordingly, the court will allow this claim to go forward.

3.    Whether Lewis has sufficiently stated a claim that Dr. Foster's order to have him restrained and injected with antipsychotic medicines violates his Eighth Amendment right to be free form cruel and unusual punishment

The amended complaint also alleges that although Dr. Foster's report to the Delaware Superior Court stated that Lewis "demonstrated no evidence of a mood disorder or psychosis during his admission to [the] DPC,"[3] she ordered him strapped down with restraints and injected with psychotropic medicines for disciplinary reasons. (D.I. 10, at 1.) According to Lewis, Dr. Foster's order demonstrates deliberate indifference on her part. (*Id.*) Thus, Lewis alleges that Dr. Foster violated his Eighth Amendment right to be free from cruel and unusual punishment.

The Eighth Amendment of the United States Constitution governs penal measures and prison conditions, and prohibits use of penal measures and existence of conditions which violate civilized standards and concepts of humanity and decency. *See Estelle v. Gamble*, 429 U.S. 97, 102 (1976). In the prison context, however, "[n]ot every governmental action affecting the interest or well-being

---

[3] This quotation is from Dr. Foster's report that she submitted to the Delaware Superior Court. The report is attached as a non-numbered exhibit to Lewis' amended complaint.

8

of a prisoner is subject to Eighth Amendment scrutiny." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986). Only those actions that impose an unnecessary and wanton infliction of pain rise to the level of cruel and unusual punishment. *Id.*

Lewis' claims constitute a challenge to his conditions of confinement at the DPC. As such, the court analyzes the claims under the deliberate indifference standard of the Eighth Amendment. Prison officials violate an inmate's rights under the Eighth Amendment when they act with deliberate indifference or reckless disregard toward an inmate's rights, health or safety, and their conduct is objectively serious, or has caused an objectively serious injury to the inmate. *See Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994). Under this partly objective, partly subjective test, a prison official's conduct is "objectively serious" if it is "incompatible with 'contemporary standards of decency.'" *Carrigan v. Davis*S, 70 F. Supp. 2d 448, 452 (D. Del. 1999) (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). The deliberate indifference prong of the test is met only if the prison official "knows and disregards an excessive risk to inmate rights, health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The plaintiff must show a sufficiently culpable state of mind which demonstrates an unnecessary and wanton infliction of pain. *Wilson v. Seiter*, 501 U.S. 294 (1991). Mere allegations of negligence do not meet the pleading standards for deliberate indifference. *See Estelle*, 429 U.S. at 105-106.

Here, the amended complaint contains more than mere allegations of negligence. Indeed, Lewis alleges that Dr. Foster acted with deliberate indifference when she disciplined him by ordering him restrained and injected with medications. Based on these allegations, the court concludes that Lewis may be able to show that Dr. Foster unnecessarily and wantonly inflicted pain

9

on him, thereby exhibiting deliberate indifference to his rights.  Because Dr. Foster has not

addressed this section 1983 claim in her motion to dismiss, the court cannot conclude at this juncture

that Lewis has failed to state a claim against her under the Eighth Amendment.[4]

      4.    Whether Lewis has sufficiently stated a claim that Gray used excessive force against
              him, thereby violating his Eighth Amendment right to be free form cruel and unusual
              punishment

Gray asserts that the court should dismiss Lewis' claims against him because the complaint

fails to include any allegation sufficient to sustain recovery under 42 U.S.C. § 1983.  According to

the motion, Lewis mentions Gray only on page two of his complaint, when describing an altercation

among Lewis and several other DPC Staff Members, including Gray.  (D.I. 24 ¶ 3.)  Gray also

asserts that Lewis fails to identify, either overtly or by implication, any constitutional or statutorily

protect right of which Gray deprived him.  (*Id.* ¶ 4.)  The court cannot agree.

After having read Lewis' amended complaint, the court concludes that it implicitly, if not

overtly, alleges a claim under the Eighth Amendment based on the use of excessive force.  The

"altercation" between Lewis and Gray that the complaint describes concerns Gray forcibly removing

of a bag of M&Ms candy from Lewis' hand, and then choking Lewis.  (D.I. 10, at 2.)  While it is

difficult for the court to conclude that the removal of a bag of candy from a prisoner's hand is

"excessive," surely a prisoner's claim that he was choked is an allegation of excessive force.


The standard that the court must use to determine whether a state actor's conduct violated

the Eighth Amendment is "whether the force was applied in a good faith effort to maintain or restore

---

    [4] The court will allow Lewis to amend his complaint in order to allege any physical
injuries that resulted from Dr. Foster's alleged conduct.  The court will discuss its rationale for
allowing Lewis to amend in section III.C. below.

discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (citations omitted). The court must consider the following factors in applying this standard: (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury inflicted, (4) the threat reasonably perceived by the responsible officials, and (5) the efforts made to temper the severity of a forceful response. *Davis v. Carroll*, 390 F. Supp. 2d 415, 419 (D. Del. 2005) (citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

Accepting Lewis' allegations as true, the court concludes that his complaint alleges facts sufficient to state an excessive force claim under the Eighth Amendment. As previously explained, Lewis specifically alleges that Gray choked him while three or four other male DPC Staff Members assaulted him with their fists and feet. Gray's motion to dismiss contends only that Lewis has not alleged any deprivation of a constitutional right. In other words, Gray's motion neither mentions nor addresses any of the above-discussed factors regarding Lewis' excessive force allegation. Accordingly, the court will deny Gray's motion to dismiss at this time.

### C.    Whether 42 U.S.C. § 1997e(e) Bars Lewis from Recovery for Alleged Constitutional Violations

Dr. Foster's motion contends that Lewis' complaint alleges no physical injury and, therefore, should be read as one for emotional damages. (D.I. 16 ¶ 9.)[5] Additionally, Dr. Foster contends that **42** U.S.C. § 1997e(e) acts as a complete bar to Lewis' constitutional claims that are premised on emotional injuries.

Section 1997e(e) of the Prison Litigation Reform Act provides that "[n]o federal civil action

---

[5] Gray's motion to dismiss does not address this issue. However, this discussion applies to Lewis' Eighth Amendment claim against Gray, as it is an alleged constitutional violation.

11

may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injuries suffered while in custody without a prior showing of physical injury." **42** U.S.C. § 1997e(e). The Third Circuit has held that section 1997e(e)'s physical injury requirement applies only to claims for compensatory damages, because "[c]laims seeking nominal or punitive damages are typically not 'for' mental or emotional injury but rather 'to vindicate constitutional rights' or 'to deter or punish egregious violations of constitutional rights,' respectively." *Mitchell v. Horn*, 318 F.3d 523, 533 (3d Cir. 2003) (quoting *Allah v. Al-Hafeez*, 226 F.3d 247, 252 (3d Cir. 2000)). Further, section 1997e(e) does not apply to claims seeking injunctive or declaratory relief. *Mitchell*, 318 F.3d at 533-34. Thus, section 1997e(e)'s "physical injury" requirement will not effect any nominal, punitive, or injunctive relief that a plaintiff has requested in his complaint.

Turning to Lewis' complaint, the relief that he requests is twenty million dollars for "pain and suffering," and for the court to "notify the Superior Court that [Dr. Foster's] report cannot be relied on by the doctor herself." (D.I. 10, at 4.) Lewis' complaint, therefore, requests compensatory damages and injunctive relief. With respect to Lewis' request for compensatory damages, the court agrees with Dr. Foster, and concludes that the complaint does not state a claim for physical injury. However, the court will grant Lewis leave to amend his complaint in order to provide allegations with respect to any physical injuries he received when he was restrained and injected with medicines, as well as when he was choked and assaulted.

Additionally, Lewis has not requested nominal or punitive damages from the defendants. With respect to the former, the court will also grant Lewis leave to amend his complaint to specifically request punitive damages, based on the alleged violations of his Fourteenth and Eighth Amendment rights discussed above. As for the latter, "'it is not necessary to allege nominal

damages.'" *Allah*, 226 F.3d at 251 (quoting *Basista v. Weir*, 340 F.2d 74, 87 (3d Cir. 1965)). Thus, at this juncture, Lewis may recover nominal damages to vindicate his constitutional rights, as well as the injunctive relief that he requests. Accordingly, the court will grant in part and deny in part Dr. Foster's motion to dismiss based on **42** U.S.C. § 1997e(e), as well as grant Lewis leave to amend his complaint in the manner previously discussed.

      **D.    Lewis' State Law Claims**

      1.    Whether Lewis has stated a medical negligence claim against Dr. Foster

      Lewis alleges that Dr. Foster's report states he received no psychotropic medication during his time at the DPC because he demonstrated no evidence of psychosis or mood disorder. Lewis further alleges, however, that on five or more occasions he was strapped down with four point restraints and injected with drugs. Next to these allegations appears the word "malpractice." (D.I. 2 ¶ IV.) A fair inference the court draws from this language is the allegation that Dr. Foster's order to have him restrained and injected with medicine against his will constitutes medical malpractice. Dr. Foster concedes that the complaint sets forth allegations regarding common law medical malpractice. Nonetheless, Dr. Foster maintains that Lewis' claim must be dismissed because he has not provided an affidavit of merit signed by an expert witness, as required by Del. Code Ann. tit. 18 § 8653. (D.I. 16 ¶ 14.)

      Medical malpractice is a negligence action and is governed by the Delaware Health Care Negligence Insurance and Litigation Act (the "Act"). The Act defines medical negligence as:

> any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient. The standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed in the same or similar field of medicine as defendant, and the use of reasonable care and diligence.

13

Del. Code Ann. tit. 18 § 6801(7). When a party alleges medical negligence, Delaware law requires the party to produce expert medical testimony detailing: "(1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury." *Bonesmo v. Nemours Foundation*, 253 F. Supp. 2d 801, 804 (D. Del. 2003) (quoting *Green v. Weiner*, 766 A.2d 492, 494-95 (Del. 2001)) (internal quotations omitted). Specifically, the Act requires that any complaint alleging medical negligence be accompanied by "[a]n affidavit of merit as to each defendant signed by an expert witness, as defined in § 6854 of this title, and accompanied by a current curriculum vitae of the witness, stating that there are reasonable grounds to believe that there has been healthcare medical negligence committed by each defendant." Del. Code Ann. tit. 18 § 8653. In addition, the Act directs the court to refuse to file and docket the complaint if it is not accompanied by an expert affidavit.

Here, Lewis alleges that Dr. Foster committed medical negligence. However, he did not include an affidavit of merit signed by an expert witness with his complaint. As such, the court will grant Dr. Foster's motion to dismiss Lewis' state law medical malpractice claims. *See Jackson v. First Correctional Med.*, 380 F. Supp. 2d 387, 392 n.2 (D. Del. 2005) (citing Del. Code Ann. tit. 18 § 6853).

2.     Whether Lewis has Stated a Claim for Civil Assault and Battery Under Delaware Law

Lewis' amended complaint alleges that Gray choked him, while three or four other DPC Staff Members assaulted him with their fists and feet. (D.I. 10, at 2.) By implication, the complaint

14

alleges that these acts constituted a battery. Lewis' statements that Dr. Foster ordered him to be administered medicine against his will also allege a claim for battery. The state of Delaware has adopted the definition of battery from the Restatement (Second) of Torts, which states "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person . . . and (b) a harmful contact with the person of the other directly or indirectly results." *Brzoska v. Olson*, 668 A.2d 1355, 1360 (Del. 1995) (quoting *Restatement (Second) of Torts* § 18 (1965)); *see* W. Page Keeton, et al., Prosser and Keeton on Torts § 9, at 39 (5th ed. 1984) ("A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or third person to suffer such a contact, or apprehension that such contact is imminent, is a battery."). Lack of consent is an essential element of battery. *Brzoska*, 668 A.2d at 1360.

In the present case, Lewis alleges that he was choked by Gray and beaten by several DPC Staff Members without his consent. This allegation is sufficient to state a claim for battery. Gray's motion to dismiss addresses only whether Lewis has stated a claim against him under 42 U.S.C. § 1983. That is, Gray's motion is silent with respect to whether Lewis has appropriately pled any state law claims against him. Accordingly, the court will not dismiss Lewis' claim against Gray for battery.

Further, Lewis alleges that Dr. Foster was responsible for the administration of medication to him without his consent. Dr. Foster recognizes that Lewis has alleged a claim for battery, but contends that the court should dismiss the claim as it pertains to her actions because Lewis does not allege that she ever made any physical contact with him. (D.I. 16 ¶ 15.) The court is not persuaded.

15

The definition of battery under Delaware law does not require physical contact between the plaintiff and the defendant. The definition requires only an *act intending to cause harmful or offensive contact* with a plaintiff, and harmful or offensive contact as a direct or indirect result. According to Lewis, Dr. Foster ordered DPC Staff Members to administer medicine to him without his consent. Thus, Dr. Foster committed an act intending to cause offensive contact. As a result of Dr. Foster's order, the medicine was administered to Lewis. That is, the harmful or offensive contact that Lewis complains about was a direct result of Dr. Foster's order. Thus, Lewis has alleged sufficient facts to state a claim for battery against Dr. Foster.

Dr. Foster also relies on Del. Code Ann. tit. 11 § 468(3), (5), and (7) as a ground supporting dismissal of Lewis' battery claims. Dr. Foster contends that a person in her position, who is responsible for the safety of Lewis, the staff and other DPC patients, is permitted to order the use of force necessary to safeguard the welfare of the patient, staff and other patients. (D.I. 16 ¶ 16.) The court disagrees. Del. Code Ann. tit. 11 § 468 sets forth several defenses to battery. However, it explicitly states that the defenses provided are defenses to *criminal* battery, not civil battery. Dr. Foster concedes this fact in her motion to dismiss, but contends that "since Lewis' complaint may be alleging common law battery[, she] can avail herself of the[] statutory defenses." (*Id.*) Remarkably, Dr. Foster offers no explanation why statutory defenses to criminal battery are applicable to a claim for civil battery. Moreover, absent from Dr. Foster's motion is any citation to a civil battery case in which a Delaware court (federal or state) applied Del. Code Ann. tit. 11 § 468(3), (5), or (7). Further, after its own search of federal and Delaware case law, the court is unable to find a civil battery case in which Del. Code Ann. tit. 11 § 468(3), (5), or (7) is discussed. Based on its findings, the court is unwilling to apply defenses that are reserved to resist criminal

16

battery claims to a civil battery claim and, therefore, will deny Dr. Foster's motion to dismiss Lewis' battery claim.

### E.    Motions to Amend

On July 7, 2005, Lewis filed a motion requesting permission to amend the complaint ("First Motion") (D.I. 19). On August 4, 2005, Lewis filed another document, titled "Additional Points to Support Motion Requesting Permission to Amend Complaint" ("Second Motion") (D.I. 20). The court construes both documents as motions to amend. The motions request the court to amend the complaint to include new claims and additional defendants. The court will address these requests in turn.

Lewis first asks the court to amend his complaint by adding new claims in order to "cure deficiencies" in his prior pleadings.[6] Rule 15 of the Federal Rules of Civil Procedure permits a party

---

[6] Lewis' First Motion requests the court to include the following claims: (1) First Amendment freedom of religion and freedom of speech violations; (2) Fourth Amendment violations for unreasonable searches and seizures; (3) Fifth Amendment due process violations; (4) Sixth Amendment speedy trial violations; (5) Eighth Amendment violations for cruel and unusual punishment; (6) Fourteenth Amendment due process violations; (7) statements of facts of unconstitutional treatment; (8) relief in regard to the petition of habeas corpus filed in state court; (9) a request for a jury trial; (10) a request for appointment of counsel; (11) a request for declaratory judgment; (12) a statement of physical injury; (13) a statement of emotional damage; (14) a request for expert psychiatric witnesses; (15) a claim for medical negligence; (16) a request for an expert physician; (17) a civil rights statute; (18) several statutory statutes; (19) statements that the plaintiff has been subjected to extended incarceration due to constitutional violations; (20) a statement of atypical and significant hardships as a result of being assaulted confined and restrained with four point restraints; (21) claims for the common law torts of assault, battery, libel and slander; (22) claims for several criminal offenses, such as assault, kidnapping, possession of a deadly weapon during the commission of a felony, attempted murder, and robbery; and (23) a request for polygraph testing. (D.I. 19 ¶¶ 1-20, 22-24.) Lewis' Second Motion asks the court to allow him to include the following: (1) specific details in regard to Dr. Foster and other persons he seeks to add as defendants "never"offering him a hearing before violating his civil rights; (2) valid factual documents that support the fact that Dr. Foster and other persons he seeks to add as defendants conspired to violate his civil rights; (3) detailed statements of atypical and significant hardships; (4) a request for liens on the defendants' assets;

to amend the complaint by leave of court or by written consent of the adverse party. Leave to amend

a complaint should be "freely given when justice so requires." FED. R. CIV. P. 15(a). The court has

discretion to deny leave to amend when there exists undue delay, bad faith, dilatory motive or undue

prejudice to the opposing party, or when the amendment would be futile. *See Foman v. Davis*, 371

U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

Specifically, an amendment would be futile for purposes of Rule 15(a) if, accepting all the well

pleaded facts as true, the amended complaint fails to state a claim upon which relief may be granted.

*See Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 646 F. Supp. 118, 120 (D. Del.

1986). In other words, "the court should apply the same standards as are applied to Rule 12(b)(6)

motions to dismiss." *Id.*

In the present case, there is no evidence of undue delay, bad fath, dilatory motive or undue

prejudice to the defendants. However, even affording Lewis' requested claim additions the most

liberal construction, it appears "beyond doubt that [he] can prove no set of facts in support of his

claim[s] that would entitle him to relief." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Lewis has

not included allegations regarding any of the claims he seeks to add. Rather, with respect to his

constitutional claims, he merely writes the number and title of the amendment for which he seeks

to allege violations, and states that he would like to amend his complaint to include a violation of

that amendment.[7] Further, with respect to his other claims, Lewis simply states he would like "to

---

(5) specific details as to how each defendant violated his civil rights, as well as which rights each
violated; (6) a civil cover sheet JS 44; and (7) a request for preliminary injunction. (D.I. 20 ¶¶ 2-
8.)

[7] For example, the first numbered paragraph of Lewis' First Motion states that he would
like "to include violations against the plaintiff's right to freely exercise religion and freedom of
speech; 1st Amendment U.S.C." (D.I. 19 ¶ 1.)

18

include" or "to request," and then lists his request.[8] Lewis does not provide any other information.

Nor does he state the identity of the defendants involved in the violations. In fact, Lewis states in

the Second Motion that he would like to amend the complaint "to include specific details of how

each defendant violated [his] civil rights, as well as to specify exactly what right(s) they violated

collectively or individually, under the color of law." (D.I. 20 ¶ 6.) Given the foregoing statement,

it is clear to the court that the amended complaints fail to provide "a short and plain statement of the

claims showing that [Lewis] is entitled to relief. . . ." Fed. R. Civ. P. 8(a); *see Green v. Howard R.*

*Young Corr. Inst.*, 229 F.R.D. 99, 105 (D. Del. 2005). Accordingly, both of Lewis' motions to

amend fail to state claims upon which relief can be granted against the defendants and are, therefore,

futile. *See* Fed. R. Civ. P. 12(b)(6). As such, the court will deny Lewis' motions to amend, without

prejudice, insofar as they seek to add new claims.

Lewis' motions also seek to add new defendants to his claims under 42 U.S.C. § 1983.[9]

As previously discussed in the context of Dr. Foster's and Gray's motions to dismiss, in order for

Lewis to state a section 1983 claim against those he seeks to add as defendants, he must show that:

(1) the alleged defendants deprived him of a constitutional right; and (2) the alleged defendants were

---

[8] Lewis' claims include  requests for appointment of counsel, expert psychiatric witnesses, and an expert physician. These "claims" are not allegations against any of the defendants. Instead, they are requests that are properly raised in motions to the court, in order to allow the defendants an opportunity to address them.

[9] The First Motion seeks to add the following defendants: Nurse Helen, Pat Riley, Rose, Karen Chamberlin, Diane Stachowski, Dave Moffitt, Mark Diggs, Florence Scott Cobbs, "Caucasian" Mr. Johnson, Sagil, Gloria Banks, "African American" Mr. Johnson, Dr. Kathryn Sheneman, and Dr. Eugene Lopez. Lewis' Second Motion seeks to add some of the same people as defendants, as well as Michael S. Talmo DPC Director, Head Nurse Curtis Cornish, Lance Sapers, C. Oats, Dr. Ovreishi, Tanya Wilson, Donna Lawrence, Pat Riley, J. Conyer, Margaret Wilson, and District Attorney Brian J. Robertson.

acting under the color of state law. 42 U.S.C. § 1983; *see, e.g., Groman v. Tp. of Manalapan*, 47 F.2d 628, 633 (3d Cir. 1995). Additionally, Lewis must allege and prove a causal connection between the defendants and the alleged wrongdoing in order to recover. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). A plaintiff establishes a causal connection by showing that the defendant was personally involved in the alleged wrongs through allegations of either personal direction or actual knowledge and acquiescence. *Id.* Finally, a plaintiff must allege personal involvement with particularity, stating the time, place, and persons responsible for the violations. *Boykins v. Ambridge Area Sch. Dist.*, 621 F.2d 75, 80 (3d Cir. 1980).

Here, each motion to amend contains a laundry list of names. However, Lewis alleges only that "Caucasian" Mr. Johnson ("Johnson One"), "African American" Mr. Johnson ("Johnson Two"), Lance Sapers ("Sapers"), and Dave Moffitt ("Moffitt") were personally involved in the incidents alleged in his amended complaint. The court will address these allegations below. With respect to the other people listed as defendants, Lewis has failed to indicate how they were personally involved in any deprivation of his constitutional rights. More important, Lewis has not alleged that any of them deprived him of a constitutional right. Thus, Lewis has not satisfied one of the essential elements of successfully pleading a section 1983 claim against those defendants. Accordingly, the court will deny his motion to amend, as it pertains to adding the following defendants: Nurse Helen, Pat Riley, Rose, Karen Chamberlin, Diane Stachowski, Mark Diggs, Florence Scott Cobbs, Sagil, Gloria Banks, Dr. Kathryn Sheneman, Dr. Eugene Lopez, Michael S. Talmo DPC Director, Head Nurse Curtis Cornish, C. Oats, Dr. Ovreishi, Tanya Wilson, Donna Lawrence, J. Conyer, Margaret Wilson, and District Attorney Brian J. Robertson.

As previously mentioned, Lewis has included allegations with respect to Johnson One,

Johnson Two, Sapers, and Moffitt. Specifically, the First Motion alleges that Johnson One and Johnson Two assisted several nurse assistants in assaulting, confining, and restraining Lewis on June 21, 2004, at eleven o'clock at night. (D.I. 19 ¶ 21.) The Second Motion alleges that Johnson Two, Sapers, and Moffitt "are the three men who were involved with the incident with Mr. Gray." (D.I. 20 ¶ 1.) The "Gray incident" is described in the amended complaint (D.I. 10), and discussed above, as occurring on or about June 13, 2004, at the DPC. (D.I. 10, at 2.) Because Lewis has stated the time (i.e. June 13, 2004 and June 21, 2004), place (i.e. DPC), and persons responsible (i.e. Johnson One, Johnson Two, Sapers, and Moffitt) for the constitutional violations he alleges, the court concludes that he has sufficiently stated section 1983 claims. Therefore, the court will grant Lewis' motion to amend, as it pertains to adding Johnson One, Johnson Two, Sapers, and Moffitt as defendants.

Dated: July 5, 2006                    /s/ Gregory M. Sleet_____
                                       UNITED STATES DISTRICT JUDGE

21



**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF DELAWARE**
OFFICE OF THE CLERK

PETER T. DALLEO
CLERK OF COURT

U.S. COURTHOUSE
844 KING STREET, LOCKBOX 18
WILMINGTON, DELAWARE 19801
(302) 573-6170
www.ded.uscourts.gov

July 5, 2006

Jimmie Lewis
SBI # 506622
Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware 19977

**RE:   Correction in Memorandum and Order issued on February 7, 2006 in C.A. No. 04-1350 (GMS)**

Dear Mr. Lewis:

This letter is to inform you of a small correction in the court's Memorandum and Order, issued on February 7, 2006 at docket item number 52. The Memorandum has been changed to reflect an error in the title of the United States Code used in Section III.C. The cited section of the United States Code now reads 42 U.S.C. § 1997e(e), whereas in the February 7, 2006 Memorandum it read 28 U.S.C. § 1997e(e).

Sincerely,
PETER T. DALLEO, CLERK

/s/ April Walker
Deputy Clerk

## Tracy Hughes

**From:**     Cynthia G. Beam, Esquire
**Sent:**     Thursday, July 06, 2006 12:11 PM
**To:**       Tracy Hughes
**Subject:** FW: Activity in Case 1:04-cv-01350-GMS Lewis v. Foster "Memorandum and Order"

**Reger Rizzo Kavulich & Darnall** LLP
ATTORNEYS AT LAW

Suite 202
1001 Jefferson Street
Wilmington, DE 19801
Phone: 302.652.3611
Fax: 302.652.3620
Web: www.rrkdlaw.com

Cynthia G. Beam, Esquire
cbeam@rrkdlaw.com

NEW IRS RULES RESTRICT WRITTEN FEDERAL TAX ADVICE FROM LAWYERS AND ACCOUNTANTS. WE INCLUDE THIS STATEMENT IN ALL OUTBOUND EMAILS BECAUSE EVEN INADVERTENT VIOLATIONS MAY BE PENALIZED. NOTHING IN THIS MESSAGE IS INTENDED TO BE USED, OR MAY BE USED, TO AVOID ANY PENALTY UNDER FEDERAL TAX LAWS. THIS MESSAGE WAS NOT WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF ANY TRANSACTION. CONTACT THE SENDER IF YOU WISH TO ENGAGE US TO PROVIDE FORMAL WRITTEN ADVICE AS TO TAX ISSUES.
THIS E-MAIL MAY CONTAIN PRIVILEGED, CONFIDENTIAL, COPYRIGHTED, OR OTHER LEGALLY PROTECTED INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT (EVEN IF THE E-MAIL ADDRESS ABOVE IS YOURS), YOU MAY NOT USE, COPY, OR RETRANSMIT IT. IF YOU HAVE RECEIVED THIS BY MISTAKE PLEASE NOTIFY US BY RETURN E-MAIL, THEN DELETE. THANK YOU.

**From:** ded_nefreply@ded.uscourts.gov [mailto:ded_nefreply@ded.uscourts.gov]
**Sent:** Thursday, July 06, 2006 11:10 AM
**To:** ded_ecf@ded.uscourts.gov
**Subject:** Activity in Case 1:04-cv-01350-GMS Lewis v. Foster "Memorandum and Order"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** There is no charge for viewing opinions.

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from asw, entered on 7/6/2006 at 12:09 PM EDT and filed on 7/5/2006
**Case Name:**      Lewis v. Foster
**Case Number:**   1:04-cv-1350
**Filer:**
**Document Number:** 68

**Docket Text:**
AMENDED MEMORANDUM re [52] Memorandum Opinion and Order . Signed by Judge Gregory M. Sleet on 7/5/06. (Attachments: # (1) Letter to Plaintiff)(asw)

7/10/2006

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=7/6/2006] [FileNumber=239804-0]
[a3ac207d1d85158170a4d44231666fa42d80e1d764010100b4cae558452c58a8ed37f
2cdc71ccb0c4b96f9e999e9b8a3048a3212a9ca3d4d9f6722533b764332]]
**Document description:** Letter to Plaintiff
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=7/6/2006] [FileNumber=239804-1]
[16ebfdd68cf58a06fd26dedb034ba21928133f528f9617d5b4589d42829e7136eec69
34d62d66868f830c1ca4f2941ddbc676bdac392e6ee29363635717bf610]]

**1:04-cv-1350 Notice will be electronically mailed to:**

Cynthia G. Beam    cbeam@regrizlaw.com

Gregory E. Smith    greg.smith@state.de.us,

Aleph Ann Woolfolk    ann.woolfolk@state.de.us, stephany.murray@state.de.us

**1:04-cv-1350 Notice will be delivered by other means to:**

Jimmie Lewis
SBI#506622
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

# EXHIBIT "D"

AMIR FATIR, Plaintiff, v. DAVID DOWDY, PATRICK RYAN,
BARRY HAWLK, LAWRENCE McGUIGAN, ROBERT SNYDER,
CARL DANBERG, STANLEY TAYLOR, and COLLEEN T.
SCHOTZBERGER, Defendants.

Civil Action No. 95-677-GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE

*2002 U.S. Dist. LEXIS 16480*

September 4, 2002, Decided

**DISPOSITION:**   Summary judgment granted, in part, and claims dismissed without prejudice. Action
stayed.

**COUNSEL:**  [*1]  For Amir Fatir, PLAINTIFF: Edward M McNally, Morris, James, Hitchens & Williams,
Wilmington, DE USA. Elizabeth A Brown, Morris, James, Hitchens & Williams, Wilmington, DE USA.

For David Dowdy, Patrick Ryan, Stanley Taylor, Colleen Shotzberger, Carl C Danberg, Robert Snyder,
Barry Hawlk, Larry McGwiggen, Lawrence McGwiggen, DEFENDANTS: Ophelia Michelle Waters,
Department of Justice State of Delaware, Wilmington, DE USA. Marc P Niedzielski, Department of Justice,
Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On April 6, 1995, Amir Fatir, a prisoner, filed a complaint against the defendants pursuant to *42 U.S.C.
§ 1983*. His allegations stem from various actions taken by the defendants, all employees of the Delaware
Correctional Center ("DCC") in Smyrna, Delaware. At the time he filed his complaint, Fatir was proceeding
*pro se*. Among other things, Fatir's original complaint ("the 1995 complaint") alleged that certain of the
defendants had tampered with his mail and had taken property belonging to him from his work area.

In May 1996, Fatir wrote [*2] the court expressing his concern that the defendants had begun to
retaliate against him for filing this lawsuit. This letter added further facts supporting the claims previously
filed in the original complaint. Although Fatir stated that the letter was a motion for a preliminary injunction
and did not attach an amended complaint, The Honorable Roderick R. McKelvie *sua sponte* decided to treat
the letter as a motion to amend. Judge McKelvie granted the motion.

In the summer of 1996, Fatir was transferred to an Arizona prison. In January 1997, he sought to
amend his complaint to add claims of retaliatory transfer and retaliation for speech protected under the *First
Amendment*. Apparently, Fatir did not file any grievances with prison authorities regarding these claims
prior to amending his complaint.

The case was eventually reassigned to this court. After the case was reassigned, Fatir filed a second
motion for appointment of counsel. Although Fatir demonstrated that he was quite capable of prosecuting
his lawsuit *pro se*, given the problems he encountered during the discovery period and the practical
difficulties presented by his transfer to Arizona, the court appointed counsel [*3] on June 20, 2000 (D.I.
57). In November 2000, Fatir, by and through his counsel, filed a motion to amend his complaint. On

January 29, 2001, the court granted this motion with the provision that the defendants would be permitted to retain any and all applicable defenses. After the third motion to amend was granted, the court entered a scheduling order which set the dispositive motion deadline at November 16, 2001.

Presently before the court are two motions. The first is the defendants' motion for summary judgment filed on November 16, 2001. In this motion, the defendants raise several defenses to the plaintiff's claims, including the plaintiff's failure to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1996 ("PLRA"), *42 U.S.C. § 1997e*. In the plaintiff's response to that motion, filed on February 15, 2002, he asserts that since his complaint was filed after the PLRA was enacted, his claims are not subject to any exhaustion requirements. The defendants respond that although this is true for the claims contained in the 1995 complaint, the new claims presented in Fatir's first, second, and third amended complaints were filed [*4] after the PLRA's enactment and are therefore subject to its exhaustion requirements.

The second motion before the court is the plaintiff's motion for leave to file a fourth amended complaint. This motion was filed on February 19, 2002, four days after the plaintiff's response to the defendants' motion for summary judgment. The proposed fourth amended complaint will amend Count Eight of the third amended complaint - which currently states a claim for deprivation of property - to state a claim for conversion. The defendants allege that this motion is the product of undue delay and will result in prejudice to their ability to defend this case. Additionally, the defendants allege that the proposed conversion claim is futile. The plaintiff responds that the amendment is not futile, and that the motion is not the result of undue delay.

Upon review of the lengthy record, the submissions of the parties, and the applicable law, the court reaches the following conclusions. First, the motion to amend will be denied. The court finds the fact that the motion was filed four days after the plaintiff's response to the motion for summary judgment supports a finding that the motion is the product [*5] of undue delay. For this reason, the court also finds that granting the motion will unreasonably prejudice the defendants and the court. Second, with regard to summary judgment, the court finds that certain of the plaintiff's claims either did not require exhaustion or were properly exhausted. The court finds, however, that there is scant evidence of exhaustion of the claims in Counts Four and Eight. Therefore, the court will order that those particular claims must be dismissed without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims. While the plaintiff is exhausting his remedies pertaining to these claims, this case will be stayed with respect to all other claims. Since the court is staying the case, the court will not decide the other legal issues in this case until the plaintiff has exhausted his remedies. The court will now more fully explain the reasons for is ruling.

## II. FACTS [1]

> 1  As indicated above, the court will not address the legal merits of the plaintiff's claims at this time. Thus, the court will only provide those facts that are pertinent to the motion to amend and the exhaustion issue raised in the motion for summary judgment.

[*6]  In 1975, Amir Fatir was arrested and charged with crimes stemming from an armed robbery and murder which occurred earlier that year. In March 1976, the plaintiff was found guilty of the charges and was sentenced to life in prison. [2] Fatir was classified to serve his imprisonment at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Although the plaintiff presented a serious disciplinary problem at the beginning of his incarceration, by 1987, he had become a model prisoner. He became an active participant in positive aspects of prison life. He even began new programs designed to help prisoners cope with life behind bars. Fatir also became an author and sought after lecturer on prison life. Most important for the purposes of the present motion, after his initial infractions, Fatir was deemed to be a low security risk and was permitted to work in the prison's Central Supply as a clerk and computer programmer. [3]

> 2  The plaintiff was originally sentenced to death, but due to the constitutional infirmity of the Delaware death penalty statute, this sentence was later reduced to life without parole.

[*7]

> 3  The Central Supply was technically on the prison grounds, but it was beyond the secure area of the prison fences. Thus, only inmates who presented low security risks were permitted to work in this area.

On April 6, 1995, Fatir filed a complaint against the defendants. [4] The complaint asserted several causes of action. First, Fatir claimed, "Defendants violated plaintiff's constitutional protection against unreasonable searches and seizures by searching my computer and copying files without his permission." (D.I. 2 at 7.) Fatir also alleged, "For the past year, Plaintiff's mail has been tampered with by mailroom officers . . . . Plaintiff has had incoming mail returned to sender without explanation and in violation of institutional mail regulations which require the mailroom officers to notify the inmates of any mail that they intend to send back to sender." (*Id.* at 10.)

> 4   The defendants Danberg, Taylor, and Schotzberger were not added until 1997. Additionally,
> Fatir has voluntarily withdrawn certain claims. Therefore, the defendants Boyle, Hosterman,
> Cunningham, and Gullege are no longer defendants in this action.

[*8] On May 16, 1996, Fatir wrote a letter to the court. (D.I. 19.) In the letter, Fatir alleged that "On May 14, 1996, Major Barry Halwk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (*Id.*) Fatir also asserted that "Defendant Dowdy has repeatedly mishandled legal mail coming into the institution for me. He has also stopped mail leaving the institution from directly going to the persons to whom the mail is addressed." (*Id.*) Fatir further stated, "I would request that the court please treat this letter as a Motion for a Preliminary Injunction." (Id.) At no point did Fatir refer to his letter as a motion to amend.

On May 23, 1996, Judge McKelvie issued an order addressing Fatir's letter-motion. The order stated as follows:

> On May 20, 1996, plaintiff sent a letter to the court stating that . . . Major Barry Hawk and
> McGwiggen [sic], had seized his personal computer, his file for this litigation, certain books,
> including plaintiff's "The Prisoner's Self-Help Litigation Manual," and computer disks. In
> addition, the plaintiff asserts *as he did in his* [*9] *original complaint* that defendant Dowdy
> is interfering with his personal and legal mail. Plaintiff seeks a temporary restraining order
> and preliminary injunction to order the return of his property and to prevent DCC officials
> from tampering with his mail. The court will construe plaintiff's letter as a proposed
> amendment to his original complaint and as a motion for injunctive relief.
>
> Plaintiff's proposed amendment to his complaint appears to claim that Hawk and
> McGwiggen's [sic] seizure of his personal property violates his *Fourteenth Amendment* right
> to due process. In addition, he appears to claim that their seizure of his legal materials and
> Dowdy's *continued* interference with legal mail violates his *First Amendment* right of access
> to the courts. As plaintiff still lacks the funds to maintain this action, and as these claims do
> not appear frivolous, the court will allow plaintiff to proceed *in forma pauperis* on these
> claims in addition to those identified by the court's October 31, 1995 Order granting plaintiff
> [sic] to proceed *in forma pauperis* against defendants Dowdy and Ryan.

(D.I. 20 at 1)(emphasis added).

On June 22, 1996, approximately three [*10] months after Judge McKelvie granted the "motion to amend," Fatir gave a speech which criticized the policies of the warden, the defendant Robert Snyder, as racist. One week later, on June 29, 1996, Fatir was informed that he would be transferred to an Arizona prison pursuant to the Interstate Corrections Compact. Fatir arrived at Santa Rita prison in Arizona on July 5, 1996. On January 10, 1997, Fatir filed a motion to amend with a new complaint attached. (D.I. 30.) In that complaint he alleged retaliatory transfer, retaliation for *First Amendment* violations, and deprivation of due process resulting from the seizure of certain of his personal effects lost during his transfer, including books, a television, a radio, legal materials, a computer, cosmetics, and other assorted items. (*Id.* at 5.) In their response to the motion, the defendants asserted that the retaliation claims should be considered separate causes of action under *section 1983*. (D.I. 41.) Without addressing the defendants' contention, Judge McKelvie granted Fatir's motion to amend. (D.I. 44.)

In April 1998, Fatir filed a second motion for appointment of counsel. [5] In September 1998, the case was reassigned to this [*11] court. The court granted the motion for appointment of counsel on June 20, 2000. Upon securing new counsel, the plaintiff was permitted to file an amended complaint over the

objection of the defendants. The amended complaint ("the 2001 complaint") was deemed filed on January 29, 2001. The 2001 complaint asserted nine causes of action, seven of which remain in this litigation. [5] The 2001 complaint did not present new causes of action. Rather, it contained reformulations of Fatir's prior allegations. Count One alleged that the defendants had tampered with Fatir's "personal correspondence and legal mail." (D.I. 80 at 19.) Count Two alleged interference with Fatir's legal mail, specifically. (*Id.* at 20.) Count Four asserted that Hawlk and McGuigan had violated Fatir's *Fourth Amendment* rights against unreasonable searches and seizures and his *Fourteenth Amendment* right to due process by seizing his litigation materials and the other items listed in the May 1996 letter. (*Id.* at 21.) Count Five asserts that Fatir was retaliated against for engaging in speech protected by the *First Amendment*. Count Six contends that the plaintiff was transferred in retaliation for filing this lawsuit. [*12] Count Eight asserts that the defendants violated the plaintiff's right to due process and deprived him of his property when they removed certain property, including books, a radio, a television, legal material, a computer, cosmetics, stamps, shoes, clothing, and two photo albums. (*Id.* at 24.) Count Nine alleges that the defendants' interference with his legal mail violated his right to have access to the courts. (*Id.* at 25.)

> 5  Fatir filed his first motion for appointment of counsel in August 1997. This motion was denied by Judge McKelvie in November 1997. (D.I. 44.)
> 6  The plaintiff has voluntarily withdrawn Count Three, an equal protection claim, and Count Seven, a due process claim based upon the plaintiff's reclassification upon arrival in Arizona. Since these claims are no longer being litigated, the court will not address them.

The court issued a scheduling order in this case on May 10, 2001. That order set the dispositive motion deadline at September 28, 2001. However, by agreement of the parties [*13] and the court, the deadline was later changed to November 16, 2001. Thus, dispositive motions were to be filed on November 16, 2001, the answering briefs were due on January 25, 2002, and the reply briefs were due on February 1, 2002.

The defendants filed their summary judgment motion on November 16, 2001, as scheduled. The motion argues, *inter alia*, that summary judgment should be granted in the defendants' favor because Fatir had failed to exhaust his administrative remedies before filing his complaint as required by the PLRA. The record indicates that the DCC had a formal grievance procedure for certain claims. The defendants have submitted an inmate grievance handbook and other materials establishing the existence of this grievance procedure. Also, Fatir testified at his deposition that there was a grievance procedure at the DCC. (D.I. 130 at A073.) When asked about his attempts at exhaustion during his deposition, Fatir testified as follows:

> Q: Did you ever file a grievance?
>
> A: Yes.
>
> Q: More than one?
>
> A: I can only recall one . . .
>
> Q: There's a form they use, correct?
>
> A: There . . . was, I think, a letter you had to write to begin the grievance process.
>
> Q: It [*14] was a form you had to fill in wasn't it?
>
> A: Maybe. I don't know. I don't recall.
>
> Q: And when you filled in this form, where would it go?
>
> A: When the grievance procedure was functioning as ordered by the court, it would go to the grievance coordinator.
>
> Q: And then from where? Would there be a hearing scheduled for it?
>
> A: There would be a hearing for it.
>
> Q: And after that there would be a decision made?
>
> A: Yes.

Q: And after that you could appeal the decision?

A: Yes.

Q: To who [sic]?

A: To the warden.

. . . .

A: The person who would be the statewide grievance coordinator [left], and the grievance procedure pretty much collapsed.

Q: There are still people that file grievances aren't there?

A: I would imagine so.

. . .

Q: In any event, in none of the instances that you complained about in the second amended complaint did you in any way file a grievance form and turn it in, correct?

A: After having been told that my issues were nongrievable . . .

Q: My question was did you actually file a written grievance and the answer is no?

A: No, I did not.

Q: Now, what things were you told were not grievable?

A: I was told that the mail tampering was not grievable. I was [*15] told that my job issues were not grievable because they were classification, and I was told that classification matters are not grievable. I was told that all the seizure of my materials, my computer itself, was not grievable, and - -

Q: Just so we're clear - -

A: - - the grievance board is not going to handle anything else from here.

Q: But you never filed a grievance and had the grievance board say that?

A: Well, the grievance coordinator said - -

Q: My question is still the same. You never actually filed a grievance and had them say, "This is not grievable"?

A: That's a two part question. . .

Q: Did you ever file a grievance form?

A: No.

Q: Since you never filed a grievance, you never heard back from the grievance board?

A: I heard back. They don't have them.


In his answer to the defendant's motion, filed on February 15, 2002, the plaintiff responded that the PLRA was enacted on April 26, 1996. Fatir thus argued that since his original complaint was filed in 1995, and the PLRA was not retroactive, his case was exempt from the exhaustion requirements of the PLRA. He also argued that with regard to the 1997 claims surrounding his transfer to Arizona, there was no available [*16] "formal" grievance procedure. The defendants assert that upon his transfer, Fatir was instructed to "contact the Interstate Compact Administrator for any legal issues." (D.I. 143 at 21-22.) The defendants, however, cite no record evidence in support of this claim. A review of the depositions given by those responsible for the transfer (namely the defendants Shotzberger, Ryan, Danberg, Taylor, as well as Mr. Stanley Turner) fails to clearly identify exactly how Fatir could have or would have been able to file a grievance regarding his transfer claims. When asked how an inmate who disagreed with a transfer might

challenge this decision, the defendant Taylor testified that "They write letters all the time. They write grievances all the time." (D.I. 130 at 157.) However, Taylor offered no testimony as to the exact operation or regulations of the purported grievance system, or to whom the grievance would be sent. Colleen Shotzberger, the Interstate Compact Administrator, testified that she gave Fatir a memo concerning the transfer of his legal materials, but did not testify that this memo or any other document notified Fatir of the appropriate grievance procedure for his transfer. (*Id.* [*17] at 299.) The prison hearing officer, Scott Turner, testified that if Fatir had indicated that he had a problem with the transfer, Turner might have been able to intervene. Additionally, Turner stated that there was no appeal from the decision to transfer. However, when Turner gave these responses, he was not specifically being asked about grievance procedures. (*Id.* at 120.) The record thus fails to clearly demonstrate how, or to whom, Fatir might appeal the transfer decision.

In their response to the plaintiff's motion, the defendants replied that although the PLRA might not be retroactive, thus saving the claims in the 1995 complaint, it did not save any claim asserted in an amended complaint after the PLRA was filed.

On February 19, 2002, a mere four days after answering the defendants' motion for summary judgment, the plaintiff filed a motion for leave to amend Count Eight of the 2001 Complaint. At present, Count Eight alleges that the defendants deprived Fatir of certain personal property, thus violating his due process rights. Fatir seeks to amend this count to instead assert a state law claim of conversion. The defendants oppose the amendment on two grounds. First, they [*18] assert that the plaintiff's motion is untimely, as it comes after the close of discovery and summary judgment. The defendants argue that this delay will prejudice their ability to defend this action. Second, the defendants assert that the plaintiff's conversion claim is futile under current law. The plaintiff responds that the motion is timely made and will not prejudice the defendants since the facts relating to the due process and conversion claims are nearly identical.

## III. DISCUSSION

Since the motions to amend and for summary judgment are subject to different legal standards, the court will address each motion in turn. The court will first discuss its reasons for denying the motion to amend. The court will then discuss the exhaustion issues raised in the defendants' motion for summary judgment.

### A. Motion to Amend

#### 1. Legal Standard

Permission to amend a pleading "shall be freely given whenever justice so requires." *FED. R. CIV. P. 15(a)*. *See also Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)* (same). Nevertheless, a court can deny a motion to amend if the motion is motivated by bad faith or if granting the motion [*19] will result in undue delay or prejudice to the opposing party. *See Cureton v. National Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001)* (citations omitted). Furthermore, the doctrine of futility allows the court to refuse any amendment that fails to state a cause of action. *See id.*

#### 2. The Plaintiff Unduly Delayed in Bringing this Motion to Amend

As noted above, a court may deny a motion to amend where the movant has unduly delayed in bringing the motion. *See id.* However, the Third Circuit has cautioned that delay alone is usually "an insufficient ground to deny leave to amend." *Id.* Nevertheless, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* Although the original complaint was filed in 1995, over seven years ago, the court will not consider the time during which the plaintiff represented himself *pro se.* The court will only consider the time from June 20, 2000 - when counsel was appointed - to the present. Counsel first amended the complaint on January 29, 2001. The motion to amend presently before the [*20] court was filed on February 19, 2002, more than one year after the *first amendment* by counsel. This one year delay was both undue and prejudicial for the following reasons.

The plaintiff's delay may become undue after a motion for summary judgment is filed where the movant has had previous opportunities to amend a complaint, but chose not to do so. *See Bethany Pharmacal Co., Inc. v. QVC, Inc., 241 F.3d 854, 861-62 (7th Cir. 2001)* (denying leave to amend where the plaintiff

"offered no explanation for waiting until it was faced with a summary judgment motion before attempting to add its promissory estoppel claim" although claim was previously available). In particular, if the requested amendment is based upon facts known to the plaintiff at the time the previous complaint was amended, the amendment is disfavored. *See M/V American Queen v. San Diego Marine Construction Corp., 708 F.2d 1483, 1492 (9th Cir. 1983)* (denying leave to amend where summary judgment was pending and amendment was not the product of newly discovery facts, but facts known at the time of the previous complaint). Similarly, if the newly presented claim and the previous claim are [*21] similar or identical, giving the plaintiff the ability to assert the new cause earlier, leave to amend is not granted. *See Coleman v. Ramada Hotel Operating Company, 933 F.2d 470, 473 (7th Cir. 1991)* (denying leave to amend after filing of summary judgment motion where the new claims "merely reiterated" the claims of the original complaint).

In the present case, by the plaintiff's own admission, the earlier alleged deprivation of property claim and newly sought conversion claims are very similar. The plaintiff admits that the new claim stems from the exact same set of factual circumstances as its predecessor. [7] Although the plaintiff acknowledges that the new claim is factually similar, implicitly conceding that it could have been asserted previously, he offers no excuse for his failure to raise this claim earlier in this litigation. Since the new conversion claim is so similar to the prior property claim and there was no reason not to present the claim in the prior amended complaint, this delay weighs against granting the plaintiff's request for leave to amend. Moreover, this matter has been in litigation for nearly seven years. Given these facts, the court can [*22] not countenance the additional delay that would result were the plaintiff permitted the sought after amendment.

> 7 The plaintiff stated, "The underlying facts supporting the proposed claim for conversion are exactly the same as those supporting the claim for due process/deprivation of property." (D.I. 146 at 4. - Pls.' Reply Br.)

Additionally, the timing of this motion is prejudicial to the defendants and the court. The court notes that the motion to amend was filed on February 19, 2002, just four days after the plaintiff filed his response to the defendants' motion for summary judgment. Motions to amend which are filed after summary judgment motions have been filed or granted are highly disfavored. *See Cureton, 252 F.3d at 273* ("When a party delays making a motion to amend until after summary judgment has been granted to the adverse party, other courts have recognized that the interests in judicial economy and finality of litigation may become particularly compelling."); *Eisenmann v. Gould-National Batteries, Inc., 169 F. Supp. 862, 864 (E.D. Pa. 1958)* [*23] (denying leave to amend where "the plaintiffs waited nearly two years to move to amend the complaint and then made the motion only after a motion for summary judgment had been filed and argued"). These belated attempts at amendment are disfavored with good reason. If parties were allowed to repeatedly amend their complaints, even after summary judgment motions had been filed, not only the opponent, but the courts, would be prejudiced by the never-ending litigation.

The plaintiff notes that since discovery has been conducted regarding the deprivation of property issue, the defendants will be able to use that discovery in their defense of the conversion claim, and therefore will not be prejudiced. The court agrees, but further notes that this is not the only source of prejudice. As previously noted, motions to amend which follow the filing of a motions for summary judgment are heavily disfavored. In the present case, the timing of the motion to amend in response to the defendant's motion raises an inference that the plaintiff is attempting to bolster his legal position - and therefore avoid summary judgment - by amending the complaint. This is an unacceptable reason to amend. *See* [*24] *Kennedy v. Josephthal & Co., 814 F.2d 798, 806 (1st Cir. 1987)* (affirming district court's denial of leave to amend where the attempt to amend the complaint appeared to be "an attempt to avoid an adverse ruling on summary judgment"); *Local 472 of the United Association of Journeymen and Apprentices v. Georgia Power Co., 684 F.2d 721, 724-25 (11th Cir. 1982)* (same). Permitting such an amendment at this stage would change the focus of that portion of the litigation, thereby prejudicing the defendants. *See Torres-Rios v. LPS Laboratories, Inc., 152 F.3d 11, 16 (1st Cir. 1998)* (noting that permitting amendment after discovery had closed and summary judgment motion had been filed would prejudice defendant).

For all of the above reasons, the court concludes that the plaintiff's undue and prejudicial delay requires the court to deny the plaintiff's motion to amend.

## B. The Exhaustion Issue

The court must address two questions. The first question is which claims, if any, must Fatir exhaust

before proceeding. Second, the court must address whether any of these remedies were properly exhausted. The court will address the questions in turn. [*25] But first, the court will outline the applicable summary judgment standard.

### 1. The Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).* When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999).* The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence -- not mere allegations -- for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996)* [*26] (citation omitted). To raise a genuine issue of material fact item, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)* (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson, 477 U.S. at 249-50.*

### 2. Whether Exhaustion was Required

The first question is whether exhaustion is required, and if so, for which claims. The PLRA mandates that:

> no action shall be brought with respect to prison conditions under *section 1983* of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

> *42 U.S.C. § 1997e(a)(1996).*

The latest version of the PLRA was enacted on April 26, 1996. *See* Pub. Law No. 104-134, 110 Stat. 1321. Congress did not state whether the law should have a retroactive [*27] effect. Nevertheless, the Third Circuit has made it clear that it believes the PLRA was not intended to be retroactive. *See Ghana v. Holland, 226 F.3d 175, 182-83 (3d Cir. 2000).* Therefore, while the PLRA would apply to claims brought into this case after April 26, 1996, it would not apply to claims asserted prior to that time. Therefore, any claim that was clearly or conceivably asserted in Fatir's 1995 complaint is exempt from any exhaustion requirement. [8] However, as the defendants correctly point out, any claims that were asserted through amendment in 1996 or 1997 may need to be exhausted. The court will now consider each of the claims presented in Fatir's 2001 complaint and determine when they were first asserted in this litigation - whether explicitly or through relation back - and whether the PLRA is applicable to them.

> 8  Although there were methods of determining exhaustion in existence prior to the enactment of the PLRA, the defendants do not assert that Fatir failed to exhaust his remedies under pre-PLRA law. They merely argue that he did not exhaust as required by the PLRA. Since the defendants did not brief the issue of pre-PLRA exhaustion, the court will consider it waived.

[*28]  **a. Count One**

Count One of the complaint states a claim for interference with mail. In Fatir's 1995 complaint, he clearly states that his "mail had been tampered with by mailroom officers." (D.I. 2 at 10.) Thus, the claims in Count One were clearly asserted prior to the enactment of the PLRA. Therefore, Fatir was not required to exhaust his remedies on this claim.

### b. Count Two

Count Two states a claim for interference with legal mail. Again, in the 1995 complaint, Fatir stated

that his "mail had been tampered with by mailroom officers." (*Id.* at 10.) There is no explicit mention of legal mail. The claims for legal mail were first explicitly asserted in the 1996 letter to Judge McKelvie. Nevertheless, the claims asserted in Count Two can be said to be an amendment or supplement that "relates back" to the 1995 complaint. Relation back is appropriate where a newly asserted claim arises out of the same conduct, transaction, or occurrence that was alleged in the original pleading. *See FED. R. CIV. P. 15 (c)*. In this case, the legal mail claim arises out of the same conduct as the civilian mail claim. Judge McKelvie held as much in his May 1996 order when he stated, [*29] "The plaintiff asserts *as he did in his original complaint* that defendant Dowdy is interfering with his personal *and* legal mail." (D.I. 20 at 1) (emphasis added). Judge McKelvie further stated, "In addition, [Fatir] appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his *First Amendment* right of access to the courts." (*Id.*)(emphasis added). These statements clearly indicate the court's belief that the legal mail claim was either implicitly asserted in the 1995 complaint or was a continuation of the mail tampering conduct contained in that complaint. This court, therefore, finds that the claims contained in Count Two relate back to the 1995 complaint and are thus not subject to the PLRA.

### c. Count Four

Count Four as currently written alleges that the defendants violated Fatir's *Fourth* and *Fourteenth Amendment* rights to be free of unreasonable searches and seizures. Specifically, the plaintiff alleges that his rights were violated when materials were seized from his cell, including his personal computer, legal files, books including "The Prisoner's Self-Help Litigation Manual" and computer disks. [*30] These facts are not mentioned in the 1995 complaint. Rather, this claim was first asserted in Fatir's May 1996 letter to Judge McKelvie, wherein he stated, "On May 14, 1996, Major Barry Hawlk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (D.I. 19.) Since this claim was first asserted in May 1996, and the PLRA was enacted in April 26, 1996, it is subject to the PLRA's exhaustion requirement.

The court considered that the claims in Count Four might relate back to the 1995 complaint. Indeed, the 1995 complaint does state a claim for search and seizure based on a search of Fatir's personal computer. However, the court concludes that the claims currently asserted in this action do not relate back to the 1995 complaint. First, by Fatir's own admission in his complaint, the facts upon which Count Four relies did not occur until May 1996. Additionally, unlike the mail tampering claim, it cannot be argued that the seizure of his property was a continuing wrong related to the wrong alleged in the 1995 complaint. Rather, it appears that the search alleged in the 1995 complaint [*31] and the May 1996 allegation are two separate and unrelated incidents. Judge McKelvie acknowledged as much in his order. Although he stated that the legal mail tampering was a continuation of actions alleged in the 1995 complaint, he did not state that the May 1996 search and seizure allegations were in any way related to the 1995 complaint. Indeed, he referred to the May 1996 allegations as "new" claims. (D.I. 20.) Moreover, since the 1995 and 1996 incidents were completely separate, they cannot be part of the same transaction or occurrence. The claims in Count Four do not relate back to the 1995 complaint. They are, therefore, subject to the PLRA.

### d. Counts Five, Six, and Eight

Counts Five, Six, and Eight each assert claims arising from Fatir's July 1996 transfer to Arizona. Each of these claims appeared in this litigation for the first time in Fatir's January 1997 amended complaint. The PLRA was in effect at that time, and each of these claims is therefore subject to its exhaustion requirement. Moreover, since the events alleged in the 1997 complaint did not occur until 1996, there is no way they can be reasonably related to any claim asserted in the 1995 complaint. Therefore, [*32] Fatir was required to exhaust the claims asserted in Counts Five, Six, and Eight.

The court observes that the PLRA applies only to "prison conditions." Counts Five, Six, and Eight all state constitutional claims. Thus, it could be argued that because they are not prison conditions claims, no exhaustion is required. The court disagrees with this view. In *Booth v. Churner, 206 F.3d 289 (3d Cir. 2000), aff'd, 532 U.S. 731, 149 L. Ed. 2d 958, 121 S. Ct. 1819 (2001)*, the Third Circuit held that an excessive force claim, which is a constitutional claim, was a "prison condition" and had to be exhausted under the PLRA. *See id. at 296.* ("Excessive force actions are 'prison conditions' actions and subject to the exhaustion requirements set forth in [the PLRA]."). The Third Circuit further stated that "Congress, in the PLRA, made its intent to subject all prisoner actions (save for habeas petitions) to § *1997e(a)*'s exhaustion requirements . . . clear." *Id. at 295.* Thus, it appears that given the Third Circuit's holding in *Booth*, even constitutional claims such as those raised in Counts Five, Six, and Eight are subject [*33] to the exhaustion

requirements of the PLRA.

The Supreme affirmed the Third Circuit in *Booth*, and has also hinted that even constitutional claims might be subject to the PLRA's requirements. Indeed, in reaching its conclusion in *Booth*, the Third Circuit relied on the Supreme Court's decision in *McCarthy v. Bronson, 500 U.S. 136, 114 L. Ed. 2d 194, 111 S. Ct. 1737 (1991)*. In *McCarthy*, the Supreme Court was asked to construe another section of the PLRA, *18 U.S.C. § 3626*, which concerns prison conditions and is interpreted in the same manner as *§ 1997e(a)*. See *Booth, 206 F.3d at 294* ("Because the two sections of the PLRA are directed toward similar ends and are thus substantially related, it follows that . . . the identical terms used in the two sections should be read as conveying the same meaning."). The *McCarthy* Court held that the term "prison conditions" included not only continuous claims of prison conditions, but also "isolated episodes of unconstitutional conduct." See *McCarthy, 500 U.S. at 139*. Thus, *McCarthy* lends further support to the argument that even constitutional claims must [*34] be exhausted.

Finally, most recently, in *Porter v. Nussle, 534 U.S. 516, 152 L. Ed. 2d 12, 122 S. Ct. 983 (2002)*, the Supreme Court was asked to address whether an excessive force claim was a "prison condition" requiring exhaustion under the PLRA. In reversing the Second Circuit, which had held that the excessive force claim did not require exhaustion, the Supreme Court read *§ 1997e(a)* very broadly, stating, "We hold that the PLRA's exhaustion requirement applies to all suits about prison life . . . whether they allege excessive force or *some other wrong*." *122 S. Ct. at 992*. The Supreme Court therefore did not specifically exclude constitutional claims from the purview of the PLRA.

In light of *Booth, McCarthy*, and *Porter*, the court finds that although the plaintiff's *First Amendment constitutio*nal claims do not appear to assert claims for prison conditions, they must be exhausted under the PLRA. *See Ghana, 226 F.3d at 177, 179* (requiring inmate plaintiff to exhaust *First Amendment* claim prior to filing suit). See also *Walker v. Maschner, 270 F.3d 573, 574 (8th Cir. 2001)* (same).

#### e. Count Nine

Count Nine is very [*35] similar to Count Two. Fatir never expressly stated a claim for denial of access to the courts in the 1995 complaint. However, in his May 1996 order, Judge McKelvie stated, "In addition, [Fatir] appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his *First Amendment* right of access to the courts." (D.I. 20 at 2.) The denial of access to courts claim, as worded by Judge McKelvie, is directly dependent upon the mail tampering claim. As previously noted, the mail tampering conduct was properly alleged in the 1995 complaint. Therefore, the claim alleged in Count Nine arises out of conduct, transactions, or occurrences that were plead in the original 1995 complaint. Thus, the claim in Count Nine relates back to the claim in the 1995 complaint and does not require exhaustion.

#### f. Conclusion

The court concludes that no exhaustion is required for Counts One, Two, and Nine. Nevertheless, exhaustion is required for Counts Four, Eight, Five, and Six. The court will now consider whether Fatir has satisfied the PLRA's exhaustion requirements with respect to these claims.

### 3. Whether Fatir Properly Exhausted the Claims

[*36] As previously stated, the PLRA requires a prisoner to exhaust all available administrative remedies before bringing an action regarding prison conditions. *See Booth, 206 F.3d at 291; Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000)*. In the Third Circuit, exhaustion of remedies is an affirmative defense to be asserted by the defendant. *See Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)*. Thus, the burden is on the defendant to prove the facts that support its exhaustion defense. Where a prisoner has failed to exhaust, the court is required to dismiss the unexhausted claims without prejudice. *See Nyhuis, 204 F.3d at 68 n. 2*.

The exhaustion requirement is mandatory. Thus, the court cannot excuse a prisoner's failure to exhaust. *See id. at 66*. Additionally, the Third Circuit has refused to recognize a futility exception to the PLRA's exhaustion requirements. *See id. at 71*. In other words, the PLRA requires an inmate to exhaust all administrative remedies prior to bringing a federal action challenging prison conditions, whether or not they provide the inmate with the relief the inmate says [*37] he or she desires in the federal action. *See id. at 71 n.6* (noting that even where prison cannot grant requested relief, exhaustion may still be helpful) (citations omitted). Nevertheless, if there is no administrative remedy available for the plaintiff's claim, the court can

find that exhaustion is not required. *See Freeman v. Snyder, 2001 U.S. Dist. LEXIS 16634, 2001 WL 515258*, at \*5 (D. Del. 2001), citing *Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000)*. Moreover, where the prisoner's compliance with the administrative scheme has been substantial, even if not complete, the court might find exhaustion. *See Nyhuis, 204 F.3d at 77-78.* The court will now consider whether Fatir had administrative remedies available to him, and if so, whether he had properly exhausted those remedies for Counts Four, Eight, Five, and Six.

### a. Was there an administrative remedy available?

An administrative remedy is "an administrative scheme adopted by the state department of corrections." *See Freeman, 2001 U.S. Dist. LEXIS 16634, 2001 WL 515258* at \*7. At minimum, it appears that an administrative remedy must be ascertainable by examination of statutes [\*38] or regulations. *See id.* at \*7 n.9 (citing *Concepcion v. Morton, 125 F. Supp. 2d 111, 117 (D.N.J. 2000))*. Conversely, a vague, informal grievance process is "hardly a grievance procedure." *See id.* at \*7. Thus, an individual administrator's decision would not qualify as a grievance procedure. *See id.* The court will now consider whether there was an administrative remedy available for Fatir for any of his claims.

### 1). Counts Four and Eight

The court finds Fatir's deposition testimony and other evidence of record clearly establishes that there was a grievance procedure at the DCC for certain claims. The inmate was required to file a grievance with the grievance board, which could then be appealed. There was nothing vague, informal or discretionary about this procedure.

Fatir does not even attempt to argue that the claims asserted in Counts Four and Eight were not redressable through the prison grievance system. Indeed, the prison grievance procedure dictated that claims concerning actions by employees could be grievable, and further states that one of the remedies for a properly filed grievance might be "restitution of property." (D.I. 135 at B199.) [\*39] It is clear that the claims in Counts Four and Eight concern employees seizing and depriving Fatir of his property in various ways. By its plain language, then, the DCC grievance system appears to be equipped to handle those allegations and provide Fatir relief by returning his property. Thus, the court finds that these claims were redressable under the DCC's grievance system, and therefore there was an administrative remedy available to Fatir for these claims.

### 2). Counts Five and Six

With respect to Counts Five and Six, Fatir argues that the available grievance process was too vague and informal to be considered an administrative remedy. The court agrees.

Although the administrative remedies for the other claims are clearly spelled out in the DCC's grievance process, at no point did any DCC official testify that the established DCC grievance procedures were applicable to Fatir's claims regarding his interstate transfer. The court must therefore ask how an inmate might have challenged the transfer. The defendants do not argue that Fatir should have used the normal DCC grievance process. Rather, they argue that Fatir was told that he should "contact the Interstate Compact Coordinator [\*40] for any legal issues" concerning his transfer. It is clear that the Interstate Compact Coordinator, Colleen Shotzberger, is an individual. This is exactly the type of "administrative remedy" that courts frown upon. *See Freeman, 2001 U.S. Dist. LEXIS 16634, 2001 WL 515258*, at \*7. Additionally, although the defendants assert that Fatir was told to contact Shotzberger, there is absolutely no evidence of record to support this contention. There is no testimony that Fatir was ever notified that he could contact Shotzberger regarding grievances stemming from his transfer. Since the inmate must be aware of the grievance procedure, this failure of proof was significant. For all of these reasons, the court finds this purported administrative remedy to be inadequate.

Similarly, although Taylor's testimony establishes that Fatir could have "written a letter" or "written a grievance" his testimony does not establish where or to whom the grievance should be addressed. More important, it definitely does not establish that there was an administrative scheme established by the State of Delaware regarding inmates grievances of interstate transfers. Although it is quite possible that the DCC (or the applicable [\*41] Interstate Compact authority) has such a grievance procedure, the defendants' evidence is woefully inadequate to demonstrate that such a procedure exists. Since exhaustion is an affirmative defense, the defendants must present evidence sufficient to prove that there was an available administrative procedure. Their failure to present any evidence on this point therefore precludes the entry of summary

judgment in their favor on the exhaustion issue for these claims. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (noting that summary judgment is appropriate against a party who fails to present evidence on an issue on which it has the burden of proof at trial).

For these reasons, the court finds that there was no administrative remedy for Fatir to exhaust regarding the claims in Counts Five and Six. Therefore, Fatir need not comply with the PLRA's exhaustion requirements on these claims.

### b. Did Fatir Substantially Comply with the Available Remedies?

The Court has determined that there was an administrative remedy available to Fatir for Counts Four and Eight. The next question is whether Fatir substantially complied with [*42] the available remedies. The court finds that he did not.

Generally, a court may find that an inmate has substantially complied with the available administrative remedies when the inmate has taken the grievance as far as he or she possibly can in the prison appeals process. *See Camp, 219 F.3d at 281* (finding substantial compliance where inmate took grievance to "ultimate administrative authority"). In this case, Fatir's deposition testimony clearly establishes that he never filed a grievance with regard to the claims in Counts Four and Eight. Fatir's failure to file any grievance stands in stark contrast to taking a grievance as far as the grievance process will permit. Thus, the court is not inclined to find that he substantially complied with the available process.

The only argument Fatir might advance to excuse his lack of exhaustion is that he was told that he could not file a grievance regarding the seizure of his property. The court is not persuaded for two reasons. First, the terms of the grievance manual - which specially state that the prison can return property - contradict and would prevent any such "understanding." Moreover, although some courts have found [*43] substantial compliance where an inmate was told a claim was not grievable, *see Freeman, 2001 U.S. Dist. LEXIS 16634, 2001 WL 515258,* at *8, this has generally only occurred where the prisoner actually files a grievance or some informal complaint and is subsequently told by the grievance board or some prison official that the claims are not grievable. *See id.* at *3 (noting that inmate had made repeated requests for redress before being told that claim was not grievable). Indeed, as a matter of policy, it makes little sense to find substantial compliance where an inmate simply assumes that a claim is not redressable through the grievance procedure, without waiting for the grievance board or other prison officials to inform him or her that the complaint is indeed not redressable. To hold otherwise would permit inmates to satisfy exhaustion requirements based solely upon their own beliefs regarding prison procedures. Obviously, that is an unworkable solution, both for the prisons and the courts.

For these reasons, the court finds that Fatir failed to substantially comply with, or exhaust, any of the available administrative remedies for Counts Four and Eight. Therefore, the court will dismiss [*44] these claims without prejudice until such time as Fatir has exhausted these claims.

## IV. CONCLUSION

For all of the foregoing reasons, the court concludes that the motion to amend will be denied based on the plaintiff's undue delay and the resulting prejudice. Additionally, the defendants' motion for summary judgment is granted on the exhaustion issue as to Claims Four and Eight. It is, however, denied as to the exhaustion issue for all other claims. The motion is denied without prejudice in all other respects. This action will be stayed pending the plaintiff's exhaustion of his administrative remedies.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The Plaintiff's Motion for Leave to Amend (D.I. 139) is DENIED.

2. The Defendants' Motion for Summary Judgment (D.I. 128) is GRANTED with respect to the plaintiff's failure to exhaust his administrative remedies regarding Counts Four and Eight. These claims shall be DISMISSED without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims.

3. The summary judgment motion is DENIED in all other respects. This denial is without prejudice to the defendants' [*45] ability to refile this motion after the plaintiff has exhausted his remedies. However, the defendants may not reassert exhaustion as an affirmative defense as the court's decision today is *res judicata* on the exhaustion issue.

4. This action shall be STAYED until such time as the plaintiff has exhausted his administrative remedies with respect to Counts Four and Eight.

Dated: September 4, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE