IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JIMMIE LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1350-GMS |
| | ) | |
| DR. SYLVIA FOSTER, | ) | |
| ROBERT N. GRAY, | ) | |
| MR. JOHNSON 1, | ) | |
| MR. JOHNSON 2, LANCE | ) | |
| SAGERS, and DAVE MOFFETT, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM**

### **I. INTRODUCTION**

The plaintiff, Jimmie Lewis ("Lewis"), a prisoner incarcerated at the James T. Vaughn

Correctional Center ("JVCC"), formerly the Delaware Correctional Center ("DCC"), Smyrna,

Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983. He also raises claims under Delaware

law. Lewis appears *pro se* and was granted leave to proceed *in forma pauperis* pursuant to 28

U.S.C. § 1915. This action arises out of incidents that allegedly occurred while Lewis was

confined to the Delaware Psychiatric Center ("DPC") to undergo a mental health evaluation

pursuant to a State court order.

Presently before the court are motions for summary judgment filed by the defendants,

Sylvia Foster (Dr. Foster), Robert N. Gray ("Gray"), Lance Sagers ("Sagers"), and David Moffett

("Moffett"). (D.I. 251, 252.) Also before the court are Lewis' motions for default judgment

against the defendant Mr. Johnson 1 ("Johnson") and for declaratory or injunctive relief.[1] (D.I. 272, 276.) For the reasons that follow, the court will grant the motions for summary judgment, and will deny the motion for default judgment and motion for declaratory or injunctive relief.

## II. PROCEDURAL AND FACTUAL BACKGROUND

Lewis alleges that the defendants violated his civil rights during a court ordered stay at the DPC.[2] (D.I. 2, 10, 56.) The original complaint named only Dr. Foster, the amended complaint named as additional defendants the DPC and staff and identified Gray as a defendant, and the second amended complaint identified additional staff member defendants as Sagers, Moffett, Johnson, and Mr. Johnson 2.[3] The amended complaint contains eight counts and complains of actions taken on May 20, 2004, June 6, 9, 10, 14, 21, 22, and 24, 2004.

The court has dismissed several claims. (D.I. 52, 68.) The claims that remain against Dr. Foster are: (1) that injecting Lewis with antipsychotic medication violated his right to due process; (2) that the four point restraints and injecting antipsychotic medication violated Lewis' right to be free from cruel and unusual punishment;[4] (3) a civil assault and battery under

---

[1]Mr. Johnson 1 has been identified as Brian Johnson. Johnson was represented by Gregory E. Smith ("Smith"), Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware. On December 14, 2007, Smith withdrew as Johnson's attorney. (D.I. 233.) Since Smith's withdrawal, no attorney has appeared on Johnson's behalf and the last order mailed to Johnson at the DPC, on or about June 9, 2008, was returned as "undeliverable" on June 16, 2008. (D.I. 274.)

[2]The court dismissed the claims against DPC on November 22, 2005. (D.I. 43.)

[3]No entry of appearance was made by Johnson 2 or counsel and the waiver of service form sent to him was returned as unexecuted. (D.I. 71.)

[4]As a pretrial detainee, Lewis' Eighth Amendment claims are properly analyzed as a Fourteenth Amendment claim. *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000).

Delaware law; and (4) that Dr. Foster did not allow Lewis to shave his head in conformity with his religious practices and her forensic report was inaccurate or untruthful.[5] Additionally, Count 5 raises excessive force claims and assault and battery claims against Gray, Moffett, and Sagers.

Only Count 5 remains viable against Moffett, Gray, and Sagers as Lewis' response to the motion for summary judgment of Moffett, Sagers, and Gray, states that "he does not seek to hold defendants Moffett, Gray, or Sagers accountable for any claims stated in his civil complaint," other than Count 5. (D.I. 259.) Lewis asks the court to dismiss without prejudice the claims in Counts 1, 2, 3, 4, 6, 7, and 8 raised against Moffett, Gray, and Sagers. (D.I. 259.) The court will grant the motion and this Memorandum will only discuss the claims raised against Moffett, Gray, and Sagers in Count 5.

Lewis was convicted of several State crimes and was housed at the Howard R. Young Correctional Institution ("HRYCI") to await sentencing.[6] (D.I. 253, exs. A; B; C, A-5.) On December 1, 2003, the Superior Court for the State of Delaware entered an order to transfer Lewis to the "Delaware State Hospital for psychiatric evaluation for the purpose of determining competency, and to obtain treatment for his own well-being." (*Id.* at ex. D.) On May 5, 2004, the HRYCI medical staff asked the Delaware Superior Court to order Lewis' immediate transfer to the DPC. (*Id.* at ex. B.) The request states that Lewis refused to take medication, was a danger to himself and others, and an evaluation was required for involuntary medication. (*Id.*) The request noted that Lewis had recently attacked a corrections officer. (*Id.*)

---

[5]Count 3 was raised for the first time in the second amended complaint. Dr. Foster did not address the issues in her motion for summary judgment.

[6]The status under the Constitution of a convicted inmate awaiting sentencing is that of a pretrial detainee. *Fuentes v. Wagner*, 206 F.3d 335, 342 (3d Cir. 2000).

-3-

Lewis was admitted to the DPC on May 21, 2004, and discharged on June 25, 2004. (*Id.* at ex. A.) He had not been sentenced at the time he was admitted to the DPC. (D.I. 353, ex. C, A-5.) According to Dr. Foster, because Lewis' confinement to the DPC was pursuant to a court order relating to a criminal matter, Lewis was confined to the Mitchell Building, a secured building. (D.I. 251, 2.) Upon arrival at the Mitchell Building, Lewis was to undergo an admission interview but he refused to communicate with the staff and would not answer any questions.[7] (D.I. 251, ex. B.) Dr. Foster's May 21, 2004 assessment noted that, in 2003, Lewis had been evaluated by a prison psychiatrist as "psychotic and delusional, a danger to self and others, refuses to take medication." (D.I. 251, ex. B.) At the same time, Dr. Foster ordered medication for Lewis to be administered PRN.[8] (*Id.* at ex. H.) The medications included Haldol[9] "for severe agitation," Benadryl to prevent EPS,[10] and Ativan[11] for agitation. (D.I. 251, ex. H.)

Dr. Foster states that the decision to have medications available on a PRN basis is part of the standard admission orders for patients admitted to the Mitchell Building, and Lewis' admission orders included the standard PRN order. (D.I. 251, ex. L ¶ 11.) Dr. Foster states that the medication was used to assist in the maintenance of safety and security in the facility. (D.I.

---

[7]On May 24, 2004, Lewis agreed to an interview. (D.I. 251, ex. C.)

[8]The medical abbreviation for "as the situation demands." *The American Heritage Stedman's Medical Dictionary* 665 (2d ed. 2004).

[9]A high-potency antipsychotic indicated for psychotic disorders and Tourette's Syndrome. *Handbook of Psychiatric Drugs* 53 (2008 ed.).

[10]May be used to treat side effects of certain psychiatric drugs such as involuntary movements and muscle stiffness (e.g., EPS). www.rxlist.com.

[11]Indicated for anxiety, alcohol withdrawal, and adjunct in the treatment of acute psychotic agitation. *Handbook of Psychiatric Drugs* 64 (2008 ed.).

251, ex. L ¶ 7.) She states that the use of Seroquel,[12] Ativan, Geodon,[13] and Benadryl were for the purpose of calming Lewis during periods of agitation. (*Id.* at ¶ 8.) She states that these medications are used on an "as needed basis" to calm a severely agitated and/or aggressive patient. (*Id.*) The use of these medications is accepted in the psychiatric community to calm an individual during a period of severe agitation and/or increased aggression. (*Id.*)

While at the DPC, Lewis' conduct required actions by the staff. For example, on May 23, June 3, and 4, 2004, he was noted for wearing "horns" on his head in an attempt to frighten the other patients. (*Id.* at ex. D.) It was noted on June 13 and 14, 2004, that Lewis' conduct was becoming aggressive and "inappropriate" toward the DPC staff. (*Id.* at ex. E.) Lewis punched or hit other patients on June 6 and 21, 2004, and, on June 24, 2004, he threw his lunch tray and another patient's tray against the wall. (*Id.* at exs. F, G.) As discussed below, in response to Lewis' conduct, on several occasions, he was either placed in the seclusion room or into four (4) point restraints and administered the PRN medications. (D.I. 251, ex. I.) While at the DPC, Lewis was frequently disruptive, sexually inappropriate, and verbally and physically aggressive towards patients and staff members. (D.I. 253, exs. E, F.) Initially, Lewis was not prescribed psychotrophic medication, as there was no evidence of a mood disorder and no evidence of psychosis. (*Id.* at ex. E.) Lewis, however, was prescribed Seroquel after it became evident that he had difficulty managing his anger and controlling his impulses. (*Id.*)

On June 6, 2004, Lewis assaulted another patient. (D.I. 253, ex. I, A-66-67.) He was

---

[12]Indicated for the treatment of acute manic episodes associated with bipolar I disorder and for the treatment of schizophrenia. *Physician's Desk Reference* 692 (60th ed. 2006).

[13]Indicated for the treatment of schizophrenia. *Physician's Desk Reference* 2515 (60th ed. 2006).

agitated and, therefore, medicated with Haldol and Benadryl. (*Id.*) Medical notes indicate that Lewis continued to be agitated, which caused a physician to give a verbal order to place Lewis on four point restraints for his safety and the safety of others. (D.I. 253, ex. I, A-66-67; J, A-80.)

Dr. Foster authored a report, dated June 10, 2004, which was submitted to the State court. (D.I. 251, ex. K.) At that time, Lewis was being administered Seroquel for anger management and impulse control. (*Id.*) The report states that Lewis "was prescribed no psychotrophic medication, as there was no evidence of a mood disorder, and no evidence of psychosis." (*Id.*) Diagnoses included malingering, alcohol abuse, history of conduct disorder, antisocial personality disorder, and hypertension. (*Id.*) Dr. Foster's assessment was that "the essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as getting out of prison into a psychiatric unit. Malingering should be strongly suspected in the presence of antisocial personality disorder. Mr. Lewis demonstrated no evidence of a mood disorder or psychosis during his admission to DPC, and it is not likely that he ever had schizophrenia or any other chronic psychotic disorder." (*Id.*) Dr. Foster opined that "as in the case of many people with antisocial personalty disorders, Mr. Lewis may need to remain on medication to help with anger management and impulse control." (*Id.*) She further opined that any threats made by Mr. Lewis to harm himself or others should be taken seriously as he is highly manipulative and will stop at little to obtain his goals." (*Id.*)

On June 14, 2004, around 8:00 p.m. Lewis became verbally and physically aggressive towards DPC staff. (D.I. 253, ex. I, A-64.) He had been placed on vending machine restrictions because of his disruptive behavior and was not allowed to buy or eat anything from the vending

-6-

machine. (*Id.*) Lewis gave a fellow patient money to purchase M&M's from the vending machine for him. (D.I. 56; D.I. 253, ex. C, A-22.) A DPC nurse saw Lewis eating the M&M's and told him to throw them out, but Lewis refused. (D.I. 56; D.I. 253, ex. C at A-23, 24.)

Lewis testified that his response was calm and reasonable. (D.I. 253, ex. C, A-24.) Yet he testified that the DPC nurse "became irate and very angry, got on the walkie-talkie, and called for emergency assistance." (*Id.*) DPC records indicate that Lewis became belligerent, threatened staff members verbally and physically, threw an elbow at the staff, and threatened to "get the staff." (D.I. 253, ex. I, A-64.) Lewis testified that during the incident he fell back and that Gray was "tugging" at his neck and it was difficult to breathe. (D.I. 253, ex. C, A-25.) During the incident, Gray deflected the elbow thrown by Lewis and pulled Lewis to him, causing both fall to the ground. (D.I. 253, ex. C, A-26; ex. H.) Lewis testified that Gray had a "choke hold" and kept clenching Lewis' neck. (D.I. 253, ex. C, A-26.) As they fell, Gray landed on the floor and Lewis was on top of him. (D.I. 253, ex. C, A-26.) Moffett also attempted to physically subdue Lewis. (D.I. 253, ex. M, A-98, 100.) Lewis testified that Sagers was on top of his legs, but according to DPC records and Sagers' testimony, he was on break at the time of the incident, having signed out of the Mitchell Building at 8:02 p.m. and returning at 8:54 p.m. after Lewis had been restrained and escorted to the quiet room. (D.I. 253, ex. C, A-26, N, A-101; ex. O, A-104, 105.) Lewis was given PRN medication of Geodon, Ativan, and Benadryl. (D.I. 251, ex. E2.) Lewis was placed in seclusion at 9 p.m. because he was hitting and kicking at the walls and DPC staff. (*Id.* at ex. J, A-79.) The DPC seclusion restraint record indicates that plaintiff continued to yell, curse, and hit objects for approximately an hour after he was secluded. (*Id.*) Lewis finally calmed down after two hours. (D.I. 253, ex. I, A-63.) In a follow-up interview,

-7-

Lewis explained that he had been secluded for "fighting staff & other pts.," and that he could have avoided such seclusion if he had not engaged in those behaviors. (D.I. 253, ex. J, A-78.)

On June 21, 2004, and into the morning of June 22nd, Lewis was given the PRN medication and was placed in four point restraints after he hit another patient. (*Id.* at A-60, 62.) Medical notes indicate that he was "rapidly escalating becoming increasingly dangerous to self and others." (D.I. 253, ex. I, A-62.) Lewis broke out of one of the restraints, struck a DPC employee, and the restraints were reapplied. (*Id.* at ex. J, A-75.) On the 21st, the four point restraints were removed and Lewis was taken to a quiet room. (*Id.* at A-61.) In the early morning of June 22nd, Lewis engaged in "explosive behavior" and he was again placed in four point restraints, but they were removed within a few hours. (*Id.* at A-60.) Additionally, he was given PRN medication. (*Id.*)

On June 24, 2004, Lewis threw his lunch tray and one of his peer's lunch trays against the wall, and screamed and cursed that he wanted his mail. (*Id.* at A-58 – A-59.) Lewis' level of agitation escalated rapidly and, after verbal intervention proved ineffective, he was given PRN medication of Geodon, Ativan, and Benadryl to help regain control of his behavior, but the agitation continued to increase. (*Id.* at A-59.) Lewis was then placed in four point restraints for his safety and for the safety of others safety. (*Id.*)

Lewis' discharge diagnoses include malingering; alcohol abuse; history of conduct disorder; antisocial personality disorder; and hypertension. (D.I. 253, ex. A) At the time of release, there were no credible signs of psychotic or mood disorders. (*Id.* at ex. E.) Lewis' prognosis on release was guarded to poor as he was "considered threatening and dangerous to others." (*Id.* at ex. E.)

-8-

While at the DPC, Lewis filed a total of six grievances. (*Id.* at ex. G.) Lewis complained: (1) on June 3, 2004, that he did not receive sufficient antibiotics to clear up an infection; (2) on June 9, 2004, that the diet offered him was inadequate; (3) on June 9, 2004, that he was not allowed shave his head with a razor; (4) on June 20, 2004, that he had been assaulted by Mr. Grey [sic] in the past week and that his throat was sore; (5) on June 23, 2004, that he found clothing in his room labeled with another patient's name tag; and (6) on June 23, 2004, that a staff member directed derogatory comments towards him. (*Id.*)

## III. SUMMARY JUDGMENT

### A. Standard of Review

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to

enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Dr. Foster moves for summary judgment on the basis that: (1) injecting medication against Lewis' will did not violate his Fourteenth Amendment rights; (2) restraining and injecting Lewis with medication did not violate his constitutional rights;[14] (3) Dr. Foster is entitled to qualified immunity; and (4) there was no assault and battery under Delaware law. (D.I. 251.) Gray, Sagers, and Moffett move for summary judgment on the grounds that Lewis cannot establish that they used excessive force and they are entitled to qualified immunity

## B. DISCUSSION

### 1. Involuntary Administration of Medication

Dr. Foster contends that, when a complaining individual is involuntarily injected with medication, summary judgment should be granted when a facility demonstrates that there existed an emergency which threatened the safety and security of other patients. Lewis argues that Dr. Foster violated his Fourteenth Amendment rights by ordering that he be injected with

---

[14]Dr. Foster discusses this issue under the Eighth Amendment but, as previously noted, it is properly analyzed under the Fourteenth Amendment.

antipsychotic drugs on numerous occasions after she authored the June 10, 2004 report stating

that there was no evidence of mood disorder or psychosis. Lewis contends the report "destroys"

Dr. Foster's position that there were medical reasons to administer antipsychotic drugs to him

against his will.

The law is clear that a prisoner "possesses a significant liberty interest in avoiding the

unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth

Amendment. *Washington v. Harper*, 494 U.S. 210, 221-22 (1990). This liberty interest is

protected by principles of both procedural and substantive due process. *Id.* at 220-23. "[T]he

Due Process Clause permits the State to treat a prison inmate who has a serious mental illness

with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the

treatment is in the inmate's medical interest."[15] *Id.* at 227, 233. Additionally, "forcing

antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding

justification and a determination of medical appropriateness." *Riggins v. Nevada*, 504 U.S. 127,

135 (1992). Nonetheless, authorities may administer antipsychotic drugs over a patient's

objection "where the decision is a product of the authorities' professional judgment." *Benn v.*

*Universal Health Sys., Inc.*, 371 F.3d 165, 175 (3d Cir. 2004) (citations omitted).

The medical records indicate that each and every time Lewis was involuntarily medicated

it was during an emergency situation and due to Lewis' agitation, aggression, and combative

behavior towards staff and patients. Dr. Foster stated that the medication was administered to

---

[15]The United States Supreme Court extended *Harper* to pretrial detainees holding, in part, that the state may only administer antipsychotic drugs to a detainee upon proof that the "medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of the defendant's own safety or the safety of others." *Riggins v. Nevada*, 504 U.S. 127, 136 (1992).

-11-

assist in the maintenance of safety and security of the DPC. She also stated that the use of

medications is an accepted practice in the psychiatric community. Lewis presents a number of

arguments why Dr. Foster should not be granted summary judgment, including that Dr. Foster

should have provided more detailed information and that the medical records are illegible. The

court had no problem reading the medical records and they contain detailed descriptions of the

occurrences at issue. Indeed, Lewis does not claim that his own actions led to his being

medicated but, instead, claims that the diagnoses in the June 10, 2004 report precluded the

involuntary administration of medication.

The court concludes that the administration of medication was justified as Lewis was a

danger to himself and others and the evidence demonstrates that it was medically appropriate.

Accordingly, in light of the facts concerning Lewis' mental health symptoms, the safety risks

associated with Lewis' aggressive and combative acts, Dr. Foster's medical decision that the

involuntary administration of the medication was appropriate under the circumstances, and for

the safety and security of the DPC, its employees and patients, the court will grant Dr. Foster's

motion for summary judgment on the issue of the involuntary administration of medication.

### 2. Excessive Force - Medication/Restraints

Lewis argues that the defendants used excessive force in the administration of medication

and use of four point restraints. As to Dr. Foster, Lewis argues that, subsequent to authoring the

June 10, 2004 report, she was aware that she could not restrain Lewis with four-point restraints

and order the involuntary administration of antipsychotic drugs. Dr. Foster argues that summary

judgment is appropriate because Lewis failed to present any evidence or information that she

disregarded an excessive risk to his rights, health or safety but, rather, that the acts she took were

-12-

to protect Lewis' health and safety.

Lewis has moved to dismiss all the claims against Moffett, Sagers, and Gray except for the June 14, 2004 occurrence and the court will grant his motion.[16] With regard to the June 14, 2004 incident and as to defendants Moffett, Sagers, and Gray, Lewis argues that they could have used less restrictive means and the occurrence was not an emergency. He further argues that whether Sagers was present is a question of credibility and for the jury to determine. Moffett and Gray argue that the use of force was occasioned by Lewis' confrontational and aggressive behavior. Sagers argues that he was not present during the occurrence.

Because Lewis was a pretrial detainee during the time in question, his claim is properly analyzed under the Fourteenth Amendment's due process provisions, rather than the Eighth Amendment's prohibitions against cruel and unusual punishment. *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000); *see Sylvester v. City of Newark,* 120 Fed. Appx. 419, 423 (3d Cir. 2005). "[T]he Fourteenth Amendment affords pretrial detainees protections at least as great as the Eighth Amendment protection available to a convicted prisoner." *Sylvester v. City of Newark,* 120 Fed. Appx. at 423 (citations omitted).

To prove a Due Process violation, the detainee must show that the force used amounts to a wanton infliction of punishment, as opposed to an amount rationally related to exercising control. *See Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000) (Eighth Amendment's cruel and unusual punishment standards apply to a pretrial detainee's excessive force claim arising in the context of a prison disturbance). *Travillion v. Leon,* 248 Fed. Appx. 353, 356 (3d Cir. 2007). If

---

[16]The court sees no need to address the issue of exhaustion of administrative remedies as addressed by Moffett, Gray, and Sages, but notes that their position is well-taken.

a plaintiff is unable to show that the use of force was wanton, the court will then consider whether the use of force was "really an incident of a legitimate nonpunitive objective." *Fuentes,* 206 F.3d at 342.

In viewing the facts of this case as to Dr. Foster, the court concludes that the use of four point restraints and the involuntary administration of medication was rationally related to exercising control over the circumstances and not to wantonly inflict punishment upon Lewis. In all instances, the use of force was done in an emergency situation when Lewis was agitated, aggressive, and combative.

The court also concludes that Sagers, Moffett, and Gray are entitled to summary judgment on the excessive force issue. Lewis testified that on June 14, 2004, he used a conversational tone when responding to DPC regarding the illicit M&M's, but by his own testimony, the conversation was followed by a call for emergency assistance. Further, in an interview following the June 14, 2004 occurrence, Lewis admitted that he had been secluded for fighting with staff and other patients. The descriptions of the occurrence by Lewis, Moffett, and Gray, all indicate that steps were taken to control Lewis. Both Lewis and Gray testified that they fell to the ground together, and Moffett testified that he had to physically restrain Lewis. Even when viewing the facts in the light most favorable to Lewis, it is apparent from the record that the force used by Moffett and Gray was to control the circumstances and not to wantonly inflict punishment upon Lewis.

Finally, while there is an issue of fact as to whether Sagers was present during the occurrence, Lewis' testimony regarding Sagers' behavior indicates that, if he was present, Sagers did not violate Lewis' constitutional rights. Indeed, Lewis' testimony reflects that Sagers actions

attempted to control Lewis. Lewis testified that Sagers "tackled him" and then crouched down using his body weight to hold Lewis' legs. (D.I. 253, ex. C, A-26.) Lewis' testimony does not describe excessive force. For the above reasons, the court will grant the defendants' motions for summary judgment on the issue of excessive force.[17]

## 3. Assault and Battery

Lewis contends that Dr. Foster committed an assault and battery. Lewis argues that Dr. Foster anticipated using antipsychotic drugs for penal measure upon his arrival at DPC, they were administered to him, and Dr. Foster ordered several DPC members to strap him down with four point restraints; all against his will and without his consent. Dr. Foster moves for summary judgment on the basis that Lewis was not injured or harmed.[18] She argues that the contact complained of would not offend the ordinary person nor would it be unwarranted by the prevalent social usages at the time and place where the contact was inflicted.

The tort of assault and battery is defined in Delaware as "the intentional, unpermitted contact upon the person of another which is harmful or offensive." *Brzoska v. Olson*, 668 A.2d 1355, 1360 (Del. 995) (citations omitted). Lack of consent is an essential element of assault and battery. *Brzoska*, 668 A.2d at 1360. The intent necessary for battery is the intent to make contact with the person, not the intent to cause harm. *Id.* (citations omitted). Also, the contact need not be harmful, it is sufficient if the contact offends the person's integrity. *Id.* (citations omitted). "In order for a contact to be offensive to a reasonable sense of personal dignity, it must be one

---

[17]The court will not address the issue of qualified immunity inasmuch as it concludes the defendants did not violated Lewis' constitutional rights.

[18]Moffett, Sagers, and Gray did not move for summary judgment on this issue and it remains pending.

which would offend the ordinary person and as such one not unduly sensitive as to his personal

dignity. It must, therefore, be a contact which is unwarranted by the social usages prevalent at

the time and place at which it is inflicted." (*Id.*) The propriety of the contact is therefore

assessed by an objective "reasonableness" standard. *In re Taylor v. Barwick,* No. 93C-02-010-

WTQ, 1997 WL 527970, at *3 (Del. Super. Ct. Jan. 10, 1997).

The record before the court indicates that the acts taken against Lewis were performed in

a hospital setting after having been determined medically appropriate, and in order to protect

Lewis, the DPC employees and its patients. Viewing the evidence as a whole, under the

circumstances, the acts taken by Dr. Foster were objectively reasonable. Therefore, the court will

grant Dr. Foster's motion for summary judgment on the assault and battery issue.[19]

---

[19]Dr. Foster did not address the issue, but it appears that she is entitled to immunity under the Delaware Tort Claims Act ("the Act"). The Act provides that "except as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages." Del. Code Ann. tit. 10, § 4011(a). It further provides for immunity in the performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed is valid or invalid. *Id.* at § 4011(b)(3). The Tort Claims Act provides, however, that an employee may be personally liable for acts and omissions causing property damage, bodily injury or death in instances in which the governmental entity is immune under this section, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent. Del. Code Ann. tit. 10, § 4011(c).

With regard to any actions taken by Dr. Foster in the performance of her official functions, she is immune from suit. *See* Del. Code Ann. tit. 10, § 4011(b)(3); *Collins v. Figueira,* C.A. No. 04C-06-009(RBY), 2006 WL 1817092 (Del. Super. Ct. June 23, 2006) (Police Department immune from suit under the Tort Claims Act for claims that it was negligence because it failed to ensure that patrolmen complied with the department's procedures and fundamental guarantees of the U.S. Constitution). Further, the evidence before the court does not indicate that Dr. Foster acted with wanton negligence or willful and malicious intent. Rather, the evidence is that under the circumstances, her actions were reasonable.

## IV. PSYCHIATRIC EVALUATION/REPORT

### A. Immunity

Pursuant to 28 U.S.C. § 1915(e)(2)(B), the court may dismiss the case at any time if it determines that the action is frivolous or malicious, fails to state a claim upon which relief may be granted or seeks monetary relief against a defendant who is immune from suit.  Count 3 alleges that the report Dr. Foster authored on June 10, 2004, pursuant to a court order, is inaccurate and untruthful.

Dr. Foster is entitled to absolute immunity for preparing the report.  Dr. Foster prepared the psychiatric evaluation of Lewis at the request of the Superior Court of the State of Delaware and furnished a written report of that evaluation to the court.  (D.I. 251, ex. K.)  Dr. Foster was, therefore, functioning as an arm of the court, and as such, she was an integral part of the judicial process and is protected by the same absolute judicial immunity that protects judges.  *McArdle v. Tronetti*, 961 F.2d 1083, 1085 (3d Cir. 1992); *see also Williams v. Consovoy*, 453 F.3d 173, 189 (3d Cir. 2006) (psychologist who performed evaluation of inmate that resulted in Parole Board's decision to deny parole acted as arm of court and was entitled to absolute judicial immunity.) Inasmuch as Dr. Foster is immune from suit on this claim, the court will dismiss the claim, *sua sponte*, pursuant to 28 U.S.C. § 1915(e)(2)(B).

### B. Injunctive Relief

Lewis moves the court to issue an order requiring Dr. Foster to amend her June 10, 2004 report.  (D.I. 276.)  Lewis contends the report is erroneous and has caused him atypical and significant hardship.  Lewis provides the court with the specific language he wants Dr. Foster to include in her amended report.

-17-

When considering a motion for a temporary restraining order or preliminary injunction, the plaintiff must demonstrate that he is (1) likely to succeed on the merits; (2) denial will result in irreparable harm; (3) granting the injunction will not result in irreparable harm to the defendants; and, (4) granting the injunction is in the public interest. *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998). "[A]n injunction may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights," *Continental Group, Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)(quoting *Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969)). "The relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985).

As discussed above, Dr. Foster has absolute immunity with regard to the June 10, 2004 report prepared at the request of the Superior Court of the State of Delaware. Accordingly, Lewis cannot succeed on the merits. Therefore, the court will deny the motion.

## V. DEFAULT JUDGMENT

Lewis moves for default judgment against Brian Johnson pursuant to Fed. R. Civ. P. 55. (D.I. 272.) Johnson was initially represented by a Deputy Attorney General of the Delaware Department of Justice. That attorney withdrew his appearance on December 14, 2007, due to a conflict of interest. (D.I. 233.) Since that time, no attorney has appeared on behalf of Johnson.

Johnson's deposition by written questions was rescheduled to take place on April 26, 2007, but was canceled and the case was stayed after Lewis moved for appointment of counsel. (D.I. 205.) By the time the deposition was reset, Johnson was no longer represented by counsel. Lewis moved to reschedule the deposition of Johnson and the court granted the motion on May

13, 2008. (D.I. 243, 269.) The order required Johnson, or his attorney, to contact the contact within twenty days from the date of the order. After Johnson did not comply with the order, Lewis filed the present motion for default judgment. On June 9, 2008, the court resent the order to Johnson at his last known place of employment, the DPC, the only address the court has for Johnson. The mail was returned as undeliverable on June 16, 2008. (D.I. 274.)

Lewis moves for default judgment on the basis that Johnson has failed to respond to discovery and is in contempt of court. Entry of default judgment is a two-step process. Fed. R. Civ. P. 55(a), (b). A party seeking to obtain a default judgment must first request that the Clerk of the Court "enter . . . the default" of the party that has not answered the pleading or "otherwise defend[ed]," within the time required by the rules or as extended by court order. Fed. R. Civ. P. 55(a). Even if default is properly entered, the entry of judgment by default pursuant to Rule 55(b)(2) is within the discretion of the trial court. *Hritz v. Woma* Corp., 732 F.2d 1178, 1180 (3d Cir. 1984).

Lewis is not entitled to default judgment pursuant to Fed. R. Civ. P. 55. Johnson has appeared and answered the complaint. (D.I. 59.) Moreover, the court exercises its discretion and declines to enter judgment by default against Johnson. For the foregoing reasons, the court will deny Lewis' motion.

## VI. CONCLUSION

For the above stated reasons the court will dismiss without prejudice Counts 1, 2, 3, 4, 6, 7, and 8 as against Moffett, Gray, and Sagers; will grant the defendants' motions for summary judgment, will dismiss the psychiatric evaluation/report claim against Dr. Foster; and will deny Lewis' motions for injunctive relief and for default judgment. The claims that remaining are the

-19-

first amendment religion issue against Dr. Foster; the assault and battery claims against Sagers,

Moffett and Gray; and the claims against Johnson. An appropriate order will be entered.

CHIEF, UNITED STATES DISTRICT JUDGE

_____ /6 _____, 2008
Wilmington, Delaware

**F I L E D**

SEP 1 6 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

-20-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JIMMIE LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1350-GMS |
| | ) | |
| DR. SYLVIA FOSTER, | ) | |
| ROBERT N. GRAY, | ) | |
| MR. JOHNSON 1, | ) | |
| MR. JOHNSON 2, LANCE | ) | |
| SAGERS, and DAVE MOFFETT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

At Wilmington this _16_ day of _Sept_, 2008, for the reasons set forth in the Memorandum issued this date;

1. The plaintiff's motion to voluntarily dismiss without prejudice Counts 1, 2, 3, 4, 6, 7, and 8 as against Moffett, Gray, and Sagers is **granted**.

2. The psychiatric evaluation/report claim against Dr. Foster is **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B).

3. The defendants' motions for summary judgment are **granted**. (D.I. 251, 252.)

4. The plaintiff's motion for default judgment is **denied**. (D.I. 272.)

5. The plaintiff's motion for declaratory or injunctive relief is **denied**. (D.I. 276.)

6. The only claims that remain are the first amendment religion issue against Dr. Foster; the assault and battery claims against Sagers, Moffett and Gray; and the claims against Johnson. The parties shall filed dispositive motions on the remaining issues on or before _11/17/08_

_____. Responses shall be filed by __12/3/08__. Replies shall be filed
by __12/10/08__. No extensions of time allowed.

CHIEF UNITED STATES DISTRICT JUDGE

**FILED**

SEP 1 6 2008

**U.S. DISTRICT COURT**
**DISTRICT OF DELAWARE**

-2-