IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JIMMIE LEWIS,<br>a/k/a Emmanuel E. Elder,<br><br>    Plaintiff,<br><br>        v.<br><br>DR. SYLVIA FOSTER, ROBERT<br>N. GRAY, MR. JOHNSON 1,<br>MR. JOHNSON 2, LANCE<br>SAGERS, and DAVE MOFFETT,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 04-1350-GMS

## **MEMORANDUM**

### I. INTRODUCTION

The plaintiff, Jimmie Lewis ("Lewis"),[1] a former inmate who was incarcerated at the

James T. Vaughn Correctional Center ("JVCC"), Smyrna, Delaware, filed this lawsuit pursuant

to 42 U.S.C. § 1983.[2]  He also raises claims under Delaware law.  Lewis appears *pro se* and was

granted leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915.  This action arises out

of incidents that allegedly occurred while Lewis was confined to the Delaware Psychiatric Center

("DPC") to undergo a mental health evaluation pursuant to a State court order.

Presently before the court are second motions for summary judgment filed by the

defendants, Sylvia Foster (Dr. Foster), Robert N. Gray ("Gray"), Lance Sagers ("Sagers"), and

---

[1]On September 12, 2005, Lewis changed his name to Emmanuel Evangel Elder.  (D.I. 297, 325.)

[2]The court was notified by the Delaware Department of Correction ("DOC") on June 19, 2009, that Lewis has been released from prison.  Lewis recently provided the court with a current address and an updated application for leave to proceed without prepaying fees or costs.  (D.I. 321, 322.)

David Moffett ("Moffett"), as well as numerous motions filed by Lewis. (D.I. 288, 289, 294, 295, 296, 298, 300, 302, 311, 322.)   For the reasons that follow, the court will grant the motions for summary judgment, and will grant Lewis' application to proceed without prepaying fees or costs and motion for extension of time, will deny as moot his motion for injunctive relief, and will deny his motions for reconsideration.

## II.  PROCEDURAL AND FACTUAL BACKGROUND

Lewis alleges that the defendants violated his constitutional rights and State law during a court ordered stay at the DPC.[3]  (D.I. 2, 10, 56.)  The original complaint named only Dr. Foster, the amended complaint added the defendants the DPC and staff and identified Gray as a defendant, and the second amended complaint identified additional staff member defendants Sagers, Moffett, Mr. Johnson 1, and Mr. Johnson 2.  The amended complaint contains eight counts and complains of actions taken on May 20, 2004, June 6, 9, 10, 14, 21, 22, and 24, 2004.

The court has dismissed several claims.  (D.I. 52, 68, 277.)  The claims that remain are the first amendment claim against Dr. Foster resulting from the alleged events of June 9, 2004; assault and battery claims under Delaware law against Sagers, Moffett, and Gray occurring on or about June 13th or 14th, 2004;[4] and claims against Johnson.[5]

---

[3]The court dismissed the claims against the DPC on November 22, 2005.  (D.I. 43.)

[4]While at the DPC, Lewis filed grievances complaining that on June 9, 2004, he was not allowed to shave his head with a razor and on June 20, 2004, he had been assaulted by Mr. Grey [sic] in the past week and his throat was sore.  (D.I. 253, ex. G.)

[5]The court directed the parties to file dispositive motions on the remaining issues on or before November 17, 2008.  (D.I. 277.)

The amended complaint alleges that Lewis, as a Hebrew Israelite, was denied his religious obligation to shave his head.[6] (D.I. 56.) Lewis alleges he explained to Dr. Foster that he grew his hair naturally for seven years, without bringing a razor or comb to it, but at some point in time, came into contact with a dead person's body (i.e., his stillborn child), and committed the ritual of cutting his hair as a "burnt sacrifice." (*Id.*) Lewis explained to Foster that he needed to continue to cut his hair until his vow had run its course. (*Id.*) When asked how long it would take, Lewis explained that he would be informed through inspiration from God. (*Id.*) The amended complaint alleges that, on or about June 14, 2004, Lewis was assaulted by Gray, Johnson, and Moffett in the DPC dining hall. (*Id.*)

Lewis was convicted of several State crimes and housed at the Howard R. Young Correctional Institution ("HRYCI") to await sentencing.[7] (D.I. 253, exs. A; B; C, A-5.) On December 1, 2003, the Superior Court for the State of Delaware ("Superior Court") entered an order to transfer Lewis to the "Delaware State Hospital for psychiatric evaluation for the purpose of determining competency, and to obtain treatment for his own well-being." (*Id.* at ex. D.) On May 5, 2004, the HRYCI medical staff asked the Superior Court to order Lewis' immediate transfer to the DPC. (*Id.* at ex. B.) Lewis was admitted to the DPC on May 21, 2004, and

---

[6]This is an eighty-year-old association of black Americans with Judaic beliefs, although many do not identify themselves as Jews. Among Hebrew Israelites, some groups say others are not Jewish enough, others are accused of pandering to the rules of white Jewish culture, some include New Testament elements in their worship, and some promulgate more militant, black separatist beliefs. Tara Bahrampour, *They're Jewish, With a Gospel Accent*, N.Y. Times, June 26, 2000. www.nytimes.com.

[7]The status under the Constitution of a convicted inmate awaiting sentencing is that of a pretrial detainee. *Fuentes v. Wagner*, 206 F.3d 335, 342 (3d Cir. 2000).

discharged on June 25, 2004. (*Id.* at ex. A.) He had not been sentenced at the time he was admitted to the DPC. (D.I. 353, ex. C, A-5.)

Lewis was interviewed by the DPC staff on May 24, 2004. (D.I. 299.) The psychological assessment reported that Lewis stated he "sometimes wears horns on his head because 'only the devil should have to go through this,' and that it makes him feel better . . . . He has put horns on his head since his admission to DPC . . . he also did this on the street, and [] he 'even got cat's eye contacts' to wear." (*Id.*) Lewis made reference to "flames of enlightenment" but did not explain what that meant. (*Id.*) Lewis believed there was a struggle between good and evil because he was with two guards who were named Godwin and Santana and the names reminded him of God and Satan. (*Id.*)

During his stay at the DPC, Lewis placed paper horns on his head. On June 4, 2004, he told the staff that in order to get his needs met, he had to wear devil horns because they bring out the devil in him and this is considered a mental illness. (D.I. 251, exs. D.) On June 5, 2004, Lewis was observed shaving his head and an attempt was made to stop him. (D.I. 251, ex. D.) He was argumentative and continued to shave his head. (*Id.*) It was explained to Lewis that shaving of the head was not permitted. (*Id.*)

A pastoral care assessment form for Lewis, dated June 9, 2004, and signed by a chaplain states as follows: "*Religious Preference: N/A; Member or Related to the Following Church, Synagogue, Congregation, etc.*: Not active. *Pastor/Religious Leader's Name (if known)*: None indicated. *Wishes to have his/her church organization/clergy/religious leader notified of hospitalization*: No. *Wishes a visit from a chaplain*: No. *Religious/Spiritual Beliefs and Practices Affecting Treatment*: Meditation, consecration, vow to the Lord, to fulfill the Creater's

-4-

[sic] destiny; Fulfill human duties and take care of myself & family. *Recommendations*: Encourage faith & practices." (D.I. 288, ex. A.) On June 9, 2004, Lewis submitted a grievance complaining that, "as a Christian in my search for religious understanding, I have to shave my head with a razor so that I can [attach] my horns to my head. But Dr. [] Foster has yelled and screamed at me in a loud hostile manner . . ., ordering me not to shave my head or wear the horns . . ., 1st U.S.C.A. violation." (D.I. 291, at 16.) Dr. Foster's forensic psychiatric evaluation, dated June 10, 2004, reports that "Lewis stated that he needs to do 'outlandish things' to get attention, such as wearing paper horns and wearing cat's eye lenses. It was explained to him that he would not be allowed to wear his paper horns at any time while at DPC, after he placed them on his head at one point. He understood, and did not attempt to wear them again." (D.I. 292, at 4.)

During his deposition Lewis testified that his religious affiliation is Hebrew Israelite. (D.I. 253, A-13.) When asked how his religion had an impact on his hair, Lewis responded, "I reserve the right to answer that question" although he previously testified that shaving his head concerned a "religious writ." (*Id.* at A-12, 13.)

While at the DPC, Lewis' conduct required actions by the staff. For example, on May 23, June 3, and 4, 2004, he was noted for wearing "horns" on his head in an attempt to frighten the other patients. (*Id.* at ex. D.) It was noted on June 13 and 14, 2004, that Lewis' conduct was becoming aggressive and "inappropriate" toward the DPC staff. (*Id.* at ex. E.) Lewis punched or hit other patients on June 6 and 21, 2004, and, on June 24, 2004, he threw his lunch tray and another patient's tray against the wall. (*Id.* at exs. F, G, I.) In response to Lewis' conduct, on several occasions, he was either placed in the seclusion room or into four (4) point restraints and administered medications. (D.I. 251, ex. I.) While at the DPC, Lewis was frequently disruptive,

sexually inappropriate, and verbally and physically aggressive towards patients and staff members. (D.I. 253, exs. E, F.)

On June 14, 2004, around 8:00 p.m. Lewis became verbally and physically aggressive towards the DPC staff. (D.I. 253, ex. I, A-64.) He had been placed on vending machine restrictions because of his disruptive behavior and was not allowed to buy or eat anything from the vending machine. (*Id.*) Lewis gave a fellow patient money to purchase M&M's from the vending machine for him. (D.I. 56; D.I. 253, ex. C, A-22.) A DPC nurse saw Lewis eating the M&M's and told him to throw them out, but Lewis refused. (D.I. 56; D.I. 253, ex. C at A-23, 24.)

Lewis testified that his response was calm and reasonable. (D.I. 253, ex. C, A-24.) Yet he testified that the DPC nurse "became irate and very angry, got on the walkie-talkie, and called for emergency assistance." (*Id.*) DPC records indicate that Lewis became belligerent, threatened staff members verbally and physically, threw an elbow at the staff, and threatened to "get the staff." (D.I. 253, ex. I, A-64.) Lewis testified that during the incident he fell back and that Gray was "tugging" at his neck and it was difficult to breathe. (D.I. 253, ex. C, A-25.) During the incident, Gray deflected an elbow thrown by Lewis and pulled Lewis to him, causing both fall to the ground. (D.I. 253, ex. C, A-26; ex. H.) Lewis testified that Gray had a "choke hold" and kept clenching Lewis' neck. (D.I. 253, ex. C, A-26.) As they fell, Gray landed on the floor and Lewis was on top of him. (D.I. 253, ex. C, A-26.) Moffett also attempted to physically subdue Lewis. (D.I. 253, ex. M, A-98, 100.) Lewis testified that Sagers was on top of his legs, but according to DPC records and Sagers' testimony, he was on break at the time of the incident, having signed out of the Mitchell Building at 8:02 p.m. and returning at 8:54 p.m. after Lewis had been restrained and escorted to the quiet room. (D.I. 253, ex. C, A-26, N, A-101; ex. O, A-

-6-

104, 105.)  Lewis was placed in seclusion at 9 p.m. because he was hitting and kicking at the

walls and DPC staff.  (D.I. 251, ex. J, A-79.)  The DPC seclusion restraint record indicates that

plaintiff continued to yell, curse, and hit objects for approximately an hour after he was secluded.

(*Id.*)  In a follow-up interview, Lewis explained that he had been secluded for "fighting staff &

other pts.," and that he could have avoided such seclusion if he had not engaged in those

behaviors.  (D.I. 253, ex. J, A-78.)  He was seen by a physician on June 21, 2004, and provided

history that two weeks prior, while restrained, a guard accidentally pressed on his neck area, and

since then he had difficulty swallowing.  (D.I. 251, ex. I.)  Examination revealed no evidence of

tracheal injury and no esophageal obstruction.  (*Id.*)

## III.  SUMMARY JUDGMENT

### A.  Standard of Review

The court shall grant summary judgment only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine

issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 n.10 (1986).  When determining whether a genuine issue of material fact exists, the

court must view the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor.  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

If the moving party has demonstrated an absence of material fact, the nonmoving party then

"must come forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P.

56(e)). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Dr. Foster moves for summary judgment on the basis that there was no violation of Lewis' First Amendment right to practice his religion. (D.I. 288.)  Gray, Sagers, and Moffett move for summary judgment on the grounds that a rational trier of fact could not find they committed assault or battery and they are immune from suit under the Delaware Tort Claims Act, Del. Code Ann. tit. 10, § 4001. (D.I. 289, 290.)

## B. DISCUSSION

### 1. Right to Exercise Religion

Dr. Foster moves for summary judgment on the grounds that Lewis was not denied his First Amendment Right to practice his religion. More particularly, she argues that Lewis has failed to demonstrate that his belief that shaving his head is deeply held or religious in nature. Alternatively, she argues that Lewis cannot meet test set forth in *Turner v. Safley* as the regulation at issue is reasonably related to a legitimate penological interest. *Turner v. Safely,* 482

-8-

U.S. 78 (1987). In his opposition, Lewis argues that his religious belief is deeply held, and that the regulation at issue was not related to a legitimate penological interest, but used to deny him of his right to exercise his religious beliefs. (D.I. 291.)

When a prisoner claims that his right to exercise religion has been curtailed, a court must determine as a threshold matter whether the prisoner has alleged a belief that is "both sincerely held and religious in nature." *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000). If so, the court must then apply the four-factor test set forth in *Safley,* 482 U.S. 78 (1987), to determine whether the curtailment at issue is "reasonably related to penological interests." *DeHart,* 227 F.3d at 51. Only beliefs which are both "sincerely held" and "religious in nature" are protected under the First Amendment. *DeHart*, 227 F.3d at 52. Purely secular views are not protected. *Frazee v. Illinois Dep't of Employment Sec.,* 489 U.S. 829, 833 (1989). The truth of a belief is not questioned, the question is whether the belief is truly held. *Cutter v. Wilkinson*, 544 U.S. 709 n.3 (2005).

Dr. Foster does not claim that Hebrew Israelite is not a "religion" within the meaning of the First Amendment. Indeed, cases filed in federal and state courts refer to the religion. *Wiley v. Glover*, No. 05-CV-1156-MEF, 2008 WL 4629924 (M.D. Ala. Sept. 3, 2008), *Allan v. Woods*, No. 05-CV-1280, 2007 WL 496411 (N.D.N.Y. Feb. 12, 2007); *Morrow v. Goord*, No. 03-CV-0713ESC, 2005 WL 1159424 (W.D.N.Y. May 17, 2005), *Meggett v. Pennsylvania Dep't of Corr.*, 892 A.2d 872 (Pa. Commw. Ct. 2006). She has, however, questioned the sincerity of Lewis' professed desire to shave his head for religious reasons.

In considering Lewis' First Amendment claim, the court notes that when he was interviewed by the chaplain on June 9, 2004, he claimed no religious affiliation and indicated he

-9-

was not active in a church. When he submitted his grievance against Dr. Foster, on the same day he referred to himself as a Christian. Additionally, his grievance indicates that, as a Christian in his search for religious understanding, it was necessary for Lewis to shave his head with a razor so that he could wear horns on his head. It was not until he filed his amended complaint two years later on March 17, 2006, that he alleged he was a Hebrew Israelite. The facts tend to belie Lewis' allegation that as a Hebrew Israelite he was required to commit the ritual of cutting his hair as a burnt sacrifice.

Dr. Foster argues that Lewis failed to submit any religious text, scripture, ordinance, tome, etc. to support his claim that his religious beliefs required the shaving of his head. (D.I. 303.) To the contrary, Lewis references several scriptures in support of his claim that his beliefs are sincerely held and religious in nature. They include Exodus 3, 3-6, 4.16, and 7.1; Numbers chapter 6; Psalms 4.5, 31.3, 18.2, 31.3, 82, 135.13, and 143.10; Proverbs 4, and 4-15; Hosea 12.5; Matthew 4.1; John 10.34; and II Timothy 2.26.[8] The court read each passage and found that Numbers, chapter 6 refers to shaving of the head. It is also referenced in the amended complaint. Of interest is that the case law reviewed indicates that Hebrew Israelites do not cut their hair, but rather let their hair grow as a part of their religious beliefs. *See Wiley v. Glover*, No. 05-CV-1156-MEF, 2008 WL 4629924 (M.D. Ala. Sept. 3, 2008); *Morrow v. Goord*, No. 03-

---

[8]"All the days of the vow of his separation there shall be no razor come upon his head: until the days be fulfilled, in the which he separateth himself unto the Lord, he shall be holy, and shall let the locks of the hair of his grow." *Numbers* 6.5. "And if any man die very suddenly by him, and he hath defiled the head of his consecration; then he shall shave his head in the day of his cleansing, on the seventh day shall he shave it." *Numbers* 6.9. "And the Nazarite shall shave the head of his separation at the door of the tabernacle of the congregation, and shall take the hair of the head of his separation, and put it in the fire which is under the sacrifice of the peace offerings." *Numbers* 6.18. *Holy Bible*, King James Version, Thomas Nelson Publishers (1984).

-10-

CV-0713ESC, 2005 WL 1159424 (W.D.N.Y. May 17, 2005), *Meggett v. Pennsylvania Dep't of Corr.*, 892 A.2d 872 (Pa. Commw. Ct. 2006). Construing the facts in the light most favorable to Lewis, as the court must, a reasonable jury might conclude that Lewis' belief, while perhaps not technically within the scope of the Hebrew Israelite religion, was "both sincerely held and religious in nature," and thus sufficient to warrant First Amendment protection.

Nonetheless, the rule at issue survives a constitutional challenge. Dr. Foster argues that denying Lewis a razor to shave his head is rationally connected to the regulation in question; the safety of other patients in the facility. In a prison setting, to demonstrate a free exercise violation, a plaintiff must show that prison officials administered or implemented a policy or regulation, not reasonably related to any legitimate penological interest or security measure, which burdens the practice of his religion or restricts his free exercise of a sincerely held religious belief. *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989); *O'Lone v. Shabazz,* 482 U.S. 342, 349 (1987); *see also Overton v. Bazzetta,* 539 U.S. 126, 132 (2003). The burden must be substantial and significantly interfere with an inmate's practice of his religious beliefs. *Hernandez,* 490 U.S. at 699. Initially, the court notes that Lewis has not explained how the rule in question substantially burdened the exercise of his religion. At most, he argues that enforcement of the rule caused him an atypical and significant hardship from May 21, 2004 through June 24, 2004. (D.I. 291, at 6.) The undisputed facts are that Lewis was not allowed to shave his head for a period of a little over a month. The court finds that this short length of time did not substantially burden Lewis' exercise of religion.

Moreover, even if Lewis could establish a burden on the exercise of his religion, the rule in question is rationally related to a legitimate penological objective. The Third Circuit has

-11-

upheld restrictions on permissible hair styles as substantially furthering governmental concerns related to safety. *See Cole v. Flick*, 758 F.2d 124, 129-32 (3d Cir. 1985). Four factors determine whether a prison regulation rationally relates to legitimate penological objectives. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)). First, there must be a "valid, rational connection" between the regulation and the legitimate governmental interest put forward to justify it. *Id.* at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). Second, where inmates have alternative means of exercising the asserted right, courts should be "particularly conscious" of the deference owed to corrections officials in establishing prison regulations. *Id.* at 90. Third, if accommodation of the asserted right will have a significant effect on other inmates, prison staff, or the allocation of prison resources, courts should be particularly deferential to the informed decisions of corrections officials. *Id.* Fourth, an absence of ready alternatives is evidence of the reasonableness of a regulation. *Id.*

Under the first factor, great deference is accorded to the judgments of prison officials in running the prison. As to the first factor, Dr. Foster has evidence of a legitimate justification for the policy, i.e., allowing Lewis to possess a razor posed a legitimate threat to the health and safety of those patients and staff at the DPC, particularly in light of his aggressive and violent behavior. Lewis argues that no safety issues were involved as razors are passed out to residents on a daily basis.

The second *Turner* factor requires that alternative means be available to the prisoner to exercise the right in question. See *Turner,* 482 U.S. at 89. Dr. Foster posits that Lewis would have been permitted to request a haircut which would entitle him to shave his head. Lewis, responds that he received no haircuts during his stay at DPC between May 21, 2005 through June

-12-

25, 2004, although he requested them. There is no evidence that the requests were directed to Dr. Foster.

As to the third *Turner* factor, Dr. Foster posits that the cost associated with special precautions in allowing Lewis to shave his head, outweighs the interest to accommodate Lewis' adherence to a religious belief. Allowing Lewis to shave his head would have required additional supervision during the time he used the razor, as well as additional searches. Further, the additional supervision would take time away from other patients who may warrant additional attention or supervision due to their condition. Lewis argues that shaving his head takes no longer than it does for the average person to shave a beard. He does not address the issue of supervision or additional searches.

As to the fourth *Turner* factor, Dr. Foster argues that there are no alternatives available other than the regulation currently in place. Lewis argues that he could have been allowed to use an electric razor at his own expense.

The court finds that the balance of all four factors supports a finding that the policy is reasonably related to a legitimate penological interest, that is the safety of the residents and staff, especially when viewed in light of the deference to which prison officials are entitled when formulating prison policy and Lewis' history of aggressive and assaultive behavior. For the above reasons, the court will grant Dr. Foster's motion for summary judgment. (D.I. 288.)

### 2. Assault and Battery

Gray, Moffett, and Sagers contend that they are entitled to summary judgment because their alleged contact with Lewis was objectively reasonable. Lewis argues that a rational trier of fact could find the defendants committed assault and battery in light of the fact that he "only had

-13-

a harmless bag of M&M candy." (D.I. 293.)  Lewis argues that the issue is one of credibility and,

at this juncture, is for a jury to decide.

The tort of assault and battery is defined in Delaware as "the intentional, unpermitted

contact upon the person of another which is harmful or offensive." *Brzoska v. Olson*, 668 A.2d

1355, 1360 (Del. 995) (citations omitted).  Lack of consent is an essential element of assault and

battery. *Brzoska*, 668 A.2d at 1360.  The intent necessary for battery is the intent to make contact

with the person, not the intent to cause harm.  *Id.* (citations omitted).  Also, the contact need not

be harmful, it is sufficient if the contact offends the person's integrity.  *Id.* (citations omitted).

"In order for a contact to be offensive to a reasonable sense of personal dignity, it must be one

which would offend the ordinary person and as such one not unduly sensitive as to his personal

dignity.  It must, therefore, be a contact which is unwarranted by the social usages prevalent at

the time and place at which it is inflicted."  (*Id.*)  The propriety of the contact is therefore

assessed by an objective "reasonableness" standard.  *In re Taylor v. Barwick*, No. 93C-02-010-

WTQ, 1997 WL 527970, at *3 (Del. Super. Ct. Jan. 10, 1997).

In its previous review of the record, the court found that, according to Lewis, on June 14,

2004, he used a conversational tone when responding to DPC regarding the illicit M&M's, but by

his own testimony, the conversation was followed by a call for emergency assistance.  In an

interview following the June 14, 2004 occurrence, Lewis admitted that he had been secluded for

fighting with staff and other patients.  The court has reviewed the record a second time and notes

that Lewis later told medical providers that an unnamed guard "accidently pressed" on his neck.

The descriptions of the occurrence by Lewis, Moffett, and Gray, all indicate that steps

were taken to control Lewis.  Both Lewis and Gray testified that they fell to the ground together,

-14-

and Moffett testified that he had to physically restrain Lewis.  Finally, Lewis' testimony reflects that Sagers actions attempted to control Lewis.[9]  Lewis testified that Sagers "tackled him" and then crouched down using his body weight to hold Lewis' legs.  (D.I. 253, ex. C, A-26.

Even when viewing the facts in the light most favorable to Lewis, it is apparent from the record that any contact among Lewis, Moffett, Gray, and Sagers was performed in a hospital setting in an effort to control and protect Lewis, a combative individual, and to protect the DPC staff and patients.  Viewing the evidence as a whole, under the circumstances, the acts taken by Moffett, Gray, and Sagers were objectively reasonable.  Accordingly, the court will grant their motion for summary judgment.

### 3. Delaware Tort Claims Act

Moffett, Gray, and Sagers also move for summary judgment on the grounds that they are immune from suit pursuant to the Delaware Tort Claims Act ("the Act"), Del. Code Ann. tit. 10, § 4010 *et seq*.  Lewis responds that the Act is not available as an affirmative defense.

The Act provides that "except as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages."  Del. Code Ann. tit. 10, § 4011(a).  It further provides for immunity in the performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed is valid or invalid.  *Id.* at § 4011(b)(3).  The Tort Claims Act provides, however, that an employee

---

[9]While Sagers' affidavit states that he was not present during the time in question, the court construes the facts in the light most favorable to Lewis, the non-moving party.

may be personally liable for acts and omissions causing property damage, bodily injury or death in instances in which the governmental entity is immune under this section, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent. Del. Code Ann. tit. 10, § 4011(c).

With regard to any actions taken by Gray, Moffett, and Sagers in the performance of their official functions, they are is immune from suit. *See* Del. Code Ann. tit. 10, § 4011(b)(3); *Collins v. Figueira*, C.A. No. 04C-06-009(RBY), 2006 WL 1817092 (Del. Super. Ct. June 23, 2006) (Police Department immune from suit under the Tort Claims Act for claims that it was negligence because it failed to ensure that patrolmen complied with the department's procedures and fundamental guarantees of the U.S. Constitution). Further, the evidence before the court does not indicate that Gray, Moffett, and Sagers acted with wanton negligence or willful and malicious intent. Rather, the evidence is that under the circumstances, their actions were reasonable. Therefore, the court will grant Gray, Moffett, and Sagers' motion for summary judgment.

## IV. PLAINTIFF'S MOTIONS

Lewis has filed numerous motions, many of them related to the court's September 16, 2008 memorandum and order granting the defendants summary judgment on many issues. The court will address the motions in turn.

### A. Motions for Reconsideration

Lewis moves the court to reinstate claims dismissed in the court's September 16, 2008 order, deny Gray, Moffett, and Sagers' first summary judgment (previously ruled upon), reinstate a claim for an order of preliminary injunction regarding a psychiatric evaluation/report, and

reverse and remand summary judgment that was granted on September 16, 2008. (D.I. 294, 296,

300, 311, 324.) He also seeks to reinstate his motion for an order to permit him to submit

evidence during a jury trial. (D.I. 295.) This last motion is related to the court's order of July 31,

2008. (*See* D.I. 275.) The court construes the foregoing motions as motions for reconsideration.

The purpose of a motion for reconsideration is to correct manifest errors of law or fact or

to present newly discovered evidence. *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.

1985). A motion for reconsideration may be granted if the moving party shows: (1) an

intervening change in the controlling law; (2) the availability of new evidence that was not

available when the court issued its order; or (3) the need to correct a clear error of law or fact or

to prevent manifest injustice. *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir.

1999). A motion for reconsideration is not properly grounded on a request that a court rethink a

decision already made. *See Glendon Energy Co. v. Borough of Glendon,* 836 F. Supp. 1109,

1122 (E.D. Pa. 1993). Motions for reargument or reconsideration may not be used "as a means

to argue new facts or issues that inexcusably were not presented to the court in the matter

previously decided." *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990).

Reargument, however, may be appropriate where "the Court has patently misunderstood a party,

or has made a decision outside the adversarial issues presented to the Court by the parties, or has

made an error not of reasoning but of apprehension." *Brambles USA*, 735 F. Supp. at 1241 (D.

Del. 1990) (citations omitted); *See also* D. Del. LR 7.1.5.

Each motion for reconsideration takes exception to the court's rulings. Lewis merely

reargues his case. He has not demonstrated any of the grounds necessary to warrant

-17-

reconsideration.  There is no need to correct a clear error of law or fact or to prevent manifest injustice and, therefore, his motions will be denied.  (D.I. 294, 295, 296, 300, 311, 324.)

### B. Miscellaneous Motions

Lewis' motion for psychiatric/psychological evaluation and hearing, construed as a motion for injunction, will be denied as moot.  (D.I. 298.)  Lewis' motion to accept dispositive motions as being timely filed, construed as a motion for extension of time, will be granted.  (D.I. 302.)  The court will grant Lewis' application to proceed without prepaying fees or costs.  (D.I. 322.)

The court notes that Lewis did not serve copies of his recent pleadings upon the attorneys of record.  Lewis is a frequent litigator and aware of service requirement.  He is placed on notice that, in the future, should he fail to provide service copies to the parties or their attorneys of record, said filings will be stricken from the record and not considered.

## V. JOHNSON DEFENDANTS

Mr. Johnson 1 has been identified as Brian Johnson.  The clerk of court is directed to correct the court docket to reflect the correct name of Mr. Johnson 1.  Mr. Johnson 2 has never been served.  On or before _October 13_, 2009, Lewis shall show cause why Mr. Johnson 2 should not be dismissed as a defendant for failure to serve process within 120 days of filing the complaint, pursuant to Fed. R. Civ. P. 4(m).

On February 10, 2009, the clerk of court entered default against the defendant Brian Johnson.  (D.I. 310.)  On or before _October 13_, 2009, Lewis may file documentation with the court  describing how he has been injured by the defendant Brian

Johnson. The court will determine whether default judgment and/or damages are appropriate based on this filing and the other papers of record.

## VI. CONCLUSION

For the above reasons the court will grant the defendants' second motions for summary judgment, will deny Lewis' motions for reconsideration, will deny as moot Lewis' motion for injunctive relief, and will grant his motion for extension of time and application to proceed without prepaying fees or costs. Lewis shall show cause why the defendant Johnson 2 should not be dismissed for failure to serve and shall submit filings on the issue of default judgment and damages as to the defendant Brian Johnson.

An appropriate order will be entered.

_____, 2009
Wilmington, Delaware

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JIMMIE LEWIS, | ) | |
| a/k/a Emmanuel E. Elder, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1350-GMS |
| | ) | |
| DR. SYLVIA FOSTER, ROBERT | ) | |
| N. GRAY, MR. JOHNSON 1, | ) | |
| MR. JOHNSON 2, LANCE | ) | |
| SAGERS, and DAVE MOFFETT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

At Wilmington this 25th day of September, 2009, for the reasons set forth in the

Memorandum issued this date;

    1. The defendant Sylvia Foster's second motion for summary judgment is **granted**. (D.I.

288.)

    2. The second motion for summary judgment of the defendants Robert N. Gray, David

Moffett, and Lance Sagers is **granted**. (D.I. 289.)

    3. The clerk of court is directed to enter judgment in favor of the defendants Sylvia

Foster Robert N. Gray, David Moffett, and Lance Sagers and against the plaintiff at the close of

the case.

    4. The plaintiff's motions for reconsideration are **denied**. (D.I. 294, 295, 296, 300, 311,

324.)

    5. The plaintiff's motion for injunctive relief is **denied** as **moot**. (D.I. 298.)

6. The plaintiff's motion for extension of time is **granted**.  (D.I. 302.)

7. The plaintiff's application to proceed without prepaying fees or costs is **granted**. (D.I. 322.)

8. The clerk of court is directed to correct the court docket to reflect the correct name of Mr. Johnson 1 to Brian Johnson.

9. On or before _October 13_, 2009, the plaintiff shall show cause why the defendant Mr. Johnson 2 should not be dismissed as a defendant for failure to serve process within 120 days of filing the Complaint, pursuant to Fed. R. Civ. P. 4(m).

10. On or before _October 13_, 2009, the plaintiff may file documentation with the court describing how he has been injured by the defendant Brian Johnson.  Failure to timely file the documentation will result in dismissal of the defendant Brian Johnson.

11. **Plaintiff is placed on notice that failure to serve future filings upon the parties or their attorneys of record will be stricken from the record and not considered.**

CHIEF, UNITED STATES DISTRICT JUDGE